MARK A. SAMUELS (S.B. #107026)
msamuels@omm.com
JAMES M. PEARL (S.B.#198481)
jpearl@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

DAVID R. EBERHART (S.B. #195474)
deberhart@omm.com
SHARON M. BUNZEL (S.B. #181609)
sbunzel@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Defendant and
Counterclaimant REALPAGE, INC.

FILED
CLERK, U.S. DISTRICT COURT

MAR 28 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YARDI SYSTEMS, INC., a California corporation,<br><br>              Plaintiff,<br><br>       v.<br><br>REALPAGE, INC., a Delaware corporation, and DC CONSULTING, INC., a Washington, D.C. corporation,<br><br>              Defendants.<br><br>──────────────────────────<br><br>REALPAGE, INC., a Delaware corporation,<br><br>              Counterclaimant,<br><br>       v.<br><br>YARDI SYSTEMS, INC., a California corporation,<br><br>              Counterdefendant. | Case No. CV11-690 ODW (JEMx)<br><br>**COUNTERCLAIMS AND ANSWER TO COMPLAINT OF REALPAGE, INC.; DEMAND FOR JURY TRIAL** |

## **COUNTERCLAIMS**

RealPage, Inc. ("RealPage"), by and through its undersigned attorneys, for its counterclaims against plaintiff and counterdefendant Yardi Systems, Inc. ("Yardi") avers on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

### **NATURE OF THE ACTION**

1.     Cloud computing is the future of information technology ("IT").  In a recent survey of 481 CFOs across the United States, 83% said that their companies expect to rely on cloud-based services in the next three to five years.  Innovators such as RealPage have reshaped how businesses think about their IT infrastructure by introducing a much more efficient platform to deliver computer software called Software-as-a-Service ("SaaS"), a type of cloud computing.  In addition, RealPage has introduced a new enterprise cloud computing service called the "RealPage Cloud" by which RealPage manages and operates all of the IT systems used by a business—including RealPage's SaaS products—at a much lower overall cost and with higher performance, greater reliability, and improved disaster recovery capabilities.

2.     As with all transformative business innovations, there are those who are left behind.  Yardi is one such company.  Yardi has clung to two outdated traditional software delivery models: (1) the "on-premises" approach, in which the client installs and runs Yardi software on its own computer server; and (2) the Application Service Provider ("ASP") approach, in which the client accesses its version, or "instance," of Yardi software via the Internet from computer servers located at Yardi's own facilities.  Unlike RealPage, Yardi does not offer true enterprise cloud computing services.  Faced with a changing business environment in which it struggles to compete, Yardi is leveraging stolen trade secrets and the market power it has established through its popular Voyager software in an anticompetitive scheme to prevent *its own clients* from obtaining the significant

1  benefits of RealPage's state-of-the-art SaaS offerings and cloud computing services

2  while Yardi attempts to build a competing cloud computing offering.

3        3.     Before the advent of cloud computing, businesses had to build data

4  centers and employ personnel to manage hardware and software upgrades.  This

5  was a capital-intensive and expensive undertaking.  Cloud computing allows

6  businesses to dramatically reduce their operating and capital costs by transferring

7  these infrastructure and support responsibilities to a third-party service provider.

8  RealPage, a leading developer of residential property management software, offers

9  its cloud computing clients these cost savings and more.  Whereas most cloud

10  computing providers are industry agnostic—purveyors of one-size-fits-all

11  solutions—RealPage is the first cloud computing provider to offer systems and

12  support designed specifically to address the needs of multifamily real estate owners

13  and property managers throughout the United States.

14        4.     RealPage hosts its cloud computing clients in the RealPage Cloud,

15  providing them uninterrupted access to all of their data and processing

16  functionality, including real-time information about each of their managed

17  properties.  The RealPage Cloud is unique because it aggregates applications from

18  multiple software providers into one enterprise-wide system that is tightly

19  integrated and managed holistically.  In other words, if a client wants to use non-

20  RealPage software in the RealPage Cloud, RealPage provides the technical

21  expertise for the client's various software and database packages to work

22  seamlessly with other software, from other providers, in the Cloud.  This allows the

23  client maximum freedom of choice and optimized performance.

24        5.     Unlike on-premises or ASP software applications, RealPage's SaaS

25  applications are ideally suited for this enterprise-wide cloud system.  SaaS

26  applications involve a single version of software code that is accessed by all clients.

27  On-premises and ASP applications, on the other hand, require a different code

28  stream for each client.  Thus, it is much easier and more reliable for third-party

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1   applications to "integrate" with (*i.e.*, communicate, share key business data, and

2   interact with) a SaaS application because the developers of third-party applications

3   need to maintain only one version of their code to integrate effectively with a SaaS

4   application.  SaaS applications are also much simpler for the end-user because,

5   unlike on-premises and ASP applications, SaaS applications do not require end-

6   users to refer to complicated user manuals and installation guides.  This is because

7   SaaS applications do not need to be installed, and online user support typically is

8   embedded in the application interface.  SaaS companies such as RealPage are thus

9   displacing on-premises and ASP software companies because SaaS products are

10   generally easier to use and the overall cost of operating a SaaS application is much

11   lower than *owning and managing a separate version of software for each client*

12   *company.*

13        6.     For example, a multifamily residential property manager using an on-

14   premises or ASP property management system like Yardi Voyager will spend

15   <u>significantly more than</u> the license fee in order to use the software.  In most cases,

16   the total cost of ownership ("TCO") for on-premise and ASP software greatly

17   exceeds the TCO for SaaS over a four-year period.  For each discrete dwelling unit

18   at a residential site under management, these costs typically will exceed the license

19   fee by (i) $1.00-$1.50 per unit per month in first-line application support and

20   administration (*e.g.*, service packs, hot fixes, plug-ins, customizations and

21   integrations); (ii) $0.25-$0.50 per unit per month in ongoing training to deal with

22   turnover in site personnel; and (iii) $0.25-$0.50 per unit per month in IT

23   infrastructure for hosting fees (if ASP), data center hardware and software (if on-

24   premises), and IT resources.  In contrast, first-line support, ongoing user training,

25   and IT infrastructure costs are *zero* for clients of RealPage's SaaS application.

26        7.     The superiority of SaaS applications is recognized well beyond the

27   multifamily property management industry.  In only a few years Salesforce.com has

28   put severe pressure on more established companies and is now a leader in the

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1  Customer Relationship Management market.  Similarly, Google's SaaS office

2  application suite is quickly gaining market share on more established traditional

3  office software products.  RealPage is the only major technology provider in the

4  multifamily property management market to offer a SaaS platform to its clients, and

5  it is enjoying success similar to Salesforce.com and Google.  Yardi is in danger of

6  being displaced because it has limited itself to the outdated on-premises and ASP

7  software delivery platforms.  The disadvantages of these outdated delivery

8  platforms are magnified as businesses make the transition to enterprise-wide cloud

9  computing.

10      8.      While Yardi offers its clients limited hosting services and calls those

11  services a "cloud," what Yardi offers, in actuality, is a "faux cloud."  Most of

12  Yardi's so-called "cloud" offerings are in fact ASP services.  Thus, Yardi must

13  manage separate instances of code for each client, which raises client costs as much

14  as 40% above those of a SaaS company.  Furthermore, Yardi's clients must incur

15  significant costs to evaluate each proposed upgrade, service pack, hot fix, and plug-

16  in to Yardi's software and then coordinate when the service will be taken offline as

17  each new upgrade or change is applied to the application.  Client-based IT staff are

18  forced to carefully plan and test the integration between Yardi's software and each

19  third-party software application used by the client every time that Yardi or another

20  provider changes its software.  This time-consuming and repetitive integration

21  testing adds significant cost and is the source of unanticipated downtime,

22  particularly since Yardi often releases many "fixes" to its application each year.  In

23  contrast, RealPage clients do not incur these costs or suffer these business

24  interruptions because upgrades and integrations are managed by RealPage, not the

25  client.

26      9.      Yardi's limitations are of its own choosing; it has simply refused to

27  make the necessary investments in technology and in its data center to create a truly

28  functional SaaS cloud computing environment.  Indeed, Yardi's data center

1   architecture is nothing more than a collection of individual servers that separately

2   support each of its clients.  Because of the cumbersome design of Yardi's faux

3   cloud, performance can be slow, often requiring larger clients to schedule long-

4   running jobs overnight or on weekends to avoid slowdowns in the performance of

5   Yardi's application during the working day.  This can be especially frustrating to

6   site personnel who are trying to manage complex operations at each apartment

7   community when month-end processing slows down the system.  Availability is a

8   challenge for Yardi because it has to manage so many different instances of

9   software, each uniquely configured and customized.  Compounding the problem, in

10  order to integrate third-party applications each third-party application must be

11  matched to the specific version, service pack, hot fix, and plug-in of software that a

12  given Yardi client is using.

13        10.    In addition, Yardi's security systems are notoriously suspect and

14  unreliable.  For example, in certain cases, Yardi clients have been able to view

15  other clients' confidential and proprietary data.  Yardi also does not provide

16  adequate real-time disaster recovery, leaving its clients vulnerable to outages.  In

17  fact, the "disaster recovery" plan that Yardi offers actually restores only a limited

18  client environment in a degraded or crippled mode for basic accounting and

19  operational functionality.  It does not cover the various integrations and other

20  services that are essential to clients.  Yardi's data security capabilities are similarly

21  lacking.  For example, when Massachusetts and Nevada passed sweeping privacy

22  and data security legislation requiring encryption of personally identifiable

23  information, Yardi was unable to deliver an acceptable technical solution, leaving

24  its clients legally exposed.  Yardi system passwords are not properly protected and

25  in some cases are not changed for years.

26        11.    In contrast to Yardi's offerings, the RealPage SaaS and cloud

27  computing offering incorporates advanced security and storage area network

28  architecture that dramatically improves the entire system's performance.  Yardi is

aware of its multiple shortcomings but is, to date, unwilling to spend the capital or invest in business processes to compete with RealPage's investments or keep up with the transforming business needs.  Yardi now finds itself at a growing disadvantage as the market and Yardi clients have gravitated quickly toward the obvious efficiencies and the superior technology and individualized service offered by RealPage.

12.   Yardi is now desperate to stop RealPage's cloud progress.  Rather than innovate and invest in a superior architecture and the infrastructure to offer its own viable cloud platform, Yardi is trying to impede the advance of a more efficient and desirable technology platform and sabotage the growth of RealPage through a wide-ranging campaign of client interference and intimidation.  The tactics employed by Yardi in its campaign to slow RealPage's advancements include:

- Coercing Yardi's own clients to sign agreements that prevent them from using RealPage's cloud computing and consulting services.

- Threatening to terminate the software licenses of Yardi clients that choose to host software in the RealPage Cloud on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud.

- Intentionally and falsely maligning RealPage's services and rights while offering hollow promises of Yardi's own abilities to service clients.

- Hiring RealPage personnel to steal RealPage's most highly confidential trade secrets, including:

  - RealPage's superior primary and disaster recovery data center infrastructure and architectural design;

  - RealPage's proprietary technology used to monitor and improve the operation of third party applications, including Yardi applications;

  - RealPage's proprietary change management and release management business processes; and

1        ➢   RealPage's confidential bid proposals made to specific potential

2            clients where Yardi was competing against RealPage.

3      13.    Yardi's campaign seeks to deny consumers the benefits of the

4 RealPage Cloud in order to lock them into Yardi's lagging business model. Clients

5 should be free to choose the RealPage Cloud or a traditional software provider like

6 Yardi. The choice should be governed by which company provides the best value

7 through technology, infrastructure, expertise, price, and service.

8

9 **JURISDICTION AND VENUE**

10      14.    This Court has original jurisdiction over RealPage's federal antitrust

11 claim, which arises under the Sherman Antitrust Act (15 U.S.C. § 1, et seq.). 28

12 U.S.C. §§ 1331, 1337(a). This Court also has supplemental jurisdiction over the

13 related violations of California statutory and common law alleged herein because

14 these claims are so related to the federal claims in this case, over which the Court

15 has original jurisdiction, that they form a part of the same case or controversy

16 within the meaning of Article III of the United States Constitution. 28 U.S.C.

17 §1367.

18      15.    This Court also has diversity jurisdiction over RealPage's

19 counterclaims because RealPage and Yardi are citizens of different states and the

20 amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

21      16.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a

22 substantial part of the wrongful conduct alleged herein occurred in this district,

23 including but not limited to the antitrust violations, acts of unfair competition, and

24 acts of misappropriation of trade secrets that give rise to RealPage's claims against

25 Yardi.

26

27 **THE PARTIES**

28      17.    RealPage is a Delaware corporation with its principal place of business

7

REALPAGE, INC.'S<br>COUNTERCLAIMS AND ANSWER<br>NO. CV11-690 ODW (JEMx)

1   in Carrollton, Texas.  It is engaged in the business of, among other things, licensing

2   multifamily property management software, providing software consulting services

3   for the real estate industry, and providing secure software hosting services for its

4   clients.

5       18.     Yardi Systems is a California corporation with its principal place of

6   business in Goleta, California.  It is engaged in the business of, among other things,

7   licensing real estate investment management and property management software.

8

9                       **FACTUAL BACKGROUND**

10  OVERVIEW OF CLOUD COMPUTING

11      19.     RealPage is a SaaS company.  Because SaaS companies host and

12  maintain their own applications, they invest significantly in their data center

13  infrastructure, disaster recovery technology, business processes, and support

14  capabilities.  Traditional on-premises software providers do not need to make such

15  an investment—they simply provide their product to the end-user for installation on

16  the end user's individual computer.  While traditional ASP software providers host

17  their product in the provider's data center, due to outdated architecture they

18  typically do not have the same hosting capabilities and infrastructure of a SaaS

19  provider.  Yardi is at its core a traditional software provider, and its fledgling

20  attempt to enter the cloud computing market must be understood in this light.

21      20.     In the most advanced cloud computing model, the client's computer

22  has only minimal software installed (such as a web browser) and all computing

23  software (whether word processing, database, email or otherwise) and all data are

24  maintained in a central data center accessible through the Internet.  Users

25  experience substantial benefits with cloud computing.  Local computers require far

26  less maintenance and fewer "bug" fixes because the operative software and data

27  reside at a remote, centralized location.  Software updates occur at the central

28  storage site and are applied by the cloud vendor to a single version of code that all

1   users of the system can access.  The servers needed to maintain the cloud can easily

2   be updated and repaired in the background while the users continue their work

3   uninterrupted.

4       21.   Cloud computing is also highly scalable.  As a company grows or

5   shrinks, it can access more or less computing or data storage capacity in the cloud

6   as its needs fluctuate.  Rather than making large capital expenditures to buy and

7   hold equipment that may become obsolete or redundant, the company always has

8   access to state-of-the-art infrastructure that is managed by professionals in

9   capacities that meet the company's current needs and can be quickly upsized or

10  downsized as circumstances require.  Simply put, cloud computing allows owners

11  to buy as much or as little computing power as they need and "lease" from the

12  cloud provider any hardware such as servers or data centers they may need only on

13  a temporary basis.  RealPage offers these cloud computing services to clients in a

14  way that Yardi has not yet successfully matched, putting Yardi at a significant

15  disadvantage as companies recognize and migrate to the unquestionable benefits of

16  cloud computing.

17      22.   RealPage developed its Cloud by building on its investment in the

18  extensive hosting and data processing support infrastructure that, as a SaaS

19  provider, it already had in place.  RealPage's state-of-the-art data centers are the

20  result of over $100 million in cumulative investment with an annual operating and

21  capital expansion budget of nearly $25 million.  This investment is in addition to

22  RealPage's product development investments, which total nearly $40 million per

23  year.  For the last several years, RealPage also has invested in hardware upgrades

24  that allow it to host not just its own SaaS applications, but also the systems of large

25  multifamily property managers.  Equally important, RealPage has invested in the

26  expert personnel and business processes necessary to service the needs of clients

27  and to optimize their systems for performance enhancements.  The RealPage Cloud

28  infrastructure comprises nearly 1,000 physical servers and a massive storage area

1    network.

2        23.    A property management company can therefore satisfy a large portion

3    of its IT needs from RealPage.  Many property management companies already

4    have built their own customized services platforms that contain their property-

5    management systems as well as their accounting, e-mail, and file-sharing

6    applications.  The RealPage Cloud allows clients to eliminate the burden of

7    maintaining, updating and growing (or shrinking) their IT operations and costs by

8    moving all of their applications to the cloud.

9        24.    By hosting an entire enterprise system—including third-party

10   applications such as Yardi Voyager—in the RealPage Cloud, RealPage is able to

11   link a client's applications to RealPage's SaaS applications and transfer data

12   seamlessly at high speeds.  This dramatically improves the integration and

13   movement of the client's information across applications, leading to a better

14   experience for the end-user.  Moreover, RealPage offers the technological

15   consulting to optimize the systems so that each piece of software, without regard to

16   the identity of its provider, communicates and operates effectively with the others.

17   Put in its simplest form, RealPage orchestrates and integrates a business's entire IT

18   operation in the cloud so that multiple software programs can speak to one another

19   as data flows seamlessly and continuously through the cloud.  RealPage's holistic,

20   industry-specific, vendor-neutral approach to the client's needs differs from the

21   traditional use of discrete programs operating independently and, at times, at cross-

22   purposes with other applications on the company's IT platform.  As one RealPage

23   Cloud client put it: "The simple fact is that RealPage is an IT shop, and they have

24   tens of millions of dollars of infrastructure in place that we as a property

25   management firm would never be able to assemble . . . We get immediate

26   redundancy, speed, performance, and change management."

27       25.    Yardi, while effective in designing and selling traditional property

28   management and accounting software, eschewed the opportunity to build the

1   necessary infrastructure, business processes, and technology to meet the new

2   challenge of cloud computing.  As a result of Yardi's inadequate and limited cloud

3   computing capabilities, Yardi clients understandably have looked for alternative

4   ways to host their Yardi software and satisfy their manifold needs for management

5   of multitenant properties.  For these and other reasons, several major Yardi clients

6   have asked RealPage to host their IT operations, *including* their Yardi software, in

7   the RealPage Cloud.

8       26.    While Yardi purports to offer some "cloud" services, they are in reality

9   nothing of the sort.  Yardi offers a narrow set of ASP hosting services.  While ASP

10  companies, like SaaS companies, offer software applications that are accessible via

11  the Internet, they do so on a limited basis.  In Yardi's case, most Yardi users access

12  only their own Yardi software over the Internet.  Yardi is simply storing the end-

13  user's software application on a Yardi server.  This server must be individually

14  maintained and operated in the same way as a server residing at the user's business

15  location.  This rudimentary hosting model is not what is generally accepted as cloud

16  computing, *i.e.*, "on demand" access to shared applications.

17      27.    For years, Yardi has resisted making the capital investments to meet

18  the new challenge of cloud computing.  Indeed, when a leading client began using

19  Yardi's hosting services, it could not persuade Yardi to invest in a SAN, or storage

20  area network, a key requirement for optimal storage performance for a large

21  institutional user.  Yardi offers only an uptime "goal" and refuses to guarantee that

22  its hosted systems will remain continuously operable.  RealPage, by contrast,

23  provides over 99.5% uptime and puts a 98% uptime guarantee in writing.

24      28.    Yardi's security is also woefully lagging.  In one instance, when a

25  client accessed its data through the Yardi hosting services, that client also was able

26  to access the confidential data of other Yardi clients.  When the client alerted Yardi

27  to the security flaw, Yardi's response was not to fix the security hole, but rather to

28  insist that this alarmingly porous design was somehow intentional!  Yardi's security

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1   lapses are especially troubling to institutional clients who are required to comply

2   with certain internal controls and to evidence the effectiveness of those controls to

3   third-party stakeholders.  While Yardi advertises its compliance capabilities relative

4   to SAS 70 Type II audits and the Payment Card Industry standards, significant gaps

5   exist in its change management and operational controls.  Because Yardi has a

6   separate, uniquely configured instance of software for each client, maintaining strict

7   controls over changes and new releases of software presents a significant problem

8   that can cause the system to be unreliable when change occurs.  These and other

9   deficiencies led at least one market-leading client who tried the Yardi hosting

10   capabilities to terminate its hosting relationship with Yardi.

11         29.    In sum, RealPage is positioned to succeed in the cloud computing

12   market.  Yardi is not.  The result is that Yardi is desperate to stop the industry's

13   migration to the RealPage Cloud and has embarked on a mission to destroy

14   RealPage's relationship with its current and future clients.  The campaign has been

15   relentless.

16

17   YARDI'S USE OF A MOLE TO MISAPPROPRIATE REALPAGE TRADE SECRETS

18         30.    In late 2008 and early 2009, an individual associated with a RealPage

19   client ("Client X"), Joe Hendrix, accepted a job offer and quickly began working as

20   RealPage's Chief Information Officer.  He was issued a company phone, badge

21   with secure-area access capabilities, and a company computer.  He was also

22   provided with invaluable proprietary information.  Hendrix participated in sales

23   calls and strategy discussions with RealPage's CEO, COO, and CTO and spent

24   weeks learning the inner-workings of RealPage and its plans for the future.  He also

25   met with RealPage clients and was entrusted with valuable RealPage confidential

26   information as well as critical bid information that RealPage clients chose to

27   provide directly to RealPage.  Hendrix knew and understood that the information

28   provided to him was confidential and proprietary and that he was required to

1  maintain its confidentiality.  At the same time that Hendrix was insinuating himself
2  into RealPage's confidences, however, he was secretly working with Yardi to
3  expand its Texas office to add to and improve Yardi's service offerings and label
4  them as "cloud computing."  Yardi immediately made use of the RealPage trade
5  secrets Hendrix misappropriated to unfairly compete for cloud computing clients.

6      31.    The betrayal began when Hendrix, while employed by Client X (a
7  significant client of both Yardi and RealPage), entered into discussions about
8  moving Client X's data center to the RealPage Cloud in order to provide a secure
9  environment for its data.  RealPage agreed and successfully moved Client X's data
10  center to the RealPage Cloud.  Knowing that after a successful migration to the
11  RealPage Cloud Client X would have no further need for his IT services, Hendrix
12  negotiated with RealPage for a job as Chief Information Officer.  RealPage hired
13  Hendrix, but Client X requested that Hendrix be permitted to wind down his
14  responsibilities while he was also working for RealPage.  RealPage's CEO agreed
15  to this unusual arrangement as a favor to Client X.  In addition to agreeing to allow
16  Hendrix to wind down his responsibilities at Client X concurrent with his RealPage
17  responsibilities, RealPage offered Hendrix a senior position, a substantial salary,
18  150,000 stock options, and provided Hendrix with sensitive, confidential, and
19  proprietary documents and information about the RealPage Cloud business model
20  and strategy, as well as access to RealPage's current and prospective clients.
21  Hendrix also was included in high-level strategy discussions and was privy to some
22  of RealPage's most sensitive information.  For example, just a few days before his
23  duties with Client X were to end, Hendrix spent hours discussing confidential
24  future RealPage business strategy with RealPage's Chief Operating Officer.

25      32.    At all times prior to his departure from Client X, Hendrix was subject
26  to the provisions of a Mutual Confidentiality Agreement between RealPage and
27  Client X.  This Agreement, which Hendrix personally signed, obligated Hendrix
28  and Client X to "hold in confidence and not to disclose or reveal to any person or

1   entity the Disclosing Party's Confidential Information." The Agreement was

2   entered into on June 19th, 2008, at the outset of discussions between RealPage and

3   Client X. The Agreement provides that "[a]ll obligations undertaken respecting

4   Confidential Information . . . will survive for two (2) years from the date of

5   provision of such Confidential Information."

6          33.    Unbeknownst to RealPage, Hendrix—while extracting RealPage's

7   confidences and promises of a sizeable salary and stock options—was acting as a

8   mole, working with Yardi to expand Yardi's office in Dallas, Texas. Yardi,

9   meanwhile, knew or had reason to know that Hendrix was presenting himself as a

10  RealPage employee in sales meetings to third parties and knew or had reason to

11  know that Hendrix was under an obligation not to disclose RealPage's confidential

12  information. After having participated in sales calls and strategy discussions with

13  RealPage and having used and relied upon RealPage's provision of information,

14  hardware, and software, Hendrix abruptly announced that he had accepted a

15  position as officer in charge of Yardi's expanded Texas operations.

16         34.    The disclosure and misuse of RealPage trade secrets began

17  immediately and may have been happening before Hendrix took the Yardi position.

18  On information and belief, Hendrix provided Yardi with RealPage's proprietary

19  information concerning: (a) RealPage data center and disaster recovery architecture,

20  a well-known architectural shortcoming of Yardi's offerings; (b) RealPage

21  technology used to monitor and improve the operation of third-party applications;

22  (c) RealPage process methods for change, problem, and release management; (d)

23  detailed and proprietary descriptions of the RealPage Cloud; and (e) the

24  confidential details of RealPage's bids for large Yardi clients. Yardi used this

25  proprietary RealPage information, misappropriated by Hendrix, to unfairly compete

26  with RealPage. RealPage's sophisticated knowledge of data security, performance

27  monitoring, and hosting was accumulated and refined through over ten years of

28  experience and over $100 million of investment. In the hands of Yardi, a

competitor that had intentionally elected not to make such an investment, this secret information was an invaluable and ill-gotten advantage in developing what it now markets to clients as a supposedly "competitive" cloud computing service.

35.    Unsurprisingly, within three weeks after Hendrix joined Yardi, the company began offering purported "cloud" services (in actuality, expanded ASP hosting services) modeled on the RealPage Cloud.  Later, Hendrix even went so far as to present confidential RealPage Cloud documents to prospective clients *as if they were Yardi's*.  Yardi could not have developed even this faux cloud business without the boost that it gained by exploiting the confidential RealPage documents and information Hendrix misappropriated.

YARDI'S CLIENT INTERFERENCE CAMPAIGN

36.    Misappropriating RealPage's trade secrets was just the beginning of Yardi's efforts to snuff RealPage's cloud business.  Yardi next took aim at its own clients.  Through a mix of threats and coercion, Yardi systematically approached RealPage clients and used every available means to attempt to end RealPage's cloud business.

37.    By way of background, several RealPage Cloud clients use the RealPage Cloud as their computing platform to host a variety of software, including their Yardi Voyager property management software.  RealPage is committed to providing its clients a broad range of consulting and support services for software hosted in the RealPage Cloud—including Yardi software.  In light of Yardi's often inadequate support, Yardi clients frequently hire independent consultants to assist them with software, add-on products, and add-on service modules.  One such independent consultant was EverGreen Solutions, Inc.  As part of RealPage's strategic planning to enhance its available in-house consulting and support services, RealPage acquired the assets of EverGreen Solutions in September 2009. EverGreen Solutions became a RealPage division and provided consulting services

1   for software users in the real estate industry, including users of Yardi's software.

2   The EverGreen division ("EverGreen") helped these clients by designing,

3   recommending, and installing software solutions and helping them implement best

4   management practices.  And RealPage understands that in some instances, a Yardi

5   software solution such as Yardi Voyager may be what is best for the RealPage

6   client.

7        38.    As the popularity of the RealPage Cloud has grown, Yardi has worked

8   furiously behind the scenes to thwart competition in the growing market for

9   vertically-integrated cloud computing for multifamily real estate owners and

10   property managers in the United States ("the vertical cloud market").  The vertical

11   cloud market is a relevant economic market because neither industry-agnostic cloud

12   providers nor traditional ASP providers are adequate substitutes for a vertical cloud

13   offering.  These other more generalized cloud and software offerings cannot satisfy

14   the specialized needs of multifamily real estate owners and property managers.  The

15   relevant geographic market for the vertical cloud market is the United States.

16        39.    Yardi's campaign has harmed competition in the vertical cloud market

17   because Yardi possesses leverage over existing and potential cloud clients by virtue

18   of the widespread adoption of its Voyager software.  Voyager is an enterprise

19   management software system designed to integrate property management functions

20   and accounting.  Voyager is a leading property management software and,

21   according to Yardi's public disclosures, is used to manage over 25,000 apartment

22   sites in the U.S.  For those businesses that use it, Yardi Voyager is a critical back-

23   office application and such businesses would face high costs if Yardi were to

24   terminate their licenses and they were forced to change platforms.  Unwilling to

25   make the necessary investments to fairly compete in the cloud market, Yardi

26   instead has tried to lock its installed base of Voyager clients out of the RealPage

27   Cloud.  Specifically, Yardi is forcing its Voyager clients through threats and

28   intimidation into anticompetitive exclusionary agreements whereby the client

1   agrees not to use the RealPage Cloud.

2       40.    Following industry-standard computing and licensing practices, Yardi

3   until recently allowed its clients—many of whom pay Yardi thousands of dollars

4   monthly or annually for the rights to use Yardi software and maintain client data—

5   to have their Yardi software hosted by a third party.  On information and belief, the

6   majority of Yardi's software licenses with its clients permit or do not prohibit

7   clients from allowing their agents, third parties, contractors, or others to assist with,

8   use, and host Yardi software.  Yardi's contracts with its clients did not, before

9   Yardi's misconduct began, limit the types of contractors a client can retain, much

10  less bar perceived competitors from being retained as contractors.  Recognizing,

11  however, that it found itself at a distinct competitive disadvantage to the RealPage

12  Cloud's superior computing platform, Yardi recently changed its software license

13  agreement to protect its eroding market position and to counteract the success of the

14  RealPage Cloud.  Specifically, Yardi has begun changing its license agreements to

15  prohibit licensees from using any "contractor" to implement or host Yardi software.

16  The agreements define a contractor as "a provider, or an affiliate of a provider, of

17  real property management and accounting software marketed primarily to the real

18  estate industry"—a definition designed by Yardi to include RealPage.  These

19  restrictions on using the RealPage Cloud are of unlimited duration.

20      41.    Yardi also has threatened to terminate license agreements with clients

21  who use both Yardi software and the RealPage Cloud on objectively baseless

22  grounds solely for the purpose of intimidating those clients into not using the

23  RealPage Cloud.  The license agreements that Yardi has threatened to terminate do

24  not impose restrictions on where or with whom licensees may host their Yardi

25  software, and hosting with the RealPage Cloud does not violate any of the terms of

26  these license agreements.  The cumulative, anticompetitive effects of these

27  improper client restrictions far outweigh any pro-competitive benefits.  Yardi's

28  campaign, to date, has already harmed competition in the marketplace and threatens

to permanently deny Yardi clients the superior technology and cost savings offered by the RealPage Cloud. Indeed, Yardi's campaign threatens to seriously retard the growth of the vertical cloud market. Below are some specific examples of Yardi's anticompetitive and tortious interference with RealPage clients.

42.     RealPage had built a successful existing client relationship with Client 1 which culminated in the negotiation and signing of a Letter Agreement for Interim Services on August 1, 2010. Client 1 is a large property management firm that develops, constructs, and acquires multifamily properties in fourteen geographic markets throughout the United States. Client 1 uses certain Yardi software products in addition to its relationship with RealPage. When Yardi learned of the Letter Agreement, it set out to interfere with RealPage's new client relationship and to disparage and damage RealPage. Yardi advised Client 1 that it could not continue with the Letter Agreement for Interim Services or any future contemplated agreements with RealPage. Worse yet, Yardi created newly-revised software license agreements in which the major change was to prohibit the client from using the RealPage Cloud. When Client 1 asked Yardi to modify the license agreement to allow it to use the RealPage Cloud, Yardi refused. As a result of the pressure, communications, and unlawful agreements imposed by Yardi, Client 1 announced that it could not use the RealPage Cloud.

43.     Similarly, RealPage had successfully built a client relationship with Client 2. Client 2 is a top ten property management firm that uses Yardi Voyager as its primary back-office accounting software and at different times has used Yardi's hosting services for Yardi Voyager, and has self-hosted such software. Recently, after a request-for-proposal ("RFP") process Client 2 moved to the RealPage Cloud for most of its IT needs, including the hosting of Yardi Voyager. During the period when Hendrix transitioned his services from Client X to his new employer—*i.e.*, to RealPage—Hendrix participated in sales calls to Client 2 together with RealPage executives. During the Client 2 sales calls, Hendrix

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1    acquired substantial confidential information from Client 2 and RealPage including

2    details regarding Client 2's dissatisfaction with Yardi, Client 2's desire to move to

3    the RealPage Cloud and other RealPage products, RealPage's plans and goals for

4    the RealPage Cloud, and detailed bid information regarding the pricing of the

5    RealPage Cloud to Client 2.

6    　　　　44.　　　Shortly thereafter, Hendrix would accomplish his bait and switch and

7    start working for Yardi, armed with RealPage confidential and proprietary

8    information.  Yardi initially had refused to bid in response to Client 2's RFP for

9    third party hosting and the outsourcing of related IT services.  Once Hendrix joined

10   Yardi, Yardi realized that it was in real jeopardy of Client 2 moving to the

11   RealPage Cloud.  As a result of Hendrix's disclosure of RealPage's confidential

12   and proprietary information, Hendrix and Yardi provided aggressive bids on behalf

13   of a then non-existent Yardi "cloud computing" service.  Hendrix's provision of

14   secret RealPage bid information to Yardi (information acquired while working for

15   RealPage and while subject to Client X's Mutual Confidentiality Agreement)

16   damaged RealPage by forcing RealPage to bid against a Yardi proposal that was

17   prepared with ill-gotten confidential information.  Furthermore, on information and

18   belief, portions of Yardi's bid simply mimicked RealPage's bid, using RealPage's

19   proprietary information and even the same font and ink color used by RealPage.

20   　　　　45.　　　When Yardi's attempts to intimidate RealPage's clients have failed,

21   Yardi has extended its interference campaign further downstream, threatening

22   RealPage's clients' clients.  Yardi has bound RealPage's clients' clients to

23   anticompetitive exclusionary agreements designed to indirectly interfere with the

24   RealPage client's ability to use the RealPage Cloud.  For example, Client 2-A is

25   one of Client 2's clients.  Client 2-A recently signed a contract with Yardi for use of

26   Yardi's Utility Billing product.  The contract, however, forbids RealPage from

27   implementing Client 2-A's software interface.  Yardi also has interfered with

28   another of Client 2's clients, Client 2-B.  Client 2-B is planning to upgrade its Yardi

software, but Yardi is refusing to allow RealPage to support Client 2-B's upgraded software. These restrictions are designed to interfere with Client 2's business relations with Clients 2-A and 2-B and, indirectly, with Client 2's ability to use the RealPage Cloud.

46. Client 3, another multifamily and commercial real estate owner, had agreed to move its data center to the RealPage Cloud. During the process of moving its data, Yardi demanded that Client 3 not use the RealPage Cloud and not even publicly associate itself with RealPage. As a result of Yardi's interference, Client 3 has decided not to use the RealPage Cloud. Yardi's actions have damaged RealPage by causing it to lose the revenue, reputational benefit, and profit from Client 3's cloud business.

47. Yardi also has repeatedly interfered with EverGreen's relationships with its existing and prospective consulting clients. For example, Client 4 was in the process of negotiating a consulting contract with EverGreen when Yardi began threatening to refuse to work with EverGreen. On January 15, 2010—as discussions between EverGreen and Client 4 were just beginning—a representative of Client 4 wrote the following to EverGreen's President:

> "One big issue that we have got to get addressed is the friction between EverGreen and Yardi. We cannot afford to be a casualty in our rollout of a strained relationship between both companies. Please be prepared to address verbally Thursday. Yardi has indicated that this will be a problem even after I clarified that we are not hosting with EverGreen."

As discussions progressed, Yardi's threats escalated. On February 13, 2010, the same representative of Client 4 wrote the following to EverGreen's President:

> "I have requested a meeting with Yardi this week to meet with you to discuss implementation. The initial response I got from . . . our [Yardi] sales representative suggested that it was likely Yardi will

1    walk from the deal if we request EverGreen as our implementor."

2    Ultimately, Yardi's threats forced Client 4 to choose another implementation

3    consultant, causing EverGreen to lose this business opportunity and the revenue and

4    profit it would have generated.

5        48.    Yardi also has interfered with its clients' rightful efforts to transition

6    off of Voyager onto RealPage's SaaS property management software, OneSite.  For

7    example, Client 5 is a past Yardi client that recently switched to OneSite.  After

8    Client 5 informed Yardi that it intended to use OneSite, Yardi changed its past

9    practice of allowing its transitioning clients to maintain read-only access to

10   historical data and intends to cut off Client 5's access in the near future.

11       49.    RealPage has a contractual and legal right to act as an agent of its

12   clients to provide secure hosting in the RealPage Cloud and to provide consulting

13   services.  The RealPage Cloud is secure and poses no risk of any misuse of

14   information.  Yardi's anticompetitive actions have harmed RealPage by

15   compromising RealPage's contractual relationships with its clients and destroying

16   the trust and goodwill engendered by RealPage's years of client development and

17   high-quality service.

18

19                    **FIRST COUNTERCLAIM**

20                 **(Misappropriation of Trade Secrets)**

21       50.    RealPage realleges and incorporates by reference the allegations

22   contained in Paragraphs 1 through 49 as though fully set forth herein.

23   RealPage has invested millions of dollars and years of time in the development of

24   confidential and trade secret information.  This trade secret information includes,

25   but is not limited to, the following categories of information: (a) RealPage data

26   center and disaster recovery architecture; (b) RealPage technology used to monitor

27   and improve the operation of third-party applications; (c) RealPage process

28   methods for change, problem and release management; (d) detailed and proprietary

1   descriptions of the RealPage Cloud; and (e) the confidential details of RealPage's

2   bids for large Yardi clients.

3        51.    RealPage's trade secrets relevant to this case comprise information not

4   generally known to the public or to other persons who would obtain economic

5   value from their disclosure or use. This information is the subject of reasonable

6   efforts by RealPage to maintain its secrecy, including the use of confidentiality and

7   nondisclosure agreements, and derives independent economic value from not being

8   generally known. The information constitutes "trade secrets" under California Civil

9   Code section 3426.1. RealPage's trade-secret information gives it a competitive

10   advantage in, among other things, its ability to offer services such as consulting

11   services and the RealPage Cloud hosting service.

12        52.    Yardi willfully and maliciously misappropriated RealPage's trade

13   secrets through improper means by obtaining them from Joe Hendrix, who had a

14   duty to maintain the trade secrets' secrecy and to forebear from disseminating or

15   using them. Yardi worked in concert with Hendrix to obtain RealPage's trade

16   secret information, all the while knowing that Hendrix was representing himself as

17   a RealPage employee and that he was subject to a confidentiality agreement. Upon

18   acquiring these stolen trade secrets, Yardi proceeded to use them without

19   RealPage's express or implied consent for the purpose of developing a competing

20   cloud computing business and competing for Client 2's and others' business.

21        53.    By reason of the above-alleged acts and conduct of Yardi, RealPage

22   has been damaged, and it will suffer further great and irreparable harm and damage.

23   The amount of this irreparable harm will be difficult to ascertain, and RealPage will

24   be without an adequate remedy at law.

25        54.    RealPage is entitled to an injunction restraining Yardi, its officers,

26   agents, employees, and all persons acting in concert with it, from engaging in

27   further unlawful acts and from reaping any additional commercial advantage from

28   its misappropriation and use of RealPage's trade secrets.

1   55.   RealPage is further entitled to an order requiring Yardi, its agents,

2   employees, and all persons acting in concert with it, to return to RealPage any and

3   all of its trade secrets and confidential, proprietary materials, including but not

4   limited to any and all materials created incorporating, referencing, or derived from

5   RealPage's trade secrets and confidential, proprietary information.

6   56.   RealPage is further entitled to recover from Yardi the damages

7   sustained by RealPage as a result of the wrongful acts as alleged herein. RealPage

8   is further entitled to recover from Yardi the gains, profits, and advantages Yardi has

9   obtained as a result of the wrongful acts alleged herein. The amount of such

10   damages, gains, profits, and advantages cannot be determined at this time but will

11   be proven at trial.

12

13   **SECOND COUNTERCLAIM**

14   **(Violation of Section 1 of the Sherman Act)**

15   57.   RealPage realleges and incorporates by reference the allegations

16   contained in Paragraphs 1 through 49 as though fully set forth herein.

17   58.   Yardi's conduct as alleged herein has been for the purpose of, and has

18   had the effect of, injuring and restraining competition in the United States vertical

19   cloud market. Yardi has entered into agreements that restrain competition in a

20   substantial portion of the vertical cloud market by forcing Voyager clients, through

21   threats and intimidation, into anticompetitive exclusionary agreements whereby the

22   client agrees explicitly, or in effect, not to use the RealPage Cloud. That conduct

23   has had and continues to have anticompetitive effects and violates Section 1 of the

24   Sherman Act, 15 U.S.C. § 1.

25   59.   The agreements are an unreasonable restraint of trade upon interstate

26   commerce. The anticompetitive effects of these agreements outweigh any

27   procompetitive effect or legitimate business justifications.

28   60.   As a direct and proximate result of Yardi's unlawful and

1   anticompetitive conduct, RealPage has been injured and damaged in its business

2   and property.

3       61.    Unless enjoined, Yardi's unlawful conduct will continue and cause

4   further injury to competition, and RealPage will continue to suffer injury for which

5   it is without adequate remedy at law.

6

7   **THIRD COUNTERCLAIM**

8   **(Violation of the California Cartwright Act)**

9       62.    RealPage realleges and incorporates by reference the allegations

10  contained in Paragraphs 1 through 49 as though fully set forth herein.

11      63.    Yardi's conduct as alleged herein has been for the purpose of, and has

12  had the effect of, injuring and restraining competition in the vertical cloud market.

13  Yardi has entered into agreements intending to restrain competition by forcing its

14  Voyager clients, through threats and intimidation, into anticompetitive exclusionary

15  agreements whereby the client agrees not to use the RealPage Cloud.  That conduct

16  has had and continues to have substantial anticompetitive effects in California, and

17  violates California Business and Professions Code sections 16720 and 16727.  The

18  anticompetitive effects of these agreements outweigh any beneficial effect or

19  legitimate business justifications.

20      64.    As a direct and proximate result of Yardi's unlawful and

21  anticompetitive conduct, RealPage has been injured and damaged in its business

22  and property.

23      65.    Unless enjoined, Yardi's unlawful conduct will continue and cause

24  further injury to competition, and RealPage will continue to suffer injury for which

25  it is without adequate remedy at law.

26

27

28

## FOURTH COUNTERCLAIM

### (Intentional Interference with Contract)

66.     RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 49 as though fully set forth herein.

67.     RealPage has or had valid contracts with third parties, including Client 1, for hosting and consulting services. Yardi has knowledge of these contracts with third parties.

68.     Yardi has willfully and intentionally interfered with those contracts by threatening RealPage's clients, including Client 1, with termination of software licensing agreements if they use the RealPage Cloud. These threats were made on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud. Yardi also has willfully and intentionally interfered with those contracts by amending its software license agreements to prohibit its licensees from using the RealPage Cloud. Yardi's wrongful acts were designed to and actually did interfere with or disrupt RealPage's contractual relationships with its clients, including Client 1.

69.     RealPage has suffered actual damages and loss as a direct and proximate result of Yardi's unlawful interference. RealPage has lost business with Client 1 and has suffered losses with other clients as a result of Yardi's interference.

70.     Yardi acted intentionally and in conscious disregard of the rights of RealPage, with malice and oppression, in that Yardi knew that its acts and conduct, as alleged herein, were unjustified and improper and would result in severe financial and economic injury to RealPage. Accordingly, RealPage is entitled to an award of punitive damages against Yardi for the sake of example and by way of punishing Yardi, in an amount to be determined at trial.

# FIFTH COUNTERCLAIM

## (Intentional Interference with Prospective Economic Advantage)

71.     RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 49 as though fully set forth herein.

72.     An economic relationship, with the reasonable probability of future economic benefit to RealPage, existed between RealPage, on the one hand, and its current and prospective RealPage Cloud clients and consulting clients (including Clients 1, 2, 3, 4, and 5), on the other hand.

73.     Yardi knew of these relationships and intended to disrupt them by threatening RealPage's clients with termination of their software licensing agreements if they chose to use the RealPage Cloud or EverGreen consulting services.  These threats were made on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud.  Yardi also has intended to disrupt these relationships by amending its software license agreements to prohibit its licensees from using the RealPage Cloud, by using RealPage's trade secrets to bid against RealPage, and by denying former Yardi clients that switch to RealPage all access to such clients' own historical data.

74.     As described throughout these Counterclaims, Yardi's conduct was independently tortious or unlawful because Yardi has restrained trade and competition in violation of the antitrust laws of the United States and the States of California and Texas by forcing its Voyager clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud.  Yardi's business acts and practices are also independently tortious or unlawful in that Yardi has used RealPage's own trade secrets, obtained unlawfully by Yardi, to unfairly compete against RealPage and to interfere with RealPage's client relationships.

75.     As a direct and proximate result of Yardi's wrongful acts as alleged herein, numerous clients and prospective clients have been forced to terminate their

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1   use of, or have been forced not to use, the RealPage Cloud and EverGreen

2   consulting services.  Yardi's wrongful conduct was a substantial factor in disrupting

3   these relationships.

4       76.     As a direct and proximate result of Yardi's wrongful acts as alleged

5   herein, RealPage has suffered actual damages and loss.  RealPage has lost business

6   and has suffered losses with clients as a result of Yardi's interference.

7       77.     Yardi acted intentionally and in conscious disregard of the rights of

8   RealPage, with malice and oppression, in that Yardi knew that its acts and conduct,

9   as alleged herein, were unjustified and improper and would result in severe

10  financial and economic injury to RealPage.  Accordingly, RealPage is entitled to an

11  award of punitive damages against Yardi for the sake of example and by way of

12  punishing Yardi, in an amount to be determined at trial.

13

14  ## SIXTH COUNTERCLAIM

15  **(Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200 Et Seq.)**

16      78.     RealPage realleges and incorporates by reference the allegations

17  contained in Paragraphs 1 through 49 as though fully set forth herein.

18      79.     Yardi's acts, as alleged above, constitute unlawful, unfair, or

19  fraudulent business practices in violation of California Unfair Competition Law

20  ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

21      80.     Yardi's business acts and practices are unlawful, fraudulent and unfair,

22  and in violation of the UCL because Yardi has restrained trade and competition in

23  violation of the antitrust laws of the United States and the State of California by

24  forcing its Voyager clients, through threats and intimidation, into anticompetitive

25  exclusionary agreements whereby the client agrees not to use the RealPage Cloud

26  or EverGreen consulting services.  Yardi's business acts and practices are also

27  unlawful, fraudulent, and unfair in that it has used trade secrets that it

28  misappropriated from RealPage to unfairly compete against RealPage and interfere

with RealPage's contractual and prospective economic relations.

81.     As a direct and proximate result of Yardi's statutory unfair competition, Yardi has been unjustly enriched in an amount to be determined at trial.

82.     In addition, Yardi's statutory unfair competition has caused, and is continuing to cause, substantial and irreparable harm to RealPage.  Unless Yardi's wrongful acts are restrained by this Court, RealPage's business will continue to suffer.  RealPage has no adequate or complete remedy at law, and the harm RealPage will suffer cannot be adequately compensated in monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, RealPage prays for judgment in its favor as follows:

a.     That RealPage be awarded damages against Yardi, including treble damages as authorized by law, in an amount to be determined at trial;

b.     That RealPage be awarded punitive damages against Yardi;

c.     That the Court award RealPage its attorneys' fees and litigation expenses as authorized by law;

d.     That the Court enter injunctions restraining Yardi preliminarily and permanently from further misappropriation of RealPage's trade secrets;

e.     That the Court enter injunctions restraining Yardi preliminarily and permanently from further acts of unfair competition;

f.     That the Court enter injunctions restraining Yardi preliminarily and permanently from continuing its anticompetitive conduct as alleged herein; and

g.     That the Court award RealPage such other and further relief as the Court deems just and appropriate.

1

## ANSWER

2    COMES NOW RealPage, for itself alone and for no other defendant, and for

3    its Answer to Yardi's Complaint, admits, denies, and alleges as follows:

4    1.    In answer to Paragraph 1, RealPage admits that this action purports to

5    be brought under the theories cited but believes that Yardi's hidden intent in filing

6    this lawsuit is to inhibit RealPage from fairly competing with Yardi and to limit

7    alternative choices for Yardi's clients, thereby preventing a more open and

8    competitive marketplace.  Except as so admitted, RealPage denies each and every

9    allegation set forth in Paragraph 1, and specifically denies that it has engaged in any

10   wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in

11   any manner, or at all.

12   2.    In answer to Paragraph 2, RealPage admits that Yardi is a developer of

13   database and application software for real estate and property management clients.

14   Except as so admitted, RealPage denies each and every allegation set forth in

15   Paragraph 2.

16   3.    In answer to Paragraph 3, RealPage admits that it competes with Yardi

17   in some markets and with respect to some products.  RealPage admits and alleges

18   that in 2009 it acquired substantially all the assets of EverGreen Solutions, Inc.,

19   including EverGreen Solutions, Inc.'s rights to the name "EverGreen," and that

20   RealPage used those assets to create a division of RealPage previously known as

21   EverGreen Solutions; this division has since been reorganized and consolidated into

22   the RealPage Professional Services Group.  RealPage admits that prior to its

23   acquisition of EverGreen Solutions, Inc., EverGreen Solutions, Inc. (and its

24   predecessor entities, referred to collectively herein as "EverGreen Solutions, Inc.")

25   was a consultant that provided technology and software support services for users

26   of Yardi's software, among others, but denies that it affirmatively joined any then-

27   so called "Yardi Independent Consultant Network" or that it undertook any

28   obligations toward Yardi as a result of its purported membership in such a Network.

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1   RealPage admits and alleges that EverGreen Solutions, Inc. was given

2   unconditional access to Yardi's Client Central and the information posted thereon,

3   and denies that such access was granted by Yardi as a result of EverGreen

4   Solutions, Inc. affirmatively joining any purported Independent Consultant

5   Network or pursuant to any purported "strict confidentiality agreement."  RealPage

6   admits that EverGreen Solutions, Inc. employed, and RealPage still employs,

7   certain of Yardi's former employees.  RealPage admits and alleges that, at or

8   around the time RealPage acquired substantially all the assets of EverGreen

9   Solutions, Inc., the corporate entity previously known as Evergreen Solutions, Inc.

10  changed its name to EverGreen Management Solutions, Inc. and, in December

11  2009, to DC Consulting, Inc.  RealPage lacks knowledge or information sufficient

12  to form a belief as to the truth of the allegation that EverGreen Solutions, Inc. was

13  "best known" for providing services "almost exclusively for users of Yardi

14  software," and therefore denies same on that ground.  Except as so admitted and

15  denied, RealPage denies each and every allegation set forth in Paragraph 3.  Other

16  than as expressly set forth in this paragraph, to the extent that the allegations in

17  Paragraph 3 are directed to or involve EverGreen Management Solutions, Inc. or

18  DC Consulting, Inc. (hereinafter collectively "DC Consulting, Inc."), RealPage

19  lacks knowledge or information sufficient to form a belief as to the truth of those

20  allegations, and therefore denies same on that ground.

21        4.      In answer to Paragraph 4, RealPage denies each and every allegation

22  therein, except admits and alleges that Yardi sent an email to EverGreen Solutions,

23  Inc. purporting to terminate its "access to Yardi Systems online support and

24  services, phone and email technical support, [and] marketing and sales resources"

25  in apparent retaliation for the acquisition of its assets by RealPage, that Yardi or its

26  representatives have sent various communications to RealPage or its counsel stating

27  in substance that RealPage should not misuse Yardi's purported confidential

28  information and RealPage has abided by those admonitions, and specifically denies

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1  that Yardi did in fact or could lawfully terminate EverGreen Solutions, Inc.'s or its

2  clients' legitimate access to Client Central. To the extent that the allegations in

3  Paragraph 4 are directed to or involve DC Consulting, Inc., RealPage lacks

4  knowledge or information sufficient to form a belief as to the truth of those

5  allegations, and therefore denies same on that ground.

6      5.     In answer to Paragraph 5, RealPage admits and alleges that it

7  announced that the former EverGreen division "will continue to work with its real

8  estate clients to improve management systems in the areas of application hosting,

9  including upgrades and new product implementation, application support, custom

10 programming and reports and integrations and interfaces," and that prior to its

11 acquisition, EverGreen Solutions, Inc. was a consultant that provided technology

12 and software support services for users of Yardi's software, among others.

13 RealPage denies that EverGreen Solutions, Inc. affirmatively joined any then-so

14 called "Yardi Independent Consultant Network" or that it undertook any obligations

15 toward Yardi as a result of its purported membership in such a Network. Except as

16 so admitted, RealPage denies each and every allegation set forth in Paragraph 5,

17 and specifically denies that it has engaged in any wrongful conduct toward Yardi or

18 that it has injured Yardi in the manner alleged, in any manner, or at all.

19     6.     In answer to Paragraph 6, RealPage denies each and every allegation

20 set forth in Paragraph 6, except (i) RealPage admits that prior to its acquisition,

21 EverGreen Solutions, Inc. was a consultant that provided technology and software

22 support services for users of Yardi's software, among others, but denies that it

23 affirmatively joined any then-so called "Yardi Independent Consultant Network" or

24 that it undertook any obligations toward Yardi as a result of its purported

25 membership in such a Network; and (ii) RealPage admits and alleges that since

26 September 2009 it has legitimately and with proper authority accessed Client

27 Central, but specifically denies that it has engaged in any wrongful conduct toward

28 Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

the extent that the allegations in Paragraph 6 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

7.      In answer to Paragraph 7, RealPage denies for lack of knowledge or information the allegations therein, except specifically denies that Yardi welcomes fair competition, that RealPage has stolen Yardi's intellectual property, or that RealPage has injured Yardi in the manner alleged, in any manner, or at all.

8.      In answer to Paragraph 8, RealPage admits the allegations set forth therein.

9.      In answer to Paragraph 9, RealPage denies each and every allegation contained therein, except admits and alleges that it is a Delaware corporation whose stock is publicly-traded, that its headquarters are in Carrollton, Texas, and that it competes with Yardi in some markets and with respect to some products.

10.      In answer to Paragraph 10, RealPage admits and alleges that in September 2009 it acquired substantially all the assets of the entity then known as EverGreen Solutions, Inc. and that those assets subsequently comprised the division of RealPage previously known as EverGreen Solutions; this division has since been reorganized and consolidated into the RealPage Professional Services Group. RealPage admits that prior to its acquisition of EverGreen Solutions, Inc., EverGreen Solutions, Inc. was a consultant that provided technology and software support services for users of Yardi's software, among others. RealPage denies that EverGreen Solutions, Inc. affirmatively joined any then-so called "Yardi Independent Consultant Network" or that it undertook any obligations toward Yardi as a result of its purported membership in such a Network. To the extent that the allegations in Paragraph 10 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

11.      In answer to Paragraph 11, RealPage admits that it does business in

California and that it services and supports clients in California and in this judicial district. RealPage admits that its former Evergreen Solutions division legitimately accessed and downloaded certain materials from Client Central, but denies that any of those materials were trade secrets. Except as so admitted and denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 11, and therefore denies same on that ground. To the extent that the allegations in Paragraph 11 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

12.    In answer to Paragraph 12, RealPage denies each and every allegation therein, and specifically denies that with respect to DC Consulting, Inc. it is or was an agent, partner, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator, that it encouraged or assisted DC Consulting, Inc. in any alleged misconduct, or that it undertook any activity within the scope of any agency, partnership, representation, affiliation, or conspiracy with DC Consulting, Inc.

13.    In answer to Paragraph 13, RealPage admits that this Court has subject matter jurisdiction over this action and admits that Yardi purports to state claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, the Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.*, and the Copyright Act, 17 U.S.C. § 101 *et seq.* RealPage denies that Yardi has suffered any damage or loss, and denies that Yardi is entitled to any relief against RealPage, whether under the cited statutes or otherwise.

14.    In answer to Paragraph 14, RealPage admits that Yardi's state law claims purport to invoke this Court's supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367. RealPage denies that Yardi is entitled to any relief against RealPage, whether under the cited statutes or otherwise.

15.    In answer to Paragraph 15, RealPage denies for lack of knowledge or information the allegations therein, but admits and alleges that Yardi purports to

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

have invoked this Court's subject matter jurisdiction under the statute cited.

16.     In answer to Paragraph 16, RealPage denies that it improperly accessed Client Central servers and denies that it downloaded trade secret materials. Except as so denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 16, and therefore denies same on that ground.  To the extent that the allegations in Paragraph 16 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

17.     In answer to Paragraph 17, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations therein, and therefore denies same on that ground.

18.     In answer to Paragraph 18, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations therein and therefore denies same on that ground, except admits and alleges that Yardi sells a software product known as Yardi Voyager ("Voyager") and that Yardi markets and promotes that product as having certain characteristics.

19.     In answer to Paragraph 19, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations therein and therefore denies same on that ground, except admits and alleges that Yardi sells a product called Yardi Genesis and that Yardi markets and promotes that product as having certain characteristics.

20.     In answer to Paragraph 20, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations therein and therefore denies same on that ground, except admits and alleges that Yardi offers certain add-on products and service modules and that Yardi markets and promotes such products and services as having certain characteristics.

21.     In answer to Paragraph 21, RealPage lacks knowledge or information

1  sufficient to form a belief as to the truth of the allegations therein and therefore

2  denies same on that ground, except admits and alleges that Yardi's clients have

3  sometimes desired assistance with their licensed software, add-on products, or

4  service modules and have frequently chosen to obtain such assistance from

5  independent consultants of their choosing, and specifically denies that Yardi may

6  lawfully preclude its clients from obtaining such services from third party

7  consultants of their choosing, that all such third party consultants are members of

8  any so-called Yardi Independent Consultant Network or have entered into

9  cooperation, consulting, nondisclosure, and/or confidentiality agreements with

10  Yardi concerning such client assistance, or that Yardi may lawfully require them to

11  do so.

12     22.    In answer to Paragraph 22, RealPage lacks knowledge or information

13  sufficient to form a belief as to the truth of the allegations therein and therefore

14  denies same on that ground, except admits that RealPage competes with Yardi in

15  certain markets and with respect to certain products; admits and alleges that Yardi

16  has created certain user guides, release notes, and other written materials for certain

17  of its software systems, add-on products, and add-on service modules; and

18  specifically denies that such user guides, release notes and other written materials

19  constitute or contain Yardi's trade secrets or that the information contained therein

20  "is valuable because it allows Yardi to compete effectively and advantageously."

21     23.    In answer to Paragraph 23, RealPage lacks knowledge or information

22  sufficient to form a belief as to the truth of the allegations therein and therefore

23  denies same on that ground, except admits and alleges that certain user guides,

24  release notes, and other written materials created by Yardi contain information

25  about Yardi's products and specifically denies that such user guides, release notes

26  and other written materials constitute or contain Yardi's trade secrets.

27     24.    In answer to Paragraph 24, RealPage lacks knowledge or information

28  sufficient to form a belief as to the truth of the allegations therein and therefore

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

denies same on that ground, except specifically denies that user guides, release notes and other written materials for Yardi's International Management and/or Voyager International Management constitute or contain trade secrets that give Yardi a competitive advantage.

25.    In answer to Paragraph 25, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations therein and therefore denies same on that ground, except specifically denies that all of Yardi's user guides, release notes and written materials constitute or contain trade secrets.

26.    In answer to Paragraph 26, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations therein and therefore denies same on that ground, except specifically denies that Yardi has provided its user guides, release notes and other written materials only to clients and consultants pursuant to licenses or other contracts with strict confidentiality provisions, and further specifically denies that Yardi has designated all of its user guides, release notes and other written materials as copyrighted, confidential, and trade secret.

27.    In answer to Paragraph 27, RealPage admits that Yardi's clients and their consultants can obtain access to Yardi's software and certain related documents through Yardi's Client Central, among other means.  RealPage admits that Yardi has issued credentials to clients and consultants for their use in accessing Client Central, but denies that such credentials have been issued only to clients who license Yardi software or to consultants who contract to affirmatively join any purported "Yardi Independent Consultant Network."  RealPage further denies that Client Central log-on credentials are valuable and that the documents accessible on Client Central are all copyrighted and trade secrets.  Except as so admitted and denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27, and therefore denies same on that ground.

28.    In answer to Paragraph 28, RealPage denies that all information about

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1    Yardi's services, sales practices, client tools, internal procedures and product

2    pricing, including price lists, are highly proprietary, confidential, trade secrets, and

3    available only on Client Central.  Except as so denied, RealPage lacks knowledge

4    or information sufficient to form a belief as to the truth of the allegations set forth

5    in Paragraph 28, and therefore denies same on that ground.

6           29.    In answer to Paragraph 29, RealPage denies that Credentials are or

7    have been treated by Yardi as highly proprietary, confidential, and trade secret.

8    Except as so denied, RealPage lacks knowledge or information sufficient to form a

9    belief as to the truth of the allegations set forth in Paragraph 29, and therefore

10   denies same on that ground.

11          30.    In answer to Paragraph 30, RealPage admits that Yardi is among

12   RealPage's competitors in certain markets with respect to certain products, and that

13   on or about September 23, 2009, RealPage acquired substantially all the assets of

14   the entity then known as EverGreen Solutions, Inc.  RealPage denies for lack of

15   knowledge or information how Yardi markets itself, whether as being a main

16   competitor of RealPage, or otherwise.  RealPage admits that in September 2010, an

17   analyst for William Blair & Company, L.L.C. wrote that EverGreen Solutions, Inc.

18   was "the largest consultant for Yardi," that RealPage's acquisition of EverGreen

19   Solutions, Inc. provided RealPage "with an entry point for offering a hosting

20   service for Yardi clients," that "integrating tightly with Yardi and running Yardi

21   solutions gives RealPage the ability to sell its solutions into Yardi's large base of

22   residential units (that typically run only accounting)" and that "Targeting the Yardi

23   base in this way is clever, in our opinion."  Except as so admitted, RealPage lacks

24   knowledge or information sufficient to form a belief as to the truth of the

25   allegations set forth in Paragraph 30, and therefore denies same on that ground.  To

26   the extent that the allegations in Paragraph 30 are directed to or involve DC

27   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

28   belief as to the truth of those allegations, and therefore denies same on that ground.

31.     In answer to Paragraph 31, RealPage admits that RealPage and Yardi compete in certain markets with respect to certain products.  RealPage admits that in an email dated September 3, 2009, Yardi purported to terminate its "3rd Party Consultant Cooperation Agreement with EverGreen Solutions, Inc." and purported to terminate access to "Yardi Systems online support and services, phone and email technical support, marketing and sales resources."  RealPage denies that Yardi informed EverGreen Solutions, Inc. that it was terminating, and denies that Yardi in fact terminated, EverGreen Solutions, Inc.'s or its clients' legitimate access to Client Central.  RealPage denies that any of the acts alleged in Paragraph 31 were taken, or necessary, to protect Yardi.  Except as so admitted and denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 31, and therefore denies same on that ground.  To the extent that the allegations in Paragraph 31 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

32.     In answer to Paragraph 32, RealPage admits that it acquired substantially all the assets of the entity formerly known as EverGreen Solutions, Inc.  RealPage denies that it completed that acquisition "knowing that EverGreen no longer had Yardi's permission to access Client Central," and denies that EverGreen Solutions, Inc. needed or lacked such permission.  RealPage denies that it completed that acquisition knowing that it had no form of authorized access to Client Central and denies that it in fact had no form of authorized access to Client Central.  RealPage denies that it completed that acquisition knowing that it would "choose to force [its] way into" Yardi's systems, and denies that it in fact "force[d]" its way into Yardi's systems.  RealPage denies that it circumvented the access restrictions on Client Central, denies that it obtained unauthorized, illegal access to the Vault, denies that it altered data in the Vault, denies that it deleted or created Client Central Credentials, and denies that it "took an assortment of confidential

1   Credentials belonging to Yardi employees, clients, and consultants" from the Vault.

2   RealPage admits that it used Client Central credentials to access Client Central and

3   download certain information therefrom but specifically denies that it has engaged

4   in any wrongful conduct toward Yardi or that it has injured Yardi in the manner

5   alleged, in any manner, or at all.  RealPage alleges that each of the instances of

6   downloading described by Yardi in its Complaint either (i) was a lawful action

7   conducted on behalf of a RealPage client, (ii) was accidental and innocuous, or (iii)

8   concerned material that was not, in fact, a trade secret, and for these and other

9   reasons, Yardi suffered no harm.  Except as so admitted and denied, RealPage lacks

10  knowledge or information sufficient to form a belief as to the truth of the

11  allegations set forth in Paragraph 32, and therefore denies same on that ground.  To

12  the extent that the allegations in Paragraph 32 are directed to or involve DC

13  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

14  belief as to the truth of those allegations, and therefore denies same on that ground.

15       33.     RealPage denies each and every allegation in Paragraph 33, except (i)

16  admits and alleges that the identified IP address is leased to RealPage's former

17  office in Tulsa, Oklahoma; (ii) admits and alleges that on or around April 1, 2010, a

18  person accessed Client Central and downloaded a Yardi price list, but denies that

19  the information on said price list is a trade secret; (iii) denies for lack of knowledge

20  and information the credentials used to access Client Central on that occasion, and,

21  therefore, the identity of the person to whom such credentials were issued or the

22  circumstances under which the same were provided to RealPage; (iv) denies for

23  lack of knowledge or information the whereabouts on April 1, 2010 of Ms. Dowen;

24  and (v) denies for lack of knowledge or information each and every allegation to

25  the extent same are directed to or involve DC Consulting, Inc.

26       34.     RealPage denies each and every allegation in Paragraph 34, except (i)

27  denies that the identified IP address is leased to any of RealPage's satellite offices;

28  (ii) denies for lack of knowledge or information whether any internet service

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

provider is dynamically allocating or has ever dynamically allocated that IP address to any RealPage employee in the vicinity of Eugene, Oregon; (iii) admits and alleges that on or around May 5, 2010, a person accessed Client Central and downloaded a Yardi price list, but denies that the information on said price list is a trade secret; (iv) denies for lack of knowledge and information the credentials used to access Client Central on that occasion, and, therefore, the identity of the person to whom such credentials were issued or the circumstances under which the same were provided to RealPage; (v) denies for lack of knowledge or information the whereabouts on May 5, 2010 of Mr. Pendergast; and (vi) denies for lack of knowledge or information each and every allegation to the extent same are directed to or involve DC Consulting, Inc.

35. RealPage denies each and every allegation in Paragraph 35, except (i) denies that the identified IP address is leased to any of RealPage's satellite offices; (ii) denies for lack of knowledge or information whether any internet service provider is dynamically allocating or has ever dynamically allocated that IP address to any RealPage employee in the vicinity of Eugene, Oregon; (iii) admits and alleges that on or around November 4, 2010, a person accessed Client Central and downloaded materials relating to Yardi's Voyager 7.0 software, but denies that the information in those materials is a trade secret or that the downloaded materials could be used to "reverse-engineer" any "unique functionality of Yardi's software" or would allow a competitor to "gain an unfair competitive advantage" in any fashion; (iv) denies for lack of knowledge and information the credentials used to access Client Central on that occasion, and, therefore, the identity of the person to whom such credentials were issued or the circumstances under which they were provided to RealPage; (v) denies for lack of knowledge or information the whereabouts on November 4, 2010 of Ms. Mills; and (vi) denies for lack of knowledge or information each and every allegation to the extent same are directed to or involve DC Consulting, Inc.

36.     RealPage denies each and every allegation in Paragraph 36, except (i) admits and alleges that it legitimately used its client's credentials to access Yardi's Client Central to facilitate the lawful provision of consulting services to RealPage clients; (ii) specifically denies that such access of Client Central was illegal; (iii) specifically denies that it "took and used Yardi client and consultant credentials" in an effort to make its access "appear normal" or to "obscure [its] tracks;" (iv) admits and alleges that the identified IP address is leased to RealPage's office in Washington, D.C.; (v) admits and alleges that on or around October 7, 2010, a user accessed Client Central with a "dts" credential and downloaded a Voyager Debt-Mortgage User's Guide, but denies that the information in said guide is a trade secret and that a "competitor could use the detailed information contained in this manual to develop a competing software product at a fraction of the cost required to create this program independently;" (vi) admits and alleges that the second page of the Voyager Debt-Mortgage User's Guide contains the language alleged in Paragraph 36; (vii) specifically denies that it needed Yardi's authorization to access Client Central and download documents therefrom; (viii) denies for lack of knowledge or information the whereabouts on October 7, 2010 of Ms. Sears; and (ix) denies for lack of knowledge or information each and every allegation to the extent same are directed to or involve DC Consulting, Inc.

37.     RealPage denies each and every allegation in Paragraph 37, except (i) admits and alleges that the identified IP address is leased to RealPage's office in Washington, D.C.; (ii) admits and alleges that on or around November 10, 2010, a user accessed Client Central with a "dts" credential and downloaded a Voyager International User's Guide, but denies that the information in said guide is a trade secret and that access to this guide "would allow a competitor to reverse-engineer critical International-specific functions without devoting the time or resources that Yardi did;" (iii) admits and alleges that the second page of the Voyager International User's Guide contains the language alleged in Paragraph 37; (iv)

specifically denies that RealPage needed Yardi's authorization to access Client Central and download documents therefrom; (v) denies for lack of knowledge or information that "Yardi spent over seven years creating the specific functionality contained within its International program;" (vi) denies for lack of knowledge or information the whereabouts on November 10, 2010 of Ms. Sears; and (vii) denies for lack of knowledge or information each and every allegation to the extent same are directed to or involve DC Consulting, Inc.

38.   RealPage denies each and every allegation in Paragraph 38, except (i) admits and alleges that on or around November 4, 2010, a person accessed Client Central and downloaded a Voyager International User's Guide (Version 7.0) and a Voyager International Currency User's Guide (Version 7.0), but denies that the information in the downloaded documents is a trade secret and denies for lack of knowledge or information that said access was made from the identified IP address; (ii) denies for lack of knowledge and information the credentials used to access Client Central on that occasion; (iii) admits and alleges that on or around November 10, 2010, a user accessed Client Central with a "dts" credential and downloaded a Voyager International User's Guide (Version 6.0.08.22, not 6.08.22) from the identified IP address, but denies that the information in the downloaded document is a trade secret; (iv) admits and alleges that RealPage has never provided services to an existing client for its implementation of Yardi International software, but denies that this makes the downloading of documents wrongful; (v) specifically denies that RealPage has no legitimate business use for the documents downloaded; and (vi) denies for lack of knowledge or information each and every allegation to the extent same are directed to or involve DC Consulting, Inc.

39.   RealPage denies each and every allegation in Paragraph 39, except (i) admits and alleges that it leases the identified IP address; (ii) admits and alleges that on or around January 3, 2011, a user, acting as an agent of RealPage client Progressive Redevelopment, Inc. ("PRI"), not Progressive Development, Inc. as

alleged by Yardi, and using the "jbrock" ID of PRI employee Jackie Brock, not Jessica Brock as alleged by Yardi, logged into Client Central for the purpose of accessing Yardi Voyager materials to facilitate the legitimate and lawful provision of consulting services to PRI relating to Yardi's Voyager software; (iii) admits and alleges that the user, in search of certain Yardi Voyager materials, instead accidentally downloaded Yardi's Enterprise 1099 Installation Utility and QuickSteps and Enterprise 2010 End-of-Year Procedures Guide, but specifically denies that the information in the downloaded documents is a trade secret; (iv) denies for lack of knowledge and information whether PRI has a license or legitimate business use for the Enterprise materials downloaded, but denies that this renders the download wrongful and alleges that Yardi gave PRI access to such materials; and (v) denies for lack of knowledge or information each and every allegation to the extent same are directed to or involve DC Consulting, Inc.

40.     In answer to Paragraph 40, RealPage denies each and every allegation contained therein, and specifically denies that it has engaged in any purported "widespread pattern" of unauthorized access, theft of Yardi trade secrets, illegal downloads, or any other improper conduct, except denies for lack of knowledge or information the basis for Yardi's assertions about the results of its own internal investigation.  To the extent that the allegations in Paragraph 40 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

41.     In answer to Paragraph 41, RealPage denies each and every allegation contained therein, and specifically denies that it has illegally accessed or downloaded Yardi proprietary and trade secret information.  To the extent that the allegations in Paragraph 41 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

42.    In answer to Paragraph 42, RealPage admits that Pinnacle, Riverstone, and PRI are RealPage's clients.  RealPage denies each and every remaining allegation contained therein, and specifically denies that it lacked or lacks legitimate access to Client Central and Yardi information, denies that it had or has "illicit knowledge of and access to Yardi's trade secret and copyrighted materials," and denies that it needed such access or knowledge to win or to provide services to the listed or any other clients.  To the extent that the allegations in Paragraph 42 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

43.    In answer to Paragraph 43, RealPage denies that Yardi's data models, user interfaces, and process workflows constitute trade secrets, denies that a competitor with access to Yardi's specifications, data models, user interfaces, and process workflows could significantly advance the development cycle of the competitor's analogous product, and denies that access to such information would allow a competitor to compete much earlier in the market or to reduce or eliminate any competitive advantage of Yardi.  Except as so denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 43, and therefore denies same on that ground.

44.    In answer to Paragraph 44, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 44, and therefore denies same on that ground.

45.    In answer to Paragraph 45, RealPage admits and alleges that it has expanded its software offerings over time and that it launched OneSite Budgeting, an integrated budgeting and forecasting tool for the multifamily industry, in May 2010.  Except as so admitted, RealPage denies each and every allegation set forth in Paragraph 45, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1    all.  To the extent that the allegations in Paragraph 45 are directed to or involve DC

2    Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

3    belief as to the truth of those allegations, and therefore denies same on that ground.

4        46.    In answer to Paragraph 46, RealPage incorporates by this reference

5    each and every admission, denial and allegation set forth in paragraphs 1 through

6    45 of this Answer as if set forth fully herein.

7        47.    In answer to Paragraph 47, RealPage denies each and every allegation

8    therein, and specifically denies that it has engaged in any wrongful conduct toward

9    Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

10   the extent that the allegations in Paragraph 47 are directed to or involve DC

11   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

12   belief as to the truth of those allegations, and therefore denies same on that ground.

13       48.    In answer to Paragraph 48, RealPage denies each and every allegation

14   therein, and specifically denies that it has engaged in any wrongful conduct toward

15   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

16   the extent that the allegations in Paragraph 48 are directed to or involve DC

17   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

18   belief as to the truth of those allegations, and therefore denies same on that ground.

19       49.    In answer to Paragraph 49, RealPage denies each and every allegation

20   therein, and specifically denies that it has engaged in any wrongful conduct toward

21   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

22   the extent that the allegations in Paragraph 49 are directed to or involve DC

23   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

24   belief as to the truth of those allegations, and therefore denies same on that ground.

25       50.    In answer to Paragraph 50, RealPage denies each and every allegation

26   therein, and specifically denies that it has engaged in any wrongful conduct toward

27   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

28   the extent that the allegations in Paragraph 50 are directed to or involve DC

1   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

2   belief as to the truth of those allegations, and therefore denies same on that ground.

3         51.   In answer to Paragraph 51, RealPage denies each and every allegation

4   therein, and specifically denies that it has engaged in any wrongful conduct toward

5   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

6   the extent that the allegations in Paragraph 51 are directed to or involve DC

7   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

8   belief as to the truth of those allegations, and therefore denies same on that ground.

9         52.   In answer to Paragraph 52, RealPage denies each and every allegation

10  therein.  To the extent that the allegations in Paragraph 52 are directed to or involve

11  DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

12  belief as to the truth of those allegations, and therefore denies same on that ground.

13        53.   In answer to Paragraph 53, RealPage denies each and every allegation

14  therein, and specifically denies that it has engaged in any wrongful conduct toward

15  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

16  the extent that the allegations in Paragraph 53 are directed to or involve DC

17  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

18  belief as to the truth of those allegations, and therefore denies same on that ground.

19        54.   In answer to Paragraph 54, RealPage denies each and every allegation

20  therein, and specifically denies that it has engaged in any wrongful conduct toward

21  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

22  RealPage specifically denies that any injunctive relief is appropriate.  To the extent

23  that the allegations in Paragraph 54 are directed to or involve DC Consulting, Inc.,

24  RealPage lacks knowledge or information sufficient to form a belief as to the truth

25  of those allegations, and therefore denies same on that ground.

26        55.   In answer to Paragraph 55, RealPage incorporates by this reference

27  each and every admission, denial and allegation set forth in paragraphs 1 through

28  54 of this Answer as if set forth fully herein.

56.   In answer to Paragraph 56, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 56 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

57.   In answer to Paragraph 57, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 57 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

58.   In answer to Paragraph 58, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 58 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

59.   In answer to Paragraph 59, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 59 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

60.   In answer to Paragraph 60, RealPage denies that any of the materials obtained by RealPage from Yardi comprise trade secrets.  Except as so denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 60, and therefore denies same on that

ground.  To the extent that the allegations in Paragraph 60 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

61.    In answer to Paragraph 61, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 61 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

62.    In answer to Paragraph 62, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  RealPage specifically denies that any punitive damages are appropriate.  To the extent that the allegations in Paragraph 62 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

63.    In answer to Paragraph 63, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  RealPage specifically denies that any injunctive relief is appropriate.  To the extent that the allegations in Paragraph 63 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

64.    In answer to Paragraph 64, RealPage incorporates by this reference each and every admission, denial and allegation set forth in paragraphs 1 through 63 of this Answer as if set forth fully herein.

65.    In answer to Paragraph 65, RealPage denies that Yardi has employed technological measures that effectively control access to all parts of Client Central

1    or that have effectively protected Yardi's rights in all purportedly copyrighted

2    materials available through Client Central.  Except as so denied, RealPage lacks

3    knowledge or information sufficient to form a belief as to the truth of the

4    allegations set forth in Paragraph 65, and therefore denies same on that ground.

5         66.    In answer to Paragraph 66, RealPage denies each and every allegation

6    therein, and specifically denies that it has engaged in any wrongful conduct toward

7    Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

8    the extent that the allegations in Paragraph 66 are directed to or involve DC

9    Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

10   belief as to the truth of those allegations, and therefore denies same on that ground.

11        67.    In answer to Paragraph 67, RealPage denies each and every allegation

12   therein, and specifically denies that it has engaged in any wrongful conduct toward

13   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

14   the extent that the allegations in Paragraph 67 are directed to or involve DC

15   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

16   belief as to the truth of those allegations, and therefore denies same on that ground.

17        68.    In answer to Paragraph 68, RealPage denies each and every allegation

18   therein, and specifically denies that it has engaged in any wrongful conduct toward

19   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

20   RealPage specifically denies that any injunctive relief is appropriate.  To the extent

21   that the allegations in Paragraph 68 are directed to or involve DC Consulting, Inc.,

22   RealPage lacks knowledge or information sufficient to form a belief as to the truth

23   of those allegations, and therefore denies same on that ground.

24        69.    In answer to Paragraph 69, RealPage incorporates by this reference

25   each and every admission, denial and allegation set forth in paragraphs 1 through

26   68 of this Answer as if set forth fully herein.

27        70.    In answer to Paragraph 70, RealPage lacks knowledge or information

28   sufficient to form a belief as to the truth of the allegations therein and therefore

1   denies same on that ground, except admits that Yardi has applied to the Register of

2   Copyrights for the Certificates of Registration listed in the table set forth following

3   Paragraph 70.  To the extent that the allegations in Paragraph 70 are directed to or

4   involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to

5   form a belief as to the truth of those allegations, and therefore denies same on that

6   ground.

7       71.    In answer to Paragraph 71, RealPage denies each and every allegation

8   therein, and specifically denies that it has engaged in any wrongful conduct toward

9   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

10  the extent that the allegations in Paragraph 71 are directed to or involve DC

11  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

12  belief as to the truth of those allegations, and therefore denies same on that ground.

13      72.    In answer to Paragraph 72, RealPage denies each and every allegation

14  therein, and specifically denies that it has engaged in any wrongful conduct toward

15  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

16  the extent that the allegations in Paragraph 72 are directed to or involve DC

17  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

18  belief as to the truth of those allegations, and therefore denies same on that ground.

19      73.    In answer to Paragraph 73, RealPage denies each and every allegation

20  therein, and specifically denies that it has engaged in any wrongful conduct toward

21  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

22  the extent that the allegations in Paragraph 73 are directed to or involve DC

23  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

24  belief as to the truth of those allegations, and therefore denies same on that ground.

25      74.    In answer to Paragraph 74, RealPage denies each and every allegation

26  therein, and specifically denies that it has engaged in any wrongful conduct toward

27  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

28  the extent that the allegations in Paragraph 74 are directed to or involve DC

1   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

2   belief as to the truth of those allegations, and therefore denies same on that ground.

3        75.   In answer to Paragraph 75, RealPage denies each and every allegation

4   therein, and specifically denies that it has engaged in any wrongful conduct toward

5   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

6   the extent that the allegations in Paragraph 75 are directed to or involve DC

7   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

8   belief as to the truth of those allegations, and therefore denies same on that ground.

9        76.   In answer to Paragraph 76, RealPage denies each and every allegation

10   therein, and specifically denies that it has engaged in any wrongful conduct toward

11   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

12   RealPage specifically denies that any injunctive relief is appropriate.  To the extent

13   that the allegations in Paragraph 76 are directed to or involve DC Consulting, Inc.,

14   RealPage lacks knowledge or information sufficient to form a belief as to the truth

15   of those allegations, and therefore denies same on that ground.

16        77.   In answer to Paragraph 77, RealPage incorporates by this reference

17   each and every admission, denial and allegation set forth in paragraphs 1 through

18   76 of this Answer as if set forth fully herein.

19        78.   In answer to Paragraph 78, RealPage denies that the "Documentation,

20   price lists, Credentials, and other information stored on Client Central" described in

21   the Complaint constitute trade secrets and denies that the information is not

22   generally known to others who, if they had access to the information, could use it to

23   compete against Yardi.  Except as so denied, RealPage lacks knowledge or

24   information sufficient to form a belief as to the truth of the allegations set forth in

25   Paragraph 78, and therefore denies same on that ground.

26        79.   In answer to Paragraph 79, RealPage denies that Yardi makes

27   reasonable efforts to maintain the confidentiality of the "Documentation, price lists,

28   Credentials, and other information stored on Client Central" described in the

1    Complaint.  Except as so denied, RealPage lacks knowledge or information

2    sufficient to form a belief as to the truth of the allegations set forth in Paragraph 79,

3    and therefore denies same on that ground.

4         80.    In answer to Paragraph 80, RealPage denies each and every allegation

5    therein, and specifically denies that it has engaged in any wrongful conduct toward

6    Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

7    the extent that the allegations in Paragraph 80 are directed to or involve DC

8    Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

9    belief as to the truth of those allegations, and therefore denies same on that ground.

10        81.    In answer to Paragraph 81, RealPage denies each and every allegation

11   therein, and specifically denies that it has engaged in any wrongful conduct toward

12   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

13   the extent that the allegations in Paragraph 81 are directed to or involve DC

14   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

15   belief as to the truth of those allegations, and therefore denies same on that ground.

16        82.    In answer to Paragraph 82, RealPage denies each and every allegation

17   therein, and specifically denies that it has engaged in any wrongful conduct toward

18   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

19   the extent that the allegations in Paragraph 82 are directed to or involve DC

20   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

21   belief as to the truth of those allegations, and therefore denies same on that ground.

22        83.    In answer to Paragraph 83, RealPage denies each and every allegation

23   therein, and specifically denies that it has engaged in any wrongful conduct toward

24   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

25   RealPage specifically denies that Yardi is entitled to exemplary damages or

26   attorneys' fees.  To the extent that the allegations in Paragraph 83 are directed to or

27   involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to

28   form a belief as to the truth of those allegations, and therefore denies same on that

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

1   ground.

2        84.    In answer to Paragraph 84, RealPage denies each and every allegation

3   therein, and specifically denies that it has engaged in any wrongful conduct toward

4   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

5   RealPage specifically denies that any injunctive relief is appropriate.  To the extent

6   that the allegations in Paragraph 84 are directed to or involve DC Consulting, Inc.,

7   RealPage lacks knowledge or information sufficient to form a belief as to the truth

8   of those allegations, and therefore denies same on that ground.

9        85.    In answer to Paragraph 85, RealPage incorporates by this reference

10  each and every admission, denial and allegation set forth in paragraphs 1 through

11  84 of this Answer as if set forth fully herein.

12       86.    In answer to Paragraph 86, RealPage denies each and every allegation

13  therein, and specifically denies that it has engaged in any wrongful conduct toward

14  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

15  the extent that the allegations in Paragraph 86 are directed to or involve DC

16  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

17  belief as to the truth of those allegations, and therefore denies same on that ground.

18       87.    In answer to Paragraph 87, RealPage denies each and every allegation

19  therein, and specifically denies that it has engaged in any wrongful conduct toward

20  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

21  the extent that the allegations in Paragraph 87 are directed to or involve DC

22  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

23  belief as to the truth of those allegations, and therefore denies same on that ground.

24       88.    In answer to Paragraph 88, RealPage denies each and every allegation

25  therein, and specifically denies that it has engaged in any wrongful conduct toward

26  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

27  the extent that the allegations in Paragraph 88 are directed to or involve DC

28  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

1    belief as to the truth of those allegations, and therefore denies same on that ground.

2        89.    In answer to Paragraph 89, RealPage denies each and every allegation

3    therein, and specifically denies that it has engaged in any wrongful conduct toward

4    Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

5    the extent that the allegations in Paragraph 89 are directed to or involve DC

6    Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

7    belief as to the truth of those allegations, and therefore denies same on that ground.

8        90.    In answer to Paragraph 90, RealPage denies each and every allegation

9    therein, and specifically denies that it has engaged in any wrongful conduct toward

10   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

11   the extent that the allegations in Paragraph 90 are directed to or involve DC

12   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

13   belief as to the truth of those allegations, and therefore denies same on that ground.

14       91.    In answer to Paragraph 91, RealPage denies each and every allegation

15   therein, and specifically denies that it has engaged in any wrongful conduct toward

16   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

17   the extent that the allegations in Paragraph 91 are directed to or involve DC

18   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

19   belief as to the truth of those allegations, and therefore denies same on that ground.

20       92.    In answer to Paragraph 92, RealPage denies each and every allegation

21   therein, and specifically denies that it has engaged in any wrongful conduct toward

22   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

23   RealPage specifically denies that any injunctive relief is appropriate.  To the extent

24   that the allegations in Paragraph 92 are directed to or involve DC Consulting, Inc.,

25   RealPage lacks knowledge or information sufficient to form a belief as to the truth

26   of those allegations, and therefore denies same on that ground.

27       93.    In answer to Paragraph 93, RealPage denies each and every allegation

28   therein, and specifically denies that it has engaged in any wrongful conduct toward

1   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

2   RealPage specifically denies that any injunctive relief is appropriate.  To the extent

3   that the allegations in Paragraph 93 are directed to or involve DC Consulting, Inc.,

4   RealPage lacks knowledge or information sufficient to form a belief as to the truth

5   of those allegations, and therefore denies same on that ground.

6       RealPage denies that Yardi is entitled to any of the relief prayed for in the

7   "Prayer For Relief" on pages 26 and 27 of Yardi's Complaint.

8                        **AFFIRMATIVE DEFENSES**

9       AS AND FOR ITS SEPARATE AND AFFIRMATIVE DEFENSES,

10  RealPage alleges as follows:

11                   **FIRST AFFIRMATIVE DEFENSE**

12                      (Failure to State a Claim)

13      1.      The Complaint, and each and every purported claim for relief therein,

14  fails to state a claim upon which relief may be granted.

15                  **SECOND AFFIRMATIVE DEFENSE**

16                      (No Injury or Damage)

17      2.      Yardi's claims are barred, in whole or in part, because Yardi has not

18  been injured or damaged as a proximate result of any act or omission for which

19  RealPage is responsible.

20                   **THIRD AFFIRMATIVE DEFENSE**

21                      (Damages Speculative)

22      3.      Yardi's claims are barred, in whole or in part, because any alleged

23  damages are speculative, uncertain, and not foreseeable to RealPage.

24                  **FOURTH AFFIRMATIVE DEFENSE**

25                      (Mitigation of Damages)

26      4.      Yardi's claims are barred, in whole or in part, by Yardi's failure to

27  mitigate its damages, if any damages exist.

28

## FIFTH AFFIRMATIVE DEFENSE

### (No Detriment)

5.     Yardi's claims are barred, in whole or in part, because Yardi has suffered no detriment from the alleged acts and omissions about which Yardi now complains.

## SIXTH AFFIRMATIVE DEFENSE

### (Waiver)

6.     Yardi's claims are barred, in whole or in part, by the doctrine of waiver.

## SEVENTH AFFIRMATIVE DEFENSE

### (Assumption of Risk)

7.     Yardi's claims are barred, in whole or in part, due to Yardi's express or implicit assumption of risk.

## EIGHTH AFFIRMATIVE DEFENSE

### (License)

8.     Yardi's claims are barred, in whole or in part, because RealPage's acts, including access and use, were authorized and/or licensed, either directly or through the rights of third parties.

## NINTH AFFIRMATIVE DEFENSE

### (Laches)

9.     Yardi's claims are barred, in whole or in part, by the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

### (Good Faith)

10.     At all times material hereto, all of RealPage's actions were undertaken in good faith and without fraud, oppression or malice against Yardi or its rights, thereby precluding any and all claims for punitive or exemplary damages.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Contributory Negligence)

11.    If and to the extent Yardi has suffered any compensable injury or damage as a proximate result of RealPage's conduct, all of which is specifically denied, all such injury and damage was the proximate result, in whole or in part, of Yardi's own negligence, fault and want of due care.

## TWELFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

12.    Yardi's claims are barred, in whole or in part, by the doctrine of unclean hands.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Fair Use)

13.    Yardi's copyright claims are barred, in whole or in part, by the doctrine of fair use.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Merger)

14.    Yardi's copyright claims are barred, in whole or in part, by the doctrine of merger.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Copyright Misuse)

15.    Yardi's copyright claims are barred, in whole or in part, by the doctrine of copyright misuse, as Yardi's copyright claims seek to secure exclusive rights beyond the scope of Yardi's copyrights.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Preemption)

16.    Yardi's state law claims are barred in whole or in part by the doctrine of preemption.

## SEVENTEENTH AFFIRMATIVE DEFENSE

(No Injunctive Relief)

17.    Yardi is not entitled to injunctive relief because any alleged injury to Yardi is not immediate or irreparable, and Yardi has an adequate remedy at law.

## EIGHTEENTH AFFIRMATIVE DEFENSE

(Ascertainability of Alleged Trade Secrets)

18.    Each and all of plaintiff's alleged trade secrets are readily ascertainable by proper means and hence not protectable.

WHEREFORE, REALPAGE, INC. respectfully prays for judgment in its favor as follows:

(a)    That the Complaint, and each and every purported claim for relief contained therein, be dismissed with prejudice;

(b)    For an award of attorney's fees and costs in its favor; and

(c)    For such other and further relief as the Court may deem just and proper.

DATED:    March 28, 2011

MARK A. SAMUELS
DAVID R. EBERHART
SHARON M. BUNZEL
JAMES M. PEARL
O'MELVENY & MYERS LLP

By: _____
Mark A. Samuels
Attorneys for Defendant and
Counterclaimant REALPAGE, INC.

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, RealPage hereby demands a jury trial on all issues so triable.

DATED:      March 28, 2011

MARK A. SAMUELS
DAVID R. EBERHART
SHARON M. BUNZEL
JAMES M. PEARL
O'MELVENY & MYERS LLP

By: _____
Mark A. Samuels
Attorneys for Defendant and
Counterclaimant REALPAGE, INC.

REALPAGE, INC.'S
COUNTERCLAIMS AND ANSWER
NO. CV11-690 ODW (JEMx)