# OFFICE COPY

1  MARK A. SAMUELS (S.B. #107026)
   msamuels@omm.com
2  JAMES M. PEARL (S.B.#198481)
   jpearl@omm.com
3  O'MELVENY & MYERS LLP
   400 South Hope Street
4  Los Angeles, CA 90071-2899
   Telephone: (213) 430-6000
5  Facsimile: (213) 430-6407

6  DAVID R. EBERHART (S.B. #195474)
   deberhart@omm.com
7  SHARON M. BUNZEL (S.B. #181609)
   sbunzel@omm.com
8  O'MELVENY & MYERS LLP
   Two Embarcadero Center, 28th Floor
9  San Francisco, CA 94111-3823
   Telephone: (415) 984-8700
10 Facsimile: (415) 984-8701

11 Attorneys for Defendant and
   Counterclaimant REALPAGE, INC.

12

13           UNITED STATES DISTRICT COURT

14          CENTRAL DISTRICT OF CALIFORNIA

15 YARDI SYSTEMS, INC.,              Case No. CV11-690 ODW (JEMx)
   a California corporation,
16                                   **REALPAGE, INC.'S FIRST AMENDED
                                     COUNTERCLAIMS; DEMAND FOR
17         Plaintiff,                JURY TRIAL**
           v.
18
   REALPAGE, INC., a Delaware
19 corporation, and DC CONSULTING,
   INC., a Washington, D.C.
20 corporation,

21         Defendants.

22 REALPAGE, INC., a Delaware
   corporation,
23
           Counterclaimant,
24         v.

25 YARDI SYSTEMS, INC., a
   California corporation,
26
           Counterdefendant.
27

28
                                   REALPAGE, INC.'S FIRST AMENDED
                                   COUNTERCLAIMS
                                   NO. CV11-690 ODW (JEMx)

## COUNTERCLAIMS

RealPage, Inc. ("RealPage"), by and through its undersigned attorneys, for its counterclaims against plaintiff and counterdefendant Yardi Systems, Inc. ("Yardi"), avers on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     Cloud computing is the future of information technology ("IT").  In a recent survey of 481 CFOs across the United States, 83% said that their companies expect to rely on cloud-based services in the next three to five years.  Innovators such as RealPage have reshaped how businesses think about their IT infrastructure by introducing a much more efficient platform to deliver computer software called Software-as-a-Service ("SaaS"), a type of cloud computing.  In addition, RealPage has introduced a new enterprise-wide, vertically-integrated cloud computing service called the "RealPage Cloud" by which RealPage manages and operates all of the IT systems used by multifamily real estate owners and property management businesses—including RealPage's SaaS products—at a much lower overall cost and with higher performance, greater reliability, and improved disaster recovery capabilities.

2.     As with all transformative business innovations, there are those who are left behind.  Yardi is one such company.  Yardi has clung to two outdated traditional software delivery models: (1) the "on-premises" approach, in which the client installs and runs Yardi software on its own computer server; and (2) the Application Service Provider ("ASP") approach, in which the client accesses its version, or "instance," of Yardi software via the Internet from computer servers located at Yardi's own facilities.  Yardi's antiquated software delivery practices have compromised its ability to effectively compete in the market for vertically-integrated cloud computing.  Faced with a changing business environment in which it struggles to keep up, Yardi is leveraging stolen trade secrets and the market

1    power it has established through its popular Voyager software in an anticompetitive

2    scheme to prevent *its own clients* from obtaining the significant benefits of

3    RealPage's state-of-the-art SaaS offerings and cloud computing services while

4    Yardi attempts to expand its competing cloud computing offering.

5         3.    Before the advent of cloud computing, businesses had to build data

6    centers and employ personnel to manage hardware and software upgrades.  This

7    was a capital-intensive and expensive undertaking.  Cloud computing allows

8    businesses to dramatically reduce their operating and capital costs by transferring

9    these infrastructure and support responsibilities to a third-party service provider.

10   RealPage, a leading developer of residential property management software, offers

11   its cloud computing clients these cost savings and more.  Whereas most cloud

12   computing providers are industry agnostic—purveyors of one-size-fits-all

13   solutions—RealPage is the first cloud computing provider to offer "vertically-

14   integrated" systems and support designed specifically to address the needs of

15   multifamily real estate owners and property managers throughout the United States.

16        4.    RealPage hosts its cloud computing clients in the RealPage Cloud,

17   providing them uninterrupted access to all of their data and processing

18   functionality, including real-time information about each of their managed

19   properties.  The RealPage Cloud aggregates applications from multiple software

20   providers into a single system that is vertically-integrated and managed holistically.

21   In other words, if a client wants to use non-RealPage software in the RealPage

22   Cloud, RealPage provides the technical expertise for the client's various software

23   and database packages to work seamlessly with other software, from other

24   providers, in the Cloud.  And RealPage provides the industry expertise to support

25   the various applications unique and relevant to the multifamily real estate and

26   property management industry.  This allows clients maximum freedom of choice to

27   select any number of different vendors and optimized performance in an

28   environment specifically tailored to their business.

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

5. Unlike on-premises or ASP software applications, RealPage's SaaS applications are ideally suited for this vertically-integrated cloud system. SaaS applications involve a single version of software code that is accessed by all clients. On-premises and ASP applications, on the other hand, require a different code stream for each client. Thus, it is much easier and more reliable for third-party applications to "integrate" with (*i.e.*, communicate, share key business data, and interact with) a SaaS application because the developers of third-party applications need to maintain only one version of their code to integrate effectively with a SaaS application. SaaS applications are also much simpler for the end-user because, unlike on-premises and ASP applications, SaaS applications do not require end-users to refer to complicated user manuals and installation guides. This is because SaaS applications do not need to be installed, and online user support typically is embedded in the application interface. SaaS companies such as RealPage are thus displacing on-premises and ASP software companies because SaaS products are generally easier to use and the overall cost of operating a SaaS application is much lower than *owning and managing a separate version of software for each client company.*

6. For example, a multifamily residential property manager using an on-premises or ASP property management system like Yardi Voyager will spend significantly more than the license fee in order to use the software. In most cases, the total cost of ownership ("TCO") for on-premise and ASP software greatly exceeds the TCO for SaaS over a four-year period. For each discrete dwelling unit at a residential site under management, these costs typically will exceed the license fee by (i) $1.00-$1.50 per unit per month in first-line application support and administration (*e.g.*, service packs, hot fixes, plug-ins, customizations and integrations); (ii) $0.25-$0.50 per unit per month in ongoing training to deal with turnover in site personnel; and (iii) $0.25-$0.50 per unit per month in IT infrastructure for hosting fees (if ASP), data center hardware and software (if on-

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   premises), and IT resources.  In contrast, first-line support, ongoing user training,
2   and IT infrastructure costs are *zero* for clients of RealPage's SaaS application.

3       7.     The superiority of SaaS applications is recognized well beyond the
4   multifamily property management industry.  In only a few years Salesforce.com has
5   put severe pressure on more established companies and is now a leader in the
6   Customer Relationship Management market.  Similarly, Google's SaaS office
7   application suite is quickly gaining market share on more established traditional
8   office software products.  RealPage is the only major technology provider in the
9   multifamily property management market to offer a SaaS platform to its clients, and
10  it is enjoying success similar to Salesforce.com and Google.  Yardi is in danger of
11  being displaced because it has limited itself to the outdated on-premises and ASP
12  software delivery platforms.

13      8.     As businesses transition to vertically-integrated cloud computing, the
14  disadvantages associated with Yardi's outdated delivery platforms are magnified.
15  Yardi's competing vertically integrated cloud service, Yardi Cloud Services™, is
16  confined and stalled by the company's antiquated technology.  Most of Yardi's so-
17  called "cloud" offerings are in fact ASP services.  Thus, Yardi must manage
18  separate instances of code for each client, which raises client costs as much as 40%
19  above those of a SaaS company.  Furthermore, Yardi's clients must incur
20  significant costs to evaluate each proposed upgrade, service pack, hot fix, and plug-
21  in to Yardi's software and then coordinate when the service will be taken offline as
22  each new upgrade or change is applied to the application.  Client-based IT staff are
23  forced to carefully plan and test the integration between Yardi's software and each
24  third-party software application used by the client every time that Yardi or another
25  provider changes its software.  This time-consuming and repetitive integration
26  testing adds significant cost and is the source of unanticipated downtime,
27  particularly since Yardi often releases many "fixes" to its application each year.  In
28  contrast, RealPage Cloud clients do not incur these costs or suffer these business

4

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   interruptions because upgrades and integrations are managed by RealPage, not the
2   client.

3         9.    Yardi's limitations are by choice; Yardi has simply refused to make
4   the necessary investments in technology and in its data center to create an optimally
5   functional cloud computing environment. Indeed, Yardi's data center architecture
6   is nothing more than a collection of individual servers that separately support each
7   of its clients. Because of the cumbersome design of Yardi's cloud, performance
8   can be slow, often requiring larger clients to schedule long-running jobs overnight
9   or on weekends to avoid slowdowns in the performance of Yardi's application
10  during the working day. This can be especially frustrating to site personnel who are
11  trying to manage complex operations at each apartment community when month-
12  end processing slows down the system. Availability is a challenge for Yardi
13  because it has to manage so many different instances of software, each uniquely
14  configured and customized. Compounding the problem, in order to integrate third-
15  party applications each third-party application must be matched to the specific
16  version, service pack, hot fix, and plug-in of software that a given Yardi client is
17  using.

18        10.    In addition, Yardi's security systems are notoriously suspect and
19  unreliable. For example, in certain cases, Yardi clients have been able to view
20  other clients' confidential and proprietary data. Yardi also does not provide
21  adequate real-time disaster recovery, leaving its clients vulnerable to outages. In
22  fact, the "disaster recovery" plan that Yardi offers actually restores only a limited
23  client environment in a degraded or crippled mode for basic accounting and
24  operational functionality. It does not cover the various integrations and other
25  services that are essential to clients. Yardi's data security capabilities are similarly
26  lacking. For example, when Massachusetts and Nevada passed sweeping privacy
27  and data security legislation requiring encryption of personally identifiable
28  information, Yardi was unable to deliver an acceptable technical solution, leaving

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   its clients legally exposed.  Yardi system passwords are not properly protected and
2   in some cases are not changed for years.

3       11.    In contrast to Yardi's offerings, the RealPage cloud computing
4   offering incorporates advanced security and storage area network architecture that
5   dramatically improves the entire system's performance.  Yardi is aware of its
6   multiple shortcomings but is, to date, unwilling to spend the capital or invest in
7   business processes to compete with RealPage's investments or keep up with the
8   transforming business needs.  Yardi now finds itself at a growing disadvantage as
9   the market and Yardi clients have gravitated quickly toward the obvious
10  efficiencies and the superior technology and individualized service offered by
11  RealPage.

12      12.    Yardi is now desperate to stop RealPage's cloud progress.  Rather than
13  innovate and invest in a superior architecture and the infrastructure to improve its
14  cloud platform, Yardi is trying to impede the advance of a more efficient and
15  desirable technology platform and sabotage the growth of RealPage through a wide-
16  ranging campaign of client interference and intimidation.  The tactics employed by
17  Yardi in its campaign to slow RealPage's advancements include:

18      •  Coercing Yardi's own clients to sign agreements that prevent them from
19          using RealPage's cloud computing and consulting services.

20      •  Threatening to terminate the software licenses of Yardi clients that choose
21          to host software in the RealPage Cloud on objectively baseless grounds
22          solely for the purpose of intimidating those clients into not using the
23          RealPage Cloud.

24      •  Intentionally and falsely maligning RealPage's services and rights while
25          offering hollow promises of Yardi's own abilities to service clients.

26      •  Hiring RealPage personnel to steal RealPage's most highly confidential
27          trade secrets, including:

28

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1     ➢ RealPage's superior primary and disaster recovery data center
2      infrastructure and architectural design;
3     ➢ RealPage's proprietary technology used to monitor and improve the
4      operation of third party applications, including Yardi applications;
5     ➢ RealPage's proprietary change management and release management
6      business processes; and
7     ➢ RealPage's confidential bid proposals made to specific potential cloud
8      computing clients where Yardi was competing against RealPage.

9     13. Yardi's campaign seeks to deny consumers the benefits of the
10   RealPage Cloud in order to lock them into Yardi's lagging business model.  Clients
11   should be free to choose the RealPage Cloud, Yardi Cloud Services, or any other
12   solution that best suits their business needs.  The choice should be governed by
13   which company provides the best value through technology, infrastructure,
14   expertise, price, and service.

15

16         **JURISDICTION AND VENUE**

17    14. This Court has original jurisdiction over RealPage's federal antitrust
18   claim, which arises under the Sherman Antitrust Act (15 U.S.C. § 1, et seq.).  28
19   U.S.C. §§ 1331, 1337(a).  This Court also has supplemental jurisdiction over the
20   related violations of California statutory and common law alleged herein because
21   these claims are so related to the federal claims in this case, over which the Court
22   has original jurisdiction, that they form a part of the same case or controversy
23   within the meaning of Article III of the United States Constitution.  28 U.S.C.
24   §1367.

25    15. This Court also has diversity jurisdiction over RealPage's
26   counterclaims because RealPage and Yardi are citizens of different states and the
27   amount in controversy exceeds $75,000.  28 U.S.C. § 1332.

28    16. Venue is proper in this district under 28 U.S.C. § 1391(b) because a

1  substantial part of the wrongful conduct alleged herein occurred in this district,
2  including but not limited to the antitrust violations, acts of unfair competition, and
3  acts of misappropriation of trade secrets that give rise to RealPage's claims against
4  Yardi.

5

6  ## THE PARTIES

7  17.  RealPage is a Delaware corporation with its principal place of business
8  in Carrollton, Texas.  It is engaged in the business of, among other things, licensing
9  multifamily property management software, providing software consulting services
10  for the real estate industry, and providing secure software hosting services for its
11  clients.

12  18.  Yardi Systems is a California corporation with its principal place of
13  business in Goleta, California.  It is engaged in the business of, among other things,
14  licensing real estate investment management and property management software.

15

16  ## FACTUAL BACKGROUND

17  OVERVIEW OF CLOUD COMPUTING

18  19.  RealPage is a SaaS company.  Because SaaS companies host and
19  maintain their own applications, they invest significantly in their data center
20  infrastructure, disaster recovery technology, business processes, and support
21  capabilities.  Traditional on-premises software providers do not need to make such
22  an investment—they simply provide their product to the end-user for installation on
23  the end user's individual computer.  While traditional ASP software providers host
24  their product in the provider's data center, due to outdated architecture they
25  typically do not have the same hosting capabilities and infrastructure of a SaaS
26  provider.  Yardi is at its core a traditional software provider, and its current
27  incapacity to fairly compete in the cloud computing market must be understood in
28  this light.

8

20. In the most advanced cloud computing model, the client's computer has only minimal software installed (such as a web browser) and all computing software (whether word processing, database, email or otherwise) and all data are maintained in a central data center accessible through the Internet. Users experience substantial benefits with cloud computing. Local computers require far less maintenance and fewer "bug" fixes because the operative software and data reside at a remote, centralized location. Software updates occur at the central storage site and are applied by the cloud vendor to a single version of code that all users of the system can access. The servers needed to maintain the cloud can easily be updated and repaired in the background while the users continue their work uninterrupted.

21. Cloud computing is also highly scalable. As a company grows or shrinks, it can access more or less computing or data storage capacity in the cloud as its needs fluctuate. Rather than making large capital expenditures to buy and hold equipment that may become obsolete or redundant, the company always has access to state-of-the-art infrastructure that is managed by professionals in capacities that meet the company's current needs and can be quickly upsized or downsized as circumstances require. Simply put, cloud computing allows owners to buy as much or as little computing power as they need and "lease" from the cloud provider any hardware such as servers or data centers they may need only on a temporary basis. RealPage offers these cloud computing services to clients in a way that Yardi has not yet successfully matched, putting Yardi at a significant disadvantage as companies recognize and migrate to the unquestionable benefits of cloud computing.

22. RealPage developed its Cloud by building on its investment in the extensive hosting and data processing support infrastructure that, as a SaaS provider, it already had in place. RealPage's state-of-the-art data centers are the result of over $100 million in cumulative investment with an annual operating and

1  capital expansion budget of nearly $25 million. This investment is in addition to

2  RealPage's product development investments, which total nearly $40 million per

3  year. For the last several years, RealPage also has invested in hardware upgrades

4  that allow it to host not just its own SaaS applications, but also the systems of large

5  multifamily property managers. Equally important, RealPage has invested in the

6  expert personnel and business processes necessary to service the needs of clients

7  and to optimize their systems for performance enhancements. The RealPage Cloud

8  infrastructure comprises nearly 1,000 physical servers and a massive storage area

9  network.

10      23.    A property management company can therefore satisfy a large portion

11  of its IT needs from RealPage. Many property management companies already

12  have built their own customized services platforms that contain their property-

13  management systems as well as their accounting, e-mail, and file-sharing

14  applications. The RealPage Cloud allows clients to eliminate the burden of

15  maintaining, updating and growing (or shrinking) their IT operations and costs by

16  moving all of their applications to the cloud.

17      24.    By hosting a property management company's entire enterprise

18  system—including third-party applications such as Yardi Voyager—in the

19  RealPage Cloud, RealPage is able to link a client's applications to RealPage's SaaS

20  applications and transfer data seamlessly at high speeds. This dramatically

21  improves the integration and movement of the client's information across

22  applications, leading to a better experience for the end-user. Moreover, RealPage

23  offers the technological consulting to optimize the systems so that each piece of

24  software, without regard to the identity of its provider, communicates and operates

25  effectively with the others. Put in its simplest form, RealPage orchestrates and

26  integrates a property management business's entire IT operation in the cloud so that

27  multiple software programs can speak to one another as data flows seamlessly and

28  continuously through the cloud. RealPage's holistic, industry-specific approach to

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1    the client's needs differs from the traditional use of discrete programs operating

2    independently and, at times, at cross-purposes with other applications on the

3    company's IT platform. As one RealPage Cloud client put it: "The simple fact is

4    that RealPage is an IT shop, and they have tens of millions of dollars of

5    infrastructure in place that we as a property management firm would never be able

6    to assemble . . . We get immediate redundancy, speed, performance, and change

7    management."

8        25.    Yardi, while effective in designing and selling traditional property

9    management and accounting software, eschewed the opportunity to build the

10    necessary infrastructure, business processes, and technology to meet the new

11    challenge of cloud computing. As a result of Yardi's inadequate cloud computing

12    capabilities, Yardi clients understandably have looked for alternative ways to host

13    their Yardi software and satisfy their manifold needs for management of

14    multitenant properties. For these and other reasons, several major Yardi clients

15    have asked RealPage to host their IT operations, *including* their Yardi software, in

16    the RealPage Cloud.

17

18        26.    For years, Yardi has resisted making the capital investments to meet

19    the new challenge of cloud computing. Indeed, when a leading client began using

20    Yardi's cloud service, it could not persuade Yardi to invest in a SAN, or storage

21    area network, a key requirement for optimal storage performance for a large

22    institutional user. Yardi offers only an uptime "goal" and refuses to guarantee that

23    its hosted systems will remain continuously operable. RealPage, by contrast,

24    provides over 99.5% uptime and puts a 98% uptime guarantee in writing.

25        27.    Yardi's security is also woefully lagging. In one instance, when a

26    client accessed its data through the Yardi cloud service, that client also was able to

27    access the confidential data of other Yardi clients. When the client alerted Yardi to

28    the security flaw, Yardi's response was not to fix the security hole, but rather to

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   insist that this alarmingly porous design was somehow intentional!  Yardi's security

2   lapses are especially troubling to institutional clients who are required to comply

3   with certain internal controls and to evidence the effectiveness of those controls to

4   third-party stakeholders.  While Yardi advertises its compliance capabilities relative

5   to SAS 70 Type II audits and the Payment Card Industry standards, significant gaps

6   exist in its change management and operational controls.  Because Yardi has a

7   separate, uniquely configured instance of software for each client, maintaining strict

8   controls over changes and new releases of software presents a significant problem

9   that can cause the system to be unreliable when change occurs.  These and other

10  deficiencies led at least one market-leading client who tried the Yardi cloud

11  capabilities to terminate its hosting relationship with Yardi.

12         28.    In sum, RealPage is positioned to succeed in the cloud computing

13  market.  Yardi is not.  The result is that Yardi is desperate to stop the industry's

14  migration to the RealPage Cloud and has embarked on a mission to destroy

15  RealPage's relationship with its current and future clients.  The campaign has been

16  relentless.

17

18  YARDI'S USE OF A MOLE TO MISAPPROPRIATE REALPAGE TRADE SECRETS

19         29.    In late 2008 and early 2009, an individual associated with a RealPage

20  client ("Client X"), Joe Hendrix, accepted a job offer as RealPage's Chief

21  Information Officer.  He was issued a company phone, badge with secure-area

22  access capabilities, and a company computer.  He was also provided with

23  invaluable proprietary information.  Hendrix participated in sales calls and strategy

24  discussions with RealPage's CEO, COO, and CTO and spent weeks learning the

25  inner-workings of RealPage and its plans for the future.  He also met with RealPage

26  clients and was entrusted with valuable RealPage confidential information as well

27  as critical bid information that RealPage clients chose to provide directly to

28  RealPage.  Hendrix knew and understood that the information provided to him was

1   confidential and proprietary and that he was required to maintain its confidentiality.

2   At the same time that Hendrix was insinuating himself into RealPage's confidences,

3   however, he was secretly working with Yardi to expand its Texas office to build

4   Yardi's competing cloud computing service.  Yardi immediately made use of the

5   RealPage trade secrets Hendrix misappropriated to unfairly compete for cloud

6   computing clients.

7          30.    The betrayal began when Hendrix, while employed by Client X (a

8   significant client of both Yardi and RealPage), entered into discussions about

9   moving Client X's data center to the RealPage Cloud in order to provide a secure

10  environment for its data.  RealPage agreed and successfully moved Client X's data

11  center to the RealPage Cloud.  Knowing that after a successful migration to the

12  RealPage Cloud Client X would have no further need for his IT services, Hendrix

13  negotiated with RealPage for a job as Chief Information Officer.  RealPage agreed

14  to hire Hendrix, but Client X requested that Hendrix be permitted to wind down his

15  responsibilities while he was also working for RealPage.  RealPage's CEO agreed

16  to this unusual arrangement as a favor to Client X.  In addition to agreeing to allow

17  Hendrix to wind down his responsibilities at Client X concurrent with his RealPage

18  responsibilities, RealPage offered Hendrix a senior position, a substantial salary,

19  150,000 stock options, and provided Hendrix with sensitive, confidential, and

20  proprietary documents and information about the RealPage Cloud business model

21  and strategy, as well as access to RealPage's current and prospective clients.

22  Hendrix also was included in high-level strategy discussions and was privy to some

23  of RealPage's most sensitive information.  For example, just a few days before his

24  duties with Client X were to end, Hendrix spent hours discussing confidential

25  future RealPage business strategy with RealPage's Chief Operating Officer.

26         31.    At all times prior to his departure from Client X, Hendrix was subject

27  to the provisions of a Mutual Confidentiality Agreement between RealPage and

28  Client X.  This Agreement, which Hendrix personally signed, obligated Hendrix

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   and Client X to "hold in confidence and not to disclose or reveal to any person or

2   entity the Disclosing Party's Confidential Information." The Agreement was

3   entered into on June 19th, 2008, at the outset of discussions between RealPage and

4   Client X. The Agreement provides that "[a]ll obligations undertaken respecting

5   Confidential Information . . . will survive for two (2) years from the date of

6   provision of such Confidential Information."

7       32.   Unbeknownst to RealPage, Hendrix—while extracting RealPage's

8   confidences and promises of a sizeable salary and stock options—was acting as a

9   mole, working with Yardi to expand Yardi's office in Dallas, Texas. Yardi,

10  meanwhile, knew or had reason to know that Hendrix was presenting himself as a

11  RealPage employee in sales meetings to third parties and knew or had reason to

12  know that Hendrix was under an obligation not to disclose RealPage's confidential

13  information. After having participated in sales calls and strategy discussions with

14  RealPage and having used and relied upon RealPage's provision of information,

15  hardware, and software, Hendrix abruptly announced that he had accepted a

16  position as officer in charge of Yardi's expanded Texas operations.

17      33.   The disclosure and misuse of RealPage trade secrets began

18  immediately and may have been happening before Hendrix took the Yardi position.

19  On information and belief, Hendrix provided Yardi with RealPage's proprietary

20  information concerning: (a) RealPage data center and disaster recovery architecture,

21  a well-known architectural shortcoming of Yardi's offerings; (b) RealPage

22  technology used to monitor and improve the operation of third-party applications;

23  (c) RealPage process methods for change, problem, and release management; (d)

24  detailed and proprietary descriptions of the RealPage Cloud; and (e) the

25  confidential details of RealPage's bids for large Yardi clients. Yardi used this

26  proprietary RealPage information, misappropriated by Hendrix, to unfairly compete

27  with RealPage. RealPage's sophisticated knowledge of data security, performance

28  monitoring, and hosting was accumulated and refined through over ten years of

1  experience and over $100 million of investment. In the hands of Yardi, a
2  competitor that had intentionally elected not to make such an investment, this secret
3  information was an invaluable and ill-gotten advantage in developing its competing
4  cloud computing service.

5      34.    Unsurprisingly, within three weeks after Hendrix joined Yardi, the
6  company began offering  a vertically-integrated service modeled on the RealPage
7  Cloud called Yardi Cloud Services. Later, Hendrix even went so far as to present
8  confidential RealPage Cloud documents to prospective clients *as if they were*
9  *Yardi's*. Yardi could not have developed this competing cloud business without the
10 boost that it gained by exploiting the confidential RealPage documents and
11 information Hendrix misappropriated.

12

13 YARDI'S CLIENT INTERFERENCE CAMPAIGN

14     35.    Misappropriating RealPage's trade secrets was just the beginning of
15 Yardi's efforts to snuff RealPage's cloud business. Yardi next took aim at its own
16 clients. Through a mix of threats and coercion, Yardi systematically approached
17 RealPage clients and used every available means to attempt to end RealPage's
18 cloud business.

19     36.    By way of background, several RealPage Cloud clients use the
20 RealPage Cloud as their computing platform to host a variety of software, including
21 their Yardi Voyager property management software. RealPage is committed to
22 providing its clients a broad range of consulting and support services for software
23 hosted in the RealPage Cloud—including Yardi software. In light of Yardi's often
24 inadequate support, Yardi clients frequently hire independent consultants to assist
25 them with software, add-on products, and add-on service modules. One such
26 independent consultant was EverGreen Solutions, Inc. As part of RealPage's
27 strategic planning to enhance its available in-house consulting and support services,
28 RealPage acquired the assets of EverGreen Solutions in September 2009.

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1    EverGreen Solutions became a RealPage division and provided consulting services

2    for software users in the real estate industry, including users of Yardi's software.

3    The EverGreen division ("EverGreen") helped these clients by designing,

4    recommending, and installing software solutions and helping them implement best

5    management practices. And RealPage understands that in some instances, a Yardi

6    software solution such as Yardi Voyager may be what is best for the RealPage

7    client.

8         37.    As the popularity of the RealPage Cloud has grown, Yardi has worked

9    furiously behind the scenes to thwart competition in the growing market for

10   vertically-integrated cloud computing for multifamily real estate owners and

11   property managers in the United States ("the vertical cloud market"). The vertical

12   cloud market is a relevant economic market because non-vertically-integrated,

13   industry-agnostic cloud providers are not adequate substitutes for a vertical cloud

14   offering. These other more generalized cloud offerings cannot satisfy the

15   specialized needs of multifamily real estate owners and property managers. The

16   relevant geographic market for the vertical cloud market is the United States.

17        38.    RealPage and Yardi are the primary competitors in the vertical cloud

18   market. Yardi has aggressively entered the market following its misappropriation

19   of RealPage's trade secrets and subsequent launching of Yardi Cloud Services.

20   Indeed, in a recent press release Yardi referred to its cloud computing environment

21   as a "foundation of [its] business." Yardi's website describes the benefits of its

22   vertically-integrated cloud service as follows: "As a leading provider of real estate

23   software and services, Yardi is uniquely positioned to provide IT infrastructure for

24   real estate enterprises, including IT planning and control, physical installations,

25   core IT services and management, enterprise applications, and platforms for

26   business intelligence, portals, and desktop applications specific to the industry."

27        39.    Yardi's anticompetitive campaign has harmed competition in the

28   vertical cloud market because Yardi possesses leverage over existing and potential

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   cloud clients by virtue of the widespread adoption of its Voyager software.

2   Voyager is a property management software system designed to integrate property

3   management functions and accounting.  The property management software market

4   is a relevant economic market in the United States.  Yardi's website describes

5   Voyager as "the industry-leading asset and property management software

6   solution." According to Yardi's public disclosures, Voyager is used to manage

7   over 25,000 apartment sites in the U.S.  Furthermore, for those businesses that use

8   it, Yardi Voyager is a critical back-office application and such businesses would

9   face high switching costs if Yardi were to terminate their licenses and they were

10  forced to change platforms; namely costs associated with conversion, data

11  migration, new license fees, and disruption of day-to-day business.  Unwilling to

12  make the necessary investments to fairly compete in the cloud market, Yardi

13  instead has tried to lock its installed base of Voyager clients out of the RealPage

14  Cloud.  Specifically, Yardi is forcing its Voyager clients through threats and

15  intimidation into anticompetitive exclusionary contracts whereby the client agrees

16  not to use the RealPage Cloud.  In doing so, Yardi has conditioned its clients'

17  ability to continue to enjoy use of their Voyager license on their agreement not to

18  use RealPage's competing cloud computing service.  Yardi's power in the property

19  management software market has resulted in Yardi obtaining and possessing

20  substantial market power in the vertical cloud market.  While market share figures

21  are not readily available in this new market, Yardi's market power in the vertical

22  cloud market is evidenced by its ability to prevent customers from exerting freedom

23  of choice in selecting their vertical cloud providers.

24      40.    Following industry-standard computing and licensing practices, Yardi

25  until recently allowed its clients—many of whom pay Yardi thousands of dollars

26  monthly or annually for the rights to use Yardi software and maintain client data—

27  to have their Yardi software hosted by a third party. On information and belief, the

28  majority of Yardi's software licenses with its clients permit or do not prohibit

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1    clients from allowing their agents, third parties, contractors, or others to assist with,

2    use, and host Yardi software.  Yardi's contracts with its clients did not, before

3    Yardi's misconduct began, limit the types of contractors a client can retain, much

4    less bar perceived competitors from being retained as contractors.  Recognizing,

5    however, that it found itself at a distinct competitive disadvantage to the RealPage

6    Cloud's superior computing platform, Yardi recently changed its software license

7    agreement to protect its eroding market position and to counteract the success of the

8    RealPage Cloud.  Specifically, Yardi has begun changing its license agreements to

9    prohibit licensees from using any "contractor" to implement or host Yardi software.

10   The agreements define a contractor as "a provider, or an affiliate of a provider, of

11   real property management and accounting software marketed primarily to the real

12   estate industry"—a definition designed by Yardi to include RealPage.  These

13   restrictions on using the RealPage Cloud are of unlimited duration.  Yardi imposed

14   these restrictions on existing licensees that have already purchased Voyager.

15   Consequently, these Yardi licensees are locked into an unanticipated, unagreed to

16   way of implementing or hosting the Yardi Voyager software.   If the client now

17   wants to use a contractor to do these tasks, the client would first have to change

18   their primary property management software program.   Clients cannot easily

19   switch to an alternative property management software because of the high

20   switching costs associated with re-aligning their IT systems and transferring their

21   data to a new software architecture – not to mention the potential disruption to day-

22   to-day business operations.

23       41.    Yardi also has threatened to terminate license agreements with clients

24   who use both Yardi software and the RealPage Cloud on objectively baseless

25   grounds solely for the purpose of intimidating those clients into not using the

26   RealPage Cloud.  The license agreements that Yardi has threatened to terminate do

27   not impose restrictions on where or with whom licensees may host their Yardi

28   software, and hosting with the RealPage Cloud does not violate any of the terms of

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1    these license agreements.  The cumulative, anticompetitive effects of these

2    improper client restrictions far outweigh any pro-competitive benefits.  Yardi's

3    campaign, to date, has already harmed competition in the marketplace and threatens

4    to permanently deny Yardi clients the superior technology and cost savings offered

5    by the RealPage Cloud.  Indeed, Yardi's campaign threatens to seriously retard the

6    growth of the vertical cloud market.  Furthermore, Yardi's campaign has prevented

7    RealPage from achieving economic scale.  With RealPage artificially stunted by

8    Yardi's misconduct, consumers are denied the innovations and lower prices that

9    would ensue from customers choosing RealPage of their own volition and RealPage

10   growing and continuing to innovate.  Yardi's conduct therefore has not only denied

11   its own Voyager customers the ability to freely choose the vertically-integrated

12   cloud services that fit their needs, Yardi's anticompetitive conduct has also

13   deprived non-Yardi customers of the innovation and lower prices that flow from

14   unrestrained competition.  Below are some specific examples of Yardi's

15   anticompetitive and tortious interference with RealPage clients.

16          42.    RealPage had built a successful existing client relationship with Client

17   1 which culminated in the negotiation and signing of a Letter Agreement for

18   Interim Services on August 1, 2010.  Client 1 is a large property management firm

19   that develops, constructs, and acquires multifamily properties in fourteen

20   geographic markets throughout the United States.  Client 1 uses certain Yardi

21   software products in addition to its relationship with RealPage.  When Yardi

22   learned of the Letter Agreement, it set out to interfere with RealPage's new client

23   relationship and to disparage and damage RealPage.  Yardi advised Client 1 that it

24   could not continue with the Letter Agreement for Interim Services or any future

25   contemplated agreements with RealPage.  Worse yet, after Client 1 had already

26   purchased Voyager Yardi created newly-revised software license agreements in

27   which the major change was to prohibit the client from using the RealPage Cloud.

28   When Client 1 asked Yardi to modify the license agreement to allow it to use the

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1  RealPage Cloud, Yardi refused.  As a result of the pressure, communications, and
2  unlawful agreements imposed by Yardi, Client 1 announced that it could not use the
3  RealPage Cloud, thus depriving RealPage of over $100,000 per year in lost
4  revenue.

5        43.    Similarly, RealPage had successfully built a client relationship with
6  Client 2.  Client 2 is a top ten property management firm that uses Yardi Voyager
7  as its primary back-office accounting software and at different times has used
8  Yardi's hosting services for Yardi Voyager, and has self-hosted such software.
9  Recently, after a request-for-proposal ("RFP") process Client 2 moved to the
10  RealPage Cloud for most of its IT needs, including the hosting of Yardi Voyager.
11  During the period when Hendrix transitioned his services from Client X to his new
12  employer—*i.e.*, to RealPage—Hendrix participated in sales calls to Client 2
13  together with RealPage executives.  During the Client 2 sales calls, Hendrix
14  acquired substantial confidential information from Client 2 and RealPage including
15  details regarding Client 2's dissatisfaction with Yardi, Client 2's desire to move to
16  the RealPage Cloud and other RealPage products, RealPage's plans and goals for
17  the RealPage Cloud, and detailed bid information regarding the pricing of the
18  RealPage Cloud to Client 2.

19        44.    Shortly thereafter, Hendrix would accomplish his bait and switch and
20  start working for Yardi, armed with RealPage confidential and proprietary
21  information.  Yardi initially had refused to bid in response to Client 2's RFP for
22  third party hosting and the outsourcing of related IT services.  Once Hendrix joined
23  Yardi, Yardi realized that it was in real jeopardy of Client 2 moving to the
24  RealPage Cloud.  As a result of Hendrix's disclosure of RealPage's confidential
25  and proprietary information, Hendrix and Yardi provided aggressive bids on behalf
26  of Yardi's competing cloud computing service.  For example, in a February 25,
27  2010, email to Client 2's CEO, Yardi's President wrote: "We understand through
28  the rumor mill that you may be considering the RealPage Cloud Computing

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

solution. . . . If you are reviewing Cloud Computing there is significant advantage to reviewing our offerings. At a minimum it will give you negotiating advantage when you speak with any provider of Cloud Computing."

45.     Hendrix's provision of secret RealPage bid information to Yardi (information acquired while working for RealPage and while subject to Client X's Mutual Confidentiality Agreement) damaged RealPage by forcing RealPage to bid against a Yardi proposal that was prepared with ill-gotten confidential information. Furthermore, on information and belief, portions of Yardi's bid simply mimicked RealPage's bid, using RealPage's proprietary information and even the same font and ink color used by RealPage.

46.     When Yardi's attempts to intimidate RealPage's clients have failed, Yardi has extended its interference campaign further downstream, threatening RealPage's clients' clients. Yardi has bound RealPage's clients' clients to anticompetitive exclusionary agreements designed to indirectly interfere with the RealPage client's ability to use the RealPage Cloud. For example, Client 2-A is one of Client 2's clients. Client 2-A recently signed a contract with Yardi for use of Yardi's Utility Billing product. The contract, however, forbids RealPage from implementing Client 2-A's software interface. Yardi also has interfered with another of Client 2's clients, Client 2-B. Client 2-B is planning to upgrade its Yardi software, but Yardi is refusing to allow RealPage to support Client 2-B's upgraded software. These restrictions are designed to interfere with Client 2's business relations with Clients 2-A and 2-B and, indirectly, with Client 2's ability to use the RealPage Cloud.

47.     Client 3, another multifamily and commercial real estate owner, had agreed to move its data center to the RealPage Cloud. During the process of moving its data, Yardi demanded that Client 3 not use the RealPage Cloud and not even publicly associate itself with RealPage. As a result of Yardi's interference, Client 3 has decided not to use the RealPage Cloud to host its Voyager software.

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1  Yardi's actions have damaged RealPage by causing it to lose revenue, reputational
2  benefit, and profit from Client 3's cloud business.

3      48.    Yardi also has repeatedly interfered with EverGreen's relationships
4  with its existing and prospective consulting clients. For example, Client 4 was in
5  the process of negotiating a consulting contract with EverGreen when Yardi began
6  threatening to refuse to work with EverGreen. On January 15, 2010—as
7  discussions between EverGreen and Client 4 were just beginning—a representative
8  of Client 4 wrote the following to EverGreen's President:

9          "One big issue that we have got to get addressed is the friction
10         between EverGreen and Yardi. We cannot afford to be a casualty in
11         our rollout of a strained relationship between both companies. Please
12         be prepared to address verbally Thursday. Yardi has indicated that this
13         will be a problem even after I clarified that we are not hosting with
14         EverGreen."

15  As discussions progressed, Yardi's threats escalated. On February 13, 2010, the
16  same representative of Client 4 wrote the following to EverGreen's President:

17         "I have requested a meeting with Yardi this week to meet with you to
18         discuss implementation. The initial response I got from . . . our
19         [Yardi] sales representative suggested that it was likely Yardi will
20         walk from the deal if we request EverGreen as our implementor."

21  Ultimately, Yardi's threats forced Client 4 to choose another implementation
22  consultant, causing EverGreen to lose this business opportunity and the revenue and
23  profit it would have generated.

24      49.    Yardi also has interfered with its clients' rightful efforts to transition
25  off of Voyager onto RealPage's SaaS property management software, OneSite. For
26  example, Client 5 is a past Yardi client that recently switched to OneSite. After
27  Client 5 informed Yardi that it intended to use OneSite, Yardi changed its past
28  practice of allowing its transitioning clients to maintain read-only access to

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   historical data and intends to cut off Client 5's access in the near future.

2       50.     RealPage has a contractual and legal right to act as an agent of its

3   clients to provide secure hosting in the RealPage Cloud and to provide consulting

4   services. The RealPage Cloud is secure and poses no risk of any misuse of

5   information. Yardi's anticompetitive actions have harmed RealPage by

6   compromising RealPage's contractual relationships with its clients and destroying

7   the trust and goodwill engendered by RealPage's years of client development and

8   high-quality service. Yardi's actions also have restrained competition in the

9   vertical cloud market and harmed consumers by preventing RealPage from

10  achieving economic scale and the accompanying ability to offer its cloud services

11  to both Yardi customers and non-Yardi customers with increased efficiency,

12  continued innovation and lower prices.

13

14                          **FIRST COUNTERCLAIM**

15                       **(Misappropriation of Trade Secrets)**

16      51.     RealPage realleges and incorporates by reference the allegations

17  contained in Paragraphs 1 through 50 as though fully set forth herein.

18  RealPage has invested millions of dollars and years of time in the development of

19  confidential and trade secret information. This trade secret information includes,

20  but is not limited to, the following categories of information: (a) RealPage data

21  center and disaster recovery architecture; (b) RealPage technology used to monitor

22  and improve the operation of third-party applications; (c) RealPage process

23  methods for change, problem and release management; (d) detailed and proprietary

24  descriptions of the RealPage Cloud; and (e) the confidential details of RealPage's

25  cloud computing bids for large Yardi clients.

26      52.     RealPage's trade secrets relevant to this case comprise information not

27  generally known to the public or to other persons who would obtain economic

28  value from their disclosure or use. This information is the subject of reasonable

1     efforts by RealPage to maintain its secrecy, including the use of confidentiality and

2     nondisclosure agreements, and derives independent economic value from not being

3     generally known. The information constitutes "trade secrets" under California Civil

4     Code section 3426.1. RealPage's trade-secret information gives it a competitive

5     advantage in, among other things, its ability to offer services such as consulting

6     services and the RealPage Cloud hosting service.

7          53.     Yardi willfully and maliciously misappropriated RealPage's trade

8     secrets through improper means by obtaining them from Joe Hendrix, who had a

9     duty to maintain the trade secrets' secrecy and to forebear from disseminating or

10     using them. Yardi worked in concert with Hendrix to obtain RealPage's trade

11     secret information, all the while knowing that Hendrix was representing himself as

12     a RealPage employee and that he was subject to a confidentiality agreement. Upon

13     acquiring these stolen trade secrets, Yardi proceeded to use them without

14     RealPage's express or implied consent for the purpose of developing a competing

15     cloud computing business and competing for Client 2's and others' business.

16          54.     By reason of the above-alleged acts and conduct of Yardi, RealPage

17     has been damaged, and it will suffer further great and irreparable harm and damage.

18     The amount of this irreparable harm will be difficult to ascertain, and RealPage will

19     be without an adequate remedy at law.

20          55.     RealPage is entitled to an injunction restraining Yardi, its officers,

21     agents, employees, and all persons acting in concert with it, from engaging in

22     further unlawful acts and from reaping any additional commercial advantage from

23     its misappropriation and use of RealPage's trade secrets.

24          56.     RealPage is further entitled to an order requiring Yardi, its agents,

25     employees, and all persons acting in concert with it, to return to RealPage any and

26     all of its trade secrets and confidential, proprietary materials, including but not

27     limited to any and all materials created incorporating, referencing, or derived from

28     RealPage's trade secrets and confidential, proprietary information.

1    57.    RealPage is further entitled to recover from Yardi the damages

2    sustained by RealPage as a result of the wrongful acts as alleged herein. RealPage

3    is further entitled to recover from Yardi the gains, profits, and advantages Yardi has

4    obtained as a result of the wrongful acts alleged herein. The amount of such

5    damages, gains, profits, and advantages cannot be determined at this time but will

6    be proven at trial.

7

8                        **SECOND COUNTERCLAIM**

9                    **(Violation of Section 1 of the Sherman Act)**

10    58.    RealPage realleges and incorporates by reference the allegations

11    contained in Paragraphs 1 through 50 as though fully set forth herein.

12    59.    Yardi's conduct as alleged herein has been for the purpose of, and has

13    had the effect of, injuring and restraining competition in the United States vertical

14    cloud market. Yardi has entered into agreements that restrain competition in a

15    substantial portion of the vertical cloud market by forcing Voyager clients, through

16    threats and intimidation, into anticompetitive exclusionary agreements whereby the

17    client agrees explicitly, or in effect, not to use the RealPage Cloud. That conduct

18    has had and continues to have anticompetitive effects and violates Section 1 of the

19    Sherman Act, 15 U.S.C. § 1.

20    60.    Yardi possesses economic power in the market for property

21    management software by virtue of its "industry leading" Voyager software, which

22    is used to manage over 25,000 apartment sites in the United States. Additionally,

23    Yardi possesses economic power over its Voyager clients because those clients

24    cannot easily switch to an alternative property management software due to the

25    high switching costs associated with re-aligning their IT systems and transferring

26    their data to a new software architecture. Yardi therefore possesses sufficient

27    economic power to coerce its customers (a substantial share of potential vertical

28    cloud customers) into not using the RealPage Cloud. This power over its Voyager

1  customers gives Yardi substantial market power in the vertical cloud market as

2  evidenced by its ability to prevent customers from using competing products.

3      61.    Voyager and the RealPage Cloud are distinct products and services

4  with different demand, and clients often seek them independently of each other.

5  Yardi has conditioned its clients' ability to license Voyager on their refusal to use

6  the RealPage Cloud. Yardi has done so through amended license agreements,

7  imposed on its clients after they have licensed Voyager and are locked in to its high

8  switching costs, whereby the client agrees at Yardi's demand to explicitly, or in

9  effect, not to use the RealPage Cloud. These agreements affect a substantial

10  amount of commerce in the vertical cloud market, a market in which Yardi

11  competes, and prevent RealPage from achieving economic scale. Absent Yardi's

12  anticompetitive restrictions, RealPage would reach optimal economic scale and

13  Yardi customers and non-Yardi customers would enjoy lower prices, greater

14  innovation and freedom of choice to select the vertical cloud provider that best suits

15  their needs.

16      62.    The agreements are an unreasonable restraint of trade upon interstate

17  commerce. The anticompetitive effects of these agreements outweigh any

18  procompetitive effect or legitimate business justifications.

19      63.    As a direct and proximate result of Yardi's unlawful and

20  anticompetitive conduct, RealPage has been injured and damaged in its business

21  and property.

22      64.    Unless enjoined, Yardi's unlawful conduct will continue and cause

23  further injury to competition, and RealPage will continue to suffer injury for which

24  it is without adequate remedy at law.

25

26  **THIRD COUNTERCLAIM**

27  **(Violation of the California Cartwright Act)**

28      65.    RealPage realleges and incorporates by reference the allegations

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1    contained in Paragraphs 1 through 50 as though fully set forth herein.

2        66.    Yardi's conduct as alleged herein has been for the purpose of, and has

3    had the effect of, injuring and restraining competition in the vertical cloud market.

4    Yardi has entered into agreements intending to restrain competition by forcing its

5    Voyager clients, through threats and intimidation, into anticompetitive exclusionary

6    agreements whereby the client agrees not to use the RealPage Cloud. That conduct

7    has had and continues to have substantial anticompetitive effects in California, and

8    violates California Business and Professions Code sections 16720 and 16727. The

9    anticompetitive effects of these agreements outweigh any beneficial effect or

10   legitimate business justifications.

11       67.    Yardi possesses economic power in the market for property

12   management software by virtue of its "industry leading" Voyager software, which

13   is used to manage over 25,000 apartment sites in the United States. Additionally,

14   Yardi possesses economic power over its Voyager clients because those clients

15   cannot easily switch to an alternative property management software due to the

16   high switching costs associated with re-aligning their IT systems and transferring

17   their data to a new software architecture. Yardi therefore possesses sufficient

18   economic power to coerce its customers (a substantial share of potential vertical

19   cloud customers) into not using the RealPage Cloud. This power over its Voyager

20   customers gives Yardi substantial market power in the vertical cloud market as

21   evidenced by its ability to prevent customers from using competing products.

22       68.    Voyager and the RealPage Cloud are distinct products and services

23   with different demand, and clients often seek them independently of each other.

24   Yardi has conditioned its clients' ability to license Voyager on their refusal to use

25   the RealPage Cloud. Yardi has done so through amended license agreements,

26   imposed on its clients after they have licensed Voyager and are locked in to its high

27   switching costs, whereby the client agrees at Yardi's demand to explicitly, or in

28   effect, not to use the RealPage Cloud. These agreements affect a substantial

1   amount of commerce in the vertical cloud market, a market in which Yardi

2   competes, and prevent RealPage from achieving economic scale.  Absent Yardi's

3   anticompetitive restrictions, RealPage would reach optimal economic scale and

4   Yardi customers and non-Yardi customers would enjoy lower prices, greater

5   innovation and freedom of choice to select the vertical cloud provider that best suits

6   their needs.

7        69.   As a direct and proximate result of Yardi's unlawful and

8   anticompetitive conduct, RealPage has been injured and damaged in its business

9   and property.

10       70.   Unless enjoined, Yardi's unlawful conduct will continue and cause

11  further injury to competition, and RealPage will continue to suffer injury for which

12  it is without adequate remedy at law.

13

14                        **FOURTH COUNTERCLAIM**

15                   **(Intentional Interference with Contract)**

16       71.   RealPage realleges and incorporates by reference the allegations

17  contained in Paragraphs 1 through 50 as though fully set forth herein.

18       72.   RealPage has or had valid contracts with third parties, including Client

19  1, for hosting and consulting services.  Yardi has knowledge of these contracts with

20  third parties.

21       73.   Yardi has willfully and intentionally interfered with those contracts by

22  threatening RealPage's clients, including Client 1, with termination of software

23  licensing agreements if they use the RealPage Cloud.  These threats were made on

24  objectively baseless grounds solely for the purpose of intimidating those clients into

25  not using the RealPage Cloud.  Yardi also has willfully and intentionally interfered

26  with those contracts by amending its software license agreements to prohibit its

27  licensees from using the RealPage Cloud.  Yardi's wrongful acts were designed to

28  and actually did interfere with or disrupt RealPage's contractual relationships with

1    its clients, including Client 1.

2        74.    RealPage has suffered actual damages and loss as a direct and

3    proximate result of Yardi's unlawful interference. RealPage has lost business with

4    Client 1 and has suffered losses with other clients as a result of Yardi's interference.

5        75.    Yardi acted intentionally and in conscious disregard of the rights of

6    RealPage, with malice and oppression, in that Yardi knew that its acts and conduct,

7    as alleged herein, were unjustified and improper and would result in severe

8    financial and economic injury to RealPage. Accordingly, RealPage is entitled to an

9    award of punitive damages against Yardi for the sake of example and by way of

10   punishing Yardi, in an amount to be determined at trial.

11

12                          **FIFTH COUNTERCLAIM**

13         **(Intentional Interference with Prospective Economic Advantage)**

14       76.    RealPage realleges and incorporates by reference the allegations

15   contained in Paragraphs 1 through 50 as though fully set forth herein.

16       77.    An economic relationship, with the reasonable probability of future

17   economic benefit to RealPage, existed between RealPage, on the one hand, and its

18   current and prospective RealPage Cloud clients and consulting clients (including

19   Clients 1, 2, 3, 4, and 5), on the other hand.

20       78.    Yardi knew of these relationships and intended to disrupt them by

21   threatening RealPage's clients with termination of their software licensing

22   agreements if they chose to use the RealPage Cloud or EverGreen consulting

23   services. These threats were made on objectively baseless grounds solely for the

24   purpose of intimidating those clients into not using the RealPage Cloud. Yardi also

25   has intended to disrupt these relationships by amending its software license

26   agreements to prohibit its licensees from using the RealPage Cloud, by using

27   RealPage's trade secrets to bid against RealPage, and by denying former Yardi

28   clients that switch to RealPage all access to such clients' own historical data.

1    79.    As described throughout these Counterclaims, Yardi's conduct was
2    independently tortious or unlawful because Yardi has restrained trade and
3    competition in violation of the antitrust laws of the United States and the States of
4    California and Texas by forcing its Voyager clients, through threats and
5    intimidation, into anticompetitive exclusionary agreements whereby the client
6    agrees not to use the RealPage Cloud. Yardi's business acts and practices are also
7    independently tortious or unlawful in that Yardi has used RealPage's own trade
8    secrets, obtained unlawfully by Yardi, to unfairly compete against RealPage and to
9    interfere with RealPage's client relationships.

10    80.    As a direct and proximate result of Yardi's wrongful acts as alleged
11    herein, numerous clients and prospective clients have been forced to terminate their
12    use of, or have been forced not to use, the RealPage Cloud and EverGreen
13    consulting services. Yardi's wrongful conduct was a substantial factor in disrupting
14    these relationships.

15    81.    As a direct and proximate result of Yardi's wrongful acts as alleged
16    herein, RealPage has suffered actual damages and loss. RealPage has lost business
17    and has suffered losses with clients as a result of Yardi's interference.

18    82.    Yardi acted intentionally and in conscious disregard of the rights of
19    RealPage, with malice and oppression, in that Yardi knew that its acts and conduct,
20    as alleged herein, were unjustified and improper and would result in severe
21    financial and economic injury to RealPage. Accordingly, RealPage is entitled to an
22    award of punitive damages against Yardi for the sake of example and by way of
23    punishing Yardi, in an amount to be determined at trial.

24
25    **SIXTH COUNTERCLAIM**
26    **(Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200 Et Seq.)**
27    83.    RealPage realleges and incorporates by reference the allegations
28    contained in Paragraphs 1 through 50 as though fully set forth herein.

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

84.   Yardi's acts, as alleged above, constitute unlawful, unfair, or fraudulent business practices in violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

85.   Yardi's business acts and practices are unlawful, fraudulent and unfair, and in violation of the UCL because Yardi has restrained trade and competition in violation of the antitrust laws of the United States and the State of California by forcing its Voyager clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud or EverGreen consulting services.  Yardi's business acts and practices are also unlawful, fraudulent, and unfair in that it has used trade secrets that it misappropriated from RealPage to unfairly compete against RealPage and interfere with RealPage's contractual and prospective economic relations.

86.   As a direct and proximate result of Yardi's statutory unfair competition, Yardi has been unjustly enriched in an amount to be determined at trial.

87.   In addition, Yardi's statutory unfair competition has caused, and is continuing to cause, substantial and irreparable harm to RealPage.  Unless Yardi's wrongful acts are restrained by this Court, RealPage's business will continue to suffer.  RealPage has no adequate or complete remedy at law, and the harm RealPage will suffer cannot be adequately compensated in monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, RealPage prays for judgment in its favor as follows:

a.   That RealPage be awarded damages against Yardi, including treble damages as authorized by law, in an amount to be determined at trial;

b.   That RealPage be awarded punitive damages against Yardi;

c.   That the Court award RealPage its attorneys' fees and litigation expenses as authorized by law;

REALPAGE, INC.'S FIRST AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1        d.     That the Court enter injunctions restraining Yardi preliminarily

2    and permanently from further misappropriation of RealPage's trade secrets;

3        e.     That the Court enter injunctions restraining Yardi preliminarily

4    and permanently from further acts of unfair competition;

5        f.     That the Court enter injunctions restraining Yardi preliminarily

6    and permanently from continuing its anticompetitive conduct as alleged

7    herein; and

8        g.     That the Court award RealPage such other and further relief as

9    the Court deems just and appropriate.

10

11

12   DATED:    May 16, 2011           MARK A. SAMUELS
                                         DAVID R. EBERHART

13                                            SHARON M. BUNZEL
                                         JAMES M. PEARL

14                                            O'MELVENY & MYERS LLP

15

16                                      By:_____

17                                          Mark A. Samuels
                                         Attorneys for Defendant and
                                         Counterclaimant REALPAGE, INC.

18

19

20

21

22

23

24

25

26

27

28

                                              REALPAGE, INC.'S FIRST AMENDED
                                                      COUNTERCLAIMS
                                              NO. CV11-690 ODW (JEMx)

1   ## DEMAND FOR TRIAL BY JURY

2    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, RealPage

3   hereby demands a jury trial on all issues so triable.

4

5    DATED:  May 16, 2011    MARK A. SAMUELS
                  DAVID R. EBERHART
6                     SHARON M. BUNZEL
                  JAMES M. PEARL
7                     O'MELVENY & MYERS LLP

8

9                     By: _____
10                      Mark A. Samuels
                  Attorneys for Defendant and
11                    Counterclaimant REALPAGE, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                33      REALPAGE, INC.'S FIRST AMENDED
                          COUNTERCLAIMS
                     NO. CV11-690 ODW (JEMx)

## PROOF OF SERVICE

I, Susan White, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On May 18, 2011, I served the within documents:

**REALPAGE, INC.'S FIRST AMENDED COUNTERCLAIMS;
DEMAND FOR JURY TRIAL**

☐    by transmitting via facsimile machine the document(s) listed above to the fax number(s) set forth below on this date at approximately 3:30 PM. The outgoing facsimile machine telephone number in this office is (213) 430-6407. The facsimile machines used in this office create a transmission report for each outgoing facsimile transmitted. A copy of the transmission report(s) for the service of this document, properly issued by the facsimile machine(s) that transmitted this document and showing that such transmission was (transmissions were) completed without error, is attached hereto.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐    by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope designated by the carrier, with delivery fees paid or provided for, for delivery the next business day to the person(s) listed above, and placing the envelope for collection today by the overnight courier in accordance with the firm's ordinary business practices. I am readily familiar with this firm's practice for collection and processing of overnight courier correspondence. In the ordinary course of business, such correspondence collected from me would be processed on the same day, with fees thereon fully prepaid, and deposited that day in a box or other facility regularly maintained by Federal Express, which is an express carrier.

☐    by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope, with Express Mail postage fully prepaid to the person(s) listed above, and placing the envelope for collection and mailing today with the United States Postal Service as an Express Mail item in accordance with the firm's ordinary business practices. I am readily familiar with this firm's practice for collection and processing of Express Mail correspondence for mailing with the United States Postal Service. In the ordinary course of business, Express Mail correspondence collected from me would be processed on the same day, with Express Mail postage thereon fully prepaid, and placed for deposit that day with the United States Postal Service by depositing it that same day in a post office, mailbox, subpost office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service for receipt of Express Mail.

LA2:929730.1

PROOF OF SERVICE

☒    by putting a true and correct copy thereof in a sealed envelope and having said envelope delivered by messenger service to the person(s) listed below.

☐    by causing the document(s) to be emailed or electronically transmitted to the person(s) at the email addresses set forth below, pursuant to a court order or an agreement of the parties to accept service by email or electronic transmission. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    by electronically filing via the CM/ECF system.

| | |
|---|---|
| Allan Gabriel | Geoffrey M. Howard |
| S. Christopher Winter | Bree Hann |
| Dykema Gossett PLLC | Chad Russell |
| 333 South Grand Ave., Suite 2100 | Bingham McCutchen LLP |
| Los Angeles, CA  90071 | Three Embarcadero Center |
| agabriel@dykema.com | San Francisco, CA  94111-4067 |
| kwinter@dykema.com | geoff.howard@bingham.com |
| | bree.hann@bingham.com |
| | chad.russell@bingham.com |
| | |
| Attorneys for Defendant | Attorneys for Plaintiff |
| DC Consulting, Inc. | Yardi Systems, Inc. |
| | |
| SERVED BY HAND DELIVERY | SERVED BY U.S. MAIL |

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on May 18, 2011, at Los Angeles, California.

_Susan White_
Susan White

PROOF OF SERVICE