1  BINGHAM MCCUTCHEN LLP
2  Geoffrey M. Howard (SBN 157468)
   Email: geoff.howard@bingham.com
3  Bree Hann (SBN 215695)
   Email: bree.hann@bingham.com
4  Chad Russell (SBN 246046)
   Email: chad.russell@bingham.com
5  Three Embarcadero Center
6  San Francisco, CA  94111-4067
   Telephone:  415.393.2000
7  Facsimile:  415.393.2286

8  Attorneys for Plaintiff and
   Counterdefendant
9  Yardi Systems, Inc.

10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14

15  Yardi Systems, Inc.,                    Case No. CV 11-00690 ODW (JEMx)

16            Plaintiff,                    **YARDI SYSTEMS, INC.'S
                                            MEMORANDUM OF POINTS AND
17       v.                                 AUTHORITIES IN SUPPORT OF ITS
                                            MOTION TO DISMISS PURSUANT
18  RealPage, Inc. and DC Consulting,       TO FED. R. CIV. P. 12(B)(6)**
19  Inc.,
                                            Hearing Date:  July 25, 2011
20            Defendants.                   Time:  1:30pm
                                            Place:  Courtroom 11, Spring Street
21                                          Judge:  Hon. Otis D. Wright II

22  _____

23  RealPage, Inc.,

24            Counterclaimant,

25       v.

26  Yardi Systems, Inc.,

27            Counterdefendant.

28  _____

1

## TABLE OF CONTENTS

2
Page

3  I.    INTRODUCTION .............................................................................1

4  II.   OVERVIEW OF THE PARTIES AND THE INDUSTRY ...........................4

5  III.  MOTION TO DISMISS LEGAL STANDARDS ..........................................5

   IV.   REALPAGE FAILS TO STATE ANTITRUST COUNTERCLAIMS ........6

6        A.    RealPage Fails To Allege *Per Se* Tying ...............................7

7        B.    RealPage's Relevant Market Fails As A Matter Of Law ....................9

8        C.    RealPage's Market Power Allegation Fails .......................................12

9        D.    RealPage Fails To Allege Harm To Competition .............................14

10       E.    RealPage Does Not Allege An Anticompetitive Agreement ............17

11             1.    The Court Should Not Accept RealPage's Formulaic
                     Allegations of "Amended License Agreements" ....................18

12             2.    None of RealPage's Purported "Exemplar" Client
                     Descriptions Allege Anticompetitive "Amended License
13                   Amendments" .........................................................................19

14 V.    REALPAGE FAILS TO STATE A COUNTERCLAIM FOR
          INTEREFERENCE WITH CONTRACT ........................................................22

15 VI.   REALPAGE'S UNFAIR COMPETITION AND PROSPECTIVE
16        INTERFERENCE COUNTERCLAIMS FAIL TO THE EXTENT
          THEY RELY ON DISMISSED COUNTERCLAIMS ................................23

17 VII.  THE COURT SHOULD NOT GRANT ANOTHER AMENDMENT .......24

18 VIII. CONCLUSION ................................................................................25

19

20

21

22

23

24

25

26

27

28

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

Page

3

CASES

4

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,

5

    141 F.3d 947 (9th Cir. 1998) ................................................................ 14, 15, 16

6

*Apple, Inc. v. Psystar Corp.*,

7

    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ............................................ 9, 10, 11, 12

8

*Ascon Props., Inc. v. Mobil Oil Co.*,

9

    866 F.2d 1149 (9th Cir. 1989) ......................................................................... 24

10

*Ashcroft v. Iqbal*,

11

    129 S. Ct. 1937, 556 U.S. ---, 173 L. Ed. 2d 868 (2009) ................................... 6

12

*Bell Atlantic Corp. v. Twombly*,

    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........................ passim

13

*Bracamontes v. Chase Home Fin. LLC*,

14

    No. 10-CV-03888, 2011 WL 332527 (N.D. Cal. Jan. 31, 2011) .................. 6, 24

15

*Brantley v. NBC Universal, Inc.*,

16

    --- F. 3d ----, No. 09-56785, 2011 WL 2163961

17

    (9th Cir. June 3, 2011) ......................................................................... 7, 14, 17

18

*Broad. Music, Inc. v. Colom. Broad. Sys., Inc.*,

19

    441 U.S. 1, 99 S. Ct. 1551, 60 L. Ed. 2d 1 (1979) ...................................... 7, 8, 9

20

*Brown Shoe Co. v. United States*,

    370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962) ............................... 14, 17

21

*Cascade Health Solutions v. PeaceHealth*,

22

    515 F.3d 883 (9th Cir. 2008) ......................................................................... 7, 8

23

*Colonial Med. Grp., Inc. v. Catholic Healthcare West*,

24

    No. C-09-2192, 2010 WL 2108123 (N.D. Cal. May 25, 2010) ........ 9, 10, 11, 16

25

*County of Tuolumne v. Sonora Cmty. Hosp.*,

26

    236 F.3d 1148 (9th Cir. 2001) ........................................................................... 7

27

*Davies v. Genesis Med. Ctr.*,

28

    994 F. Supp. 1078 (S.D. Iowa 1998) .............................................................. 12

TABLE OF AUTHORITIES
(continued)

Page

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ............................................................ 12

*E & E Co., Ltd. v. Kam Hing Enters., Inc.*,
   No. C-08-0871, 2008 WL 3916256 (N.D. Cal. Aug. 25, 2008)................. 18, 19

*Falstaff Brewing Co. v. Stroh Brewery Co.*,
   628 F. Supp. 822 (N.D. Cal. 1986)........................................ 14, 16, 17

*G & C Auto Body Inc. v. Geico Gen. Ins. Co.*,
   No. C06-04898, 2008 WL 687371 (N.D. Cal. Mar. 11, 2008) ................... 22, 23

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed 2d 26 (2006) .................................. 7, 8

*In re Air Passenger Comp. Reservations Sys. Antitrust Litig.*,
   694 F. Supp. 1443 (C.D. Cal. 1988) ................................................ 13

*In re Cal. Title Ins. Antitrust Litig.*,
   No. C 08-01341, 2009 WL 3756686 (N.D. Cal. Nov. 6, 2009) ........................ 23

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,
   No. CV 07-00043, 2007 WL 4976364 (C.D. Cal. Oct. 29, 2007) .. 17, 18, 19, 24

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984) ........................................... 8

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) .................................................... 6, 18

*Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*,
   146 F.3d 691 (9th Cir. 1998) .................................................... 22, 23

*Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*,
   701 F.2d 1276 (9th Cir. 1983) .................................................... 6, 24

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
   No. C07-01057, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ........................ 13

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) ........................................................ 17

TABLE OF AUTHORITIES
(continued)

Page

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118, 270 Cal. Rptr. 1 (1990) ........................................................ 22

*Papasan v. Allain*,
   478 U.S. 265, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) ................................... 6

*Pareto v. FDIC*,
   139 F.3d 696 (9th Cir. 1998) .............................................................. 5, 6, 10, 11

*Philips Med. Capital, LLC v. Med. Insights Diagnostics Ctr., Inc.*,
   471 F. Supp. 2d 1035 (N.D. Cal. 2007) .......................................................... 23

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3rd Cir. 1997) ...................................................................... 9, 12

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ........................................................................... 9

*Reddy v. Litton Indus., Inc.*,
   912 F.2d 291 (9th Cir. 1990) ......................................................................... 24

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
   532 F.3d 963 (9th Cir. 2008) ............................................................... passim

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ........................................................................... 6

*Tarque v. Nat'l Rental Car Fin. Corp.*,
   No. CV 08-3882, 2009 WL 2711951 (C.D. Cal. Aug. 26, 2009) ..................... 24

*Texaco Inc. v. Dagher*,
   547 U.S. 1, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006) ......................................... 7

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377, 76 S. Ct. 994, 100 L. Ed. 1264 (1956) ......................................... 9

*Yanik v. Countrywide Home Loans, Inc.*,
   No. CV 10-6268, 2010 WL 4256312 (C.D. Cal. Oct. 18, 2010) ............... 22, 23

*Zella v. E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007) ..................................................... 19, 22

iv

1

## TABLE OF AUTHORITIES
(continued)

2

Page

3

STATUTES

4

Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 1727 ......................................... 7

5

Sherman Act, 15 U.S.C. § 1 ........................................................................... passim

6

OTHER AUTHORITIES

7

Judicial Council of Cal. Civ. Jury Instructions (CACI) No. 2201 ......................... 22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS

## I.      INTRODUCTION

Yardi Systems, Inc. ("Yardi") and RealPage, Inc. ("RealPage") are competing providers of real property management and accounting software.  Yardi brought this case against RealPage after discovering RealPage had broken into Yardi's password-protected customer support website and downloaded substantial amounts of Yardi's trade secrets and copyrighted support material.  This theft occurred while Yardi was engaging RealPage in dialogue about Yardi's concerns that RealPage might be violating Yardi's intellectual property rights.

In its response to Yardi's Complaint, RealPage admitted to much of this downloading.  However, RealPage hid those admissions behind 32 pages of alleged "Counterclaims."  The Counterclaims suffered from a variety of fatal defects that Yardi disclosed to RealPage in meet and confer discussions.  In response, RealPage filed a major overhaul as "Amended Counterclaims."  Because RealPage failed to cure those defects, Yardi moves to dismiss five of the six Amended Counterclaims.  RealPage still fails to plead viable antitrust and contractual interference causes of action.  Its unfair competition and prospective interference counterclaims also fail to the extent they rely on alleged antitrust violations or contractual interference.

***Antitrust Counterclaims (Sherman and Cartwright Acts).***  RealPage devotes just a few paragraphs of its Amended Counterclaims to Yardi's alleged antitrust violations, accusing Yardi of coercing unidentified Yardi clients into amending their software licenses.  It alleges that these amendments are anticompetitive because they restrain trade in a market for so-called "vertical cloud services" by precluding the unidentified clients from hosting Yardi software on RealPage's systems.  The Court should dismiss the antitrust counterclaims for five reasons.

First, although RealPage has stated it intends to proceed on a *per se* tying theory, its allegations do not support that claim.  *Per se* tying occurs when a defendant uses its power in one product market to force customers to purchase a *second* product in a *separate* product market.  Nowhere does RealPage allege that

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1    Yardi has forced customers to purchase *a second product*, much less one in a

2    separate market.  RealPage only alleges that Yardi has prohibited some customers

3    from hosting Yardi software with RealPage.  This is not *per se* tying.

4         Second, RealPage fails to define the "relevant market" affected by Yardi's

5    alleged conduct.  A relevant market must consist of all interchangeable products, for

6    example, all software hosting services that customers might reasonably choose

7    instead of the "RealPage Cloud."  According to RealPage, no such competing

8    products exist, so the relevant market need not include them.  But RealPage

9    elsewhere contradicts itself, for example, when it admits that "[c]lients should be

10   free to choose the RealPage Cloud … ***or any other solution that best suits their***

11   ***business needs***."  Because the true relevant market includes these admitted but

12   unidentified "other solution[s]," RealPage's market definition fails.

13        Third, RealPage fails to allege market power.  The Amended Counterclaims

14   omit basic facts required to demonstrate a plausible and substantial threat to

15   competition, such as:  the size of the market, its current and potential consumers,

16   current and potential competitors, or the number or percentage of consumers in the

17   market affected by Yardi's alleged conduct.  Without alleging that Yardi has the

18   power to unreasonably restrain trade, RealPage's antitrust counterclaims fail.

19        Fourth, RealPage fails to allege harm to competition.  It does not allege that it

20   has been excluded from the "vertical cloud" market; to the contrary, RealPage

21   allegedly created and dominates that market.  Nor does it allege that Yardi has

22   excluded other suppliers from the alleged market, or that new suppliers cannot enter.

23   The only harm RealPage arguably alleges is to its own bottom line.  That is not

24   "harm to competition" sufficient to state an antitrust claim.

25        Fifth, RealPage fails to identify any agreement in restraint of trade.  It alleges

26   that Yardi and some unidentified customers have amended their license agreements

27   in an improper way.  RealPage does not identify the customers, does not identify the

28   amendments, and, tellingly, does not state the terms of the original licenses that

1    Yardi supposedly amended.  Absent these facts (which RealPage cannot amend to

2    include), it fails to allege a necessary "agreement in restraint of trade."

3         ***Contractual Interference.***  RealPage's counterclaim for contractual

4    interference fails because it does not allege, as it must, an actual breach or disruption

5    of any contract between RealPage and a third party.

6         ***Unfair Competition and Prospective Interference***.  Finally, the Court should

7    dismiss the unfair competition and intentional interference with prospective

8    economic advantage counterclaims to the extent they rely on RealPage's flawed

9    antitrust and contractual interference counterclaims.

10        The form and nature of RealPage's Amended Counterclaims illustrate why the

11   five counterclaims discussed above have no basis.  RealPage simply has

12   manufactured these counterclaims, and bolted them in front of its Answer, to divert

13   attention from its admitted illegal conduct, level inflammatory and irrelevant

14   accusations at Yardi, and unleash a torrent of expensive discovery.

15        In due course, Yardi will prove all of RealPage's counterclaims false –

16   although that is evident on their face.  For example, RealPage alleges that starting in

17   2008 a Yardi employee, who it describes as a "Yardi mole," "willfully and

18   maliciously" took RealPage's "most highly confidential trade secrets" and used them

19   to "unfairly compete against RealPage."  These allegations are false.  Were they true,

20   RealPage had a duty to disclose them to prospective and current shareholders even

21   prior to its first public offering in August 2010.  It defies logic that RealPage would

22   instead sit idly by, laboring against the effects of this alleged devastating theft, and

23   do *nothing* about it until more than two years later when forced to admit to Yardi's

24   unrelated allegations.  RealPage has made up its many pages of marketing

25   "allegations" too.  For instance, it alleges that its "RealPage Cloud" comprises

26   "nearly 1,000 physical servers," but just one month before making that allegation, it

27   stated in its Annual Report to the SEC that "[t]he RealPage Cloud consists of … 360

28   physical servers."  Similarly, RealPage says its "Cloud" is "state-of-the-art" and

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   provides "improved disaster recovery capabilities," when in reality it has located its

2   entire facility in two data centers twenty miles apart in Texas, where one

3   catastrophic event (such as a tornado) could destroy them both.

4       At trial, this case will center around RealPage's admitted computer fraud,

5   misappropriation, and infringement.  Right now, the Court should dismiss five of

6   RealPage's six Amended Counterclaims.  RealPage has now twice failed to allege

7   sufficient facts in support of these counterclaims and instead has pled itself into an

8   incurable corner.  In addition to its contradictory allegations, public statements by

9   RealPage properly subject to judicial notice foreclose the possibility of any good

10  faith amendment.  The Court should grant Yardi's motion to dismiss without leave

11  to amend.

12  **II.    OVERVIEW OF THE PARTIES AND THE INDUSTRY**

13      Yardi and RealPage both develop and license software and provide related

14  services for real estate and property management clients.  RealPage's First Amended

15  Counterclaims, Dkt. No. 34, ("FAC"),  ¶¶ 17-18.[1]  Yardi calls its flagship software

16  application product "Voyager."  RealPage calls its primary product "OneSite."  *See,*

17  *e.g.*, *id.*, ¶ 49.  Many other companies develop and license software in competition

18  with both Yardi and RealPage.  *See* Request for Judicial Notice ("RFJN"), Ex. 2.

19      Yardi and RealPage sell support services for their software, as do multiple

20  competitors for theirs.  FAC, ¶ 13.  Support services can include "hosting," which

21  refers to the location where the software is installed and accessed by the client.

22  Some clients host their software on computers they own or lease ("on-premises" or

23  "self hosting"), and pay the software provider, consultants, and/or employees to

24  maintain the software.  *See, e.g.*, *id.*, ¶¶ 2, 43.  Other clients host their software

25  remotely with the provider.  This remote hosting goes by various terms.  For

26  ───────────────

27  [1] Yardi has also sued defendant DC Consulting, Inc., a surviving entity resulting from RealPage's acquisition of Evergreen Solutions, Inc., a provider of software support services for Yardi

28  software.  DC Consulting answered Yardi's Complaint and did not bring counterclaims.

1   example, RealPage refers to Yardi's remote hosting as an application service

2   provider ("ASP") model, and refers to its own remote hosting as a Software-as-a-

3   Service ("SaaS") remote model.  *Id.*, ¶¶ 1-2.  Other clients host their software

4   remotely in third-party data centers.  *Id.*, ¶ 36.  RealPage refers to its data center for

5   third-party hosting as a "vertical cloud," and other third-party data centers as

6   "industry-agnostic cloud providers."  *Id.*, ¶¶ 3, 37.

7         "Cloud computing" is an imprecise industry term for remote application

8   hosting.  *Cf. id.*, ¶ 3.  For instance, RealPage alleges that its remote "SaaS" service is

9   a "type of cloud computing."  *Id.*, ¶ 1.  It also alleges that its newly-announced

10  "RealPage Cloud" service is "vertically-integrated cloud computing."  *Id.*  On the

11  other hand, RealPage alleges that Yardi's cloud services are "in fact ASP services."

12  *Id.*, ¶ 8.  The imprecision is also apparent in RealPage's replacement of the phrase

13  "Yardi's *hosting* services" in its original Counterclaims with the term "Yardi's *cloud*

14  service" in its Amended Counterclaims.  Declaration of Chad Russell in Support of

15  Motion to Dismiss ("Russell Decl."), ¶ 2 & Ex. A (redlines) at new ¶¶ 26-27 (also

16  replacing "Yardi *hosting* capabilities" with "Yardi *cloud* capabilities") (emphasis

17  supplied).  Similarly, RealPage's Amended Counterclaims delete the original

18  allegation that Yardi's cloud services are "not what is generally accepted as cloud

19  computing."  *Id.* at old ¶ 26.  In any event, clients choose from these multiple

20  hosting options for their software according to their preferences.  *See* FAC, ¶ 13

21  (Clients should choose the "solution that best suits their business needs.").

22  **III.    MOTION TO DISMISS LEGAL STANDARDS**

23        To survive a motion to dismiss, a plaintiff must allege sufficient facts.

24  Relying on "labels and conclusions," "unwarranted inferences," or a "formulaic

25  recitation of the elements" does not suffice without "further factual enhancement."

26  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-57, 127 S. Ct. 1955, 1964-66,

27  167 L. Ed. 2d 929, 940-41 (2007); *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir.

28  1998) ("[C]onclusory allegations of law and unwarranted inferences are not

1  sufficient to defeat a motion to dismiss.").  This "factual enhancement" is critical for

2  antitrust claims because of the "potentially enormous expense of discovery."

3  *Twombly*, 544 U.S. at 557, 559-60.  Such facts also ensure that a defendant knows

4  the claims against it.  *Id.* at 565 n.10 ("[A] defendant seeking to respond to

5  plaintiffs' conclusory allegations in the § 1 context would have little idea where to

6  begin.").  Therefore, "evidentiary facts" must be alleged because "discovery in

7  antitrust cases frequently causes substantial expenditures and gives the plaintiff the

8  opportunity to extort large settlements even where he does not have much of a case."

9  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046-48 (9th Cir. 2008).

10       Thus, a court should not accept as true "a legal conclusion couched as a

11  factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92

12  L. Ed. 2d 209, 232 (1986); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 556 U.S. ---,

13  173 L. Ed. 2d 868, 884 (2009) ("[P]leadings that, because they are no more than

14  conclusions, are not entitled to the assumption of truth.").  Unwarranted inferences

15  undeserving of deference include conclusions contradicted by alleged factual details.

16  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001) (A plaintiff

17  can "plead himself out of a claim by including … details contrary to his claims.").

18       Denying leave to amend a complaint is appropriate when amendment would

19  be "futile."  *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d

20  1276, 1293 (9th Cir. 1983).  The Court may consider judicially-noticed documents in

21  determining futility.  *Bracamontes v. Chase Home Fin. LLC*, No. 10-CV-03888,

22  2011 WL 332527, at *4 (N.D. Cal. Jan. 31, 2011) (dismissing claim with prejudice

23  when judicially-noticed document showed that "amendment would be futile").  As

24  explained in Yardi's RFJN, Yardi requests that the Court judicially notice two public

25  documents authored by RealPage in considering the futility of amendment.

26  **IV.    REALPAGE FAILS TO STATE ANTITRUST COUNTERCLAIMS**

27       RealPage alleges Yardi has violated Section 1 of the Sherman Act ("Section

28  1") and the California Cartwright Act.  FAC, ¶¶ 58-64.  The pleading requirements

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    under the Sherman and Cartwright Acts are the same.  *County of Tuolumne v.*

2    *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).  Both claims fail, for five

3    reasons.  First, RealPage has failed to allege a *per se* tying counterclaim.  Thus, the

4    Court must review RealPage's counterclaims under the "rule of reason" standard.

5    However, RealPage has also failed to allege four elements of a rule of reason claim:

6    (1) the "relevant market" at issue; (2) market power sufficient to substantially

7    restrain trade in the alleged relevant market; (3) actual harm to competition in the

8    relevant market; and (4) an unreasonable agreement causing the alleged harm to

9    competition.  *Brantley v. NBC Universal, Inc.*, --- F. 3d ----, No. 09-56785, 2011 WL

10   2163961, at *3-4 (9th Cir. June 3, 2011); 15 U.S.C. § 1.

11           **A.      RealPage Fails To Allege *Per Se* Tying**

12           Section 1 claims are presumptively analyzed under a "rule of reason" analysis.

13   *Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S. Ct. 1276, 1279, 164 L. Ed. 2d 1, 7

14   (2006).  As opposed to rule of reason claims, agreements are "*per se*" prohibited

15   only when "so plainly anticompetitive that no elaborate study of the industry is

16   needed to establish their illegality."  *Id.* (citation and quotation omitted).  Courts do

17   not declare an agreement *per se* illegal until they have had "considerable experience"

18   with the category of misconduct alleged.  *Broad. Music, Inc. v. Colom. Broad. Sys.,*

19   *Inc.*, 441 U.S. 1, 9-10, 99 S. Ct. 1551, 1557, 60 L. Ed. 2d 1, 10 (1979) (reversing

20   recognition by the Second Circuit of new form of *per se* prohibited conduct).

21   Although RealPage agreed its Counterclaims did not present a *per se* counterclaim,

22   and amended them after Yardi contended that not even a rule of reason counterclaim

23   properly was alleged, it now asserts a *per se* "tying" counterclaim under *Cascade*

24   *Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008).  Russell Decl., ¶¶ 3-

25   5 & Exs. B & C.  This counterclaim fails, because RealPage does not allege that

26   Yardi has forced customers to purchase a second Yardi product.

27           Not all tying arrangements are illegal.  To the contrary, "many tying

28   arrangements … are fully consistent with a free, competitive market."  *Ill. Tool*

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   *Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 45, 126 S. Ct. 1281, 1292, 164 L. Ed 2d

2   26, 41 (2006).  The "essential characteristic" of illegal tying is that a seller has

3   "force[d] the buyer into the purchase of a tied product."  *Jefferson Parish Hosp.*

4   *Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 1558, 80 L. Ed. 2d 2, 13 (1984).

5   Therefore, "[t]he Supreme Court has developed a unique *per se* rule for illegal tying

6   arrangements," which requires allegations that the defendant (1) tied together the

7   sale of two distinct products or services, and (2) has enough economic power in the

8   market for the first product to force customers to purchase the second product in the

9   second market.  *PeaceHealth*, 515 F.3d at 913.  The Ninth Circuit distinguishes this

10   "unique" *per se* rule from other "rarely encounter[ed]" but conceivable forms of rule

11   of reason tying, such as "when the customer promises not to take the tied product

12   from the defendant's competitor."  *Id.* at 912 n.23 (citing no such cases).

13       *PeaceHealth* involved allegations that the defendant had forced consumers to

14   purchase its "primary and secondary care" hospital services along with its distinct

15   "tertiary care" services.  *Id.* at 912.  The Ninth Circuit reversed a grant of summary

16   judgment because there were issues of fact as to whether the plaintiff could prove the

17   alleged forced purchase of the second product.  *Id.* at 912-16.  In doing so, the Ninth

18   Circuit also rejected the plaintiff's argument for a lower *per se* standard, stating "the

19   Supreme Court has emphasized that the coerced purchase of the tied product is the

20   key aspect of an illegal tie."  *Id.* at 913-914 (citing *Jefferson Parish*, 466 U.S. at 12).

21       In contrast to *PeaceHealth*, RealPage does not allege that Yardi has forced the

22   purchase of *any* second product, much less any Yardi product in RealPage's alleged

23   "vertical cloud" market.  Instead, it alleges only that Yardi has convinced some

24   clients *not* to purchase something from RealPage.  FAC, ¶ 59-61.  That is not *per se*

25   tying under *PeaceHealth* or any other binding authority.  Indeed, by asserting that

26   Yardi's alleged conduct qualifies as *per se* tying, RealPage contradicts *Broadcast*

27   *Music*'s requirement of "considerable experience with certain business

28   relationships" before classifying conduct as *per se* objectionable.  *Broad. Music,* 441

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    U.S. at 9-10.  Accordingly, the Court should dismiss RealPage's allegations to the

2    extent RealPage now contends it states a *per se* counterclaim.

3         Yardi now addresses the four elements RealPage fails to satisfy under the rule

4    of reason standard.

5         **B.      RealPage's Relevant Market Fails As A Matter Of Law**

6         Under the rule of reason standard, RealPage must allege a legally sufficient

7    "relevant market" affected by the anticompetitive conduct.  *Rebel Oil Co., Inc. v.*

8    *Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market definition is

9    crucial.  Without [it], it is impossible to determine market share.").

10        The relevant market is a *product* market – *i.e.*, "consumers do not define the

11   boundaries of the market."  *Colonial Med. Grp., Inc. v. Catholic Healthcare West*,

12   No. C-09-2192, 2010 WL 2108123, at *3-4 (N.D. Cal. May 25, 2010) (citation and

13   quotation omitted).  It includes products with "reasonable interchangeability for the

14   purpose for which they are produced."  *United States v. E.I. du Pont de Nemours &*

15   *Co.*, 351 U.S. 377, 404, 76 S. Ct. 994, 1012, 100 L. Ed. 1264, 1285 (1956)

16   (cellophane was reasonably interchangeable with other packaging materials, despite

17   costing up to three times more).  Reasonably interchangeable products are

18   competing products sold by "the group or groups of sellers or producers who have

19   actual or potential ability to deprive each other of significant levels of business."

20   *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008) (citation

21   and quotation omitted).  An alleged relevant market is facially unsustainable and

22   should be dismissed if it "does not encompass all interchangeable substitute

23   products."  *Colonial Med.*, 2010 WL 2108123, at *3 (citing *Queen City Pizza, Inc. v.*

24   *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir. 1997)).

25        RealPage alleges that Yardi's anticompetitive conduct affects a so-called

26   "vertical cloud" market, which allegedly includes "vertically-integrated cloud

27   computing for multifamily real estate owners and property managers in the United

28   States."  FAC at ¶¶ 37, 59.  RealPage uses the term "vertically-integrated cloud

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   computing" in various ways, but consistently equates it only with hosting services

2   offered by RealPage.  *See, e.g., id.*, ¶ 3 ("RealPage is the first cloud computing

3   provider to offer 'vertically-integrated' systems.").  This market definition fails as a

4   matter of law for at least three reasons.

5        First, RealPage uses *consumers* to define a *product* market.  RealPage does

6   not allege why hosting services bought by "multifamily real estate owners and

7   property managers" (*i.e.*, alleged "vertical cloud" services), and which allegedly are

8   "highly scalable" and can be "quickly upsized or downsized," are not

9   interchangeable with hosting services bought by other types of customers.  *Id.*, ¶¶ 21,

10   37.  Similarly, the plaintiff in *Colonial Medical* first defined its market as services

11   provided to "inmates of the California prison system," then amended its definition to

12   services provided to "prison inmates."  2010 WL 2108123, at *3-4.  The court

13   dismissed both the original and amended claims because each definition was "legally

14   insufficient."  *Id.*  RealPage fails to state antitrust claims for the same reason.

15        Second, even within its insufficient consumer-based "vertical cloud" market,

16   RealPage fails to distinguish "industry-agnostic" providers.  FAC, ¶ 37.  RealPage

17   says only that these providers are not adequate substitutes for "vertical cloud"

18   providers because they "cannot satisfy the specialized needs" of RealPage's target

19   customers.  *Id.*  This statement acknowledges that other cloud competitors exist, yet

20   then fails to allege facts to justify omitting them from the relevant market.  *Twombly*,

21   550 U.S. at 554-57; *Pareto*, 139 F.3d at 699.

22        Though legally deficient, RealPage's omission is understandable.  It admits, as

23   it must, that "*most* cloud computing providers are industry agnostic," and it knows

24   that its counterclaims fail if (among other reasons) Yardi's alleged conduct has no

25   effect on "*most*" suppliers competing in the same market as RealPage.  FAC, ¶ 3

26   (emphasis supplied).  However, RealPage must allege plausible facts explaining *why*

27   these admitted competitors do not have the "actual or potential ability" to deprive

28   RealPage of business.  *Apple*, 586 F. Supp. 2d at 1196; FAC, ¶¶ 3, 37.  Indeed, as

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1  RealPage elsewhere admits, *consumers* (whether or not excluded by RealPage from

2  its market definition) decide which hosting platform meets their needs.  *See* FAC, ¶

3  13 ("Clients should be free to choose … any other solution that best suits their

4  business needs."); *Colonial Med.*, 2010 WL 2108123, at *3 (Substitutability is

5  measured "from the point of view of the buyers.").  RealPage's self-serving

6  conclusion that its product is superior does not suffice.  The Court should not defer

7  to the perfunctory allegation that industry-agnostic providers do not compete with

8  RealPage.

9      Third, RealPage excludes multiple *other* hosting services in addition to

10  "industry-agnostic" providers, also with no factual basis.  For example, RealPage

11  alleges that existing hosting options for Yardi software alone includes "(1) the 'on-

12  premises' approach, in which the client installs and runs Yardi software on its own

13  computer server; and (2) the Application Service Provider ('ASP') approach, in

14  which the client accesses its version, or 'instance,' of Yardi software via the Internet

15  from computer servers located at Yardi's own facilities."  FAC, ¶ 2.  Since Yardi's

16  clients admittedly include multifamily real estate owners and property managers, *id.*,

17  ¶ 18, RealPage has thus alleged that its target "vertical cloud" customers choose

18  Yardi's on-premises and ASP hosting services.  That means those services have the

19  "actual or potential ability" to deprive RealPage of business.  *Apple*, 586 F. Supp. 2d

20  at 1196.  RealPage's counterclaims fail by not alleging facts to justify omitting those

21  services its alleged market.  *Twombly*, 550 U.S. at 554-57; *Pareto*, 139 F.3d at 699.

22      In fact, RealPage repeatedly contradicts its market definition by alleging that

23  industry consumers can, do, and *should* choose other options along the hosting

24  services spectrum over the RealPage "Cloud."  As one example, RealPage alleges

25  that Yardi software is ***not*** "ideally suited" for hosting in a vertical cloud.  FAC, ¶ 5

26  ("*Unlike on-premises or ASP software applications* [such as Yardi Voyager],

27  RealPage's SaaS applications are ideally suited for this vertically-integrated cloud

28  system.") (emphasis supplied).  But RealPage fails to allege how software *not suited*

Case No. CV-11-00690 ODW (JEMx)

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   for hosting in a vertical cloud reasonably can be hosted *only in a vertical cloud*, as

2   its market definition requires.  As another example, RealPage alleges that "[m]ost of

3   Yardi's so-called 'cloud' offerings are in fact ASP services."  *Id.*, ¶ 8.  However,

4   RealPage fails to explain why it includes Yardi's cloud/ASP services along with

5   RealPage in the relevant market, *id.*, ¶ 38, *but no other* "*in fact ASP*" *providers.*[2]

6       In sum, RealPage repeatedly acknowledges that industry consumers freely

7   choose hosting services interchangeable with RealPage's alleged new "vertical

8   cloud" service.  Its failure either to include these services in its relevant market

9   definition, or to allege facts demonstrating they are not interchangeable for antitrust

10   purposes, means that the Court should dismiss its antitrust counterclaims.  *Apple*,

11   586 F. Supp. 2d at 1196; *Queen City Pizza*, 124 F.3d at 437-38; *see also Davies v.*

12   *Genesis Med. Ctr.*, 994 F. Supp. 1078, 1098-99 (S.D. Iowa 1998) (dismissing a

13   "narrow market" contradicted by "many factual assertions" in the complaint).

14       **C.**    **RealPage's Market Power Allegation Fails**

15       As a third ground for dismissal, RealPage fails to allege that Yardi possesses

16   market power.  *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 72 (9th

17   Cir. 2008) ("A failure to allege power in the relevant market is a sufficient ground to

18   dismiss an antitrust complaint.").  Hypothesizing about "conceivable impairments of

19   competition" does not mean that "any such impairment has occurred or is likely, or

20   much less is substantial in magnitude."  *Dickson v. Microsoft Corp.*, 309 F.3d 193,

21   207 (4th Cir. 2002) (internal citation and quotation omitted).  Rather, a claim must

22   "allege facts demonstrating that the defendants played a significant role in the

23   relevant market."  *Id.* (internal citation and quotation omitted).  Additionally, to state

24

25   [2] RealPage originally alleged that "[w]hile Yardi purports to offer some 'cloud' services, they are

26   in reality nothing of the sort.  Yardi offers a narrow set of ASP hosting services. … This rudimentary hosting model is not what is generally accepted as cloud computing, i.e., 'on demand' access to shared applications."  Russell Decl., ¶ 2 & Ex. A (redlines) at old ¶ 26.  When Yardi

27   informed RealPage it intended to move to dismiss, RealPage deleted these allegations and added the exactly opposite assertion that "RealPage and Yardi are the primary competitors in the vertical

28   cloud market."  *Compare id.* at old ¶ 26 *with* new ¶ 38; FAC, ¶ 38.

Case No. CV-11-00690 ODW (JEMx)

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    a claim based on the use of market power in one market to restrain trade in a second

2    market, the plaintiff must allege facts demonstrating that the two markets are, in fact,

3    separate and distinct from each other.  *See Rick-Mik Enters.*, 532 F.3d at 974-75

4    (dismissing antitrust claim based on inter-market coercion because the failure

5    properly to allege "separate and distinct product[s]" was "fatal").

6         RealPage alleges that "through amended license agreements, imposed on its

7    clients after they have licensed Voyager," Yardi has the power to "coerce its

8    customers (a substantial share of potential vertical cloud customers) into *not using*

9    the RealPage Cloud."  FAC, ¶¶ 60-61 (emphasis supplied).  These allegations fail to

10   state a claim for at least three reasons.  *Twombly*, 550 U.S. at 554-57.

11        First, RealPage does not allege two separate markets.  The only distinction it

12   alleges, without factual support, is that "Voyager and the RealPage Cloud are

13   distinct products."  FAC, ¶ 61.  This two-brand *product* comparison is irrelevant.

14   *See In re Air Passenger Comp. Reservations Sys. Antitrust Litig.*, 694 F. Supp. 1443,

15   1457 (C.D. Cal. 1988) ("Producers engage in product differentiation *because* they

16   are involved in a highly competitive market and are merely attempting to compete

17   with other brands.") (emphasis in original).  Instead, RealPage must (and fails to)

18   distinguish its alleged "property management software" *market* from its alleged

19   "vertical cloud" *market*.  *Rick-Mik Enters.*, 532 F.3d at 974-75.  Failing to do so

20   dooms its antitrust counterclaims.

21        Second, as discussed in Section IV.E below, RealPage fails to allege that

22   Yardi *actually* has coerced customers to agree to license amendments.  In fact,

23   several purported exemplars contradict any inference that Yardi has done so.

24   *Cf. Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057, 2008 WL

25   686834, at *9 (N.D. Cal. Mar. 11, 2008) (dismissing an antitrust claim in part

26   because the plaintiff's "only concrete factual allegation regarding … market power

27   cuts against the conclusion that [defendant] enjoyed market power").

28        Third, RealPage fails to allege that Yardi has market power in the alleged

1   market for "property management software."  FAC, ¶ 60.  A typical, well-pled claim

2   would include descriptive facts about the alleged market, which the Court then could

3   use to assess an allegation of market power.  *See, e.g.*, *Rick-Mik Enters.*, 532 F.3d at

4   972-73 (dismissing an antitrust claim for failing to allege market power because the

5   complaint alleged no quantitative facts about the parties' or other competitors'

6   presence in the purported relevant market).  RealPage alleges only that Yardi

7   Voyager is "industry leading" and "is used to manage over 25,000 apartment sites."

8   FAC, ¶ 60.  Similarly, the plaintiff in *Rick-Mik* alleged only that the defendant

9   "rank[ed] number one in the industry," leading the Ninth Circuit to hold that such

10  lack of detail was "fundamentally flawed," making dismissal with prejudice

11  appropriate.  *Rick-Mik Enters.*, 532 F.3d at 972, 977.  RealPage's "fundamentally

12  flawed" allegations should be dismissed without leave to amend as well.

13  **D.    RealPage Fails To Allege Harm To Competition**

14  As a fourth ground for dismissal, RealPage fails to allege injury to *competition*

15  as opposed to injury to itself.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325-

16  28, 344, 82 S. Ct. 1502, 1523-25, 1534, 8 L. Ed. 2d 510, 535-37, 547 (1962); *see*

17  *also Falstaff Brewing Co. v. Stroh Brewery Co.*, 628 F. Supp. 822, 831 (N.D. Cal.

18  1986) ("To require defendants to further defend an anti-trust action, where it appears

19  that plaintiffs cannot properly allege, much less prove, anything beyond mere

20  business torts or unfair trade practices, would be a gross miscarriage of justice.").

21  "Harm to consumers," including "reduced choice or increased prices," does

22  not satisfy the requirement of injury to competition.  *Brantley*, 2011 WL 2163961,

23  at *6 (upholding dismissal of antitrust claim by this District, stating "[i]n the absence

24  of any allegation of injury to competition, as opposed to injuries to consumers, we

25  conclude that plaintiffs have failed to state a claim for an antitrust violation").

26  Instead, a plaintiff must allege (1) reduction in *competition* in the relevant

27  market "of significant magnitude," and (2) barriers prohibiting new suppliers from

28  replacing any allegedly excluded competitors.  *Adaptive Power Solutions, LLC v.*

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    *Hughes Missile Sys. Co.*, 141 F.3d 947, 951-52 (9th Cir. 1998) ("[A] temporary

2    decline in the number of competitors … is not significant enough to be classified as

3    an injury to competition under the Sherman Act.").  RealPage alleges neither.

4          ***Reduction in Competition.***  As to the first element, RealPage does not (and

5    could not) allege that Yardi has reduced competition by excluding RealPage from

6    the purported "vertical cloud" market.  To the contrary, RealPage alleges that

7    customers are flocking to its "Cloud," filling up "1,000 physical servers" in which

8    RealPage has invested "over $100 million."  FAC, ¶ 22.

9          RealPage also does not allege that Yardi has denied consumers access to

10   "vertical cloud" providers.  Yardi's alleged license amendments restrict only a

11   client's "way of implementing or hosting the Yardi Voyager software."  *Id.*, ¶ 40.

12   RealPage specifically alleges that those consumers may host *any or all* of their

13   software applications in the "RealPage Cloud."  *See, e.g.*, *id.* at ¶ 1 (alleging the

14   option to host "*all* of the IT systems used by [a client]") (emphasis supplied), ¶ 4

15   (alleging RealPage adjusts "*if* a client wants to host non-RealPage software")

16   (emphasis supplied), ¶ 23 ("The RealPage Cloud allows clients to … mov[e] *all* of

17   their applications to the cloud.") (emphasis supplied), ¶ 43 (describing a client using

18   the "RealPage Cloud" for "most of its IT needs").  Yardi's alleged restrictions

19   therefore do not prevent clients from participating in the supposed "vertical cloud"

20   market, even as narrowly (and improperly) defined, by hosting their other

21   applications in the "RealPage Cloud."

22         Furthermore, RealPage offers no facts to suggest that Yardi's alleged conduct

23   could "significant[ly]" harm competition in the alleged "vertical cloud market."

24   *Adaptive Power Solutions*, 141 F.3d at 951-52.  To the contrary, RealPage

25   repeatedly alleges instances in which Yardi is powerless to do so.  For example,

26   RealPage alleges that "*several* RealPage Cloud clients use the RealPage Cloud as

27   their computing platform to host a variety of software, *including their Yardi Voyager*

28   *property management software*."  FAC, ¶ 36 (emphasis supplied).  "Several" clients

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   using the RealPage "Cloud" to host Yardi software is a vague allegation, but it

2   exceeds the number of identified customers coerced by Yardi's supposed "market

3   power" – *i.e.*, zero.  *See* Section IV.E, below.  RealPage offers no explanation for

4   how these clients have evaded Yardi's alleged coercion, or how RealPage's alleged

5   ability to win enough "cloud" deals over Yardi to enjoy "success similar to

6   Salesforce.com and Google" squares with its purported concern that Yardi is

7   stamping out competition.  FAC, ¶¶ 7, 28.  RealPage thus fails to state a claim by

8   failing to allege facts demonstrating that Yardi's alleged conduct has foreclosed

9   "substantial" competition.  *Colonial Med.*, 2010 WL 2108123, at *6 (dismissing

10  antitrust claim because there were no facts "from which it reasonably could be

11  inferred that the percentage of the product market foreclosed is sufficiently

12  substantial to support a claim under § 1 of the Sherman Act").

13          ***Barriers to Entry.***  As to the second element, RealPage does not allege that

14  Yardi has prevented other "vertical cloud" providers from hosting Yardi software, or

15  that Yardi's conduct prevents new suppliers from entering the alleged "vertical

16  cloud" market.  *Cf. Adaptive Power Solutions*, 141 F.3d at 951-52; *see also Falstaff*

17  *Brewing Co.*, 628 F. Supp. at 828 ("[T]he elimination of a single competitor … will

18  not constitute an injury to competition compensable under the Sherman Act.").

19          Thus, even accepting RealPage's conclusions and unwarranted inferences, the

20  effect of Yardi's conduct *at most* is to deprive RealPage of *additional* revenue that

21  affected customers might be willing to pay RealPage to add Yardi hosting to the

22  bundle of other "vertical cloud" services clients can freely purchase from RealPage,

23  by RealPage's own admissions.  *See, e.g.*, FAC, ¶ 47 ("Yardi's actions have

24  damaged RealPage by causing it to lose revenue, reputational benefit, and profit"

25  attributable to Yardi Voyager when a client otherwise "move[d] its data center to the

26  RealPage Cloud.").  Nothing in RealPage's Amended Counterclaims indicates that

27  this incremental potential profit rises to "significant magnitude."  *Adaptive Power*

28  *Solutions*, 141 F.3d at 951-52.  But even if it were significant, alleged harm to

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1    RealPage's business does not qualify as harm to competition.  *Brown Shoe Co.*, 370

2    U.S. at 344; *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812-13 (9th Cir.

3    1988) (Even a "substantial loss [by] a competitor does not equal injury to

4    competition."  Rather, it is "the impact upon competitive conditions in a definable

5    market which distinguishes the antitrust violation from the ordinary business tort.")

6    (internal citations and quotations omitted); *Falstaff Brewing Co.*, 628 F. Supp. at 827

7    (Failure to allege an "adverse effect on competition as distinguished from effects on

8    plaintiff's own business … will not satisfy the pleading requirements of Section 1.").

9         RealPage's original Counterclaims included these same gaps, claiming *only*

10   that Yardi's alleged conduct "has had and continues to have anticompetitive effects."

11   Russell Decl., ¶ 2 & Ex. A (redlines) at new ¶ 59.  RealPage responded to Yardi's

12   meet and confer efforts by amending to add, "[a]bsent Yardi's anticompetitive

13   restrictions, RealPage would reach optimal economic scale and Yardi customers and

14   non-Yardi customers would enjoy lower prices, greater innovation and freedom of

15   choice to select the vertical cloud provider that best suits their needs."  *Id.* at new

16   ¶ 61; FAC, ¶ 61.  These factually-devoid allegations are no less conclusory than

17   before, and warrant dismissal on that basis alone.  *Twombly*, 550 U.S. at 554-57.

18   Further, RealPage's alleged potential for lower prices or greater choice do not alone

19   suffice to allege harm to competition.  *Brantley*, 2011 WL 2163961, at *5.[3]

20        **E.      RealPage Does Not Allege An Anticompetitive Agreement**

21        As the fifth basis for dismissal, RealPage does not allege an unreasonable

22   "agreement" causing harm to competition.  *Twombly*, 550 U.S. at 553-54.

23        Alleging the existence of an unidentified agreement does not suffice.  *Int'l*

24   *Norcent Tech. v. Koninklijke Philips Elecs. N.V.*, No. CV 07-00043, 2007 WL

25   4976364, at *10 (C.D. Cal. Oct. 29, 2007) ("As with the magic words 'coerce,'

26   'combine,' and 'conspiracy,' a mere allegation that parties entered into an agreement

27   _____

28   [3] If these allegations suffice, then plaintiffs always could ensure invasive antitrust discovery by alleging that loss of income prevented optimal economic scale, lower prices, and innovation.

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    to restrain trade does not suffice to state a § 1 claim.").  Rather, RealPage must

2    identify the alleged agreements and the parties to them.  *Rick-Mik Enters.*, 532 F.3d

3    at 975-76 (upholding dismissal of an antitrust claim that failed to identify the

4    "numerous" parties with whom defendant allegedly agreed); *E & E Co., Ltd. v. Kam*

5    *Hing Enters., Inc.*, No. C-08-0871, 2008 WL 3916256, at *1-2 (N.D. Cal. Aug. 25,

6    2008) (dismissing antitrust claims alleging agreements with "unidentified key

7    suppliers" and unidentified "various manufacturers in China").

8               **1.    The Court Should Not Accept RealPage's Formulaic**
                       **Allegations of "Amended License Agreements"**

9        RealPage alleges that "Yardi has entered into agreements that restrain

10   competition" in the form of "amended license agreements, imposed on its clients

11   after they have licensed Voyager and are locked in to its high switching costs,

12   whereby the client agrees at Yardi's demand to explicitly, or in effect, not to [sic]

13   use the RealPage Cloud."  FAC, ¶¶ 59-61.  This conclusion, devoid of plausible

14   factual context, fails to state a claim under *Twombly*.

15       Like RealPage, the *Twombly* plaintiff pled Section 1 claims.  *Twombly*, 550

16   U.S. 544.  Like RealPage, the *Twombly* plaintiff alleged unspecified agreements.  *Id.*

17   In light of an antitrust claim's "potentially enormous expense of discovery," the

18   Supreme Court held that "a conclusory allegation of agreement at some unidentified

19   point does not supply facts adequate" to state a Section 1 claim.[4]  *Id.* at 557, 559-60;

20   *see also Kendall*, 518 F.3d at 1046-48.

21       RealPage does not identify – in the way *Twombly* and its progeny require –

22   any "amended" agreements summarily alleged in its Amended Counterclaims.  FAC,

23   ¶¶ 59-61.  Nor does it allege that Yardi has forced license amendments on *all* of

24   Yardi's Voyager clients (which might arguably identify the alleged agreeing parties

---

25   [4] RealPage has served 138 document requests on Yardi seeking, for example, "All CUSTOMER
26   CONTRACTS" (No. 28), "All DOCUMENTS relating to or reflecting any actual or contemplated
     changes or amendments to any CUSTOMER CONTRACT" (No. 29), and "All DOCUMENTS
27   constituting or reflecting meeting notes, reports, minutes, summaries, preparation, or presentation
     materials with YARDI customers" (No. 34).  Russell Decl., ¶ 6 & Ex. D.  Courts warn against this
28   type of "extortion."  *Kendall*, 518 F.3d at 1047; *Twombly*, 550 U.S. at 558-59.

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    at issue).  In fact, RealPage alleges the opposite.  For example, "Client 2" – a "top

2    ten property management firm" – allegedly moved its Yardi software *to the*

3    *RealPage "Cloud"* after a competitive bid process against Yardi.  *Id.*, ¶¶ 43-45.

4    RealPage makes no allegation that Yardi imposed an "amendment" to Client 2's

5    Voyager license preventing Client 2's freedom to choose the RealPage "Cloud."

6    Instead, it complains that Yardi's bid allegedly drove down the price RealPage could

7    extract from Client 2 – a *more* competitive outcome for the consumer.  *Id.*

8         Without having identified any of the alleged parties to any of the alleged

9    "amended license agreements," RealPage has not alleged facts necessary to state a

10   Section 1 claim.  *Int'l Norcent Tech.*, 2007 WL 4976364, at *10; *Rick-Mik Enters.*,

11   532 F.3d at 975-76; *E & E Co.*, 2008 WL 3916256, at *1-2.

12        **2.    None of RealPage's Purported "Exemplar" Client
              Descriptions Allege Anticompetitive "Amended License
13            Amendments"**

14        RealPage alleges relationships with seven Yardi clients to whom it has

15   assigned code names.  FAC, ¶¶ 42-49.  It alleges these clients are "specific examples

16   of Yardi's anticompetitive and tortious interference with RealPage clients."  *Id.*,

17   ¶ 41.  That statement is misleading.  RealPage does not reference *any* of these

18   clients, or Yardi's alleged conduct relating to them, in its *antitrust* counterclaims.

19   *Id.*, ¶¶ 58-70.  This omission is intentional:  RealPage instead specifically names

20   these clients in its *interference* counterclaims.  *Id.*, ¶¶ 73, 77.  RealPage does not get

21   a "free pass to the summary judgment stage" when its best "examples" of Yardi's

22   misconduct do not allege the "amended license agreements" on which RealPage

23   bases its antitrust counterclaims.  *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124,

24   1132 (C.D. Cal. 2007) ("[A]s masters of their Complaint, Plaintiffs must allege the

25   best facts for their case.  Presumably, Plaintiffs have done so … .").

26        The table below demonstrates, for six of the seven "exemplar" clients, that

27   RealPage has not alleged, and in some cases has contradicted, an amended license

28   agreement imposed by Yardi ("Client 1" is discussed further below).

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

| Coded Client | Alleged Relevance | Cite |
|---|---|---|
| "Client 2" | Named in interference with prospective economic advantage *only*. RealPage won a bid against Yardi and now hosts this client's Yardi software in its cloud. Contradicts RealPage's antitrust allegations that Yardi prevents clients from being hosted in the RealPage cloud. | ¶¶ 43-45 |
| "Client 2-A" | Not named for *any* counterclaim. "Recently signed" contract with Yardi that allegedly prohibits RealPage from "implementing" the software interface. No allegation related to cloud services or a coerced amended license. | ¶ 46 |
| "Client 2-B" | Not named for *any* counterclaim. Yardi allegedly refused to permit RealPage to "support" an "upgrade" that this customer is allegedly "planning." No allegation related to cloud services or a coerced amended license. | ¶ 46 |
| "Client 3" | Named in interference with prospective economic advantage *only*. Customer moved its data center to the RealPage cloud despite Yardi allegedly having "demanded" that it not do so. No allegation related to a coerced amended license. | ¶ 47 |
| "Client 4" | Named in interference with prospective economic advantage *only*. Client allegedly did not choose RealPage as its "implementation consultant." No allegation related to cloud services or a coerced amended license. | ¶ 48 |
| "Client 5" | Named in interference with prospective economic advantage *only*. Client has allegedly switched from Yardi software to RealPage software (rather than the reverse). No allegation related to cloud services or a coerced amended license. | ¶ 49 |

For "Client 1," the lone remaining client "exemplar," RealPage alleges that "after Client 1 had already purchased Voyager Yardi created newly-revised software license agreements." FAC, ¶ 42. This allegation is also misleading, and does not support RealPage's antitrust counterclaims, for three reasons.

First, RealPage does not allege, as it must, that Client 1 *agreed* to Yardi's supposed "newly-revised" license. RealPage fails to state a claim on this basis alone: the heart of its Section 1 and Cartwright Act counterclaims is an agreement

1   between two or more entities in restraint of trade.  *Twombly*, 550 U.S. at 554-57.

2          Second, RealPage does not allege that Yardi *amended* an existing Client 1

3   license.  RealPage's antitrust allegations rely on "amended license agreements."

4   FAC, ¶ 61.  If Yardi had amended Client 1's license, RealPage could have said so,

5   even if only on information and belief.  Alternatively, RealPage could have attached

6   any alleged license and amended license to its Counterclaims or Amended

7   Counterclaims.  It did neither.  Instead, different from the "amendments" in its

8   antitrust allegations, RealPage alleges that Yardi "created newly-revised software

9   license agreements" after Client 1 "purchased" Voyager.  *Compare id.*, ¶ 42 *with*

10  ¶ 61.  RealPage alleges no facts to suggest that Client 1 had a pre-existing Yardi

11  license *or* that Yardi introduced an amendment to any such license.

12         Third, RealPage does not allege high switching costs.  RealPage's antitrust

13  allegations rely on Yardi's power over customers disadvantaged by the "high

14  switching costs associated with re-aligning their IT systems and transferring their

15  data to a new software architecture."  *Id.*, ¶ 60.  If Client 1 was forced to sign an

16  amendment because of switching costs, RealPage could have said so.  Instead, it

17  alleges only that Yardi created an agreement "after Client 1 had already purchased

18  Voyager" (and did not make even this allegation until the Amended Counterclaims).

19  *Id.*, ¶ 42; Russell Decl., ¶ 2 & Ex. A (redlines) at new ¶ 42.  A mere "purchaser" is

20  not locked in under RealPage's alleged criteria.  RealPage is silent as to whether

21  Yardi had *delivered* the software, whether Client 1 had *installed* the software,

22  whether Client 1 had begun *using* the software, or whether Client 1 had committed

23  its "IT systems" or "data."  FAC, ¶ 40.  RealPage alleges no facts to suggest that

24  Client 1 was handicapped by the "switching costs" central to its antitrust allegations

25  (*if* it agreed to a license amendment, which RealPage also does not allege).

26  *Compare id.*, ¶ 42 *with* ¶ 61.

27         The Client 1 allegations thus do not support the existence of an "amended

28  license agreement" or a locked-in client.  Indeed, RealPage's careful word choice

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1     signals that it knows no such antitrust violation exists.

2         After two iterations of the Counterclaims, the Court should take note that

3     RealPage continues to explicitly reference (some of) these "exemplar" clients in

4     stating its interference counterclaims, while excluding them *all* from its antitrust

5     counterclaims. *Compare id.*, ¶¶ 71-82, *with* ¶¶ 58-70. RealPage is right to continue

6     to exclude them; they do not belong there. But its antitrust counterclaims cannot

7     survive when its best efforts to identify even a single agreement, after months of

8     investigation and two complaints, fail. *Zella*, 529 F. Supp. 2d at 1132.

9    **V.     REALPAGE FAILS TO STATE A COUNTERCLAIM FOR**
10             **INTEREFERENCE WITH CONTRACT**

11         An interference with contract claim must allege, among other elements, a valid

12     contract with a third party and actual breach or disruption of the contract. *Pac. Gas*

13     *& Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126, 270 Cal. Rptr. 1, 3

    (1990); Judicial Council of Cal. Civ. Jury Instructions (CACI) No. 2201.

14         Courts should dismiss contractual interference claims that do not identify the

15     contract at issue and/or allege facts describing how the contract was "actually

16     breached or disrupted." *G & C Auto Body Inc. v. Geico Gen. Ins. Co.*, No. C06-

17     04898, 2008 WL 687371, at *11 (N.D. Cal. Mar. 11, 2008); *Kentmaster Mfg. Co. v.*

18     *Jarvis Prods. Corp.*, 146 F.3d 691, 695 (9th Cir. 1998) (dismissing claim because

19     plaintiff did "not identif[y] any existing contracts and does not even directly allege

20     that any contracts were breached"); *Yanik v. Countrywide Home Loans, Inc.*, No. CV

21     10-6268, 2010 WL 4256312, at *5-6 (C.D. Cal. Oct. 18, 2010) (dismissing claim

22     because plaintiff "failed to identify facts establishing the contracts with which

23     defendants allegedly interfered").

24         The only agreement identified by RealPage in support of its contractual

25     interference counterclaim is an alleged "Letter Agreement for Interim Services" with

26     "Client 1." FAC, ¶¶ 42, 72. RealPage otherwise refers to unspecified "contracts

27     with third parties." *Id.*, ¶ 72. Excluding Client 1, RealPage's counterclaim fails

28

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   because RealPage has not identified any of the supposed "third parties" at issue, the

2   contracts with which Yardi has allegedly interfered, or the nature of any alleged

3   breach or disruption.  *Kentmaster*, 146 F.3d at 695; *Yanik*, 2010 WL 4256312, at *5.

4        Nor does the alleged Client 1 "Letter Agreement for Interim Services" save

5   the counterclaim.  RealPage alleges that Client 1 "*announced* that it could not use

6   the RealPage Cloud," but does *not* allege, as it must, that Client 1 breached the

7   "Letter Agreement," or how Yardi disrupted performance of the "Letter Agreement."

8   FAC, ¶ 42 (emphasis supplied).  In fact, RealPage does not allege, nor is there any

9   reason to infer, that performance under the "Letter Agreement" required RealPage to

10  host Client 1's Yardi software in its "Cloud."  *Id.*  If no Yardi hosting was required,

11  then no alleged restriction by Yardi could have caused a breach or disruption.

12       RealPage thus alleges no facts to warrant concluding that Yardi "did interfere

13  with or disrupt RealPage's contractual relationships," *id.*, ¶ 73, and the Court should

14  dismiss the interference with contract counterclaim.  *G & C Auto Body*, 2008 WL at

15  687371, at *11; *Philips Med. Capital, LLC v. Med. Insights Diagnostics Ctr., Inc.*,

16  471 F. Supp. 2d 1035, 1046 (N.D. Cal. 2007) (dismissing interference claims based

17  on "conclusory language that merely repeats the elements of these torts").

18  **VI.   REALPAGE'S UNFAIR COMPETITION AND PROSPECTIVE
        INTERFERENCE COUNTERCLAIMS FAIL TO THE EXTENT THEY
19      RELY ON DISMISSED COUNTERCLAIMS**

20       If the Court dismisses the antitrust and/or contractual interference

21  counterclaims, it also should dismiss RealPage's unfair competition and prospective

22  interference counterclaims to the extent they rely on antitrust or contractual

23  interference allegations.  *See* FAC, ¶¶ 79, 85 (referencing "violation of the antitrust

24  laws" as alleged unlawful predicate acts); *Kentmaster*, 146 F.3d at 694-96 (affirming

25  dismissal of unfair competition claim based on dismissed antitrust claims); *In re Cal.*

26  *Title Ins. Antitrust Litig.*, No. C 08-01341, 2009 WL 3756686, at *8 (N.D. Cal. Nov.

27  6, 2009) (dismissing unfair competition claim "to the extent it relies on [dismissed]

28  alleged antitrust violations").

**MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

# VII.   THE COURT SHOULD NOT GRANT ANOTHER AMENDMENT

Courts should deny leave to amend when amendment would be "futile." *Klamath-Lake Pharm. Ass'n*, 701 F.2d at 1293.  An amended complaint "may only allege other facts consistent with the challenged pleading." *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990) (internal citation and quotation omitted). A court has "particularly broad" discretion to deny leave to amend "where plaintiff has previously amended the complaint," as here. *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989); *see also Int'l Norcent Tech.*, 2007 WL 4976364, at *15-16 (denying leave to file a second amended complaint that "allege[d] essentially the same claim pled in the original complaint").

The Court may judicially notice documents to consider futility. *Bracamontes*, 2011 WL 332527, at *4; *see also Tarque v. Nat'l Rental Car Fin. Corp.*, No. CV 08-3882, 2009 WL 2711951, at *5 (C.D. Cal. Aug. 26, 2009) (denying motion to amend when "judicially noticed facts" established that it would "be futile for Plaintiff to amend his complaint").  Yardi requests that the Court take judicial notice of two publicly-available documents authored by RealPage.  RFJN, Exs. 1 & 2.

The first document is RealPage's most recent Form 10-Q Quarterly Report, filed with the SEC on May 9, 2011 – eight days before RealPage filed its Amended Counterclaims.  *Id.*, Ex. 1.  RealPage asserts in the Report that "[t]he market for our solutions is *intensely competitive*, *fragmented* and *rapidly changing* with relatively *low barriers to entry*." *Id.* (emphasis supplied).  RealPage continues, "[w]ith the introduction of *new technologies and market entrants*, we expect *competition to intensify in the future*." *Id.* (emphasis supplied).  It also states that it "face[s] competition primarily from point solution providers, including traditional software vendors, application service providers, or ASPs, and other software as a service, or SaaS, providers." *Id.*  RealPage admits that it provides services "marketed" as the "RealPage Cloud" to only "some of [its] customers." *Id.*

The second document is a RealPage press release issued on April 25, 2011 –

Case No. CV-11-00690 ODW (JEMx)

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   almost a month after RealPage filed its original Counterclaims.  RFJN, Ex. 2.  In the

2   release, RealPage's Vice President of Cloud Computing states, "Most companies use

3   a *mish-mash of different software systems*, *with varying degrees of integration*. …

4   Many top companies within the multifamily industry have chosen the RealPage

5   Cloud *over traditional hosting providers* because it works better and provides a cost-

6   effective solution to meet their IT needs."  *Id.* (emphasis supplied).

7        These documents admit in just a few sentences what RealPage's Amended

8   Counterclaims tip-toe around for 32 pages – *i.e.*, that real estate software owners

9   choose from a spectrum of "intensely competitive" and "rapidly changing" hosting

10  providers, and that "some" have chosen the "RealPage Cloud" while "most" have

11  chosen a "mish-mash" of systems with "varying degrees of integration."  RFJN,

12  Exs. 1 & 2.  In the face of these public statements, including to the SEC, RealPage

13  cannot now allege that Yardi has foreclosed substantial competition or prevented

14  market entry by new suppliers, or that customers do not choose any other hosting

15  solutions over the "RealPage Cloud."

16       Attempting again to amend the Amended Counterclaims would be futile,

17  including because no good faith amendments consistent with RealPage's first two

18  complaints could account for these public statements by RealPage management.

19  **VIII.  CONCLUSION**

20       RealPage has now had two opportunities to attempt to state causes of action

21  for antitrust violations and interference with contract.  For all of the reasons stated

22  above, the Court should dismiss RealPage's Second, Third, and Fourth Amended

23  Counterclaims without leave to amend.  The Court should also dismiss RealPage's

24  Fifth and Sixth Amended Counterclaims (unfair competition and prospective

25  interference) to the extent they rely on any dismissed counterclaims.

26

27

28

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   DATED:  June 16, 2011     Bingham McCutchen LLP

2

3                   By: _____/s/ Bree Hann_____

4                          Bree Hann

5        Attorneys for Plaintiff and Counterdefendant
                    Yardi Systems, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. CV-11-00690 ODW (JEMx)

MEMORANDUM ISO YARDI'S RULE 12(B)(6) MOTION TO DISMISS