1  BINGHAM MCCUTCHEN LLP
2  Geoffrey M. Howard (SBN 157468)
   Email: geoff.howard@bingham.com
3  Bree Hann (SBN 215695)
   Email: bree.hann@bingham.com
4  Chad Russell (SBN 246046)
   Email: chad.russell@bingham.com
5  Three Embarcadero Center
6  San Francisco, CA  94111-4067
   Telephone:  415.393.2000
7  Facsimile:  415.393.2286

8  Attorneys for Plaintiff and
   Counterdefendant
9  Yardi Systems, Inc.

10

                 UNITED STATES DISTRICT COURT
11
                 CENTRAL DISTRICT OF CALIFORNIA
12

13

14

15  Yardi Systems, Inc.,                Case No. CV 11-00690 ODW (JEMx)

16              Plaintiff,              **DECLARATION OF CHAD RUSSELL
                                        IN SUPPORT OF YARDI SYSTEMS,
17       v.                             INC.'S MOTION TO DISMISS
                                        PURSUANT TO FED. R. CIV. P.
18  RealPage, Inc. and DC Consulting,   12(B)(6)**
    Inc.,
19                                      Hearing Date:  July 25, 2011
20              Defendants.             Time:  1:30pm
                                        Place:  Courtroom 11, Spring Street
21                                      Judge:  Hon. Otis D. Wright II
22

23  RealPage, Inc.,

24              Counterclaimant,

25       v.

26  Yardi Systems, Inc.,

27              Counterdefendant.

28
                                                    Case No. CV-11-00690 ODW (JEMx)

_____
            RUSSELL DECLARATION ISO YARDI'S MOTION TO DISMISS

1    I, Chad Russell, declare as follows:

2    1.    I am member of the State Bar of California and an associate at Bingham

3    McCutchen LLP, counsel of record for Plaintiff and Counterdefendant Yardi

4    Systems, Inc. ("Yardi") in this action.  I have personal knowledge of the matters

5    stated in this Declaration by virtue of my representation of Yardi in this action.  If

6    called and sworn as a witness, I could and would competently testify as to such

7    matters.

8    2.    Attached as **Exhibit A** is a true and correct copy of a redline comparing

9    Defendant and Counterclaimant RealPage, Inc.'s Counterclaims to its First Amended

10   Counterclaims.  RealPage, Inc. ("RealPage") provided this redline at Yardi's request

11   on May 19, 2011.

12   3.    At a May 4, 2011 teleconference that I attended, RealPage's counsel

13   agreed that RealPage was not asserting a *per se* antitrust claim in its original

14   Counterclaims.  Attached as **Exhibit B** is a true and correct copy of a letter from

15   Bree Hann, counsel for Yardi, to James Pearl, counsel for RealPage, on the same

16   day, confirming that agreement.  Portions of Exhibit B are highlighted to assist the

17   Court in identifying the information relevant to Yardi's Motion to Dismiss.

18   4.    Attached as **Exhibit C** is a true and correct copy of an email from

19   James Pearl, counsel for RealPage, to Bree Hann, counsel for Yardi, on May 15,

20   2011, stating, with reference to RealPage's First Amended Counterclaims, that "the

21   changes to the counterclaims are really just points of clarification and minor in

22   scope."  Portions of Exhibit C are highlighted to assist the Court in identifying the

23   information relevant to Yardi's Motion to Dismiss.

24   5.    At a June 10, 2011 teleconference that I attended, RealPage's counsel

25   stated that RealPage now asserts a *per se* tying claim under "*PeaceHealth*" in its

26   First Amended Counterclaims.  RealPage's counsel did not identify any other cases

27   or *per se* theories.

28   6.    Attached as **Exhibit D** are true and correct copies of RealPage's First

RUSSELL DECLARATION ISO YARDI'S MOTION TO DISMISS

1    Set of Requests for Production to Yardi, Nos. 28-46.  To date, RealPage has served

2    138 document requests on Yardi.

3

4              I declare under penalty of perjury that the foregoing is true and correct.

5    Executed in San Francisco, California, on June 16, 2011.

6

7

8                                              _____

9                                                        Chad Russell

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUSSELL DECLARATION ISO YARDI'S MOTION TO DISMISS

EXHIBIT A

MARK A. SAMUELS (S.B. #107026)
msamuels@omm.com
JAMES M. PEARL (S.B.#198481)
jpearl@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

DAVID R. EBERHART (S.B. #195474)
deberhart@omm.com
SHARON M. BUNZEL (S.B. #181609)
sbunzel@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Defendant and
Counterclaimant REALPAGE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YARDI SYSTEMS, INC., a California corporation,<br><br>              Plaintiff,<br><br>       v.<br><br>REALPAGE, INC., a Delaware corporation, and DC CONSULTING, INC., a Washington, D.C. corporation,<br><br>              Defendants.<br>_____<br><br>REALPAGE, INC., a Delaware corporation,<br><br>              Counterclaimant,<br><br>       v.<br><br>YARDI SYSTEMS, INC., a California corporation,<br><br>              Counterdefendant. | Case No. CV11-690 ODW (JEMx)<br><br>~~COUNTERCLAIMS AND ANSWER TO COMPLAINT OF~~ REALPAGE, INC.**'S FIRST AMENDED COUNTERCLAIMS**; DEMAND FOR JURY TRIAL |

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
~~AND ANSWER~~

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit A**
**Page 2**        2

REALPAGE, INC.'S ANSWER TO
COMPLAINT
NO. CV11-690 ODW (JEMx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNTERCLAIMS

RealPage, Inc. ("RealPage"), by and through its undersigned attorneys, for its counterclaims against plaintiff and counterdefendant Yardi Systems, Inc. ("Yardi"), avers on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      Cloud computing is the future of information technology ("IT").  In a recent survey of 481 CFOs across the United States, 83% said that their companies expect to rely on cloud-based services in the next three to five years.  Innovators such as RealPage have reshaped how businesses think about their IT infrastructure by introducing a much more efficient platform to deliver computer software called Software-as-a-Service ("SaaS"), a type of cloud computing.  In addition, RealPage has introduced a new enterprise-wide, vertically-integrated cloud computing service called the "RealPage Cloud" by which RealPage manages and operates all of the IT systems used by a businessmultifamily real estate owners and property management businesses—including RealPage's SaaS products—at a much lower overall cost and with higher performance, greater reliability, and improved disaster recovery capabilities.

2.      As with all transformative business innovations, there are those who are left behind.  Yardi is one such company.  Yardi has clung to two outdated traditional software delivery models: (1) the "on-premises" approach, in which the client installs and runs Yardi software on its own computer server; and (2) the Application Service Provider ("ASP") approach, in which the client accesses its version, or "instance," of Yardi software via the Internet from computer servers located at Yardi's own facilities.  Unlike RealPage, Yardi does not offer true enterprise cloud computing servicesYardi's antiquated software delivery practices have compromised its ability to effectively compete in the market for vertically-integrated cloud computing.  Faced with a changing business environment in which

1  it struggles to ~~compete~~keep up, Yardi is leveraging stolen trade secrets and the

2  market power it has established through its popular Voyager software in an

3  anticompetitive scheme to prevent *its own clients* from obtaining the significant

4  benefits of RealPage's state-of-the-art SaaS offerings and cloud computing services

5  while Yardi attempts to ~~build a~~expand its competing cloud computing offering.

6      3.    Before the advent of cloud computing, businesses had to build data

7  centers and employ personnel to manage hardware and software upgrades.  This

8  was a capital-intensive and expensive undertaking.  Cloud computing allows

9  businesses to dramatically reduce their operating and capital costs by transferring

10  these infrastructure and support responsibilities to a third-party service provider.

11  RealPage, a leading developer of residential property management software, offers

12  its cloud computing clients these cost savings and more.  Whereas most cloud

13  computing providers are industry agnostic—purveyors of one-size-fits-all

14  solutions—RealPage is the first cloud computing provider to offer "vertically-

15  integrated" systems and support designed specifically to address the needs of

16  multifamily real estate owners and property managers throughout the United States.

17      4.    RealPage hosts its cloud computing clients in the RealPage Cloud,

18  providing them uninterrupted access to all of their data and processing

19  functionality, including real-time information about each of their managed

20  properties.  The RealPage Cloud ~~is unique because it~~ aggregates applications from

21  multiple software providers into ~~one enterprise-wide~~a single system that is ~~tightly~~

22  vertically-integrated and managed holistically.  In other words, if a client wants to

23  use non-RealPage software in the RealPage Cloud, RealPage provides the technical

24  expertise for the client's various software and database packages to work

25  seamlessly with other software, from other providers, in the Cloud.  ~~This allows the~~

26  ~~client~~And RealPage provides the industry expertise to support the various

27  applications unique and relevant to the multifamily real estate and property

28  management industry.  This allows clients maximum freedom of choice to select

1  any number of different vendors and optimized performance in an environment

2  specifically tailored to their business.

3      5.      Unlike on-premises or ASP software applications, RealPage's SaaS

4  applications are ideally suited for this enterprise widevertically-integrated cloud

5  system.  SaaS applications involve a single version of software code that is

6  accessed by all clients.  On-premises and ASP applications, on the other hand,

7  require a different code stream for each client.  Thus, it is much easier and more

8  reliable for third-party applications to "integrate" with (*i.e.*, communicate, share

9  key business data, and interact with) a SaaS application because the developers of

10  third-party applications need to maintain only one version of their code to integrate

11  effectively with a SaaS application.  SaaS applications are also much simpler for

12  the end-user because, unlike on-premises and ASP applications, SaaS applications

13  do not require end-users to refer to complicated user manuals and installation

14  guides.  This is because SaaS applications do not need to be installed, and online

15  user support typically is embedded in the application interface.  SaaS companies

16  such as RealPage are thus displacing on-premises and ASP software companies

17  because SaaS products are generally easier to use and the overall cost of operating a

18  SaaS application is much lower than *owning and managing a separate version of*

19  *software for each client company.*

20      6.      For example, a multifamily residential property manager using an on-

21  premises or ASP property management system like Yardi Voyager will spend

22  significantly more than the license fee in order to use the software.  In most cases,

23  the total cost of ownership ("TCO") for on-premise and ASP software greatly

24  exceeds the TCO for SaaS over a four-year period.  For each discrete dwelling unit

25  at a residential site under management, these costs typically will exceed the license

26  fee by (i) $1.00-$1.50 per unit per month in first-line application support and

27  administration (*e.g.*, service packs, hot fixes, plug-ins, customizations and

28  integrations); (ii) $0.25-$0.50 per unit per month in ongoing training to deal with

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED  AND ANSWER

1   turnover in site personnel; and (iii) $0.25-$0.50 per unit per month in IT

2   infrastructure for hosting fees (if ASP), data center hardware and software (if on-

3   premises), and IT resources.  In contrast, first-line support, ongoing user training,

4   and IT infrastructure costs are *zero* for clients of RealPage's SaaS application.

5         7.   The superiority of SaaS applications is recognized well beyond the

6   multifamily property management industry.  In only a few years Salesforce.com has

7   put severe pressure on more established companies and is now a leader in the

8   Customer Relationship Management market.  Similarly, Google's SaaS office

9   application suite is quickly gaining market share on more established traditional

10   office software products.  RealPage is the only major technology provider in the

11   multifamily property management market to offer a SaaS platform to its clients, and

12   it is enjoying success similar to Salesforce.com and Google.  Yardi is in danger of

13   being displaced because it has limited itself to the outdated on-premises and ASP

14   software delivery platforms.  ~~The disadvantages of these outdated delivery~~

15   ~~platforms are magnified as businesses make the transition to enterprise-wide cloud~~

16   ~~computing.~~

17         8.   ~~While Yardi offers its clients limited hosting services and calls those~~

18   ~~services a "cloud," what Yardi offers, in actuality, is a "faux cloud."~~As businesses

19   transition to vertically-integrated cloud computing, the disadvantages associated

20   with Yardi's outdated delivery platforms are magnified.  Yardi's competing

21   vertically integrated cloud service, Yardi Cloud Services™, is confined and stalled

22   by the company's antiquated technology.  Most of Yardi'[2]'s so-called "cloud"

23   offerings are in fact ASP services.  Thus, Yardi must manage separate instances of

24   code for each client, which raises client costs as much as 40% above those of a

25   SaaS company.  Furthermore, Yardi's clients must incur significant costs to

26   evaluate each proposed upgrade, service pack, hot fix, and plug-in to Yardi's

27   software and then coordinate when the service will be taken offline as each new

28   upgrade or change is applied to the application.  Client-based IT staff are forced to

REALPAGE, INC.'S COUNTERCLAIMS
FIRST AMENDED ~~AND ANSWER~~

1  carefully plan and test the integration between Yardi's software and each third-

2  party software application used by the client every time that Yardi or another

3  provider changes its software.  This time-consuming and repetitive integration

4  testing adds significant cost and is the source of unanticipated downtime,

5  particularly since Yardi often releases many "fixes" to its application each year.  In

6  contrast, RealPage Cloud clients do not incur these costs or suffer these business

7  interruptions because upgrades and integrations are managed by RealPage, not the

8  client.

9       9.     Yardi's limitations are ~~of its own choosing; it~~by choice; Yardi has

10  simply refused to make the necessary investments in technology and in its data

11  center to create ~~a truly~~an optimally functional ~~SaaS~~ cloud computing environment.

12  Indeed, Yardi's data center architecture is nothing more than a collection of

13  individual servers that separately support each of its clients.  Because of the

14  cumbersome design of Yardi's ~~faux~~ cloud, performance can be slow, often

15  requiring larger clients to schedule long-running jobs overnight or on weekends to

16  avoid slowdowns in the performance of Yardi's application during the working day.

17  This can be especially frustrating to site personnel who are trying to manage

18  complex operations at each apartment community when month-end processing

19  slows down the system.  Availability is a challenge for Yardi because it has to

20  manage so many different instances of software, each uniquely configured and

21  customized.  Compounding the problem, in order to integrate third-party

22  applications each third-party application must be matched to the specific version,

23  service pack, hot fix, and plug-in of software that a given Yardi client is using.

24       10.    In addition, Yardi's security systems are notoriously suspect and

25  unreliable.  For example, in certain cases, Yardi clients have been able to view

26  other clients' confidential and proprietary data.  Yardi also does not provide

27  adequate real-time disaster recovery, leaving its clients vulnerable to outages.  In

28  fact, the "disaster recovery" plan that Yardi offers actually restores only a limited

**Exhibit A**
**Page 7**  5

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED AND ANSWER

1  client environment in a degraded or crippled mode for basic accounting and

2  operational functionality.  It does not cover the various integrations and other

3  services that are essential to clients.  Yardi's data security capabilities are similarly

4  lacking.  For example, when Massachusetts and Nevada passed sweeping privacy

5  and data security legislation requiring encryption of personally identifiable

6  information, Yardi was unable to deliver an acceptable technical solution, leaving

7  its clients legally exposed.  Yardi system passwords are not properly protected and

8  in some cases are not changed for years.

9        11.    In contrast to Yardi's offerings, the RealPage SaaS and cloud

10  computing offering incorporates advanced security and storage area network

11  architecture that dramatically improves the entire system's performance.  Yardi is

12  aware of its multiple shortcomings but is, to date, unwilling to spend the capital or

13  invest in business processes to compete with RealPage's investments or keep up

14  with the transforming business needs.  Yardi now finds itself at a growing

15  disadvantage as the market and Yardi clients have gravitated quickly toward the

16  obvious efficiencies and the superior technology and individualized service offered

17  by RealPage.

18        12.    Yardi is now desperate to stop RealPage's cloud progress.  Rather than

19  innovate and invest in a superior architecture and the infrastructure to offerimprove

20  its own viable cloud platform, Yardi is trying to impede the advance of a more

21  efficient and desirable technology platform and sabotage the growth of RealPage

22  through a wide-ranging campaign of client interference and intimidation.  The

23  tactics employed by Yardi in its campaign to slow RealPage's advancements

24  include:

25     •  Coercing Yardi's own clients to sign agreements that prevent them from

26        using RealPage's cloud computing and consulting services.

27     •  Threatening to terminate the software licenses of Yardi clients that choose

28        to host software in the RealPage Cloud on objectively baseless grounds

**Exhibit A**
**Page 8**   6

REALPAGE, INC.'S COUNTERCLAIMS
FIRST AMENDED AND ANSWER

1    solely for the purpose of intimidating those clients into not using the

2    RealPage Cloud.

3    •    Intentionally and falsely maligning RealPage's services and rights while

4         offering hollow promises of Yardi's own abilities to service clients.

5    •    Hiring RealPage personnel to steal RealPage's most highly confidential

6         trade secrets, including:

7         ➢    RealPage's superior primary and disaster recovery data center

8              infrastructure and architectural design;

9         ➢    RealPage's proprietary technology used to monitor and improve the

10             operation of third party applications, including Yardi applications;

11        ➢    RealPage's proprietary change management and release management

12             business processes; and

13        ➢    RealPage's confidential bid proposals made to specific potential cloud

14             computing clients where Yardi was competing against RealPage.

15        13.    Yardi's campaign seeks to deny consumers the benefits of the

16   RealPage Cloud in order to lock them into Yardi's lagging business model.  Clients

17   should be free to choose the RealPage Cloud or a traditional software provider like

18   Yardi, Yardi Cloud Services, or any other solution that best suits their business

19   needs.  The choice should be governed by which company provides the best value

20   through technology, infrastructure, expertise, price, and service.

21

22                        **JURISDICTION AND VENUE**

23        14.    This Court has original jurisdiction over RealPage's federal antitrust

24   claim, which arises under the Sherman Antitrust Act (15 U.S.C. § 1, et seq.).  28

25   U.S.C. §§ 1331, 1337(a).  This Court also has supplemental jurisdiction over the

26   related violations of California statutory and common law alleged herein because

27   these claims are so related to the federal claims in this case, over which the Court

28   has original jurisdiction, that they form a part of the same case or controversy

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1    within the meaning of Article III of the United States Constitution.  28 U.S.C.
2    §1367.

3         15.    This Court also has diversity jurisdiction over RealPage's
4    counterclaims because RealPage and Yardi are citizens of different states and the
5    amount in controversy exceeds $75,000.  28 U.S.C. § 1332.

6         16.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a
7    substantial part of the wrongful conduct alleged herein occurred in this district,
8    including but not limited to the antitrust violations, acts of unfair competition, and
9    acts of misappropriation of trade secrets that give rise to RealPage's claims against
10   Yardi.

11

12                          **THE PARTIES**

13        17.    RealPage is a Delaware corporation with its principal place of business
14   in Carrollton, Texas.  It is engaged in the business of, among other things, licensing
15   multifamily property management software, providing software consulting services
16   for the real estate industry, and providing secure software hosting services for its
17   clients.

18        18.    Yardi Systems is a California corporation with its principal place of
19   business in Goleta, California.  It is engaged in the business of, among other things,
20   licensing real estate investment management and property management software.

21

22                       **FACTUAL BACKGROUND**

23   OVERVIEW OF CLOUD COMPUTING

24        19.    RealPage is a SaaS company.  Because SaaS companies host and
25   maintain their own applications, they invest significantly in their data center
26   infrastructure, disaster recovery technology, business processes, and support
27   capabilities.  Traditional on-premises software providers do not need to make such
28   an investment—they simply provide their product to the end-user for installation on

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1    the end user's individual computer.  While traditional ASP software providers host

2    their product in the provider's data center, due to outdated architecture they

3    typically do not have the same hosting capabilities and infrastructure of a SaaS

4    provider.  Yardi is at its core a traditional software provider, and its ~~fledgling~~

5    ~~attempt~~current incapacity to ~~enter~~fairly compete in the cloud computing market

6    must be understood in this light.

7         20.    In the most advanced cloud computing model, the client's computer

8    has only minimal software installed (such as a web browser) and all computing

9    software (whether word processing, database, email or otherwise) and all data are

10   maintained in a central data center accessible through the Internet.  Users

11   experience substantial benefits with cloud computing.  Local computers require far

12   less maintenance and fewer "bug" fixes because the operative software and data

13   reside at a remote, centralized location.  Software updates occur at the central

14   storage site and are applied by the cloud vendor to a single version of code that all

15   users of the system can access.  The servers needed to maintain the cloud can easily

16   be updated and repaired in the background while the users continue their work

17   uninterrupted.

18        21.    Cloud computing is also highly scalable.  As a company grows or

19   shrinks, it can access more or less computing or data storage capacity in the cloud

20   as its needs fluctuate.  Rather than making large capital expenditures to buy and

21   hold equipment that may become obsolete or redundant, the company always has

22   access to state-of-the-art infrastructure that is managed by professionals in

23   capacities that meet the company's current needs and can be quickly upsized or

24   downsized as circumstances require.  Simply put, cloud computing allows owners

25   to buy as much or as little computing power as they need and "lease" from the

26   cloud provider any hardware such as servers or data centers they may need only on

27   a temporary basis.  RealPage offers these cloud computing services to clients in a

28   way that Yardi has not yet successfully matched, putting Yardi at a significant

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED AND ANSWER

1   disadvantage as companies recognize and migrate to the unquestionable benefits of

2   cloud computing.

3         22.    RealPage developed its Cloud by building on its investment in the

4   extensive hosting and data processing support infrastructure that, as a SaaS

5   provider, it already had in place.  RealPage's state-of-the-art data centers are the

6   result of over $100 million in cumulative investment with an annual operating and

7   capital expansion budget of nearly $25 million.  This investment is in addition to

8   RealPage's product development investments, which total nearly $40 million per

9   year.  For the last several years, RealPage also has invested in hardware upgrades

10  that allow it to host not just its own SaaS applications, but also the systems of large

11  multifamily property managers.  Equally important, RealPage has invested in the

12  expert personnel and business processes necessary to service the needs of clients

13  and to optimize their systems for performance enhancements.  The RealPage Cloud

14  infrastructure comprises nearly 1,000 physical servers and a massive storage area

15  network.

16        23.    A property management company can therefore satisfy a large portion

17  of its IT needs from RealPage.  Many property management companies already

18  have built their own customized services platforms that contain their property-

19  management systems as well as their accounting, e-mail, and file-sharing

20  applications.  The RealPage Cloud allows clients to eliminate the burden of

21  maintaining, updating and growing (or shrinking) their IT operations and costs by

22  moving all of their applications to the cloud.

23        24.    By hosting ~~an~~a property management company's entire enterprise

24  system—including third-party applications such as Yardi Voyager—in the

25  RealPage Cloud, RealPage is able to link a client's applications to RealPage's SaaS

26  applications and transfer data seamlessly at high speeds.  This dramatically

27  improves the integration and movement of the client's information across

28  applications, leading to a better experience for the end-user.  Moreover, RealPage

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1   offers the technological consulting to optimize the systems so that each piece of

2   software, without regard to the identity of its provider, communicates and operates

3   effectively with the others.  Put in its simplest form, RealPage orchestrates and

4   integrates a property management business's entire IT operation in the cloud so that

5   multiple software programs can speak to one another as data flows seamlessly and

6   continuously through the cloud.  RealPage's holistic, industry-specific, vendor-

7   neutral approach to the client's needs differs from the traditional use of discrete

8   programs operating independently and, at times, at cross-purposes with other

9   applications on the company's IT platform.  As one RealPage Cloud client put it:

10  "The simple fact is that RealPage is an IT shop, and they have tens of millions of

11  dollars of infrastructure in place that we as a property management firm would

12  never be able to assemble . . . We get immediate redundancy, speed, performance,

13  and change management."

14         25.    Yardi, while effective in designing and selling traditional property

15  management and accounting software, eschewed the opportunity to build the

16  necessary infrastructure, business processes, and technology to meet the new

17  challenge of cloud computing.  As a result of Yardi's inadequate and limited cloud

18  computing capabilities, Yardi clients understandably have looked for alternative

19  ways to host their Yardi software and satisfy their manifold needs for management

20  of multitenant properties.  For these and other reasons, several major Yardi clients

21  have asked RealPage to host their IT operations, *including* their Yardi software, in

22  the RealPage Cloud.

23         26.    While Yardi purports to offer some "cloud" services, they are in reality

24  nothing of the sort.  Yardi offers a narrow set of ASP hosting services.  While ASP

25  companies, like SaaS companies, offer software applications that are accessible via

26  the Internet, they do so on a limited basis.  In Yardi's case, most Yardi users access

27  only their own Yardi software over the Internet.  Yardi is simply storing the end-

28  user's software application on a Yardi server.  This server must be individually

**Exhibit A**
**Page 13** 11
FIRST AMENDED
REALPAGE, INC.'S
COUNTERCLAIMS
AND ANSWER

1  ~~maintained and operated in the same way as a server residing at the user's business~~

2  ~~location.  This rudimentary hosting model is not what is generally accepted as cloud~~

3  ~~computing, *i.e.*, "on demand" access to shared applications.~~

4

5  <u>26.</u>   ~~27.~~ For years, Yardi has resisted making the capital investments to

6  meet the new challenge of cloud computing.  Indeed, when a leading client began

7  using Yardi's ~~hosting services~~<u>cloud service</u>, it could not persuade Yardi to invest in

8  a SAN, or storage area network, a key requirement for optimal storage performance

9  for a large institutional user.  Yardi offers only an uptime "goal" and refuses to

10  guarantee that its hosted systems will remain continuously operable.  RealPage, by

11  contrast, provides over 99.5% uptime and puts a 98% uptime guarantee in writing.

12  <u>27.</u>   ~~28.~~ Yardi's security is also woefully lagging.  In one instance, when a

13  client accessed its data through the Yardi ~~hosting services~~<u>cloud service</u>, that client

14  also was able to access the confidential data of other Yardi clients.  When the client

15  alerted Yardi to the security flaw, Yardi's response was not to fix the security hole,

16  but rather to insist that this alarmingly porous design was somehow intentional!

17  Yardi's security lapses are especially troubling to institutional clients who are

18  required to comply with certain internal controls and to evidence the effectiveness

19  of those controls to third-party stakeholders.  While Yardi advertises its compliance

20  capabilities relative to SAS 70 Type II audits and the Payment Card Industry

21  standards, significant gaps exist in its change management and operational controls.

22  Because Yardi has a separate, uniquely configured instance of software for each

23  client, maintaining strict controls over changes and new releases of software

24  presents a significant problem that can cause the system to be unreliable when

25  change occurs.  These and other deficiencies led at least one market-leading client

26  who tried the Yardi ~~hosting~~<u>cloud</u> capabilities to terminate its hosting relationship

27  with Yardi.

28

REALPAGE, INC.'S COUNTERCLAIMS
<u>FIRST AMENDED</u> ~~AND ANSWER~~

28.   29. In sum, RealPage is positioned to succeed in the cloud computing market.  Yardi is not.  The result is that Yardi is desperate to stop the industry's migration to the RealPage Cloud and has embarked on a mission to destroy RealPage's relationship with its current and future clients.  The campaign has been relentless.

YARDI'S USE OF A MOLE TO MISAPPROPRIATE REALPAGE TRADE SECRETS

29.   30. In late 2008 and early 2009, an individual associated with a RealPage client ("Client X"), Joe Hendrix, accepted a job offer and quickly began working as RealPage's Chief Information Officer.  He was issued a company phone, badge with secure-area access capabilities, and a company computer.  He was also provided with invaluable proprietary information.  Hendrix participated in sales calls and strategy discussions with RealPage's CEO, COO, and CTO and spent weeks learning the inner-workings of RealPage and its plans for the future.  He also met with RealPage clients and was entrusted with valuable RealPage confidential information as well as critical bid information that RealPage clients chose to provide directly to RealPage.  Hendrix knew and understood that the information provided to him was confidential and proprietary and that he was required to maintain its confidentiality.  At the same time that Hendrix was insinuating himself into RealPage's confidences, however, he was secretly working with Yardi to expand its Texas office to add to and improve build Yardi's service offerings and label them as "competing cloud computing service."  Yardi immediately made use of the RealPage trade secrets Hendrix misappropriated to unfairly compete for cloud computing clients.

30.   31. The betrayal began when Hendrix, while employed by Client X (a significant client of both Yardi and RealPage), entered into discussions about moving Client X's data center to the RealPage Cloud in order to provide a secure environment for its data.  RealPage agreed and successfully moved Client X's data

1    center to the RealPage Cloud.  Knowing that after a successful migration to the

2    RealPage Cloud Client X would have no further need for his IT services, Hendrix

3    negotiated with RealPage for a job as Chief Information Officer.  RealPage

4    ~~hired~~ agreed to hire Hendrix, but Client X requested that Hendrix be permitted to

5    wind down his responsibilities while he was also working for RealPage.

6    RealPage's CEO agreed to this unusual arrangement as a favor to Client X.  In

7    addition to agreeing to allow Hendrix to wind down his responsibilities at Client X

8    concurrent with his RealPage responsibilities, RealPage offered Hendrix a senior

9    position, a substantial salary, 150,000 stock options, and provided Hendrix with

10   sensitive, confidential, and proprietary documents and information about the

11   RealPage Cloud business model and strategy, as well as access to RealPage's

12   current and prospective clients.  Hendrix also was included in high-level strategy

13   discussions and was privy to some of RealPage's most sensitive information.  For

14   example, just a few days before his duties with Client X were to end, Hendrix spent

15   hours discussing confidential future RealPage business strategy with RealPage's

16   Chief Operating Officer.

17       31.   ~~32.~~ At all times prior to his departure from Client X, Hendrix was

18   subject to the provisions of a Mutual Confidentiality Agreement between RealPage

19   and Client X.  This Agreement, which Hendrix personally signed, obligated

20   Hendrix and Client X to "hold in confidence and not to disclose or reveal to any

21   person or entity the Disclosing Party's Confidential Information."  The Agreement

22   was entered into on June 19th, 2008, at the outset of discussions between RealPage

23   and Client X.  The Agreement provides that "[a]ll obligations undertaken respecting

24   Confidential Information . . . will survive for two (2) years from the date of

25   provision of such Confidential Information."

26       32.   ~~33.~~ Unbeknownst to RealPage, Hendrix—while extracting RealPage's

27   confidences and promises of a sizeable salary and stock options—was acting as a

28   mole, working with Yardi to expand Yardi's office in Dallas, Texas.  Yardi,

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
~~AND ANSWER~~

1  meanwhile, knew or had reason to know that Hendrix was presenting himself as a

2  RealPage employee in sales meetings to third parties and knew or had reason to

3  know that Hendrix was under an obligation not to disclose RealPage's confidential

4  information.  After having participated in sales calls and strategy discussions with

5  RealPage and having used and relied upon RealPage's provision of information,

6  hardware, and software, Hendrix abruptly announced that he had accepted a

7  position as officer in charge of Yardi's expanded Texas operations.

8      33.  34. The disclosure and misuse of RealPage trade secrets began

9  immediately and may have been happening before Hendrix took the Yardi position.

10  On information and belief, Hendrix provided Yardi with RealPage's proprietary

11  information concerning: (a) RealPage data center and disaster recovery architecture,

12  a well-known architectural shortcoming of Yardi's offerings; (b) RealPage

13  technology used to monitor and improve the operation of third-party applications;

14  (c) RealPage process methods for change, problem, and release management; (d)

15  detailed and proprietary descriptions of the RealPage Cloud; and (e) the

16  confidential details of RealPage's bids for large Yardi clients.  Yardi used this

17  proprietary RealPage information, misappropriated by Hendrix, to unfairly compete

18  with RealPage.  RealPage's sophisticated knowledge of data security, performance

19  monitoring, and hosting was accumulated and refined through over ten years of

20  experience and over $100 million of investment.  In the hands of Yardi, a

21  competitor that had intentionally elected not to make such an investment, this secret

22  information was an invaluable and ill-gotten advantage in developing what it now

23  markets to clients as a supposedly "competitive" its competing cloud computing

24  service.

25      34.  35. Unsurprisingly, within three weeks after Hendrix joined Yardi, the

26  company began offering purported "cloud" services (in actuality, expanded ASP

27  hosting services) a vertically-integrated service modeled on the RealPage Cloud

28  called Yardi Cloud Services.  Later, Hendrix even went so far as to present

1  confidential RealPage Cloud documents to prospective clients *as if they were*
2  *Yardi's*.  Yardi could not have developed even this ~~faux~~competing cloud business
3  without the boost that it gained by exploiting the confidential RealPage documents
4  and information Hendrix misappropriated.

5

6  YARDI'S CLIENT INTERFERENCE CAMPAIGN

7      35. ~~36.~~ Misappropriating RealPage's trade secrets was just the beginning
8  of Yardi's efforts to snuff RealPage's cloud business.  Yardi next took aim at its
9  own clients.  Through a mix of threats and coercion, Yardi systematically
10 approached RealPage clients and used every available means to attempt to end
11 RealPage's cloud business.

12     36. ~~37.~~ By way of background, several RealPage Cloud clients use the
13 RealPage Cloud as their computing platform to host a variety of software, including
14 their Yardi Voyager property management software.  RealPage is committed to
15 providing its clients a broad range of consulting and support services for software
16 hosted in the RealPage Cloud—including Yardi software.  In light of Yardi's often
17 inadequate support, Yardi clients frequently hire independent consultants to assist
18 them with software, add-on products, and add-on service modules.  One such
19 independent consultant was EverGreen Solutions, Inc.  As part of RealPage's
20 strategic planning to enhance its available in-house consulting and support services,
21 RealPage acquired the assets of EverGreen Solutions in September 2009.
22 EverGreen Solutions became a RealPage division and provided consulting services
23 for software users in the real estate industry, including users of Yardi's software.
24 The EverGreen division ("EverGreen") helped these clients by designing,
25 recommending, and installing software solutions and helping them implement best
26 management practices.  And RealPage understands that in some instances, a Yardi
27 software solution such as Yardi Voyager may be what is best for the RealPage
28 client.

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

37.   38. As the popularity of the RealPage Cloud has grown, Yardi has worked furiously behind the scenes to thwart competition in the growing market for vertically-integrated cloud computing for multifamily real estate owners and property managers in the United States ("the vertical cloud market").  The vertical cloud market is a relevant economic market because neithernon-vertically-integrated, industry-agnostic cloud providers nor traditional ASP providers are not adequate substitutes for a vertical cloud offering.  These other more generalized cloud and software offerings cannot satisfy the specialized needs of multifamily real estate owners and property managers.  The relevant geographic market for the vertical cloud market is the United States.

38.   RealPage and Yardi are the primary competitors in the vertical cloud market.  Yardi has aggressively entered the market following its misappropriation of RealPage's trade secrets and subsequent launching of Yardi Cloud Services.  Indeed, in a recent press release Yardi referred to its cloud computing environment as a "foundation of [its] business."  Yardi's website describes the benefits of its vertically-integrated cloud service as follows: "As a leading provider of real estate software and services, Yardi is uniquely positioned to provide IT infrastructure for real estate enterprises, including IT planning and control, physical installations, core IT services and management, enterprise applications, and platforms for business intelligence, portals, and desktop applications specific to the industry."

39.   Yardi's anticompetitive campaign has harmed competition in the vertical cloud market because Yardi possesses leverage over existing and potential cloud clients by virtue of the widespread adoption of its Voyager software.  Voyager is an enterprisea property management software system designed to integrate property management functions and accounting.  Voyager is a leading property management software and, accordingThe property management software market is a relevant economic market in the United States.  Yardi's website describes Voyager as "the industry-leading asset and property management

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED AND ANSWER

software solution."  According to Yardi's public disclosures, Voyager is used to manage over 25,000 apartment sites in the U.S.  ForFurthermore, for those businesses that use it, Yardi Voyager is a critical back-office application and such businesses would face high switching costs if Yardi were to terminate their licenses and they were forced to change platforms; namely costs associated with conversion, data migration, new license fees, and disruption of day-to-day business.  Unwilling to make the necessary investments to fairly compete in the cloud market, Yardi instead has tried to lock its installed base of Voyager clients out of the RealPage Cloud.  Specifically, Yardi is forcing its Voyager clients through threats and intimidation into anticompetitive exclusionary agreementscontracts whereby the client agrees not to use the RealPage Cloud.  In doing so, Yardi has conditioned its clients' ability to continue to enjoy use of their Voyager license on their agreement not to use RealPage's competing cloud computing service.  Yardi's power in the property management software market has resulted in Yardi obtaining and possessing substantial market power in the vertical cloud market.  While market share figures are not readily available in this new market, Yardi's market power in the vertical cloud market is evidenced by its ability to prevent customers from exerting freedom of choice in selecting their vertical cloud providers.

40.    Following industry-standard computing and licensing practices, Yardi until recently allowed its clients—many of whom pay Yardi thousands of dollars monthly or annually for the rights to use Yardi software and maintain client data—to have their Yardi software hosted by a third party.  On information and belief, the majority of Yardi's software licenses with its clients permit or do not prohibit clients from allowing their agents, third parties, contractors, or others to assist with, use, and host Yardi software.  Yardi's contracts with its clients did not, before Yardi's misconduct began, limit the types of contractors a client can retain, much less bar perceived competitors from being retained as contractors.  Recognizing, however, that it found itself at a distinct competitive disadvantage to the RealPage

1  Cloud's superior computing platform, Yardi recently changed its software license
2  agreement to protect its eroding market position and to counteract the success of the
3  RealPage Cloud.  Specifically, Yardi has begun changing its license agreements to
4  prohibit licensees from using any "contractor" to implement or host Yardi software.
5  The agreements define a contractor as "a provider, or an affiliate of a provider, of
6  real property management and accounting software marketed primarily to the real
7  estate industry"—a definition designed by Yardi to include RealPage.  These
8  restrictions on using the RealPage Cloud are of unlimited duration. Yardi imposed
9  these restrictions on existing licensees that have already purchased Voyager.
10  Consequently, these Yardi licensees are locked into an unanticipated, unagreed to
11  way of implementing or hosting the Yardi Voyager software.   If the client now
12  wants to use a contractor to do these tasks, the client would first have to change
13  their primary property management software program.   Clients cannot easily
14  switch to an alternative property management software because of the high
15  switching costs associated with re-aligning their IT systems and transferring their
16  data to a new software architecture – not to mention the potential disruption to day-
17  to-day business operations.

18       41.    Yardi also has threatened to terminate license agreements with clients
19  who use both Yardi software and the RealPage Cloud on objectively baseless
20  grounds solely for the purpose of intimidating those clients into not using the
21  RealPage Cloud.  The license agreements that Yardi has threatened to terminate do
22  not impose restrictions on where or with whom licensees may host their Yardi
23  software, and hosting with the RealPage Cloud does not violate any of the terms of
24  these license agreements.  The cumulative, anticompetitive effects of these
25  improper client restrictions far outweigh any pro-competitive benefits.  Yardi's
26  campaign, to date, has already harmed competition in the marketplace and threatens
27  to permanently deny Yardi clients the superior technology and cost savings offered
28  by the RealPage Cloud.  Indeed, Yardi's campaign threatens to seriously retard the

**Exhibit A**
**Page 21** 19

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED AND ANSWER

1  growth of the vertical cloud market.  Furthermore, Yardi's campaign has prevented

2  RealPage from achieving economic scale.  With RealPage artificially stunted by

3  Yardi's misconduct, consumers are denied the innovations and lower prices that

4  would ensue from customers choosing RealPage of their own volition and RealPage

5  growing and continuing to innovate.  Yardi's conduct therefore has not only denied

6  its own Voyager customers the ability to freely choose the vertically-integrated

7  cloud services that fit their needs, Yardi's anticompetitive conduct has also

8  deprived non-Yardi customers of the innovation and lower prices that flow from

9  unrestrained competition.  Below are some specific examples of Yardi's

10  anticompetitive and tortious interference with RealPage clients.

11       42.    RealPage had built a successful existing client relationship with Client

12  1 which culminated in the negotiation and signing of a Letter Agreement for

13  Interim Services on August 1, 2010.  Client 1 is a large property management firm

14  that develops, constructs, and acquires multifamily properties in fourteen

15  geographic markets throughout the United States.  Client 1 uses certain Yardi

16  software products in addition to its relationship with RealPage.  When Yardi

17  learned of the Letter Agreement, it set out to interfere with RealPage's new client

18  relationship and to disparage and damage RealPage.  Yardi advised Client 1 that it

19  could not continue with the Letter Agreement for Interim Services or any future

20  contemplated agreements with RealPage.  Worse yet, after Client 1 had already

21  purchased Voyager Yardi created newly-revised software license agreements in

22  which the major change was to prohibit the client from using the RealPage Cloud.

23  When Client 1 asked Yardi to modify the license agreement to allow it to use the

24  RealPage Cloud, Yardi refused.  As a result of the pressure, communications, and

25  unlawful agreements imposed by Yardi, Client 1 announced that it could not use the

26  RealPage Cloud, thus depriving RealPage of over $100,000 per year in lost

27  revenue.

28

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED AND ANSWER

43.     Similarly, RealPage had successfully built a client relationship with Client 2.  Client 2 is a top ten property management firm that uses Yardi Voyager as its primary back-office accounting software and at different times has used Yardi's hosting services for Yardi Voyager, and has self-hosted such software.  Recently, after a request-for-proposal ("RFP") process Client 2 moved to the RealPage Cloud for most of its IT needs, including the hosting of Yardi Voyager.  During the period when Hendrix transitioned his services from Client X to his new employer—*i.e.*, to RealPage—Hendrix participated in sales calls to Client 2 together with RealPage executives.  During the Client 2 sales calls, Hendrix acquired substantial confidential information from Client 2 and RealPage including details regarding Client 2's dissatisfaction with Yardi, Client 2's desire to move to the RealPage Cloud and other RealPage products, RealPage's plans and goals for the RealPage Cloud, and detailed bid information regarding the pricing of the RealPage Cloud to Client 2.

44.     Shortly thereafter, Hendrix would accomplish his bait and switch and start working for Yardi, armed with RealPage confidential and proprietary information.  Yardi initially had refused to bid in response to Client 2's RFP for third party hosting and the outsourcing of related IT services.  Once Hendrix joined Yardi, Yardi realized that it was in real jeopardy of Client 2 moving to the RealPage Cloud.  As a result of Hendrix's disclosure of RealPage's confidential and proprietary information, Hendrix and Yardi provided aggressive bids on behalf of ~~a then non-existent~~ Yardi~~-~~ *'s competing* cloud computing~~"~~ ~~service.  Hendrix's provision of secret RealPage bid information to Yardi (information acquired while working for RealPage and while subject to Client X's Mutual Confidentiality Agreement) damaged RealPage by forcing RealPage to bid against a Yardi proposal that was prepared with ill-gotten confidential information.  Furthermore, on information and belief, portions of Yardi's bid simply mimicked RealPage's bid, using RealPage's proprietary information and even the same font and ink color used~~

REALPAGE, INC.'S COUNTERCLAIMS
FIRST AMENDED AND ANSWER

1  by RealPage. service.  For example, in a February 25, 2010, email to Client 2's

2  CEO, Yardi's President wrote:  "We understand through the rumor mill that you

3  may be considering the RealPage Cloud Computing solution. . . . If you are

4  reviewing Cloud Computing there is significant advantage to reviewing our

5  offerings.  At a minimum it will give you negotiating advantage when you speak

6  with any provider of Cloud Computing."

7       45.    Hendrix's provision of secret RealPage bid information to Yardi

8  (information acquired while working for RealPage and while subject to Client X's

9  Mutual Confidentiality Agreement) damaged RealPage by forcing RealPage to bid

10  against a Yardi proposal that was prepared with ill-gotten confidential information.

11  Furthermore, on information and belief, portions of Yardi's bid simply mimicked

12  RealPage's bid, using RealPage's proprietary information and even the same font

13  and ink color used by RealPage.

14       46.    45. When Yardi's attempts to intimidate RealPage's clients have

15  failed, Yardi has extended its interference campaign further downstream,

16  threatening RealPage's clients' clients.  Yardi has bound RealPage's clients' clients

17  to anticompetitive exclusionary agreements designed to indirectly interfere with the

18  RealPage client's ability to use the RealPage Cloud.  For example, Client 2-A is

19  one of Client 2's clients.  Client 2-A recently signed a contract with Yardi for use of

20  Yardi's Utility Billing product.  The contract, however, forbids RealPage from

21  implementing Client 2-A's software interface.  Yardi also has interfered with

22  another of Client 2's clients, Client 2-B.  Client 2-B is planning to upgrade its Yardi

23  software, but Yardi is refusing to allow RealPage to support Client 2-B's upgraded

24  software.  These restrictions are designed to interfere with Client 2's business

25  relations with Clients 2-A and 2-B and, indirectly, with Client 2's ability to use the

26  RealPage Cloud.

27       47.    46. Client 3, another multifamily and commercial real estate owner,

28  had agreed to move its data center to the RealPage Cloud.  During the process of

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1  moving its data, Yardi demanded that Client 3 not use the RealPage Cloud and not

2  even publicly associate itself with RealPage.  As a result of Yardi's interference,

3  Client 3 has decided not to use the RealPage Cloud to host its Voyager software.

4  Yardi's actions have damaged RealPage by causing it to lose the revenue,

5  reputational benefit, and profit from Client 3's cloud business.

6       48.   47. Yardi also has repeatedly interfered with EverGreen's relationships

7  with its existing and prospective consulting clients.  For example, Client 4 was in

8  the process of negotiating a consulting contract with EverGreen when Yardi began

9  threatening to refuse to work with EverGreen.  On January 15, 2010—as

10 discussions between EverGreen and Client 4 were just beginning—a representative

11 of Client 4 wrote the following to EverGreen's President:

12       "One big issue that we have got to get addressed is the friction

13       between EverGreen and Yardi.  We cannot afford to be a casualty in

14       our rollout of a strained relationship between both companies.  Please

15       be prepared to address verbally Thursday.  Yardi has indicated that this

16       will be a problem even after I clarified that we are not hosting with

17       EverGreen."

18 As discussions progressed, Yardi's threats escalated.  On February 13, 2010, the

19 same representative of Client 4 wrote the following to EverGreen's President:

20       "I have requested a meeting with Yardi this week to meet with you to

21       discuss implementation.  The initial response I got from . . . our

22       [Yardi] sales representative suggested that it was likely Yardi will

23       walk from the deal if we request EverGreen as our implementor."

24 Ultimately, Yardi's threats forced Client 4 to choose another implementation

25 consultant, causing EverGreen to lose this business opportunity and the revenue and

26 profit it would have generated.

27       49.   48. Yardi also has interfered with its clients' rightful efforts to

28 transition off of Voyager onto RealPage's SaaS property management software,

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1  OneSite.  For example, Client 5 is a past Yardi client that recently switched to

2  OneSite.  After Client 5 informed Yardi that it intended to use OneSite, Yardi

3  changed its past practice of allowing its transitioning clients to maintain read-only

4  access to historical data and intends to cut off Client 5's access in the near future.

5      50.    49. RealPage has a contractual and legal right to act as an agent of its

6  clients to provide secure hosting in the RealPage Cloud and to provide consulting

7  services.  The RealPage Cloud is secure and poses no risk of any misuse of

8  information.  Yardi's anticompetitive actions have harmed RealPage by

9  compromising RealPage's contractual relationships with its clients and destroying

10 the trust and goodwill engendered by RealPage's years of client development and

11 high-quality service. Yardi's actions also have restrained competition in the

12 vertical cloud market and harmed consumers by preventing RealPage from

13 achieving economic scale and the accompanying ability to offer its cloud services

14 to both Yardi customers and non-Yardi customers with increased efficiency,

15 continued innovation and lower prices.

16

17                          **FIRST COUNTERCLAIM**

18                       **(Misappropriation of Trade Secrets)**

19     51.    50. RealPage realleges and incorporates by reference the allegations

20 contained in Paragraphs 1 through 4950 as though fully set forth herein.

21 RealPage has invested millions of dollars and years of time in the development of

22 confidential and trade secret information.  This trade secret information includes,

23 but is not limited to, the following categories of information: (a) RealPage data

24 center and disaster recovery architecture; (b) RealPage technology used to monitor

25 and improve the operation of third-party applications; (c) RealPage process

26 methods for change, problem and release management; (d) detailed and proprietary

27 descriptions of the RealPage Cloud; and (e) the confidential details of RealPage's

28 cloud computing bids for large Yardi clients.

52. 51. RealPage's trade secrets relevant to this case comprise information not generally known to the public or to other persons who would obtain economic value from their disclosure or use. This information is the subject of reasonable efforts by RealPage to maintain its secrecy, including the use of confidentiality and nondisclosure agreements, and derives independent economic value from not being generally known. The information constitutes "trade secrets" under California Civil Code section 3426.1. RealPage's trade-secret information gives it a competitive advantage in, among other things, its ability to offer services such as consulting services and the RealPage Cloud hosting service.

53. 52. Yardi willfully and maliciously misappropriated RealPage's trade secrets through improper means by obtaining them from Joe Hendrix, who had a duty to maintain the trade secrets' secrecy and to forebear from disseminating or using them. Yardi worked in concert with Hendrix to obtain RealPage's trade secret information, all the while knowing that Hendrix was representing himself as a RealPage employee and that he was subject to a confidentiality agreement. Upon acquiring these stolen trade secrets, Yardi proceeded to use them without RealPage's express or implied consent for the purpose of developing a competing cloud computing business and competing for Client 2's and others' business.

54. 53. By reason of the above-alleged acts and conduct of Yardi, RealPage has been damaged, and it will suffer further great and irreparable harm and damage. The amount of this irreparable harm will be difficult to ascertain, and RealPage will be without an adequate remedy at law.

55. 54. RealPage is entitled to an injunction restraining Yardi, its officers, agents, employees, and all persons acting in concert with it, from engaging in further unlawful acts and from reaping any additional commercial advantage from its misappropriation and use of RealPage's trade secrets.

56. 55. RealPage is further entitled to an order requiring Yardi, its agents, employees, and all persons acting in concert with it, to return to RealPage any and

1  all of its trade secrets and confidential, proprietary materials, including but not

2  limited to any and all materials created incorporating, referencing, or derived from

3  RealPage's trade secrets and confidential, proprietary information.

4       57.    56. RealPage is further entitled to recover from Yardi the damages

5  sustained by RealPage as a result of the wrongful acts as alleged herein.  RealPage

6  is further entitled to recover from Yardi the gains, profits, and advantages Yardi has

7  obtained as a result of the wrongful acts alleged herein.  The amount of such

8  damages, gains, profits, and advantages cannot be determined at this time but will

9  be proven at trial.

10

11                    **SECOND COUNTERCLAIM**

12              **(Violation of Section 1 of the Sherman Act)**

13      58.    57. RealPage realleges and incorporates by reference the allegations

14  contained in Paragraphs 1 through 49 50 as though fully set forth herein.

15      59.    58. Yardi's conduct as alleged herein has been for the purpose of, and

16  has had the effect of, injuring and restraining competition in the United States

17  vertical cloud market.  Yardi has entered into agreements that restrain competition

18  in a substantial portion of the vertical cloud market by forcing Voyager clients,

19  through threats and intimidation, into anticompetitive exclusionary agreements

20  whereby the client agrees explicitly, or in effect, not to use the RealPage Cloud.

21  That conduct has had and continues to have anticompetitive effects and violates

22  Section 1 of the Sherman Act, 15 U.S.C. § 1.

23      60.    Yardi possesses economic power in the market for property

24  management software by virtue of its "industry leading" Voyager software, which

25  is used to manage over 25,000 apartment sites in the United States.  Additionally,

26  Yardi possesses economic power over its Voyager clients because those clients

27  cannot easily switch to an alternative property management software due to the

28  high switching costs associated with re-aligning their IT systems and transferring

1   their data to a new software architecture.  Yardi therefore possesses sufficient

2   economic power to coerce its customers (a substantial share of potential vertical

3   cloud customers) into not using the RealPage Cloud.  This power over its Voyager

4   customers gives Yardi substantial market power in the vertical cloud market as

5   evidenced by its ability to prevent customers from using competing products.

6   　　　61.   Voyager and the RealPage Cloud are distinct products and services

7   with different demand, and clients often seek them independently of each other.

8   Yardi has conditioned its clients' ability to license Voyager on their refusal to use

9   the RealPage Cloud.  Yardi has done so through amended license agreements,

10  imposed on its clients after they have licensed Voyager and are locked in to its high

11  switching costs, whereby the client agrees at Yardi's demand to explicitly, or in

12  effect, not to use the RealPage Cloud.  These agreements affect a substantial

13  amount of commerce in the vertical cloud market, a market in which Yardi

14  competes, and prevent RealPage from achieving economic scale.  Absent Yardi's

15  anticompetitive restrictions, RealPage would reach optimal economic scale and

16  Yardi customers and non-Yardi customers would enjoy lower prices, greater

17  innovation and freedom of choice to select the vertical cloud provider that best suits

18  their needs.

19  　　　62.   59. The agreements are an unreasonable restraint of trade upon

20  interstate commerce.  The anticompetitive effects of these agreements outweigh any

21  procompetitive effect or legitimate business justifications.

22  　　　63.   60. As a direct and proximate result of Yardi's unlawful and

23  anticompetitive conduct, RealPage has been injured and damaged in its business

24  and property.

25  　　　64.   61. Unless enjoined, Yardi's unlawful conduct will continue and cause

26  further injury to competition, and RealPage will continue to suffer injury for which

27  it is without adequate remedy at law.

28

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

**THIRD COUNTERCLAIM**

**(Violation of the California Cartwright Act)**

65.   62. RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 49 50 as though fully set forth herein.

66.   63. Yardi's conduct as alleged herein has been for the purpose of, and has had the effect of, injuring and restraining competition in the vertical cloud market.  Yardi has entered into agreements intending to restrain competition by forcing its Voyager clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud.  That conduct has had and continues to have substantial anticompetitive effects in California, and violates California Business and Professions Code sections 16720 and 16727.  The anticompetitive effects of these agreements outweigh any beneficial effect or legitimate business justifications.

67.   Yardi possesses economic power in the market for property management software by virtue of its "industry leading" Voyager software, which is used to manage over 25,000 apartment sites in the United States.  Additionally, Yardi possesses economic power over its Voyager clients because those clients cannot easily switch to an alternative property management software due to the high switching costs associated with re-aligning their IT systems and transferring their data to a new software architecture.  Yardi therefore possesses sufficient economic power to coerce its customers (a substantial share of potential vertical cloud customers) into not using the RealPage Cloud.  This power over its Voyager customers gives Yardi substantial market power in the vertical cloud market as evidenced by its ability to prevent customers from using competing products.

68.   Voyager and the RealPage Cloud are distinct products and services with different demand, and clients often seek them independently of each other.  Yardi has conditioned its clients' ability to license Voyager on their refusal to use the RealPage Cloud.  Yardi has done so through amended license agreements,

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED ~~AND ANSWER~~

1   imposed on its clients after they have licensed Voyager and are locked in to its high

2   switching costs, whereby the client agrees at Yardi's demand to explicitly, or in

3   effect, not to use the RealPage Cloud.  These agreements affect a substantial

4   amount of commerce in the vertical cloud market, a market in which Yardi

5   competes, and prevent RealPage from achieving economic scale.  Absent Yardi's

6   anticompetitive restrictions, RealPage would reach optimal economic scale and

7   Yardi customers and non-Yardi customers would enjoy lower prices, greater

8   innovation and freedom of choice to select the vertical cloud provider that best suits

9   their needs.

10   69.   64.  As a direct and proximate result of Yardi's unlawful and

11   anticompetitive conduct, RealPage has been injured and damaged in its business

12   and property.

13   70.   65.  Unless enjoined, Yardi's unlawful conduct will continue and cause

14   further injury to competition, and RealPage will continue to suffer injury for which

15   it is without adequate remedy at law.

16

17   **FOURTH COUNTERCLAIM**

18   **(Intentional Interference with Contract)**

19   71.   66.  RealPage realleges and incorporates by reference the allegations

20   contained in Paragraphs 1 through 49 50 as though fully set forth herein.

21   72.   67.  RealPage has or had valid contracts with third parties, including

22   Client 1, for hosting and consulting services.  Yardi has knowledge of these

23   contracts with third parties.

24   73.   68.  Yardi has willfully and intentionally interfered with those contracts

25   by threatening RealPage's clients, including Client 1, with termination of software

26   licensing agreements if they use the RealPage Cloud.  These threats were made on

27   objectively baseless grounds solely for the purpose of intimidating those clients into

28   not using the RealPage Cloud.  Yardi also has willfully and intentionally interfered

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1  with those contracts by amending its software license agreements to prohibit its

2  licensees from using the RealPage Cloud.  Yardi's wrongful acts were designed to

3  and actually did interfere with or disrupt RealPage's contractual relationships with

4  its clients, including Client 1.

5      74.  69. RealPage has suffered actual damages and loss as a direct and

6  proximate result of Yardi's unlawful interference.  RealPage has lost business with

7  Client 1 and has suffered losses with other clients as a result of Yardi's interference.

8      75.  70. Yardi acted intentionally and in conscious disregard of the rights of

9  RealPage, with malice and oppression, in that Yardi knew that its acts and conduct,

10  as alleged herein, were unjustified and improper and would result in severe

11  financial and economic injury to RealPage.  Accordingly, RealPage is entitled to an

12  award of punitive damages against Yardi for the sake of example and by way of

13  punishing Yardi, in an amount to be determined at trial.

14

15                          **FIFTH COUNTERCLAIM**

16        **(Intentional Interference with Prospective Economic Advantage)**

17      76.  71. RealPage realleges and incorporates by reference the allegations

18  contained in Paragraphs 1 through 49 50 as though fully set forth herein.

19      77.  72. An economic relationship, with the reasonable probability of future

20  economic benefit to RealPage, existed between RealPage, on the one hand, and its

21  current and prospective RealPage Cloud clients and consulting clients (including

22  Clients 1, 2, 3, 4, and 5), on the other hand.

23      78.  73. Yardi knew of these relationships and intended to disrupt them by

24  threatening RealPage's clients with termination of their software licensing

25  agreements if they chose to use the RealPage Cloud or EverGreen consulting

26  services.  These threats were made on objectively baseless grounds solely for the

27  purpose of intimidating those clients into not using the RealPage Cloud.  Yardi also

28  has intended to disrupt these relationships by amending its software license

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1   agreements to prohibit its licensees from using the RealPage Cloud, by using

2   RealPage's trade secrets to bid against RealPage, and by denying former Yardi

3   clients that switch to RealPage all access to such clients' own historical data.

4        79. 74. As described throughout these Counterclaims, Yardi's conduct was

5   independently tortious or unlawful because Yardi has restrained trade and

6   competition in violation of the antitrust laws of the United States and the States of

7   California and Texas by forcing its Voyager clients, through threats and

8   intimidation, into anticompetitive exclusionary agreements whereby the client

9   agrees not to use the RealPage Cloud.  Yardi's business acts and practices are also

10  independently tortious or unlawful in that Yardi has used RealPage's own trade

11  secrets, obtained unlawfully by Yardi, to unfairly compete against RealPage and to

12  interfere with RealPage's client relationships.

13       80. 75. As a direct and proximate result of Yardi's wrongful acts as

14  alleged herein, numerous clients and prospective clients have been forced to

15  terminate their use of, or have been forced not to use, the RealPage Cloud and

16  EverGreen consulting services.  Yardi's wrongful conduct was a substantial factor

17  in disrupting these relationships.

18       81. 76. As a direct and proximate result of Yardi's wrongful acts as

19  alleged herein, RealPage has suffered actual damages and loss.  RealPage has lost

20  business and has suffered losses with clients as a result of Yardi's interference.

21       82. 77. Yardi acted intentionally and in conscious disregard of the rights of

22  RealPage, with malice and oppression, in that Yardi knew that its acts and conduct,

23  as alleged herein, were unjustified and improper and would result in severe

24  financial and economic injury to RealPage.  Accordingly, RealPage is entitled to an

25  award of punitive damages against Yardi for the sake of example and by way of

26  punishing Yardi, in an amount to be determined at trial.

27

28

REALPAGE, INC.'S
COUNTERCLAIMS
FIRST AMENDED AND ANSWER

## SIXTH COUNTERCLAIM

### (Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200 Et Seq.)

83.   78. RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 49 50 as though fully set forth herein.

84.   79. Yardi's acts, as alleged above, constitute unlawful, unfair, or fraudulent business practices in violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

85.   80. Yardi's business acts and practices are unlawful, fraudulent and unfair, and in violation of the UCL because Yardi has restrained trade and competition in violation of the antitrust laws of the United States and the State of California by forcing its Voyager clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud or EverGreen consulting services.  Yardi's business acts and practices are also unlawful, fraudulent, and unfair in that it has used trade secrets that it misappropriated from RealPage to unfairly compete against RealPage and interfere with RealPage's contractual and prospective economic relations.

86.   81. As a direct and proximate result of Yardi's statutory unfair competition, Yardi has been unjustly enriched in an amount to be determined at trial.

87.   82. In addition, Yardi's statutory unfair competition has caused, and is continuing to cause, substantial and irreparable harm to RealPage.  Unless Yardi's wrongful acts are restrained by this Court, RealPage's business will continue to suffer.  RealPage has no adequate or complete remedy at law, and the harm RealPage will suffer cannot be adequately compensated in monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, RealPage prays for judgment in its favor as follows:

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

1        a.    That RealPage be awarded damages against Yardi, including

2 treble damages as authorized by law, in an amount to be determined at trial;

3        b.    That RealPage be awarded punitive damages against Yardi;

4        c.    That the Court award RealPage its attorneys' fees and litigation

5 expenses as authorized by law;

6        d.    That the Court enter injunctions restraining Yardi preliminarily

7 and permanently from further misappropriation of RealPage's trade secrets;

8        e.    That the Court enter injunctions restraining Yardi preliminarily

9 and permanently from further acts of unfair competition;

10        f.    That the Court enter injunctions restraining Yardi preliminarily

11 and permanently from continuing its anticompetitive conduct as alleged

12 herein; and

13        g.    That the Court award RealPage such other and further relief as

14 the Court deems just and appropriate.

15

16

17 **ANSWER**

18 COMES NOW RealPage, for itself alone and for no other defendant, and for

19 its Answer to Yardi's Complaint, admits, denies, and alleges as follows:

20     1.    In answer to Paragraph 1, RealPage admits that this action purports to

21 be brought under the theories cited but believes that Yardi's hidden intent in filing

22 this lawsuit is to inhibit RealPage from fairly competing with Yardi and to limit

23 alternative choices for Yardi's clients, thereby preventing a more open and

24 competitive marketplace.  Except as so admitted, RealPage denies each and every

25 allegation set forth in Paragraph 1, and specifically denies that it has engaged in any

26 wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in

27 any manner, or at all.

28

REALPAGE, INC.'S
FIRST AMENDED COUNTERCLAIMS
AND ANSWER

EXHIBIT B

# BINGHAM

Bree Hann
Direct Phone: 415.393.2958
Direct Fax:   415.393.2286
bree.hann@bingham.com

May 4, 2011

**Via Electronic Mail**

James Pearl, Esq.
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
email: JPearl@OMM.com

Re: *Yardi Systems, Inc. v. RealPage, Inc.*, 2:11-cv-00690 ODM (JEMx)

Dear Bo:

I write to confirm our call today regarding Yardi's contemplated motion to dismiss. On the call, we discussed in detail each of the issues identified in Yardi's letter of April 29, 2011. RealPage agreed that it was not asserting a *per se* antitrust claim. RealPage also indicated that it does not currently intend to amend its Counterclaims. Please let us know as soon as possible if RealPage changes its position so that Yardi does not waste time drafting its motion to dismiss.

Yardi also reiterated on the call its request that RealPage identify all customers and provide copies of all contracts referred to in the Counterclaims. Yardi noted that if RealPage will not provide that information this week, then Yardi will likely need to request an extension of the date to respond to RealPage's Counterclaims.

Additionally, to further explain Yardi's letter of April 29, Yardi reads the Counterclaims to explicitly limit the tern "vertically-integrated" (*see, e.g.*, ¶ 38) to cloud services that are "enterprise-wide," such that applications from multiple software providers used by a client are aggregated into one "enterprise-wide" system. Yardi also reads the Counterclaims to allege that Yardi does not offer "vertically-integrated" cloud services. Yardi bases its understanding on multiple allegations in the Counterclaims, including but not limited to those identified below:

> ¶ 1 – "RealPage has introduced a new enterprise cloud computing service called the 'RealPage Cloud' by which RealPage manages and operates all of the IT systems used by a business."

Boston
Hartford
Hong Kong
London
Los Angeles
New York
Orange County
San Francisco
Santa Monica
Silicon Valley
Tokyo
Washington

Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA
94111-4067

T +1.415.393.2000
F +1.415.393.2286
bingham.com

**Exhibit B**
**Page 1**

James Pearl, Esq.
May 4, 2011
Page 2

¶ 4 – "The RealPage Cloud is unique because it aggregates applications from multiple software providers into one enterprise-wide system that is tightly integrated and managed holistically."

¶ 7 – "RealPage is the only major technology provider in the multifamily property management market to offer a SaaS platform to its clients, and it is enjoying success similar to Salesforce.com and Google."

¶ 23 – "The RealPage Cloud allows clients to eliminate the burden of maintaining, updating and growing (or shrinking) their IT operations and costs by moving all of their applications to the cloud."

¶ 24 – "By hosting an entire enterprise system – including third-party applications such as Yardi Voyager – in the RealPage Cloud, RealPage is able to link a client's applications to RealPage's SaaS applications and transfer data seamlessly at high speeds."

¶ 26 – "While Yardi purports to offer some 'cloud' services, they are in reality nothing of the sort.  Yardi offers a narrow set of ASP hosting services."

¶ 7 – "Yardi is in danger of being displaced because it has limited itself to the outdated on-premises and ASP software delivery platforms.  The disadvantages of these outdated delivery platforms are magnified as businesses make the transition to enterprise-wide cloud computing."

¶ 38 – "As the popularity of the RealPage Cloud has grown, Yardi has worked furiously behind the scenes to thwart competition in the growing market for vertically-integrated cloud computing for multifamily real estate owners and property managers in the United States ("the vertical cloud market").  The vertical cloud market is a relevant economic market because neither industry-agnostic cloud providers nor traditional ASP providers are adequate substitutes for a vertical cloud offering."

If RealPage intended a different definition for the term "vertically-integrated," please let us know as soon as possible and identify the allegations in the Counterclaims supporting any such definition.  Similarly, if RealPage intended to allege that Yardi provides "vertically-integrated" cloud services, please identify those allegations as well.

Sincerely yours,

Bree Hann /u

Bree Hann

**Exhibit B**
**Page 2**

EXHIBIT C

**Russell, Chad**

---

| | |
|---|---|
| **From:** | Pearl, James [JPearl@OMM.com] |
| **Sent:** | Sunday, May 15, 2011 5:21 PM |
| **To:** | Hann, Bree |
| **Cc:** | Samuels, Mark; Pardo, Gabriel; Howard, Geoff; Russell, Chad; Chin, Lisa |
| **Subject:** | RE: Stip |

**Attachments:**      RealPage May 15 stip re  counterclaim.DOC



RealPage May 15
stip re  count...

Bree -- given that the changes to the counterclaims are really just points of clarification and minor in scope (as you will see), we do not believe additional time to respond is necessary.  Nevertheless, in the spirit of this potentially being a long case and the fact that we will need to work together on many deadlines in the future, we will agree to the request that Yardi has until June 16 to answer or otherwise respond. We tweaked your language accordingly.

As to who things should be sent to on this side, if you always include Mark, they will get circulated.  We will copy the folks on your side per your request.

Bo


-----Original Message-----
From: Hann, Bree [mailto:bree.hann@bingham.com]
Sent: Sunday, May 15, 2011 11:51 AM
To: Pearl, James
Cc: Samuels, Mark; Pardo, Gabriel; Howard, Geoff; Russell, Chad; Chin, Lisa
Subject: RE: Stip

Bo, thanks for the draft.  We suggest the parties build into this stip a minimum of a month for Yardi's response, so that we don't have to bother the Court later for an additional order if we can all agree (after Yardi reviews the Counterclaims) on that period of time.  A version with track changes is attached.

Also, going forward, it would be great if you would generally send emails related to the case to Geoff Howard, Chad Russell, Lisa Chin, and me.  I've added those people to this email so you have their addresses at hand.  Please let us know if there is a specific group at your firm to whom you would like us to send our emails.

Thanks,
Bree

-----Original Message-----
From: Pearl, James [mailto:JPearl@OMM.com]
Sent: Friday, May 13, 2011 6:59 PM
To: Hann, Bree
Cc: Samuels, Mark; Pardo, Gabriel
Subject: Stip

Bree -- attached is a proposed stip on RealPage's first amended counterclaims. Please let us know if this is acceptable to Yardi.

Have a good weekend.

Bo

Confidentiality Notice: The information in this e-mail (including attachments, if any) is

**Exhibit C**
1

considered confidential and is intended only for the recipient(s) listed above. Any
review, use, disclosure, distribution or copying of this e-mail is prohibited except by or
on behalf of the intended recipient. If you have received this email in error, please
notify me immediately by reply email, delete this email, and do not disclose its contents
to anyone.

Bingham McCutchen LLP Circular 230 Notice: To ensure compliance with IRS requirements, we
inform you that any U.S. federal tax advice contained in this communication is not
intended or written to be used, and cannot be used by any taxpayer, for the purpose of
avoiding any federal tax penalties. Any legal advice expressed in this message is being
delivered to you solely for your use in connection with the matters addressed herein and
may not be relied upon by any other person or entity or used for any other purpose without
our prior written consent.

**Exhibit C**

2

EXHIBIT D

1   MARK A. SAMUELS (S.B. #107026)
    msamuels@omm.com
2   JAMES M. PEARL (S.B.#198481)
    jpearl@omm.com
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA 90071-2899
    Telephone: (213) 430-6000
5   Facsimile: (213) 430-6407

6   DAVID R. EBERHART (S.B. #195474)
    deberhart@omm.com
7   SHARON M. BUNZEL (S.B. #181609)
    sbunzel@omm.com
8   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
9   San Francisco, CA 94111-3823
    Telephone: (415) 984-8700
10  Facsimile: (415) 984-8701

11  Attorneys for Defendant and
    Counterclaimant REALPAGE, INC.
12

13                UNITED STATES DISTRICT COURT

14               CENTRAL DISTRICT OF CALIFORNIA

15  YARDI SYSTEMS, INC.,              Case No. CV11-690 ODW (JEMx)
    a California corporation,
16                                    **DISCOVERY MATTER**
17            Plaintiff,
        v.                            **DEFENDANT AND
18                                    COUNTERCLAIMANT REALPAGE,
    REALPAGE, INC., a Delaware        INC.'S FIRST SET OF REQUESTS
19  corporation, and DC CONSULTING,   FOR PRODUCTION TO PLAINTIFF
    INC., a Washington, D.C.          AND COUNTERDEFENDANT YARDI
20  corporation,                      SYSTEMS, INC.**

21            Defendants.             **Judge**: Hon. Otis D. Wright II

22  REALPAGE, INC., a Delaware        **Magistrate**: Hon. John E. McDermott
    corporation,
23
              Counterclaimant,
24       v.
25  YARDI SYSTEMS, INC., a
    California corporation,
26
              Counterdefendant.
27

28
                                      REALPAGE'S FIRST SET OF REQUESTS
                                      FOR PRODUCTION TO YARDI
                                      NO. CV11-690 ODW (JEMx)

28.     All CUSTOMER CONTRACTS.

29.     All DOCUMENTS relating to or reflecting any actual or contemplated changes or amendments to any CUSTOMER CONTRACT.

30.     All DOCUMENTS relating to, reflecting, or constituting COMMUNICATIONS between and among YOU and YOUR former, current or potential customers, or any PERSON in an actual or potential business relationship with said customers, concerning REALPAGE, including but not limited to COMMUNICATIONS concerning any restrictions on those customers' use of YARDI SOFTWARE as a result of their relationship with REALPAGE.

31.     All DOCUMENTS relating to, reflecting, or constituting COMMUNICATIONS between and among YOU and REALPAGE's former, current or potential customers, or any PERSON in an actual or potential business relationship with said customers, concerning REALPAGE, including but not limited to COMMUNICATIONS concerning any restrictions on those customers' use of YARDI SOFTWARE as a result of their relationship with REALPAGE.

32.     All DOCUMENTS relating to, reflecting, or constituting YOUR internal COMMUNICATIONS concerning REALPAGE, including but not limited to COMMUNICATIONS concerning any restrictions on the use of YARDI SOFTWARE with REALPAGE products and services.

33.     All DOCUMENTS relating to REALPAGE and its relationship with YOUR former, current or potential customers, or any PERSON in an actual or potential business relationship with said customers.

34.     All DOCUMENTS constituting or reflecting meeting notes, reports, minutes, summaries, preparation, or presentation materials with YARDI customers.

35.     All DOCUMENTS constituting or reflecting analyses, summaries, reports, studies or other writings prepared comparing REALPAGE and YARDI products, services or offerings in any manner, including but not limited to from a price, technology, or quality standpoint.

36.     All DOCUMENTS constituting or reflecting market analyses, studies, or reports regarding the market for real estate and property management software, including but not limited to REALPAGE SOFTWARE and YARDI SOFTWARE.

37.     All DOCUMENTS constituting or reflecting market analyses, studies, or reports regarding the market for vertically integrated, enterprise-wide cloud computing for multifamily real estate owners and property managers.

38.     All DOCUMENTS evaluating, analyzing, or comparing the merits, total cost of ownership, and/or ease of use of Software-as-a-Service software delivery models versus Application Service Provider software delivery models or "on-premises" software delivery models in which software is installed and run by the end-user.

39.     All DOCUMENTS evaluating, analyzing, or comparing the merits and/or total cost of ownership of REALPAGE's software delivery model versus YARDI's software delivery model.

40.     All DOCUMENTS relating to or reflecting YARDI's market share for any product or service YARDI offers, including but not limited to YARDI SOFTWARE and YARDI CLOUD SERVICES.

41.     DOCUMENTS sufficient to show and detail YARDI's material capital investments in hosted, Application Service Provider, or cloud computing services,

1 | including infrastructure and data center expenditures.

2 |      42.    All DOCUMENTS relating to or reflecting YARDI's investment into

3 | data centers or Storage Area Networks.

4 |      43.    All DOCUMENTS relating to or reflecting YARDI's "uptime" goal

5 | and YARDI's actual "uptime" related to YARDI CLOUD SERVICES or YOUR

6 | other application hosting or support services.

7 |      44.    DOCUMENTS sufficient to show and detail revenue by quarter for

8 | each YARDI customer.

9 |      45.    All DOCUMENTS relating to, reflecting, or constituting

10 | COMMUNICATIONS between and among YOU and Riverstone Residential

11 | Group relating to Property Solutions International, Inc.

12 |      46.    All DOCUMENTS relating to, reflecting, or constituting

13 | COMMUNICATIONS between and among YOU and Property Solutions

14 | International, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REALPAGE'S FIRST SET OF REQUESTS
FOR PRODUCTION TO YARDI
NO. CV11-690 ODW (JEMx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:      May 18, 2011                    MARK A. SAMUELS
                                            DAVID R. EBERHART
                                            SHARON M. BUNZEL
                                            JAMES M. PEARL
                                            O'MELVENY & MYERS LLP


                                            By: _Jame M. Pearl / s.t._____
                                                 James M. Pearl
                                            Attorneys for Defendant and
                                            Counterclaimant REALPAGE, INC.

REALPAGE'S FIRST SET OF REQUESTS
FOR PRODUCTION TO YARDI
NO. CV11-690 ODW (JEMx)