**O**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| RealPage, Inc.,                             )<br>             Counter-Claimant,  )<br>                                                 )<br>v.                                                )<br>                                                 )<br>Yardi Systems, Inc.,                     )<br>             Counter-Defendant. )<br>_____) | Case No. CV 11-00690 ODW (JEMx)<br><br>ORDER **GRANTING IN PART** AND **DENYING IN PART** COUNTER-DEFENDANT'S MOTION DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) [40] [Filed 06/16/11] |

## I.   INTRODUCTION

Pending before the Court is Counter-Defendant Yardi Systems, Inc.'s ("Yardi") Motion to Dismiss Counter-Claimant RealPage, Inc.'s ("RealPage") First Amended Counterclaim ("FACC") pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 40.) RealPage filed an Opposition to the instant Motion, to which Yardi filed a Reply. (Dkt. Nos. 44, 51.) Having carefully considered the papers filed in support of and in opposition to the instant Motion, the Court deems the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. For the following reasons, Yardi's Motion to Dismiss is **GRANTED in PART** and **DENIED in PART.**

## II. FACTUAL BACKGROUND

RealPage and Yardi are competitors in the real property management and accounting business. (FACC ¶¶ 1, 2.) Perhaps Yardi's greatest success has been its popular Voyager software – a computer program used to integrate property management functions and accounting. (FACC ¶¶ 2, 39.) Voyager can be installed on a computer – known as the "on-premises" approach – or clients can remotely access their version of the program stored on Yardi's servers via the Internet – known as the Application Service Provider ("ASP") approach. (*Id.*)  RealPage, on the other hand, markets a version of cloud computing it calls Software-as-a-Service (the "SaaS"), whereby it offers "vertically-integrated" systems and support designed specifically to address the needs of multifamily real estate owners and property managers throughout the United States. (FACC ¶ 3.) The SaaS allows RealPage clients to aggregate applications from multiple software providers into a single system, which is stored on RealPage's servers and can be remotely accessed by the client via the Internet. (FACC ¶ 4.) Both the ASP approach and SaaS require clients to pay an additional fee for the service. (FACC ¶¶ 2, 4.) RealPage claims the greatest benefit of the SaaS is that it involves only a single version of software code accessed by all clients, thus requiring developers of third-party applications to maintain only one version of their code and causing the cost of ownership to be reduced. (FACC ¶ 5.) Yardi's ASP approach requires a different code stream for each client resulting in higher-end costs. (*Id.*)

RealPage alleges that rather than innovate and invest in a superior cloud system, Yardi sought to impede and sabotage the growth of the SaaS in an effort to stay competitive with, and not lose business to, RealPage. (FACC ¶ 12.) One way in which Yardi allegedly sought to impede and sabotage RealPage was by and through Joe Hendrix ("Hendrix"), an employee of a significant client of both Yardi and RealPage ("Client X"). (FACC ¶ 30.) While at Client X, Hendrix moved the company's data center to the SaaS. (FACC ¶¶ 29, 30.) Recognizing Client X would no longer have need for his services after its IT department was outsourced to RealPage, Hendrix interviewed for and was hired as the Chief Information Officer at RealPage. (FACC ¶ 30.) Per Client X's request, Hendrix was permitted to wind down his responsibilities with Client X while also working for RealPage, but he was subject to the provisions of a Mutual Confidentiality Agreement. (FACC ¶¶ 30, 31.) This agreement indicated that Hendrix was forbidden to

disclose any propriety information regarding RealPage's business model, strategy, or current and prospective clients for two year from the date of the contract. (FACC ¶ 31.)

RealPage further alleges that, at this same time and with Yardi's knowledge, Hendrix was acting as a mole for Yardi. (FACC ¶ 32.) As such, Hendrix provided Yardi with: (a) RealPage data center and disaster recovery architecture; (b) RealPage technology used to monitor and improve the operation of third-party applications; (c) RealPage process methods for change, problem, and release management; (d) detailed and proprietary descriptions of the SaaS; and (e) the confidential details of RealPage's bids for large Yardi clients. (FACC ¶¶ 32, 33.) Furthermore, after participating in sales calls, strategy discussion, and receiving information regarding RealPage hardware and software, Hendrix abruptly announced he had accepted a position with Yardi to expand its Texas operations. (FACC ¶ 32.) Then, within three weeks of Hendrix departure from RealPage, Yardi began offering a vertically-integrated service called Yardi Cloud Services, allegedly modeled on the SaaS. (FACC ¶ 34.)

RealPage also claims Yardi initiated a campaign to force its Voyager clients, through threats and intimidation, into anti-competitive exclusionary contracts, the terms of which allegedly stated that unless clients agreed not to use the SaaS, they would face termination of their licencing agreements. (FACC ¶ 39.) Moreover, because Voyager is a critical back-office application without a suitable alternative program, businesses faced high switching costs if they were to terminate their license agreements with Yardi and change platforms. (*Id.*) Examples of this misconduct was allegedly manifested in relation to five RealPage clients ("Clients 1-5," respectively).

Client 1, a large property management firm and user of Voyager, entered into a Letter Agreement for Interim Services with RealPage (the "Letter Agreement"). (FACC ¶ 42.) The Letter Agreement indicated, among other things, that Client 1's affiliate would continue to support any Yardi applications until RealPage and Client 1 entered into an additional agreement, called the Cloud Service Agreement, at a later date. (Reply, Exh. 1 at 2, 6.) RealPage alleges that Yardi would not modify its licensing agreement to allow Client 1 to use Voyager on the SaaS; rather it "advised Client 1 that it could not continue with the Letter Agreement for Interim Services or any future contemplated agreements with RealPage." (*Id.*) Subsequently, Client 1 announced that it could not use the SaaS, and RealPage was deprived of over $100,000 annually. (*Id.*)

3

Client 2, a top ten property management firm and user of Voyager, moved to RealPage's SaaS for most of its IT needs, including the hosting of Voyager. (FACC ¶ 43.) Although Yardi had initially refused to bid for Client 2's third party hosting and outsourcing of related IT services, Hendrix, who had participated in sales calls to Client 2 and acquired substantial confidential information including detailed bid information, strongly encouraged Yardi to recapture Client 2's business. (FACC ¶¶ 43, 44.) Yardi consequently aggressively bid for Client 2's business.[1] (*Id.*) Additionally, Clients 2-A and 2-B, both customers of Client 2, were affected by Yardi's campaign against RealPage in that Yardi would not allow RealPage to implement Client 2-A's software interface, nor would Yardi allow RealPage to support Client 2-B's upgraded software. (FACC ¶ 46.)

Client 3, another multifamily and commercial real estate owner, agreed to move its data center to the SaaS. (FACC ¶ 47.) During the migration, however, Yardi allegedly demanded that Client 3 not use the SaaS, nor associate itself with RealPage. (*Id.*) Subsequently, Client 3 decided not to use the SaaS to host its Voyager software and RealPage lost the revenue it would have generated managing that application. (*Id.*)

RealPage also alleges Yardi repeatedly interfered with RealPage's subsidiary consulting company, EverGreen, and EverGreen's relationships with its existing and prospective consulting clients. (FACC ¶ 48.) One such instance occurred when EverGreen was in the process of negotiating a consulting contract with Client 4. (*Id.*) Negotiations were supposedly interrupted, however, when Yardi told Client 4 that it would not work with EverGreen, and Client 4 – not wanting to "be a casualty in" a strained relationship between the two companies – decided not to enter into the consulting contract. (*Id.*)

Finally, RealPage alleges Yardi interfered with Client 5's ability to transition from Voyager to RealPage's SaaS property management software, OneSite. (FACC ¶ 49.) Yardi allegedly accomplished this by changing its practice of allowing transitioning clients to maintain read-only access to historical data on Voyager, and supposedly intending to cut off Client 5's access in the future. (*Id.*)

---

[1] The FACC does not indicate whether Yardi was successful at recapturing Client 2's business or if Client 2 remained with RealPage.

4

In response to Yardi's January 24, 2011 Complaint, RealPage filed a Counterclaim on March 28, 2011, followed by the FACC on May 18, 2011. The FACC proceeds on six claims: (1) misappropriation of trade secrets; (2) violation of Section 1 of the Sherman Antitrust Act; (3) violation of the California Cartwright Act; (4) intentional interference with a contract; (5) intentional interference with a prospective economic advantage; and (6) unfair competition in violation of the California Business and Professions Code section 17200, also known as the Unfair Competition Law ("UCL"). Subsequently, Yardi filed the instant Motion to Dismiss on June 16, 2011.

### III.     LEGAL STANDARD

"To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint generally must satisfy only the minimal notice pleading requirements of Rule 8(a)(2)." *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). For a complaint to sufficiently state a claim, its "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* Rather, to overcome a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief." *Id.* (internal citation and quotation marks omitted).

When considering a 12(b)(6) motion, a court is generally limited to considering material within the pleadings and must construe "[a]ll factual allegations set forth in the complaint . . . as true and . . . in the light most favorable to [the plaintiff]." *See Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (citing *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996)). A court is not, however, "required to accept as true

5

allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).[2]

## IV.   DISCUSSION

Yardi argues that five of RealPage's counterclaims fail to state any claim upon which relief can be granted.[3] First, Yardi contends RealPage's antitrust claims under the Sherman Antitrust Act and the California Cartwright Act fail to: (a) properly allege *per se* tying, (b) define the relevant market affected by Yardi's alleged conduct, (c) allege market power, (d) allege harm to competition, and (e) identify any agreement in restraint of trade.  Second, Yardi argues RealPage's claim for intentional interference with a contract does not allege an actual breach or disruption of any contract between RealPage and a third party.  Third, Yardi contends that the claims for intentional interference with a prospective economic advantage and unfair competition fail to the extent they rely on RealPage's flawed antitrust and contractual interference claims.   The Court addresses each argument in turn.

### A.   REALPAGE'S ANTITRUST CLAIMS

RealPage brings two claims under federal and state antitrust statutes: (1) 15 U.S.C. § 1 (" § 1"), or the Sherman Antitrust Act; and (2) the California Cartwright Act – section 16727 of the California Business and Professions Code.[4]  While § 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ," the Supreme Court has narrowed its definition to only prohibit unreasonable restraints of trade. *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  In this case, Yardi challenges RealPage's antitrust claims on the ground that RealPage fails to

---

[2] To the extent the Court relies on any documents not attached directly to the FACC, those documents are mentioned in the FACC and are thereby incorporated by reference.  Furthermore, "[a] trial court may presume that public records are authentic and trustworthy," *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir.1999), and, thus, fall within the purview of Federal Rule of Evidence 201. *See Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).

[3] Yardi does not bring any argument in the instant Motion against RealPage's first claim for misappropriation of trade secrets.  In light of the allegations levied against Yardi for willfully and maliciously misappropriating RealPage's trade secrets by means of Hendrix, (see FACC ¶¶ 51-57), and because Yardi failed to provide any argument to the contrary, this claim survives the Motion to Dismiss.

[4] While the FACC merely states in a head note that RealPage is bringing its third counterclaim under the California Cartwright Act, it does not allege any specific section under the Act. (FACC at 28.)  Therefore, the Court is forced to rely upon RealPage's Opposition which makes reference to section 16727. (Opp'n at 5.)

allege either a "rule of reason" or a *per se* tying agreement. (Mot. at 6-7; Reply at 2-3, 6, 12.)

Both § 1 and section 16727 prohibit illegal tying arrangements. *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1088 (9th Cir. 2009); *Nicolosi Distrib., Inc. v. BMW of N.A.*, No. 10-03256, 2011 WL 1483424, at *2 (N.D. Cal. Apr. 19, 2011). "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agree that he will not purchase that product from any other supplier.'" *Image Technical Service, Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615 (9th Cir. 1990) (quoting *Northern Pac. Ry. Co. V. United States*, 356 U.S. 1, 5-6 (1958)); *Blough*, 574 F.3d at 1088 (a tying arrangement is where a party ties "two products or services together, whereby 'the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product).'") (quoting *Cascade Health Solution v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008)).

Before the Court attempts to analyze the five different ways Yardi argues RealPage failed to state an antitrust claim, it must first determine if there is a tying arrangement such that Yardi's conduct would be subject the aforementioned antitrust statutes. RealPage asserts that the tying product, Yardi's Voyager software, is tied to Yardi's "anticompetitive exclusionary agreements," which preclude Yardi clients from using Voyager on the SaaS. (FACC ¶ 59.) Based solely upon these criteria, Yardi's Voyager program and its exclusionary licensing agreement appear to fall within bounds of an illegal tying agreement. The Court, however, cannot overlook the full definition of a tied product. As explained above, for an illegal tying arrangement to exist, the sale of the Voyager software must be conditioned upon the purchase of cloud computing, or at least the non-purchase of cloud computing from RealPage. Yet, the facts indicate that Voyager software does not have to be used with *any* cloud computing services. (FACC ¶¶ 2, 39.) Indeed, clients can elect to use the on-premise approach whereby they can install the software on their own computers and manage it themselves. (*Id.*) Thus, because Yardi does not tie the sale of Voyager with a tied product, *i.e.* the purchase of cloud computing or the non-purchase of cloud computing from RealPage, the facts as pleaded do not fit the definition of a tying arrangement. Therefore RealPage fails to allege that Yardi engaged in an illegal tying arrangement. Consequently, RealPage's antitrust claims against Yardi fail and Yardi's Motion is **GRANTED** as to these claims.

### B. REALPAGE'S CLAIMS FOR INTENTIONAL INTERFERENCE WITH A CONTRACT AND FOR INTENTIONAL INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE

As an initial matter, the only contract at issue in this case is the Letter Agreement between RealPage and Client 1. Indeed, RealPage does not allege there was a valid contract between it and Clients 2, 2-A, 2-B, 3, 4, 5, or that such a contract was breached by Yardi's actions. RealPage does, however, allege that Yardi interfered with the prospective economic advantage as to all Clients. The Court first addresses the issues as they relate to Client 1.

The elements of an action for intentional interference with a contract are "'(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" *Hahn v. Diaz-Barba*, 194 Cal. App. 4th 1177, 1197 (2011) (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998)). "A refusal to deal is one means by which a person may induce another to commit a breach of his contract with a third person." Restatement (Second) of Torts § 766 cmt. k (1979). A claim for intentional interference with a prospective economic advantage is comprised of the same elements as intentional interference with a contract in that it requires evidence of an economic relationship with a probability of future economic benefit, but some additional wrongful conduct other than the alleged interference is required. *J.A. Savage v. Pacific Gas and Elec. Co.*, 21 Cal. App. 4th 434, 448 (Ct. App. 1994); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).

The Letter Agreement provides that RealPage will not host the Yardi software, but that an affiliate of Client 1 will provide these hosting services. (Reply, Exh. 1 at 2.) While the Letter Agreement further states that RealPage will begin to host these services upon the execution of an additional agreement called the Cloud Service Agreement, the prospective Cloud Service Agreement never materialized. Thus, although contemplated, RealPage and Client 1 never had an actual agreement whereby RealPage would host any Yardi applications. Indeed, the contract only provides that Client 1's affiliate will host these services. None of Yardi's alleged actions interfere with Client 1's affiliate's ability to host these services. Consequently, RealPage's claim for intentional interference with

a contract fails. Moreover, to the extent that RealPage argues that Yardi's failure to modify the licensing agreement constitutes intentional interference with a contract, in light of the foregoing, this argument also fails. In essence, the prospective Cloud Service Agreement cannot be said to be an actual contract. Rather, it is a prospective economic advantage.

For Yardi to have interfered with RealPage's prospective economic advantage as to Clients 1, 2, 2-A, 2-B, 3, 4, and/or 5, not only must the FACC properly plead the above mentioned elements for this tort, but RealPage must also "allege an act that is wrongful independent of the interference itself." *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007). Here, RealPage alleges Yardi's conduct was independently tortious or unlawful because Yardi restrained trade and competition in violation of the aforementioned antitrust law. (FACC ¶ 79.) Moreover, RealPage also claims Yardi acted wrongfully when it "used RealPage's own trade secrets, obtained unlawfully by Yardi, to unfairly compete against RealPage and to interfere with RealPage's client relationships." (*Id.*)

To the extent RealPage bases Yardi's wrongful conduct upon violation of antitrust law, the Court has already determined those claim to be improperly pleaded. Therefore, the Court finds any reliance upon them to be unavailing. To the extent RealPage RealPage claims Yardi used the proprietary information unlawfully provided to it by Hendrix as to interfere with any prospective economic advantage, it does so only as to Client 2. (FACC ¶ 43.) No such allegations exist as to Clients 1, 2-A, 2-B, 3, 4, and 5. Therefore, the Court need only to look at whether Yardi acted wrongfully in its alleged attempt to interfere with the prospective economic advantage between RealPage and Client 2, and whether RealPage has properly alleged all the elements of this tort against Yardi as to Client 2.

RealPage claims that its prospective economic relationship with Client 2 was damaged when, at Hendrix's encouragement and with Hendrix's possession of proprietary information, Yardi began to bid for Client 2's third-party hosting services. The Court has already acknowledged that RealPage's claim for misappropriation of trade secrets has not been challenged in the context of the instant Motion. Thus, for purposes of the instant Motion, the Court presumes that the FACC properly asserts Yardi acted wrongfully as to Client 2. It is also true that RealPage asserts a valid expectation between it and Client 2,

and that Yardi was aware of this expectation and intentionally sought to disrupt or interfere with the relationship. (*See* FACC ¶¶ 43-44, 77-78.) Yet, the FACC falls short of alleging any actual disruption or breach of the prospective economic relationship between RealPage and Client 2.

RealPage only alleges Yardi attempted to interfere with the prospective economic relationship between RealPage and Client 2 by using the unlawful proprietary information to aggressively bid for Client 2's business. The FACC remains vague and ambiguous as to whether Yardi's aggressive bids toward Client 2 had any effect upon the potential economic relationship or if it caused Client 2 to walk away from a potential contract with RealPage. Moreover, the FACC does not allege any damages caused to RealPage by Yardi's actions towards Client 2. Rather, the FACC implies that Yardi's attempts to intimidate Client 2 failed. (*See* FACC ¶ 46). Consequently, RealPage fails to properly plead the final two elements for intentional interference of a prospective economic advantage – actual breach and resulting damage. Accordingly, Yardi's Motion is **GRANTED** as to both intentional interference claims.

### C. REALPAGE'S UCL CLAIM

UCL section 17200, indicates that a claim may be brought against a party for any "unlawful, unfair, or fraudulent business act or practice . . . ." "An act is 'unlawful' under section 17200 if it violates an underlying state or federal statute or common law . . . . An act is 'unfair' if the act threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law . . . . A practice is 'fraudulent' if members of the public are likely to be deceived . . . ." *Quintero Family Trust v. OneWest Bank, F.S.B.*, No. 09-CV-1561-IEG, 2010 WL 392312, at *12 (S.D. Cal. Jan. 27, 2010).

Yardi argues that because RealPage's other claim fail, the UCL claim fails to the extent that it relies upon the other claims. RealPage's claim for misappropriation of trade secrets, however, has not been challenged. Therefore, it provides a sufficient foundation for RealPage's UCL claim against Yardi. Consequently, Yardi's Motion is **DENIED** as to this claim.

### V. CONCLUSION

For of the foregoing reasons, RealPage's claims against Yardi for misappropriation of trade secrets and violation of the UCL survive Yardi's Motion to Dismiss. Accordingly, Yardi's Motion to Dismiss is **DENIED** as to these claims. As to its antitrust and intentional interference claims, however, RealPage fails to properly state a claim upon which relief can be granted. Accordingly, Yardi's Motion to Dismiss is **GRANTED** as to these claims. If it so chooses, RealPage may amend these claims if it can, in good faith, allege facts to support them. Any amended counterclaim must be filed within thirty (30) days of the date of this Order.

**IT IS SO ORDERED.**

August 11, 2011

_____
HON. OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE