1   MARK A. SAMUELS (S.B. #107026)
    msamuels@omm.com
2   JAMES M. PEARL (S.B.#198481)
    jpearl@omm.com
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA  90071-2899
    Telephone:   (213) 430-6000
5   Facsimile:   (213) 430-6407

6   DAVID R. EBERHART (S.B. #195474)
    deberhart@omm.com
7   SHARON M. BUNZEL (S.B. #181609)
    sbunzel@omm.com
8   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
9   San Francisco, CA  94111-3823
    Telephone:  (415) 984-8700
10  Facsimile:   (415) 984-8701

11  Attorneys for Defendant and
    Counterclaimant REALPAGE, INC.

12

13              **UNITED STATES DISTRICT COURT**

14             **CENTRAL DISTRICT OF CALIFORNIA**

15  YARDI SYSTEMS, INC.,              Case No. CV11-690 ODW (JEMx)
    a California corporation,
16                                    **REALPAGE, INC.'S SECOND**
                                      **AMENDED COUNTERCLAIMS;**
17             Plaintiff,             **DEMAND FOR JURY TRIAL**

18        v.

19  REALPAGE, INC., a Delaware
    corporation, and DC CONSULTING,
20  INC., a Washington, D.C.
    corporation,

21             Defendants.

22  ─────────────────────────

23  REALPAGE, INC., a Delaware
    corporation,

24             Counterclaimant,

25        v.

26  YARDI SYSTEMS, INC., a
    California corporation,

27             Counterdefendant.

28

COMES NOW RealPage, Inc. ("RealPage"), and for its counterclaims against Yardi Systems, Inc. ("Yardi"), avers on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This case is about Yardi's attempts to use its dominant position and stranglehold over its Voyager software customers to block them from using a product they want: the RealPage Cloud.  Rather than compete on the merits for cloud computing customers, Yardi used stolen RealPage trade secrets to build a competitive cloud offering.  Once it had an ill-gotten competitive cloud offering in place, Yardi then bullied its customers into amended license agreements that forbid the customers' use of competitive cloud offerings, including the RealPage Cloud. When customers have resisted Yardi's pressure, Yardi has threatened to terminate the customers' license agreements, which would propel those customers' operations into chaos, as they rely upon Yardi's software to run their businesses.  By these counterclaims, RealPage seeks redress for Yardi's misconduct.

2.     Currently, Yardi and RealPage are the only two competitors in the market for vertically-integrated cloud computing services specialized to the needs of real estate owners and property managers (the "Vertical Cloud Market").  In the Vertical Cloud Market, Yardi and RealPage offer services that enable customers' multiple software applications to be hosted and managed off-site in a multi-tenant data center, accessible via the Internet, and specifically tuned to the specialized applications and related IT service needs of real estate owners and property managers ("Vertical Cloud Services").  To illustrate, a manager of real property requires multiple software applications to run its business, typically including a back office accounting application, property management software application, maintenance and purchasing applications, leasing and prospect management applications, a revenue management application, a background screening

application, a payment processing application, document management system, and reporting and utility management software, in addition to its other standard office applications such as virus protection, Microsoft Outlook, Exchange, Excel, and Word.  RealPage and Yardi host these various applications or interfaces to them in the "cloud" and provide industry-specific expertise that allows these applications to integrate and run smoothly together.  This hosting and integration is described as "enterprise managed service."  In addition, Yardi and RealPage—both of whom also offer their own proprietary property management software applications—use their industry-specific expertise to help their cloud computing clients optimize the unique applications commonly used in the property management industry.  This specialized focus on serving clients' multiple hosting and integration needs within that single industry is what makes RealPage's and Yardi's cloud services "vertically-integrated."  The Vertical Cloud Market is relatively new, but it is growing quickly.

3.     RealPage was the first company to offer Vertical Cloud Services, and RealPage made substantial investments in its infrastructure to serve its cloud computing customers.  Yardi arrived later to the game, but was only able to enter the Vertical Cloud Market because of cloud computing trade secrets it misappropriated from RealPage.  While Yardi has fought vigorously to attract customers to its Vertical Cloud Services, it has not fought fairly.  In addition to misappropriating RealPage's trade secrets pertaining to RealPage's Vertical Cloud Services, and rather than competing for vertical cloud business fairly and on the merits, Yardi has leveraged its substantial market power in a separate, adjacent market—the market for back office accounting software for the residential property management industry (the "Property Management Back Office Accounting Software Market")—to prevent customers from using RealPage's Vertical Cloud Services offering, referred to herein as the "RealPage Cloud."

4. Yardi possesses market power in the Property Management Back Office Accounting Software Market. This business-critical software houses all of a property manager's accounting records and offers capabilities specialized to its needs. Yardi offers the market-leading Property Management Back Office Accounting Software which it markets as Yardi Voyager. Once a customer deploys Yardi's Voyager Back Office Accounting software, it is exceedingly difficult, and in some cases prohibitively expensive, for that customer to switch to an alternative Property Management Back Office Accounting Software product due to the high switching costs associated with moving the data from one system to another, new license fees, and the disruption of day-to-day business necessitated by re-aligning IT systems and transferring data. Yardi's market power therefore derives not only from Voyager Back Office Accounting Software's high penetration among Property Management Back Office Accounting Software customers, but also from the fact that those customers are locked in and cannot easily switch to competing software.

5. Yardi is using both its substantial market power in the Property Management Back Office Accounting Software Market, and stolen trade secrets, to harm competition in the Vertical Cloud Market. Yardi has coerced its *own Yardi Voyager Back Office Accounting Software clients* into signing amended license agreements that prevent them from using the RealPage Cloud hosting services. For those licensee clients that have resisted and tried to host Voyager Back Office Accounting Software in the RealPage Cloud, Yardi has threatened to terminate their software licenses on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud. Yardi has also threatened to send notices of potential termination due to breach to those licensees' own customers. If a firm uses its market power in one market (here, the Property Management Back Office Accounting Software Market) to prevent customers from using a competitor's product in another market (here, the Vertical Cloud Market), it is illegal under federal and California antitrust and unfair competition laws. It is

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1    also illegal conduct under California's tortious interference with prospective

2    economic advantage and tortious interference with contract statutes.

3            6.      In addition to the naked coercion of its customers, Yardi also hired a

4    key RealPage employee to steal RealPage's most highly confidential trade secrets

5    including:

6            ➢ RealPage's superior primary and disaster recovery data center

7                infrastructure and architectural design;

8            ➢ RealPage's proprietary technology used to monitor and improve the

9                performance of third party applications, including Yardi applications;

10           ➢ RealPage's proprietary change management, release management and

11               problem management business processes;

12           ➢ RealPage's marketing and technology plans regarding the RealPage

13               Cloud; and

14           ➢ RealPage's confidential bid proposals made to specific potential cloud

15               computing clients where Yardi was competing against RealPage.

16           7.      While improperly attempting to limit competition in the Vertical Cloud

17   Market, Yardi has used stolen RealPage trade secrets to create its own cloud service

18   modeled after the RealPage Cloud.  Yardi has also used these trade secrets to

19   interfere with RealPage's customer relationships.  Without stealing RealPage's

20   trade secrets, Yardi would not have a viable cloud service of its own.  Using these

21   stolen secrets and its market power in the Property Management Back Office

22   Accounting Software Market, Yardi has interfered with RealPage's client

23   relationships and prevented customers from using the RealPage Cloud, leaving

24   consumers with only one Vertical Cloud Services provider: Yardi.  Through

25   Yardi's campaign of stealing trade secrets, forcing changes to contract terms,

26   threatening to terminate existing software license agreements, and threatening to

27   notify licensees' own customers of potential termination of the licenses, Yardi

28

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   seeks to deny consumers the benefits of choice and fair competition in the Vertical

2   Cloud Market.

3       8.      Finally, in addition to its anticompetitive conduct in the market place

4   and its bullying of its own customers, Yardi has waged an unprecedented assault on

5   RealPage on Wall Street and in the press, including having its agents communicate

6   with Wall Street analysts to try and drive down the RealPage stock price.

7       9.      Through its conduct, Yardi has harmed competition in the Vertical

8   Cloud Market.  Yardi's Property Management Back Office Accounting Software

9   customers represent a substantial share of potential Vertical Cloud Services

10  customers.  Yardi's objective is to obstruct RealPage's ability to compete for these

11  customers so that Yardi will face less competition in the Vertical Cloud Market.

12  This diminished competition from RealPage will enable Yardi to charge a higher

13  price to consumers while selling an inferior product.  If Yardi ultimately is

14  successful in driving RealPage out of the market altogether, then consumers will

15  face no choice in the Vertical Cloud Market.

16      10.     Moreover, Yardi's Property Management Back Office Accounting

17  Software customers include many of the largest property managers.  Yardi's

18  restrictive agreements are thus blocking the natural organic growth that would

19  otherwise allow RealPage to achieve the scale necessary to continually innovate its

20  services and reduce its costs.  These large property managers enable RealPage to

21  spread the costs of expensive hardware and software investments over a greater

22  volume of clients and in the end offer a lower price to consumers.  In addition to

23  lower prices, the savings RealPage achieves through increased economies of scale

24  can also be invested by RealPage in innovative new cloud computing technology.

25  Cloud computing is a new and rapidly evolving industry.  Yardi's attempts to stifle

26  the most innovative new player in this market (RealPage) have significant

27  anticompetitive implications in the form of diminished current and future

28  innovation.  Consequently, as a direct result of Yardi's conduct, there is reduced

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

choice, higher prices for consumers and less innovation in the Vertical Cloud Market.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction over RealPage's federal antitrust claims, which arise under the Sherman Antitrust Act (15 U.S.C. § 1, § 2). 28 U.S.C. §§ 1331, 1337(a). This Court also has supplemental jurisdiction over the related claims for violation of California statutory and common law alleged herein because these claims are so related to the federal claims in this case, over which the Court has original jurisdiction, that they form a part of the same case or controversy within the meaning of Article III of the United States Constitution. 28 U.S.C. § 1367.

12. This Court also has diversity jurisdiction over RealPage's counterclaims because RealPage and Yardi are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332.

13. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the wrongful conduct alleged herein occurred in this district, including but not limited to the antitrust violations, acts of unfair competition, and acts of misappropriation of trade secrets that give rise to RealPage's claims against Yardi.

## THE PARTIES

14. RealPage is a Delaware corporation with its principal place of business in Carrollton, Texas. It is engaged in the business of, among other things, licensing multifamily property management software and Property Management Back Office Accounting Software, providing software consulting services for the real estate industry, and providing Vertical Cloud Services for its clients.

15. Yardi Systems is a California corporation with its principal place of business in Goleta, California. It is engaged in the business of, among other things,

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

licensing property management software and Property Management Back Office Accounting Software and providing Vertical Cloud Services for its clients.

## FACTUAL BACKGROUND

### Market Definition – Property Management Back Office Accounting Software Market

16.   As described above, Yardi's conduct affects two distinct but related markets—the Property Management Back Office Accounting Software Market and the Vertical Cloud Market.

17.   Property Management Back Office Accounting Software is accounting software designed specifically for residential property management.  It includes standard accounting features, such as accounts payable, accounts receivable, cash management, general ledger, portfolio reporting and asset management, but it also offers capabilities specialized to the needs of real estate owners and property managers.  It is generally used in conjunction with property management front office software—referred to in the industry as "leasing and rents" software.[1]  Property Management Back Office Accounting Software is critical to a property manager's ability to effectively run its business.

18.   Yardi competes in the Property Management Back Office Accounting Software Market through its Voyager product line.  The other competitors in this market include RealPage, with its OneSite software brand, MRI Software, J.D. Edwards and AMSI.  It is important to note, however, that MRI Software, J.D. Edwards and AMSI have only been marginal players in the Property Management Back Office Accounting Software Market, and their products are not ideally suited to the customers in this market.  In addition, the same barriers to entry in the

---

[1] Front office software assists a property manager with various aspects of acquiring, managing and moving out residents.  Its functions, for example, include storing resident information, updating and maintaining the resident ledger, running credit and background checks, generating and sending invoices to residents for rent and utilities, tracking deposits and late fees, and monitoring occupancy and amenities for rental units.

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

Property Management Back Office Accounting Software Market, discussed below, that make entry by a new competitor unlikely, also function to make expansion by these weak substitutes implausible.

19.   There are high barriers to entry in the Property Management Back Office Accounting Software Market due to the large upfront costs, development time, complexity, and combination of expertise and experience required to make a commercially successful product in this market.  Moreover, new entrants are unlikely to get a return on their initial investment of time, money and resources because most of the customers in this market have already adopted a Property Management Back Office Accounting Software product, and due to high switching costs, are generally unwilling to move their business to a new entrant.  Therefore, it is unlikely that a new competitor will enter the market for Property Management Back Office Accounting Software.

20.   The Property Management Back Office Accounting Software Market is recognized as a distinct product market in the property management industry. While most competitors in this market sell both back office and front office software, there is separate customer demand for these products.  For example, because each vendor's back office and front office software may offer different strengths or unique features, customers often use one vendor's back office software and another vendor's front office software.  In fact, because Yardi's Voyager Back Office Accounting Software product is so dominant in the Property Management Back Office Accounting Software Market, for reasons described below, many customers use Yardi's Back Office Accounting Software, but nonetheless elect to use another competitor's front office software.  Indeed, as one industry analyst noted, Yardi has a "large base of residential units (that typically run only [Yardi's back office] accounting [software])."

21.   Property Management Back Office Accounting Software customers tend to be managers of 1,000 or more individual apartment units ("units") who,

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

because they manage such large numbers of units, have complex and specialized needs. Less sophisticated property management accounting software products exist for managers of single-family units and small numbers of multi-family units. The competitors in the market recognize the differing needs of property managers based upon the number of units managed. For example, RealPage offers, via a subsidiary, a separate product known as Propertyware and Yardi has a separate product, known as DIY Real Estate Solutions, specifically developed to address the needs of property managers of fewer than 1,000 units.[2] If subjected to a small but significant non-transitory increase in price ("SSNIP"), the customers of Property Management Back Office Accounting Software would not switch to these less sophisticated property management software products because they do not perform the complex functions or possess the advanced features that managers of 1,000 plus units require. Therefore, basic property management accounting software is not an adequate substitute for Property Management Back Office Accounting Software.

22.    In addition, industry-neutral or generic back office accounting software is not an adequate substitute for Property Management Back Office Accounting Software because it is not designed to process the specific types of data that are unique and integral to property management. Property managers require software that contemplates, facilitates and streamlines accounting tasks that are specific to the property management business. Such specialized requirements include, for example, (i) utilization of real estate-specific nomenclature, data types and data fields, (ii) accounting for and managing tenant deposit funds, (iii) accounting for and presentation of data that involves the interperformance of both the general ledger and the resident/tenant ledger, and (iv) management of other types of

---

[2] Yardi acquired DIY Real Estate Solutions in May 2010. The press release announcing the acquisition stated: "The acquisition of DIY adds a complete, integrated property management system designed for companies that manage 1,000 or fewer units . . . DIY will enable Yardi to provide Web solutions for small property managers."

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1  information and data that are unique to or specialized in the real estate industry,

2  such as information related to intercompany relationships, specialized methods of

3  addressing percentage ownership of properties or assets and partnership

4  distributions and reporting, common area maintenance pools, expense

5  reconciliations and real estate asset valuations.  Generic, industry-neutral back

6  office accounting software, even sophisticated accounting software, does not

7  readily address these needs.  If subjected to a SSNIP, Property Management Back

8  Office Accounting Software customers would not switch to sophisticated but

9  industry-neutral accounting software applications, such as SAP, because they do

10  not have the real estate specific feature sets described above.  Therefore, the

11  Property Management Back Office Accounting Software Market constitutes its own

12  distinct relevant product market for which there is no adequate substitute.

13       23.    The relevant geographic market for the Property Management Back

14  Office Accounting Software Market is the United States.

15

## Yardi Has Market Power in the Property Management Back Office Accounting Software Market

18       24.    Yardi has market power in the Property Management Back Office

19  Accounting Software Market.  According to Yardi's First Amended Complaint in

20  this case, "[f]or almost thirty years, Yardi has been a leading developer of database

21  and application software for real estate and property management clients."  Yardi's

22  website describes its Voyager brand, which includes Yardi's Property Management

23  Back Office Accounting Software, as "the industry-leading asset and property

24  management software solution."  Yardi's marketing materials similarly tout the

25  Voyager brand as its clients' "core business system."  Moreover, independent

26  industry analysts recognize that Yardi derives market power from its Property

27  Management Back Office Accounting Software.  As one analyst noted, "Yardi's

28  competitive advantages are its back-end accounting systems and reporting

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   features." Another analyst noted that one of Yardi's key strengths "is its back

2   office accounting capability." A third analyst noted that "Yardi is more suited for

3   back office accounting functions and not front office (renter-facing sales) staff."

4        25.    Additionally, Yardi possesses power over its Property Management

5   Back Office Accounting Software clients because those clients are "locked in" and

6   cannot easily switch to an alternative Property Management Back Office

7   Accounting Software product due to high switching costs.  For example, Property

8   Management Back Office Accounting Software stores all of a customer's

9   accounting data and information related to its property management. If a customer

10  chooses to switch software, there are massive costs associated with transferring this

11  data and information to a new system.  This transfer also results in disruption of the

12  customer's day-to-day business.  In addition, customers invest a great deal of time

13  and expense creating highly customized accounting reports for their specific

14  business needs.  If a customer switches away from Yardi's Property Management

15  Back Office Accounting Software, these vital customized reports will not generally

16  transfer to another software so the investment in creating those reports is lost.  Also,

17  there are additional costs related solely to acquiring and adopting new software,

18  such as costs associated with the potential disruption of the business, and the need

19  to train users, develop and implement new processes where required, and recreate

20  customized forms and reports.  Moreover, the risk of failure of critical business

21  systems during the process of switching software can put an entire business at risk.

22  These switching costs are staggering and often run into the millions of dollars.  In

23  fact, these switching costs can be up to three times more expensive than the

24  software licensing costs—which makes switching costs the number one factor in a

25  company's decision to remain with its current Property Management Back Office

26  Accounting Software provider.  Indeed, because of these staggering switching

27  costs, it would take a property manager many years to see a return on its investment

28  in any new Property Management Back Office Accounting Software product that it

switched to, making it virtually impossible to justify a switch. Therefore, once customers have adopted a particular Property Management Back Office Accounting Software system, there is a strong incumbency factor that prevents them from switching to another vendor. As one industry analyst explained in analyzing RealPage's market position, "RealPage competes to sell its solutions against existing systems that prospects have already made significant expenditures to install, making them 'sticky.'" Yardi's market power therefore derives not only from high market penetration among Property Management Back Office Accounting Software customers, but also from the fact that those customers are locked in to Yardi's "sticky" Voyager Back Office Accounting Software and cannot easily switch to a competing product.

26.    The high switching costs that users of Voyager Back Office Accounting Software face have effects beyond those users themselves. Many large institutional property owners and investors do not manage properties themselves, but instead hire professional property management firms to manage their properties for a fee ("fee managers"). These institutional owners and investors frequently use Yardi's Voyager Back Office Accounting Software themselves in order to monitor their investments. To ensure that they maintain a single system of record throughout their portfolio, these institutional owners and investors often require their fee managers to also use Yardi's Voyager Back Office Accounting Software. Once these fee managers adopt Yardi's Voyager Back Office Accounting Software, they face *two* layers of lock-in: lock-in due to switching costs, and lock-in because the institutional owners are themselves locked into the use of Voyager Back Office Accounting Software and mandate that their fee managers use it as well. Thus, a fee manager that wishes to stop using Voyager Back Office Accounting Software faces two virtually insurmountable obstacles: (1) switching costs that would take years to recoup, and (2) a significant loss of business from institutional owners and investors that are, themselves, locked-in to using Voyager Back Office Accounting

Software and will not work with fee managers who do not also license and use Voyager Back Office Accounting Software. The effects of this double lock-in problem on fee managers are pronounced. To illustrate, when looking at the total number of apartment units managed by the top 50 property managers, over 75% of those that are fee managed (over 1.1 million units) are managed using Yardi's Voyager Back Office Accounting Software. Yardi's dominance is even more apparent when looking at the total number of apartment units managed by the top 25 property managers (those most likely to fee manage for major institutional property owners): among that subset, *over 90% of those units that are fee managed are managed using Yardi's Voyager Back Office Accounting Software.*[3]

27.     Finally, Yardi's power in the Property Management Back Office Accounting Software Market is evidenced by its ability to coerce customers and prevent them from exercising their free will in an adjacent market—the Vertical Cloud Market. The power to successfully coerce a customer is evidence of market power. Accordingly, Yardi has market power in the Property Management Back Office Accounting Software Market.

## Market Definition – Vertical Cloud Market

28.     The market in which competition has been harmed by Yardi's conduct is the Vertical Cloud Market. As described above, the Vertical Cloud Market is the market for vertically-integrated cloud computing services specialized to the needs of real estate owners and property managers. This product market includes only two providers—Yardi and RealPage.

29.     The real estate and property management industry is uniquely positioned to benefit from the transition to cloud computing. As one industry analyst observed in describing the benefits of the RealPage Cloud: "Perhaps more

---

[3] These "locked in" fee managers are precisely the customers that RealPage is trying to attract to its RealPage Cloud.

1  than most industries, real estate has a tendency to constantly expand and contract.

2  This dynamic makes it challenging for IT managers to purchase the appropriate

3  amount of hardware and staff to support it.  In most cases, property managers have

4  either overinvested or underinvested in hardware and headcount.  Further,

5  companies that manage their own data centers often spend as much 80% of their IT

6  dollars on 'keeping the lights on'—maintaining legacy IT systems—as opposed to

7  investing in innovative technologies."

8       30.    The Vertical Cloud Market is distinct from generic cloud computing

9  services, such as those offered by Amazon and Rackspace, because it offers a

10  specialized service tailored to real estate owners and property managers.  As

11  explained above, Yardi and RealPage offer services that enable customers' multiple

12  software applications to be hosted and managed off-site in a multi-tenant data

13  center.  Some of the most important services provided as part of Vertical Cloud

14  Services are the structuring of the infrastructure and architecture on which the

15  property management software applications operate and the integration of such

16  software applications so they run smoothly together and at peak optimization.  This

17  requires industry-specific knowledge, expertise and technologies that generic cloud

18  service providers do not possess and cannot provide to these customers.  For

19  example, Amazon and Rackspace have little, if any, experience integrating back

20  office accounting software to front office property management software, nor do

21  they have experience integrating front office property management applications to

22  the hundreds of potential third party applications that are available to interface with

23  the front office property management system.  Yet the integration of these interface

24  points is essential to the many clients that seek Vertical Cloud Services.  Indeed,

25  Yardi touts this industry specific expertise on its website promoting its cloud

26  service, stating "[a]s a leading provider of real estate software and services, Yardi is

27  uniquely positioned to provide IT infrastructure for real estate enterprises."  In a

28  product brochure for its cloud service, Yardi similarly explains that "[w]ith Yardi as

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   your outsourced IT provider, your core business applications are maintained and
2   supported by experienced professionals focused on your business and the industry."
3   Yardi goes on to describe the following as a "competitive differentiator[]" that
4   "set[s] Yardi apart from other IT outsource providers": "A unique understanding of
5   clients' business processes as a provider of their core business system, Yardi
6   Voyager™." As a result of the industry expertise RealPage and Yardi provide, the
7   software applications used by real estate owners and property managers perform
8   dramatically better in the Vertical Cloud Market than they do or would in a generic
9   cloud market. For these reasons, customers in the Vertical Cloud Market would not
10  switch to generic cloud hosting services, such as those offered by Amazon and
11  Rackspace, in response to a SSNIP.

12      31.   This industry-specific software expertise is a significant barrier to entry
13  for other potential competitors. The knowledge, expertise and technology
14  necessary for cloud hosting that is specific to the property management industry are
15  trade secrets that RealPage developed over many years and as a result of substantial
16  financial investment, and that Yardi acquired through theft and misappropriation.
17  Without this trade secret information, which only RealPage and Yardi possess,
18  other potential competitors are not able to penetrate the Vertical Cloud Market and
19  offer a competing service.

20      32.   An additional barrier to entry is market acceptance. Because Yardi and
21  RealPage offer underlying property management software, customers trust their
22  knowledge and expertise regarding these products. Moreover, Yardi and RealPage
23  both have established reputations and track records in this industry and with these
24  customers. Property management is a conservative industry that prefers established
25  vendors, especially for critical software hosting needs. It is virtually impossible for
26  new entrants without an established track record in the property management
27  software industry to enter the Vertical Cloud Market. Indeed, in light of the market
28  acceptance and industry-specific software expertise barriers to entry, property

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1    management software providers are the only companies capable of offering Vertical

2    Cloud Services.

3        33.    In addition, single-application hosting services, in which a client

4    accesses its own individual copy of a software program (such as Voyager) remotely

5    via the Internet, are not adequate or reasonable substitutes for Vertical Cloud

6    Services. To put it simply, a single-application of software hosted over the Internet

7    is not a Vertical Cloud Service. Indeed, Yardi itself defines cloud computing as

8    services in which "a third party IT provider . . . house[s], host[s], and maintain[s]

9    all or most of the hardware and applications a real estate company would use to run

10   its business." In other words, a Vertical Cloud Service offers enterprise managed

11   services, which involve the management of *multiple* software applications. This

12   service requires specialized expertise because different systems, such as back office

13   accounting, front office property management, maintenance and purchasing,

14   revenue management, utility billing, applicant screening, Internet marketing, human

15   resources, payroll, document management and email are dependent on one another

16   and need to be integrated in order to function properly together. A customer whose

17   applications are not properly integrated may face computer crashes, data corruption

18   issues and other technical problems.

19       34.    In addition, Vertical Cloud Services have distinct advantages over

20   single-application hosting related to the outsourcing of a customer's IT and

21   hardware. For example, rather than making large capital expenditures to buy and

22   hold equipment that may become obsolete or redundant, companies using Vertical

23   Cloud Services have access to state-of-the-art infrastructure that is administered by

24   professionals in capacities that meet the company's current needs and can be

25   quickly upsized or downsized as circumstances require. In addition, because the

26   operative software and data reside at a remote, centralized location, local computers

27   require far less maintenance and fewer "bug" fixes. Also, the servers needed to

28   maintain the cloud can easily be updated and repaired in the background while the

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   users continue their work uninterrupted.  In summary, Vertical Cloud Services host

2   and integrate a client's information technology systems, obviating much of the need

3   for the client to invest in its own IT infrastructure, hardware maintenance, service,

4   and other related costs.[4]  Vertical Cloud Services are thus fundamentally different

5   from a one-off, single-application hosting option, and the latter is thus not a

6   reasonable substitute for the former.  For all these reasons, customers in the Vertical

7   Cloud Market would not switch to single-application hosting in response to a

8   SSNIP, and single-application hosting services do not compete in the Vertical

9   Cloud Market.

10       35.    Similarly, on premise "hosting," also known as self-hosting, is not a

11  reasonable substitute in the Vertical Cloud Market.  With on premise hosting, the

12  client installs and runs property management software on its own computer servers.

13  A SSNIP in the Vertical Cloud Market would not cause cloud customers to switch

14  to on premise hosting because the small price increase in the cost of Vertical Cloud

15  Services would be offset by the much higher costs to the customer of hiring IT

16  personnel, purchasing hardware, and managing and maintaining the infrastructure

17  necessary for on premise hosting.  Vertical Cloud Services offer specialized and

18  valuable features to customers, including integrated support for a broad range of

19  software applications designed specifically for use by property managers, and an

20  operating system environment and IT infrastructure, including servers, storage,

21  routing hardware, and disaster recovery capabilities, accessible to the customer

22  through the Internet.  Therefore, while a SSNIP *might* cause a customer on the

23  margin to delay adoption of Vertical Cloud Services, the features offered by

24

25  [4] As Yardi explains in marketing its cloud service: "The core assumption of cloud computing is that an outsourced technology provider will assume responsibility for

26  a company's IT functions, including application hosting and maintenance, data hosting and maintenance, data center related database administration and network

27  support, custom reports and interfaces. . . . Cloud computing relieves clients of the costs associated with maintaining large IT staffs and clients pay only for those

28  servers and other resources they actually use."

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

Vertical Cloud Services are so unique that ultimately a customer's decision to use
Vertical Cloud Services is governed by non-price factors, such as the age of a
customer's IT, the complexity of a customer's applications, a customer's comfort
level with hosting its IT off-site, and a customer's desire for adoption of new
technology. A customer's decision to switch from on premise hosting to Vertical
Cloud Services is not governed by small increases in price. Consequently, on
premise hosting does not provide a price discipline on Vertical Cloud Services nor
would a SSNIP affect demand between the two products. As a result, on premise
hosting is not an adequate substitute in the Vertical Cloud Market.

36.    The relevant geographic market for the Vertical Cloud Market is the
United States.

## Competitive Landscape of the Vertical Cloud Market

37.    While Yardi is a leading provider in the Property Management Back
Office Accounting Software Market, Yardi has lagged behind RealPage in the
Vertical Cloud Market. RealPage offers cloud computing services to clients in a
way that Yardi has not yet successfully matched, putting Yardi at a significant
disadvantage as companies recognize and migrate to the unquestionable benefits of
the RealPage Cloud. Thus, as the Vertical Cloud Market formed, RealPage
achieved through innovation and merit a significant lead in technology,
infrastructure, and customer service as a result of its substantial investment. As one
industry analyst explained: "We believe that RealPage has a unique competitive
position and that the company, therefore, should benefit disproportionately from
increasing cloud computing adoption in the rental housing vertical."

38.    Yardi aggressively entered the Vertical Cloud Market with the launch
of its competing vertically-integrated cloud service, Yardi Cloud Services™. Yardi
Cloud Services is impaired and limited by Yardi's inadequate investment. For
example, Yardi's security is lagging, and Yardi's cloud does not provide adequate

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

real-time disaster recovery, leaving its clients vulnerable to outages. Yardi also offers only an uptime "goal" and refuses to guarantee that its hosted systems will remain continuously operable. Uptime guarantees are critical in this industry, as they enable property managers to better manage their businesses.

39. Yardi, while effective in designing and selling property management and accounting software, eschewed the opportunity to build the necessary infrastructure, business processes, and technology to meet the new challenge of vertically-integrated cloud computing. As a result of Yardi's limited cloud computing capabilities, Yardi clients understandably have looked for alternative ways to host their Yardi software and satisfy their manifold needs for property management. For these and other reasons, several major Yardi clients have asked RealPage to host their Yardi software, along with other software applications, in the RealPage Cloud.

40. Recognizing that Yardi Cloud Services could not compete on the merits, Yardi embarked on a campaign to leverage its powerful position in the Property Management Back Office Accounting Software Market to stifle competition in the Vertical Cloud Market. Specifically, Yardi is forcing its Voyager Back Office Accounting Software clients, through express and implied threats and intimidation, into anticompetitive exclusionary amendments to their software licensing agreements whereby those clients agree not to use the RealPage Cloud or any other potential cloud service provider. In doing so, Yardi has conditioned its clients' ability to continue to enjoy use of their Voyager Back Office Accounting Software on such clients' agreement not to use any competing Vertical Cloud Services provider. These agreements are described in detail below.

41. Customers acquiesce in these anticompetitive exclusionary amendments to their Voyager Back Office Accounting Software licensing agreements with Yardi not because they prefer Yardi Cloud Services or wish to constrain their future purchasing decisions in the Vertical Cloud Market, but instead

because they are *forced* to do so by Yardi's actual and implied threats of license termination, in the event the customer chooses to do business with RealPage. Once a customer chooses Voyager Back Office Accounting Software, it is locked into the use of this software due to extremely high switching costs, which would take years to recoup. In addition, because of Voyager Back Office Accounting Software's unique functionality, for some customers who require these capabilities, there are no viable competitive alternatives. As a result, customers have no practical alternative but to agree to Yardi's demands of exclusivity and succumb to its anticompetitive threats, even though customers may prefer to host their Voyager Back Office Accounting Software in the RealPage Cloud. This problem is particularly pronounced for larger institutional fee managers, who face two layers of lock-in: one due to high switching costs, and another due to their clients' (institutional property owners and investors) lock-in. Customers' acquiescence in Yardi's demands, and Yardi's ability to impose these demands without meaningful risk of customer defection, underscores Yardi's market power in the Property Management Back Office Accounting Software Market.

## YARDI'S UNLAWFUL PRACTICES

42.    Rather than innovate and invest in a superior architecture and infrastructure, Yardi is trying to impede the adoption of the RealPage Cloud through a campaign of customer interference and intimidation. Yardi's tactics include coercing its own customers to sign anticompetitive amendments to their Voyager Back Office Accounting Software license agreements that explicitly prohibit them from using RealPage's cloud computing and consulting services. For those that resist the restrictions (including current RealPage Cloud customers), Yardi has threatened to terminate their software licenses and also contact their customers, leaving them with an impossible choice: face prohibitively high switching costs and business interruption if they abandon Voyager Back Office

Accounting Software, or forego using the Vertical Cloud Services provider of their choice.

43.     Yardi's interference campaign has stifled competition in the Vertical Cloud Market.  First, Voyager Back Office Accounting Software customers, who tend to manage large numbers of units and utilize multiple software applications, are exactly the type of customer that requires the specialized expertise and application optimization offered by Vertical Cloud Services.  Smaller property managers, who use basic real estate property management software, have less need for the integration and application infrastructure that Vertical Cloud Services afford.  Second, in order for RealPage to reach economies of scale and provide an efficient Vertical Cloud Services product to consumers, it needs to provide those services to customers that manage a large volume of units.  Many of the large fee managers use Voyager Back Office Accounting Software.  So Yardi in effect is attempting to lock RealPage out of the most likely customers for its Vertical Cloud Services and the high volume customers in the market.  Without these customers, RealPage cannot achieve economies of scale and offer the lower prices to consumers that result from high volumes and increased efficiency.  These customers are essential for RealPage to be able to offer the best Vertical Cloud Services at the lowest price, and to continue to innovate and offer next generation products in this industry.  Yardi's conduct, therefore, reduces the quality of RealPage's product, increases prices overall to consumers, stifles innovation in the industry, and allows Yardi to offer an inferior product for a higher price.  As a result, Yardi's conduct is harming competition in the Vertical Cloud Market.

44.     Yardi has not only blocked customers to prevent their use of the RealPage Cloud, Yardi also has stolen RealPage's most highly confidential trade secrets.  Yardi obtained these trade secrets by poaching a newly hired high-level RealPage executive who was privy to the granular details of RealPage's cloud computing technology, who went on sales calls pitching the RealPage Cloud to

1   potential customers, and who had participated in the shaping and design of

2   RealPage's competitive sales strategy for cloud computing. Notably, Yardi did not

3   begin interfering with RealPage's client relationships and forcing amendments to its

4   Voyager Back Office Accounting Software license agreements *until after* Yardi had

5   stolen RealPage's trade secrets and used them to develop and launch a competing

6   cloud service of its own.

7

8   **Yardi's Anticompetitive and Exclusionary Conduct and Interference with**

9   **RealPage's Customers**

10   45.   By way of background, RealPage is committed to providing its clients

11   a broad range of consulting and support services for software hosted in the

12   RealPage Cloud—including Yardi software. Yardi clients frequently hire

13   independent consultants to assist them with software, add-on products, and add-on

14   service modules. One such independent consultant was EverGreen Solutions, Inc.

15   As part of RealPage's strategic planning to enhance its available in-house

16   consulting and support services, RealPage acquired the assets of EverGreen

17   Solutions in September 2009. EverGreen Solutions became a RealPage division

18   and provided consulting services for software users in the real estate industry,

19   including users of Yardi's software. The EverGreen division ("EverGreen") helped

20   these clients by designing, recommending, and installing software solutions and

21   helping them implement best management practices. RealPage understands that in

22   some instances, a Yardi software solution, such as Yardi's Voyager Back Office

23   Accounting Software, may be what is best for a RealPage client.

24   46.   Following industry-standard computing and licensing practices, Yardi

25   until recently allowed its clients—many of whom pay Yardi thousands of dollars

26   monthly or annually for the rights to use Yardi software and maintain client data—

27   to have their Voyager Back Office Accounting Software hosted by a third party.

28   On information and belief, the majority of Yardi's software licenses with its clients

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

permitted or did not prohibit clients from allowing their agents, third parties, contractors, or others to assist with, use, and host Yardi software. Yardi's contracts with its clients did not, before Yardi's misconduct began, limit the types of contractors a client could retain, much less bar perceived competitors from being retained as contractors. Recognizing that it found itself at a distinct competitive disadvantage to RealPage's superior Vertical Cloud Service, Yardi recently changed its software license agreements to illegally counter the RealPage competitive threat and lock its installed base of Voyager Back Office Accounting Software clients out of the RealPage Cloud.

47.     Specifically, Yardi has begun changing its license agreements to prohibit licensees from using any "contractor" to implement or host Yardi software. The agreements define an excluded contractor as "a provider, or an affiliate of a provider, of real property management and accounting software marketed primarily to the real estate industry"—a definition designed and intended by Yardi to target and exclude RealPage specifically, and other potential Vertical Cloud Services competitors, more generally.[5] These restrictions on using the RealPage Cloud are of unlimited duration. Yardi imposed these restrictions on existing licensees that had already purchased Voyager Back Office Accounting Software. Thus, these Yardi licensees are locked into an unanticipated way of implementing or hosting their Voyager Back Office Accounting Software. If a Voyager Back Office Accounting Software client now wants to use the RealPage Cloud (which today is the only competitor to Yardi Cloud Services in the Vertical Cloud Market), the client would first have to change its back office accounting software. Clients cannot easily switch to an alternative back office accounting software because of the high switching costs associated with re-aligning their IT systems, and in many

---

[5] Although RealPage is currently the only competitor to Yardi in the Vertical Cloud Market, to the extent a new competitor enters the market, it would also be subject to these restrictions.

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

cases because of the locked-in position of their own clients, as described above. By preventing its licensees from hosting their Voyager Back Office Accounting Software in the RealPage Cloud, Yardi is effectively preventing these clients from using the RealPage Cloud *at all* because, in the long term, it does not make technological or economic sense for property management firms to host their Voyager Back Office Accounting Software separately from their other property management software products. Finally, Yardi also has threatened to terminate license agreements with clients who use both Yardi Back Office Accounting Software and the RealPage Cloud on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud.

48. Yardi's anticompetitive actions have harmed RealPage by compromising RealPage's contractual relationships with its clients and destroying the trust and goodwill earned by RealPage through years of client development and high-quality service. Yardi's illegal conduct is intended to destroy competition in the Vertical Cloud Market so that Yardi can gain market share and foist its inferior Vertical Cloud Services on unwilling or unwitting customers. Indeed, Yardi's actions have already restrained and injured competition in the Vertical Cloud Market, and have harmed consumers by preventing RealPage from achieving economic scale and the accompanying ability to offer its Vertical Cloud Services to both Yardi customers and non-Yardi customers with increased efficiency, continued innovation and lower prices. Moreover, there is a dangerous probability that Yardi will achieve monopoly power in the Vertical Cloud Market if its conduct does not cease. Below are some specific examples of Yardi's anticompetitive conduct and tortious interference with RealPage clients.

49. Client 1 is a large property management firm that develops, constructs, and acquires multifamily properties in fourteen geographic markets throughout the United States. Client 1 uses Voyager Back Office Accounting Software. RealPage had built a successful existing client relationship with Client 1 which culminated in

1  the negotiation and signing of a Letter Agreement for Interim Services on August 1,

2  2010.  The Letter Agreement was its own stand-alone *executed, valid and*

3  *enforceable agreement* whereby RealPage would provide transition and migration

4  services, as well as hosting and other base services during the interim term for all

5  non-Yardi applications.  When Yardi learned of the Letter Agreement, it set out to

6  interfere with RealPage's new client relationship and to disparage and damage

7  RealPage.  Yardi advised Client 1 that it could not continue to work with RealPage

8  either under its existing Letter Agreement for Interim Services, nor under any

9  contemplated future agreements with RealPage.  Therefore, Client 1 was forced to

10  cancel the services that RealPage was providing for the *non-Yardi applications*

11  under the Letter Agreement, depriving RealPage of substantial revenue.  Absent

12  Yardi's interference and disruption of the contractual relationship, RealPage would

13  have continued to perform these services for *non-Yardi applications* pursuant to

14  the Letter Agreement.

15      50.    Worse yet, after Client 1 was locked into using Voyager Back Office

16  Accounting Software due to high switching costs, Yardi amended Client 1's

17  existing software license agreement to prohibit Client 1 from hosting its Yardi Back

18  Office Accounting Software in the RealPage Cloud, as described above.  Because

19  of the high switching costs it would face if it did not accede to this coercive

20  amendment, Client 1 agreed to the amendment.  Client 1's amended license

21  agreement thus prohibited it from executing its existing plan to host its Voyager

22  Back Office Accounting Software in the RealPage Cloud.  Because it would not

23  make economic or practical sense for Client 1 to continue hosting its non-Yardi

24  software in the RealPage Cloud without hosting its Voyager Back Office

25  Accounting Software as well (indeed, this was the reason Client 1 could only agree

26  to host its non-Yardi software in the RealPage Cloud on an interim basis), Yardi's

27  amended license agreement effectively prohibited Client 1 from using the RealPage

28  Cloud to host even its non-Yardi software.  When Client 1 asked Yardi to change

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

the newly modified license agreement to allow Client 1 to use the RealPage Cloud, Yardi refused.  Yardi's refusal to remove or waive its illegal anticompetitive license provision prohibited Client 1 from being able to use the RealPage Cloud, disrupting an economic relationship RealPage enjoyed with Client 1 which carried a probability of future economic benefit to RealPage.

51.    Yardi's intent was to force Client 1 to use Yardi Cloud Services for its software hosting needs—a service that Yardi was able to offer only as a result of its misappropriation of RealPage's trade secrets.  Without this purloined knowledge, Yardi would not have a competing Vertical Cloud Service to coerce its Voyager Back Office Accounting Software customers into patronizing and would not have had the ability to interfere with and disrupt RealPage's existing contractual relationship with Client 1, nor its prospective economic advantage with Client 1.  As a result of the unlawful and anticompetitive restrictions imposed by Yardi, Client 1 announced that it could not use the RealPage Cloud, thus depriving RealPage of over $100,000 per year in lost revenue as well as other losses.

52.    Similarly, RealPage had successfully built a client relationship with Client 2.  Client 2 is a top-ten property management firm that uses Yardi Voyager Back Office Accounting Software, and at different times has used Yardi's hosting services for Yardi Voyager, and has self-hosted such software.  As discussed in more detail below, in late 2008 and early 2009, an individual named Joe Hendrix ostensibly accepted a job offer as RealPage's Chief Information Officer.  In this role, Hendrix acquired RealPage's confidential and proprietary information related to the RealPage Cloud.  Hendrix participated in sales calls to Client 2 together with RealPage executives.  During the Client 2 sales calls, Hendrix acquired substantial confidential information from Client 2 and RealPage including details regarding Client 2's dissatisfaction with Yardi, Client 2's desire to move to the RealPage Cloud and to use other RealPage products, RealPage's plans and goals for the

RealPage Cloud, and detailed bid information regarding the pricing of the RealPage Cloud to Client 2.

53.    Unbeknownst to RealPage, Hendrix was a mole working for Yardi. Shortly after acquiring confidential information related to RealPage's relationship with Client 2, Hendrix would accomplish his bait and switch and start working for Yardi. Yardi immediately made use of the RealPage trade secrets Hendrix misappropriated to unfairly compete for cloud computing clients. For example, Yardi initially had refused to bid in response to Client 2's Request for Proposal for third party hosting and the outsourcing of related IT services. Once Hendrix disclosed RealPage's trade secrets to Yardi, Yardi realized that it was in real jeopardy of Client 2 moving to the RealPage Cloud. As a result of Hendrix's disclosure of RealPage's confidential and proprietary information, Hendrix and Yardi were able to submit aggressive bids to Client 2 for Yardi's competing cloud computing service. For example, in a February 25, 2010 email to Client 2's CEO, Yardi's President wrote: "We understand through the rumor mill that you may be considering the RealPage Cloud Computing solution. . . . If you are reviewing Cloud Computing there is significant advantage to reviewing our offerings. At a minimum it will give you negotiating advantage when you speak with any provider of Cloud Computing." In fact, there was no rumor mill—it was Joe Hendrix, the Yardi mole.

54.    Hendrix's disclosure of secret RealPage bid information to Yardi damaged RealPage in the Vertical Cloud Market by forcing RealPage to bid against a Yardi proposal that was prepared with ill-gotten confidential information. Furthermore, on information and belief, portions of Yardi's bid simply mimicked RealPage's bid, using RealPage's proprietary information and even the same font and ink color used by RealPage. As a result of Yardi's interference and misappropriation of RealPage's trade secrets, the deal between RealPage and Client 2 was delayed and RealPage was forced to compete against its own technology and

27

1   to lower the price of the cloud services it offered to Client 2. Yardi's conduct

2   therefore resulted in both a disruption of the relationship with Client 2 and

3   substantial monetary damage to RealPage through the lowered prices forced by the

4   illegal Yardi bid and lost revenue resulting from the delay in implementing the

5   service. These damages are a direct consequence of Yardi's anticompetitive

6   conduct, its tortious interference and its misappropriation of RealPage trade secrets.

7        55.   RealPage and Client 2 subsequently entered into a five year agreement

8   for RealPage to host Client 2's software applications, including its Voyager Back

9   Office Accounting Software. As a result of the deal, several Client 2 employees

10  transitioned over to RealPage in order to facilitate the hosting of Client 2's software

11  on the RealPage Cloud. At the time, Yardi assured Client 2 that so long as it

12  allowed Yardi to compete for its Vertical Cloud Services business, it would respect

13  Client 2's purchase decision. When, after that head to head competition between

14  Yardi and RealPage, Client 2 decided to use the RealPage Cloud, Yardi again said

15  it would respect Client 2's decision to host with RealPage and that Yardi would

16  cooperate with the arrangement. However, more than a year later, Yardi repudiated

17  that agreement and now claims that Client 2's hosting with RealPage is in violation

18  of Client 2's 2003 Voyager licensing agreement. Yardi's claims are without any

19  merit or justification. Yet, Yardi continues to make threats to Client 2 and Client

20  2's customers that they will no longer be able to use Yardi's applications if they

21  host with the RealPage Cloud. As a result of Yardi's baseless claims and threats,

22  the Client 2 employees who had shifted over to RealPage will need to move back to

23  Client 2—at great financial cost to RealPage. In addition to this disruption, Client

24  2, who previously had planned to use additional RealPage services and products,

25  has declined to move forward with these plans in light of Yardi's threats, depriving

26  RealPage of future revenue. Yardi's campaign of intimidation and coercion has

27  made customers, like Client 2, hesitant to do any future business with RealPage for

28

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1  fear of harassment by Yardi, and this has directly resulted in lost business and direct

2  monetary damage to RealPage.

3       56.    Yardi has also extended its interference campaign further downstream,

4  threatening RealPage's clients' clients.  Yardi has bound RealPage's clients' clients

5  to anticompetitive exclusionary agreements designed to indirectly interfere with the

6  RealPage client's ability to use the RealPage Cloud.  For example, Client 2-A is

7  one of Client 2's clients.  Client 2-A recently signed a contract with Yardi for use of

8  Yardi's Utility Billing product.  The contract, however, forbids Client 2-A from

9  engaging RealPage to implement Client 2-A's software interface.  Yardi also has

10 interfered with another of Client 2's clients, Client 2-B.  Client 2-B is planning to

11 upgrade its Yardi software, but Yardi is refusing to allow Client 2-B to engage

12 RealPage to support Client 2-B's upgraded software.  These restrictions are

13 designed to interfere with Client 2's business relations with Clients 2-A and 2-B

14 and, indirectly, with Client 2's ability to use the RealPage Cloud.

15      57.    Client 3, another multifamily and commercial real estate owner, had

16 agreed to move its data center to the RealPage Cloud and was in the process of

17 doing so.  During the process of moving its data, however, Yardi demanded that

18 Client 3 not use the RealPage Cloud and not even publicly associate itself with

19 RealPage.  As a result of Yardi's interference, Client 3 has decided not to use the

20 RealPage Cloud to host its Voyager Back Office Accounting Software.  Yardi's

21 actions have damaged RealPage by causing it to lose revenue, reputational benefit,

22 and profit from Client 3's cloud business.

23      58.    Yardi also has repeatedly interfered with EverGreen's relationships

24 with its existing and prospective consulting clients.  For example, Client 4 was in

25 the process of negotiating a consulting contract with EverGreen when Yardi began

26 threatening to refuse to work with EverGreen.  On January 15, 2010—as

27 discussions between EverGreen and Client 4 were just beginning—a representative

28 of Client 4 wrote the following to EverGreen's President:

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   "One big issue that we have got to get addressed is the friction

2   between EverGreen and Yardi.  We cannot afford to be a casualty in

3   our rollout of a strained relationship between both companies.  Please

4   be prepared to address verbally Thursday.  Yardi has indicated that this

5   will be a problem even after I clarified that we are not hosting with

6   EverGreen."

7       59.   As discussions progressed, Yardi's threats escalated.  On February 13,

8   2010, the same representative of Client 4 wrote the following to EverGreen's

9   President:

10  "I have requested a meeting with Yardi this week to meet with you to

11  discuss implementation.  The initial response I got from . . . our

12  [Yardi] sales representative suggested that it was likely Yardi will

13  walk from the deal if we request EverGreen as our implementor."

14  Ultimately, Yardi's threats forced Client 4 to choose another implementation

15  consultant, causing EverGreen to lose this business opportunity and the revenue and

16  profit it would have generated.

17

18  **Yardi's Conduct Constitutes Negative Tying, Which is *Per Se* Illegal**

19      60.   A tying arrangement is "an agreement by a party to sell one product but

20  only on the condition that the buyer also purchase a different (or tied) product, *or at*

21  *least agrees that he will not purchase that product from any other supplier*.  A tying

22  arrangement is *per se* unreasonable if the defendant has sufficient economic power

23  in the tying product market to restrain competition appreciably in the tied product

24  market and if the arrangement affects more than an insubstantial volume of

25  interstate commerce in the tied product."  *Image Technical Serv., Inc. v. Eastman*

26  *Kodak Co.*, 903 F.2d 612, 615 (9th Cir. 1990) (emphasis in original, internal

27  citations omitted).

28

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

61.     Yardi's newly amended software license agreements condition licensees' use of Yardi's Voyager Back Office Accounting Software (the tying product) on an agreement not to use the Vertical Cloud Services (the tied product) of competing property management software companies, the only one of which today belongs to RealPage.  These agreements are commonly referred to as negative tying, or "tie out," agreements and they are *per se* violations of the Sherman Act and California's Cartwright Act.  *See, e.g., Kodak*, 903 F.2d at 615 (agreements not to use a competitor's products or services are *per se* illegal); Cal. Bus. & Prof. Code § 16727 (stating that "[i]t shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, [or] commodities. . . on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . or services of a competitor or competitors of the lessor or seller).

62.     Such agreements are *per se* illegal regardless of whether some Yardi licensees might choose to self-host their Voyager Back Office Accounting Software (*i.e.*, host the software "on premise") and regardless of whether Voyager Back Office Accounting Software *must* be hosted with a cloud services provider.  For example, plaintiffs in *Kodak* argued that Kodak had illegally tied the sale of its photocopier parts to an agreement not to use the maintenance services of Independent Service Organizations.  *Kodak*, 903 F.2d at 615.  Notably, Kodak acknowledged that it would, however, "sell parts to owners who agree to self-service their machines."  *Id.*  The Ninth Circuit determined that this fact in no way barred plaintiff's negative tying claim.  *Id.*  The Supreme Court subsequently affirmed the Ninth Circuit's reasoning.  *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 463, 112 S. Ct. 2072, 2080, 119 L.Ed.2d 265, 281 (1992) (allowing negative tying claim despite the fact that "some consumers, those who self-service for example, would purchase parts without service").

63.   Finally, because the Vertical Cloud Market includes only two competitors at this time—Yardi and RealPage—Yardi's restrictive license agreements foreclose all other suppliers in the tied market.  In other words, Yardi has effectively prohibited its locked-in clients from using the services of all other potential Vertical Cloud Services providers.

### Property Management Back Office Accounting Software and Vertical Cloud Services are Two Distinct Products

64.   Property Management Back Office Accounting Software and Vertical Cloud Services are distinct products and services with different demand, and they are used in two separate and distinct product markets.  Clients often seek Property Management Back Office Accounting Software products and Vertical Cloud Services independently of each other and often from different providers.  In addition, many customers purchase Property Management Back Office Accounting Software and choose not to purchase Vertical Cloud Services.  Also, these products are provided separately to buyers by sellers, including RealPage and Yardi.  In fact, on its website Yardi advertises its Vertical Cloud Service separately from its software products.  In fact, Yardi has sold Property Management Back Office Accounting Software for years, but only recently entered the Vertical Cloud Market.

65.   Moreover, Property Management Back Office Accounting Software and Vertical Cloud Services are not substitutes for one another, as they perform completely separate functions.  Rather than displacing the underlying software, the Vertical Cloud Market serves to complement Property Management Back Office Accounting Software by outsourcing the information technology needs of the customer and ensuring interoperability among the property manager's various software products, including Property Management Back Office Accounting Software.

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

<u>Yardi Has Market Power in the Property Management Back Office Accounting</u>
<u>Software Market</u>

66.     Yardi possesses market power in the Property Management Back
Office Accounting Software Market by virtue of its Voyager Back Office
Accounting Software, manifested by its ability to coerce customers into signing
amended license agreements and the high switching costs those customers face.
*See supra* at ¶¶ 24-27.  Yardi therefore possesses sufficient market power in the
tying product market to coerce its customers (a substantial share of potential
Vertical Cloud Services customers) into not using the RealPage Cloud in the tied
product market.

67.     Market power is the power "to force a purchaser to do something that
he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v.
Hyde,* 466 U.S. 2, 15, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984).  The foregoing
allegations of coercion—including the specific allegations of coercion relating to
Clients 1 and 3—constitute direct and specific evidence of Yardi's market power in
the Property Management Back Office Accounting Software Market.  Furthermore,
Yardi has threatened to terminate the software licenses of Yardi clients that choose
to host Yardi software in the RealPage Cloud.  Customers have succumbed to those
threats, which provides further evidence and support for an inference of market
power.

<u>Yardi's Conduct Affects a Substantial Volume of Commerce</u>

68.     Yardi's anticompetitive and exclusionary conduct affects more than an
insubstantial volume of interstate commerce in the Property Management Back
Office Accounting Software Market and the Vertical Cloud Market.  For example,
as alleged above, Yardi bound Client 1 to a newly amended license agreement that
foreclosed access to Yardi's competitors in the Vertical Cloud Market, including

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   RealPage. Client 1 was prepared to use the RealPage Cloud, but was prevented

2   from doing so by Yardi's amended license agreement, depriving RealPage of over

3   $100,000 per year in revenue. Thus, the amount of business affected by Yardi's

4   negative tying agreement is *at least* this much.

5

6   **Yardi's Amended Software Licenses Constitute Exclusive Dealing Agreements**

7   **and are Unreasonable Restraints of Trade Under the Rule of Reason**

8           69.    Yardi's newly amended software license agreements prohibit Voyager

9   Back Office Accounting Software customers from using any Vertical Cloud

10  Services product on the market other than Yardi's Vertical Cloud Services product.

11  These amended license agreements constitute exclusive dealing in violation of

12  Section 1 of the Sherman Act, 15 U.S.C. § 1. For the reasons explained *supra* in

13  ¶¶ 9, 10 and *infra* in ¶¶ 74-77, these agreements have foreclosed competition in a

14  substantial share of the Vertical Cloud Market. If these agreements are allowed to

15  stand, every Voyager Back Office Accounting Software customer will have only

16  one Vertical Cloud Services option and Yardi could raise its prices and reduce its

17  services in this market without any repercussions.

18

19  **Yardi's Conduct Constitutes Attempted Monopolization of the Vertical**

20  **Cloud Market**

21          70.    Yardi's campaign of stealing trade secrets, communicating with Wall

22  Street analysts to try and drive down the RealPage stock price, forcing changes to

23  contract terms, threatening to terminate existing license agreements, threatening to

24  communicate with its licensee's customers, conditioning its clients' ability to use

25  Voyager Back Office Accounting Software on their coerced agreement not to use

26  the RealPage Cloud, and interfering with RealPage's client relationships is intended

27  to monopolize the Vertical Cloud Market in violation of Section 2 of the Sherman

28  Act, 15 U.S.C. § 2. As explained *supra* in ¶¶ 9, 10, 42-44 and *infra* in ¶¶ 74-77,

Yardi has engaged in anticompetitive conduct designed to destroy competition in the Vertical Cloud Market and there is a dangerous probability of Yardi achieving monopoly power in this market if its conduct does not cease.

71.    In addition, the Vertical Cloud Market constitutes an aftermarket for cloud services used to host Property Management Back Office Accounting Software. Yardi and RealPage are the only competitors in this aftermarket. When Yardi's customers entered into their original Voyager Back Office Accounting Software license agreements, there were no restrictions on what Vertical Cloud Services the customers could use. In and around 2010, Yardi began forcing customers—through exclusive agreements and threats of Voyager license termination—to purchase only Yardi's Vertical Cloud Services. Because these customers are already locked in to using Voyager Back Office Accounting Software, for the reasons described *supra* in ¶¶ 4 and 25, this post lock-in change has a significant effect. Even though many customers would like to use RealPage's Vertical Cloud Services, customers are unable to do so for fear of violating the anticompetitive amendments to their Voyager Back Office Accounting Software license agreements.

72.    Yardi has unquestionable market power with respect to the customers that are locked into using Voyager Back Office Accounting Software. By changing policies once customers are already locked-in, Yardi is able to wield this market power in order to force customers to restrict their purchasing decisions in the cloud services aftermarket and, therefore, there is a dangerous probability that Yardi's attempt to monopolize this aftermarket will be successful.

73.    Yardi's efforts to foreclose RealPage—its sole competitor in the Vertical Cloud Market—from a substantial share of the market will have the effect of increasing prices and decreasing innovation in the Vertical Cloud Market. Left unchecked, Yardi's efforts to leverage its market dominance in the Property Management Back Office Accounting Software Market to gain a dominant share of

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   the Vertical Cloud Market will leave customers with no viable competitive

2   alternatives in the Vertical Cloud Market, allowing Yardi to dictate prices in this

3   market, particularly with respect to customers already locked into the use of Yardi's

4   Property Management Back Office Accounting Software.  As discussed in more

5   detail below, Yardi's conduct has already resulted in harm to competition.

6

7                 **MARKET EFFECTS AND HARM TO COMPETITION**

8          74.    The cumulative, anticompetitive effects of these improper client

9   restrictions far outweigh any pro-competitive benefits.  Yardi's unlawful

10  restrictions have had a pernicious effect on competition and lack any redeeming

11  value.  Yardi's campaign, to date, has already substantially harmed competition in

12  the Vertical Cloud Market and threatens to permanently deny Yardi clients the

13  superior technology and cost savings offered by the RealPage Cloud.  Indeed,

14  Yardi's campaign threatens to seriously impede or halt the growth of the Vertical

15  Cloud Market.

16         75.    Yardi's Property Management Back Office Accounting Software

17  customers represent a substantial share of potential Vertical Cloud Services

18  customers.  Yardi's coercive tactics and market power in the Property Management

19  Back Office Accounting Software Market have caused at least two prospective

20  RealPage Cloud customers to abandon their plans to use the service.  Moreover,

21  these two customers are simply examples of the many customers affected by

22  Yardi's new policy of coercively restricting its customers' choice of Vertical Cloud

23  Services providers.  In fact, over the past year, Yardi is believed to have coerced

24  most, if not all, of its locked-in Voyager Back Office Accounting Software

25  customers into signing exclusionary license agreement amendments that restrict

26  them in their choice of Vertical Cloud Services providers.

27         76.    Yardi's conduct has also prevented RealPage from achieving economic

28  scale.  Yardi is locking up its Property Management Back Office Accounting

36

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1  Software customers, which include many of the largest property managers.  In other
2  words, Yardi's restrictive agreements are preventing RealPage from reaching a
3  critical mass of customers for its RealPage Cloud that will allow it to achieve scale
4  and reduce costs.  These savings will either be passed on to the consumer or
5  invested in innovative new cloud computing technology.  In either case,
6  competition in the Vertical Cloud Market will be enhanced.

7       77.   With the RealPage Cloud artificially stunted by Yardi's misconduct,
8  consumers are denied the innovations and lower prices that would ensue from
9  customers choosing the RealPage Cloud of their own volition and RealPage's
10  growing its vertical cloud offering and continuing to innovate.  Yardi's conduct
11  therefore has not only denied its own Voyager Back Office Accounting Software
12  customers the ability to freely choose the Vertical Cloud Services that best fit their
13  needs, but Yardi's anticompetitive conduct has also deprived non-Yardi customers
14  of the innovation and lower prices that flow from unrestrained competition.

15

16  **Yardi Used a Mole to Misappropriate RealPage's Vertical Cloud Trade**
17  **Secrets**

18       78.   Yardi has not only blocked customers to prevent their use of the
19  RealPage Cloud, Yardi also has stolen RealPage's most highly confidential trade
20  secrets.  Yardi obtained these trade secrets by poaching a newly-hired high-level
21  RealPage executive who was privy to RealPage's confidential and proprietary
22  information, and then used this trade secret information to develop and launch its
23  own Vertical Cloud Service, and interfere with RealPage's customer relationships.

24       79.   Specifically, in late 2008 and early 2009, an individual associated with
25  a RealPage client ("Client X"), Joe Hendrix, ostensibly accepted a job offer as
26  RealPage's Chief Information Officer.  He was issued a company phone, badge
27  with secure-area access capabilities, and a company computer.  He was also
28  provided with invaluable proprietary information.  Hendrix participated in sales

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

calls and strategy discussions with RealPage's CEO, COO, and CTO and spent weeks learning the inner-workings of RealPage and its plans for the development of its cloud computing service. He also met with RealPage clients and was entrusted with valuable RealPage confidential information as well as critical bid information that RealPage clients chose to provide directly to RealPage. Hendrix knew and understood that the information provided to him was confidential and proprietary and that he was required to maintain its confidentiality. At the same time that Hendrix was insinuating himself into RealPage's confidences, however, he was secretly working with Yardi to expand its Texas office to build Yardi's competing cloud computing service. Yardi immediately made use of the RealPage trade secrets Hendrix misappropriated to unfairly compete for cloud computing clients.

80.    The betrayal began when Hendrix, while employed by Client X (a significant client of both Yardi and RealPage), entered into discussions about moving Client X's data center to the RealPage Cloud in order to provide a secure environment for its data. RealPage agreed and successfully moved Client X's data center to the RealPage Cloud. Knowing that after a successful migration to the RealPage Cloud Client X would have no further need for his IT services, Hendrix negotiated with RealPage for a job as Chief Information Officer. RealPage agreed to hire Hendrix, but Client X requested that Hendrix be permitted to wind down his responsibilities while he was also working for RealPage. RealPage's CEO agreed to this unusual arrangement as a favor to Client X. In addition to agreeing to allow Hendrix to wind down his responsibilities at Client X concurrent with his RealPage responsibilities, RealPage offered Hendrix a senior position, a substantial salary, 150,000 stock options, and provided Hendrix with sensitive, confidential, and proprietary documents and information about the RealPage Cloud business model and strategy, as well as access to RealPage's current and prospective clients. Hendrix also was included in high-level strategy discussions and was privy to some of RealPage's most sensitive information. For example, just a few days before his

duties with Client X were to end, Hendrix spent hours discussing confidential future RealPage business strategy with RealPage's Chief Operating Officer.

81.  At all times prior to his departure from Client X, Hendrix was subject to the provisions of a Mutual Confidentiality Agreement between RealPage and Client X. This Agreement, which Hendrix personally signed, obligated Hendrix and Client X to "hold in confidence and not to disclose or reveal to any person or entity the Disclosing Party's Confidential Information." The Agreement was entered into on June 19, 2008, at the outset of discussions between RealPage and Client X. The Agreement provides that "[a]ll obligations undertaken respecting Confidential Information . . . will survive for two (2) years from the date of provision of such Confidential Information."

82.  Unbeknownst to RealPage, Hendrix—while extracting RealPage's confidences and promises of a sizeable salary and stock options—was acting as a mole, working with Yardi to expand Yardi's office in Dallas, Texas. Yardi, meanwhile, knew or had reason to know that Hendrix was presenting himself as a RealPage employee to his friends and family and in sales meetings to third parties, and knew or had reason to know that Hendrix was under an obligation not to disclose RealPage's confidential information. After having participated in sales calls and strategy discussions with RealPage and having used and relied upon RealPage's provision of information, hardware, and software, Hendrix abruptly announced that he had accepted a position as officer in charge of Yardi's expanded Texas operations.

83.  The disclosure and misuse of RealPage trade secrets began immediately and may have been happening even before Hendrix announced officially that he had become a Yardi employee. On information and belief, Hendrix provided Yardi with RealPage's proprietary information concerning: (a) RealPage data center and disaster recovery architecture, a well-known architectural shortcoming of Yardi's offerings; (b) RealPage technology used to

1  monitor and improve the operation of third-party applications; (c) RealPage process

2  methods for change, problem, and release management; (d) detailed and proprietary

3  descriptions of the RealPage Cloud including marketing and technology plans; and

4  (e) the confidential details of RealPage's bids for large Yardi clients.  Yardi used

5  this proprietary RealPage information, misappropriated by Hendrix, to unfairly

6  compete with RealPage.  RealPage's sophisticated knowledge of data security,

7  performance monitoring, and hosting was accumulated and refined through over ten

8  years of experience and over $100 million of investment.  In the hands of Yardi, a

9  competitor that had deliberately chosen not to make such an investment, this secret

10  information was an invaluable and ill-gotten advantage in developing its competing

11  cloud computing service.

12      84.    Given this illicit head start at RealPage's expense, within three weeks

13  after Hendrix joined Yardi, the company began offering a vertically-integrated

14  service modeled on the RealPage Cloud called "Yardi Cloud Services."  Later,

15  Hendrix even went so far as to present confidential RealPage Cloud documents to

16  prospective clients as if they were Yardi's.  The timing of Yardi's Cloud Services

17  offering was no coincidence.  Yardi could not have developed this competing cloud

18  business without the boost that it gained by exploiting the confidential RealPage

19  information Hendrix misappropriated.

20

## FIRST COUNTERCLAIM

### (Misappropriation of Trade Secrets)

23      85.    RealPage realleges and incorporates by reference the allegations

24  contained in Paragraphs 1 through 84 as though fully set forth herein.

25      86.    RealPage has invested millions of dollars and years of time in the

26  development of confidential and trade secret information.  This trade secret

27  information includes, but is not limited to, the following categories of information:

28  (a) RealPage data center and disaster recovery architecture; (b) RealPage

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1   technology used to monitor and improve the operation of third-party applications;

2   (c) RealPage process methods for change, problem and release management; (d)

3   detailed and proprietary descriptions of the RealPage Cloud including marketing

4   and technology plans; and (e) the confidential details of RealPage's cloud

5   computing bids for large Yardi clients.

6        87.   RealPage's trade secrets relevant to this case comprise information not

7   generally known to the public or to other persons who would obtain economic

8   value from their disclosure or use. This information is the subject of reasonable

9   efforts by RealPage to maintain its secrecy, including the use of confidentiality and

10  nondisclosure agreements, and derives independent economic value from not being

11  generally known. The information constitutes "trade secrets" under California Civil

12  Code section 3426.1. RealPage's trade-secret information gives it a competitive

13  advantage in, among other things, its ability to offer services such as consulting

14  services and the RealPage Cloud hosting service.

15       88.   Yardi willfully and maliciously misappropriated RealPage's trade

16  secrets through improper means by obtaining them from Joe Hendrix, who had a

17  duty to maintain the trade secrets' secrecy and to forebear from disseminating or

18  using them. Yardi worked in concert with Hendrix to obtain RealPage's trade

19  secret information, all the while knowing that Hendrix was representing himself as

20  a RealPage employee and that he was subject to a confidentiality agreement. Upon

21  acquiring these stolen trade secrets, Yardi proceeded to use them without

22  RealPage's express or implied consent for the purpose of developing a competing

23  cloud computing business and competing for Client 2's and others' business. Yardi

24  has also used these stolen trade secrets as an integral part of its customer

25  interference campaign. Without the stolen trade secrets, Yardi would be unable to

26  offer a competing product to the RealPage Cloud.

27       89.   By reason of the above-alleged acts and conduct of Yardi, RealPage

28  has been damaged, and it will suffer further great and irreparable harm and damage.

1   The amount of this irreparable harm will be difficult to ascertain, and RealPage will

2   be without an adequate remedy at law.

3       90.   RealPage is entitled to an injunction restraining Yardi, its officers,

4   agents, employees, and all persons acting in concert with it, from engaging in

5   further unlawful acts and from reaping any additional commercial advantage from

6   its misappropriation and use of RealPage's trade secrets.

7       91.   RealPage is further entitled to an order requiring Yardi, its agents,

8   employees, and all persons acting in concert with it, to return to RealPage any and

9   all of its trade secrets and confidential, proprietary materials, including but not

10   limited to any and all materials created incorporating, referencing, or derived from

11   RealPage's trade secrets and confidential, proprietary information.

12       92.   RealPage is further entitled to recover from Yardi the damages

13   sustained by RealPage as a result of the wrongful acts as alleged herein.  RealPage

14   is further entitled to recover from Yardi the gains, profits, and advantages Yardi has

15   obtained as a result of the wrongful acts alleged herein.  The amount of such

16   damages, gains, profits, and advantages cannot be determined at this time but will

17   be proven at trial.

18

19                      **SECOND COUNTERCLAIM**

20              **(Violation of Section 1 of the Sherman Act)**

21       93.   RealPage realleges and incorporates by reference the allegations

22   contained in Paragraphs 1 through 84 as though fully set forth herein.

23       94.   Yardi's conduct as alleged herein has been for the purpose of, and has

24   had the effect of, injuring and restraining competition in the Vertical Cloud Market

25   in the United States.  Yardi has entered into agreements that restrain competition in

26   a substantial portion of the Vertical Cloud Market by forcing Voyager Back Office

27   Accounting Software clients, through threats and intimidation, into anticompetitive

28   exclusionary agreements whereby the client agrees explicitly, or in effect, not to use

1  the RealPage Cloud. Yardi's amended license agreement with Client 1 is one

2  example of these anticompetitive agreements. Yardi's conduct has had and

3  continues to have anticompetitive effects and violates Section 1 of the Sherman

4  Act, 15 U.S.C. § 1.

5        95.    Yardi possesses market power in the Property Management Back

6  Office Accounting Software Market by virtue of its Voyager Back Office

7  Accounting Software. Additionally, Yardi possesses market power over its

8  Voyager Back Office Accounting Software clients because those clients cannot

9  easily switch to an alternative Property Management Back Office Accounting

10  Software due to the high switching costs associated with re-aligning their IT

11  systems and transferring their data to new software architecture. Yardi therefore

12  possesses sufficient market power to coerce its customers (a substantial share of

13  potential Vertical Cloud Services customers) into not using the RealPage Cloud.

14  This power over its Voyager Back Office Accounting Software customers gives

15  Yardi substantial market power in the Vertical Cloud Market as evidenced by its

16  ability to prevent customers from exercising their free will to use competing

17  products.

18        96.    Voyager Back Office Accounting Software and the RealPage Cloud are

19  distinct products and services with different demand, and clients often seek them

20  independently of each other. Yardi has conditioned its clients' ability to continue

21  using Voyager Back Office Accounting Software on their coerced agreement not to

22  use the RealPage Cloud. Yardi has done so through amended license agreements,

23  imposed on its clients after they have already licensed Voyager Back Office

24  Accounting Software and are locked in due to the extraordinarily high financial and

25  logistical switching costs, whereby the client agrees at Yardi's demand to explicitly,

26  or in effect, not use the RealPage Cloud. Yardi's amended license agreement with

27  Client 1 is one example of these anticompetitive agreements. These agreements

28  affect and foreclose a substantial amount of commerce in the Vertical Cloud

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

Market, a market in which Yardi competes, and prevent RealPage from achieving economic scale. Absent Yardi's anticompetitive restrictions, RealPage would reach optimal economic scale and Yardi customers and non-Yardi customers would enjoy lower prices, greater innovation and freedom of choice to select the Vertical Cloud Services provider that best suits their needs.

97.   The agreements also constitute an unreasonable restraint of trade upon interstate commerce. The anticompetitive effects of these agreements outweigh any procompetitive effect or legitimate business justifications.

98.   The agreements are *per se* illegal as negative tying agreements. The agreements are also illegal as tying arrangements under the rule of reason. Finally, Yardi's amended Voyager license agreements constitute unlawful exclusive dealing under Section 1 of the Sherman Act as the amended license agreements force Voyager Back Office Accounting Software customers into using only Yardi's cloud product.

99.   As a direct and proximate result of Yardi's unlawful and anticompetitive conduct, RealPage has been injured and damaged in its business and property.

100.   Unless enjoined, Yardi's unlawful conduct will continue and cause further injury to competition, and RealPage will continue to suffer injury for which it is without adequate remedy at law

## THIRD COUNTERCLAIM
### (Violation of Section 2 of the Sherman Act)

101.   RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

102.   Yardi's conduct as alleged herein has been intended to, and has had the effect of, injuring and destroying competition in the Vertical Cloud Market in the United States. Yardi has engaged in predatory and anticompetitive conduct as a

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

result of its misappropriation of RealPage's trade secrets, its attempts to drive down the RealPage stock price via communications with Wall Street analysts, its threats and intimidation of Voyager Back Office Accounting Software clients, its coercion of those clients (including Client 1) into anticompetitive exclusionary agreements whereby the client agrees explicitly, or in effect, not to use the RealPage Cloud, and its interference with RealPage's client relationships.  There is a dangerous probability that Yardi will achieve monopoly power in the Vertical Cloud Market. Yardi's conduct has had and continues to have anticompetitive effects and violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

103.  Yardi possesses market power in the Property Management Back Office Accounting Software Market by virtue of its Voyager Back Office Accounting Software.  Additionally, Yardi possesses market power over its Voyager Back Office Accounting Software clients because those clients cannot easily switch to an alternative Property Management Back Office Accounting Software due to the high switching costs associated with re-aligning their IT systems and transferring their data to new software architecture.  Yardi therefore possesses sufficient market power to coerce its Back Office Accounting Software customers (a substantial share of potential Vertical Cloud Services customers) into not using the RealPage Cloud.  This power over its Voyager Back Office Accounting Software customers gives Yardi substantial market power in the Vertical Cloud Market as evidenced by its ability to prevent customers from exercising their free will to use competing products.

104.  Voyager Back Office Accounting software and the RealPage Cloud are distinct products and services with different demand, and clients often seek them independently of each other.  Yardi has conditioned its clients' ability to continue using Voyager Back Office Accounting Software on their coerced agreement not to use the RealPage Cloud.  Yardi has done so through amended license agreements, imposed on its clients after they have already licensed Voyager Back Office

Accounting Software and are locked in due to the extraordinarily high financial and logistical switching costs, whereby the client agrees at Yardi's demand to explicitly, or in effect, not to use the RealPage Cloud. Yardi's amended license agreement with Client 1 is one example of these anticompetitive agreements. These agreements affect and foreclose a substantial amount of commerce in the Vertical Cloud Market, a market in which Yardi competes, and prevent RealPage from achieving economic scale. Absent Yardi's anticompetitive restrictions, RealPage would reach optimal economic scale and Yardi customers and non-Yardi customers would enjoy lower prices, greater innovation and freedom of choice to select the vertical cloud provider that best suits their needs.

105.   The Vertical Cloud Market constitutes an aftermarket for cloud services used to host Property Management Back Office Accounting Software. Yardi and RealPage are the only competitors in this aftermarket. When Yardi's customers entered into their original Voyager Back Office Accounting Software agreements, there were no restrictions on what Vertical Cloud Services the customers could use. Yardi later began forcing customers—through exclusive agreements and threats of Voyager license termination—to purchase only Yardi cloud services. Because these customers are already locked in to using Voyager Back Office Accounting Software, customers are unable to use the RealPage Cloud for fear of violating the anticompetitive amendments to their Voyager Back Office Accounting Software license agreements.

106.   Yardi has unquestionable market power with respect to the customers that are locked into using Voyager Back Office Accounting Software. By changing policies once customers are already locked-in, Yardi is able to wield this market power in order to force customers to restrict their purchasing decisions in the cloud services aftermarket and, therefore, there is a dangerous probability that Yardi's attempt to monopolize this aftermarket will be successful.

107.   The agreements also constitute an unreasonable restraint of trade upon interstate commerce.  The anticompetitive effects of these agreements outweigh any procompetitive effect or legitimate business justifications.

108.   The agreements are illegal as negative tying agreements.  Finally, Yardi's amended Voyager license agreements constitute unlawful exclusive dealing as the amended license agreements force Voyager Back Office Accounting Software customers into using only Yardi's cloud product.

109.   As a direct and proximate result of Yardi's unlawful and anticompetitive conduct, RealPage has been injured and damaged in its business and property.

110.   Unless enjoined, Yardi's unlawful conduct will continue and cause further injury to competition, and RealPage will continue to suffer injury for which it is without adequate remedy at law.

## FOURTH COUNTERCLAIM

### (Violation of the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16722, 16726, and 16727))

111.   RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

112.   Yardi's conduct as alleged herein has been for the purpose of, and has had the effect of, injuring and restraining competition in the Vertical Cloud Market. Yardi has entered into agreements intending to restrain competition by forcing its Voyager Back Office Accounting Software clients (including Client 1), through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud.  That conduct has had and continues to have substantial anticompetitive effects in California, and violates Cal. Bus. & Prof. Code §§16720, 16722, 16726, and 16727 (stating that "[i]t shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise,

1  machinery, supplies, [or] commodities. . . on the condition, agreement or
2  understanding that the lessee or purchaser thereof shall not use or deal in the goods
3  . . . or services of a competitor or competitors of the lessor or seller). The
4  anticompetitive effects of these agreements outweigh any beneficial effect or
5  legitimate business justifications.

6      113.  Yardi possesses market power in the Property Management Back
7  Office Accounting Software Market by virtue of its Voyager Back Office
8  Accounting Software. Additionally, Yardi possesses market power over its
9  Voyager Back Office Accounting Software clients because those clients cannot
10 easily switch to an alternative Property Management Back Office Accounting
11 Software due to the high switching costs associated with re-aligning their IT
12 systems and transferring their data to new software architecture. Yardi therefore
13 possesses sufficient market power to coerce its customers (a substantial share of
14 potential vertical cloud customers) into not using the RealPage Cloud. This power
15 over its Voyager Back Office Accounting Software customers gives Yardi
16 substantial market power in the Vertical Cloud Market as evidenced by its ability to
17 prevent customers from using competing products.

18     114.  Voyager Back Office Accounting Software and the RealPage Cloud are
19 distinct products and services with different demand, and clients often seek them
20 independently of each other. Yardi has conditioned its clients' ability to continue
21 using Voyager Back Office Accounting Software on their coerced agreement not to
22 use the RealPage Cloud. Yardi has done so through amended license agreements,
23 imposed on its clients after they have licensed Voyager Back Office Accounting
24 Software and are locked in to its high switching costs, whereby the client agrees at
25 Yardi's demand to explicitly, or in effect, not to use the RealPage Cloud. Yardi's
26 amended license agreement with Client 1 is one example of these anticompetitive
27 agreements. These agreements affect and foreclose a substantial amount of
28 commerce in the Vertical Cloud Market, a market in which Yardi competes, and

1    prevent RealPage from achieving economic scale.  Absent Yardi's anticompetitive

2    restrictions, RealPage would reach optimal economic scale and Yardi customers

3    and non-Yardi customers would enjoy lower prices, greater innovation and freedom

4    of choice to select the Vertical Cloud Services provider that best suits their needs.

5          115.  As a direct and proximate result of Yardi's unlawful and

6    anticompetitive conduct, RealPage has been injured and damaged in its business

7    and property.

8          116.  Unless enjoined, Yardi's unlawful conduct will continue and cause

9    further injury to competition, and RealPage will continue to suffer injury for which

10   it is without adequate remedy at law.

11

12                          **FIFTH COUNTERCLAIM**

13                   **(Intentional Interference with Contract)**

14         117.  RealPage realleges and incorporates by reference the allegations

15   contained in Paragraphs 1 through 84 as though fully set forth herein.

16         118.  RealPage has or had valid contracts with third parties, including

17   Clients 1 and 2, for hosting and consulting services.  Yardi has or had knowledge of

18   these contracts with third parties.

19         119.  Yardi has willfully and intentionally interfered with those contracts by

20   threatening RealPage's clients with termination of software licensing agreements if

21   they use the RealPage Cloud.  These threats were made on objectively baseless

22   grounds solely for the purpose of intimidating those clients into not using the

23   RealPage Cloud.  Yardi also has willfully and intentionally interfered with those

24   contracts by amending its software license agreements to prohibit its licensees from

25   using the RealPage Cloud.  Yardi's wrongful acts were designed to and actually did

26   interfere and disrupt RealPage's contractual relationships with its clients, including

27   Clients 1 and 2.

28

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

120. RealPage has suffered actual damages and loss as a direct and proximate result of Yardi's unlawful interference. RealPage has lost business with Client 1 and Client 2 and has suffered losses with other clients as a result of Yardi's interference.

121. Yardi acted intentionally and in conscious disregard of the rights of RealPage, with malice and oppression, in that Yardi knew that its acts and conduct, as alleged herein, were unjustified and improper and would result in severe financial and economic injury to RealPage. Accordingly, RealPage is entitled to an award of punitive damages against Yardi for the sake of example and by way of punishing Yardi, in an amount to be determined at trial.

## SIXTH COUNTERCLAIM

### (Intentional Interference with Prospective Economic Advantage)

122. RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

123. An economic relationship, with the reasonable probability of future economic benefit to RealPage, existed between RealPage, on the one hand, and its current and prospective RealPage Cloud clients and consulting clients (including Clients 1, 2, 3, and 4), on the other hand.

124. Yardi knew of these relationships and intended to disrupt them by threatening RealPage's clients with termination of their software licensing agreements if they chose to use the RealPage Cloud or EverGreen consulting services. These threats were made on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud. Yardi also has intended to disrupt these relationships by amending its software license agreements to prohibit its licensees from using the RealPage Cloud, and by using RealPage's trade secrets to bid against RealPage.

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

125.   As described throughout these Counterclaims, Yardi's conduct was independently tortious or unlawful because Yardi has restrained trade and competition in violation of the antitrust laws of the United States and California by forcing its Voyager Back Office Accounting Software clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby those clients agree not to use the RealPage Cloud.  Yardi's business acts and practices are also independently tortious or unlawful in that Yardi has used RealPage's own trade secrets, obtained unlawfully by Yardi, to unfairly compete against RealPage and to interfere with RealPage's client relationships.  Finally, Yardi's acts constitute (1) unlawful business practices and (2) unfair business practices under California's Unfair Competition statutes because, among other reasons, they violate the policy and spirit of the antitrust laws and significantly threaten or harm competition.

126.   As a direct and proximate result of Yardi's wrongful acts as alleged herein, numerous clients and prospective clients have been forced to terminate their use of, or have been forced not to use, the RealPage Cloud and EverGreen consulting services.  Yardi's wrongful conduct was a substantial factor in disrupting these relationships.

127.   As a direct and proximate result of Yardi's wrongful acts as alleged herein, RealPage has suffered actual damages and loss.  RealPage has lost business and has suffered losses with clients as a result of Yardi's interference.

128.   Yardi acted intentionally and in conscious disregard of the rights of RealPage, with malice and oppression, in that Yardi knew that its acts and conduct, as alleged herein, were unjustified and improper and would result in severe financial and economic injury to RealPage.  Accordingly, RealPage is entitled to an award of punitive damages against Yardi for the sake of example and by way of punishing Yardi, in an amount to be determined at trial.

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

## SEVENTH COUNTERCLAIM

### (Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200 et seq.)

129.  RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

130.  Yardi's acts, as alleged above, constitute unlawful, unfair, and fraudulent business practices in violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

131.  Yardi's business acts and practices are unlawful, fraudulent and unfair, and in violation of the UCL because Yardi has restrained trade and competition in violation of the antitrust laws of the United States and California by forcing its Voyager Back Office Accounting Software clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud or EverGreen consulting services.  Yardi's business acts and practices are also unlawful, fraudulent, and unfair in that it has used trade secrets that it misappropriated from RealPage to unfairly compete against RealPage and interfere with RealPage's contractual and prospective economic relations.

132.  As a direct and proximate result of Yardi's statutory unfair competition, Yardi has been unjustly enriched in an amount to be determined at trial.

133.  In addition, Yardi's statutory unfair competition has caused, and is continuing to cause, substantial and irreparable harm to RealPage.  Unless Yardi's wrongful acts are restrained by this Court, RealPage's business will continue to suffer.  RealPage has no adequate or complete remedy at law, and the harm RealPage will suffer cannot be adequately compensated in monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, RealPage prays for judgment in its favor as follows:

   a.   That RealPage be awarded damages against Yardi, including treble damages as authorized by law, in an amount to be determined at trial;

   b.   That RealPage be awarded punitive damages against Yardi;

   c.   That the Court award RealPage its attorneys' fees and litigation expenses as authorized by law;

   d.   That the Court enter injunctions restraining Yardi preliminarily and permanently from further misappropriation of RealPage's trade secrets;

   e.   That the Court enter injunctions restraining Yardi preliminarily and permanently from further acts of unfair competition;

   f.   That the Court enter injunctions restraining Yardi preliminarily and permanently from further acts of interference;

   g.   That the Court enter injunctions restraining Yardi preliminarily and permanently from continuing its anticompetitive conduct as alleged herein; and

   h.   That the Court award RealPage such other and further relief as the Court deems just and appropriate.


DATED:     September 2, 2011          MARK A. SAMUELS
                                      DAVID R. EBERHART
                                      SHARON M. BUNZEL
                                      JAMES M. PEARL
                                      O'MELVENY & MYERS LLP


                                      By: _____
                                          Mark A. Samuels
                                      Attorneys for Defendant and
                                      Counterclaimant REALPAGE, INC.

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

1

## DEMAND FOR TRIAL BY JURY

2       Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, RealPage

3   hereby demands a jury trial on all issues so triable.

4

5       DATED:      September 2, 2011        MARK A. SAMUELS
                                             DAVID R. EBERHART
6                                            SHARON M. BUNZEL
                                             JAMES M. PEARL
7                                            O'MELVENY & MYERS LLP

8

9                                            By: _____
                                                   Mark A. Samuels
10                                           Attorneys for Defendant and
                                             Counterclaimant REALPAGE, INC.

11

12

13

14

15

16

17   CC1:855851.10

18

19

20

21

22

23

24

25

26

27

28

REALPAGE, INC.'S SECOND AMENDED
COUNTERCLAIMS
NO. CV11-690 ODW (JEMx)

## PROOF OF SERVICE

I, Susan White, declare:

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On September 2, 2011, I served the within document:

**REALPAGE, INC.'S SECOND AMENDED COUNTERCLAIMS; DEMAND FOR JURY TRIAL**

☐ by transmitting via facsimile machine the document(s) listed above to the fax number(s) set forth below on this date at approximately 10:24 AM. The outgoing facsimile machine telephone number in this office is (213) 430-6407. The facsimile machines used in this office create a transmission report for each outgoing facsimile transmitted. A copy of the transmission report(s) for the service of this document, properly issued by the facsimile machine(s) that transmitted this document and showing that such transmission was (transmissions were) completed without error, is attached hereto.

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope designated by the carrier, with delivery fees paid or provided for, for delivery the next business day to the person(s) listed above, and placing the envelope for collection today by the overnight courier in accordance with the firm's ordinary business practices. I am readily familiar with this firm's practice for collection and processing of overnight courier correspondence. In the ordinary course of business, such correspondence collected from me would be processed on the same day, with fees thereon fully prepaid, and deposited that day in a box or other facility regularly maintained by Federal Express, which is an express carrier.

☐ by putting a true and correct copy thereof, together with an unsigned copy of this declaration, in a sealed envelope, with Express Mail postage fully prepaid to the person(s) listed above, and placing the envelope for collection and mailing today with the United States Postal Service as an Express Mail item in accordance with the firm's ordinary business practices. I am readily familiar with this firm's practice for collection and processing of Express Mail correspondence for mailing with the United States Postal Service. In the ordinary course of business, Express Mail correspondence collected from me would be processed on the same day, with Express Mail postage thereon fully prepaid, and placed for deposit that day with the United States Postal Service by depositing it that same day in a post office, mailbox, subpost office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service for receipt of Express Mail.

LA2:929730.1

PROOF OF SERVICE

1    ☒        by causing a true and correct copy thereof in a sealed envelope and having said
              envelope delivered by messenger service to the person(s) listed below.

2

3    ☐        by causing the document(s) to be emailed or electronically transmitted to the
              person(s) at the email addresses set forth below, pursuant to a court order or an
              agreement of the parties to accept service by email or electronic transmission.  I
4             did not receive, within a reasonable time after the transmission, any electronic
              message or other indication that the transmission was unsuccessful.

5

6    ☐        by electronically filing via the CM/ECF system.

7    Allan Gabriel                              Geoffrey M. Howard
     S. Christopher Winter                      Bree Hann
8    Tamara A. Husbands                         James B. Lewis
     Dykema Gossett PLLC                        Lisa Chin
9    333 South Grand Ave., Suite 2100           Bingham McCutchen LLP
     Los Angeles, CA  90071                     Three Embarcadero Center
10   agabriel@dykema.com                        San Francisco, CA  94111-4067
     kwinter@dykema.com                         geoff.howard@bingham.com
11   thusbands@dykema.com                       bree.hann@bingham.com
                                                James.lewis@bingham.com
12                                              lisa.chin@bingham.com
     Attorneys for Defendant
13   DC Consulting, Inc.
                                                Attorneys for Plaintiff
14                                              Yardi Systems, Inc.

15

16           I declare under penalty of perjury under the laws of the United States that the
     above is true and correct.
17
             Executed on September 2, 2011, at Los Angeles, California.
18

19

20                                                      Susan White

21

22

23

24

25

26

27

28

     LA2:929730.1                                                    PROOF OF SERVICE