BINGHAM MCCUTCHEN LLP
Geoffrey M. Howard (SBN 157468)
Email: geoff.howard@bingham.com
James B. Lewis (SBN 71669)
Email: james.lewis@bingham.com
Bree Hann (SBN 215695)
Email: bree.hann@bingham.com
Three Embarcadero Center
San Francisco, CA  94111-4067
Telephone:  415.393.2000
Facsimile:  415.393.2286

Attorneys for Plaintiff and
Counterdefendant
Yardi Systems, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Yardi Systems, Inc.,<br><br>   Plaintiff,<br><br>  v.<br><br>RealPage, Inc. and DC Consulting, Inc.,<br><br>   Defendants. | Case No. CV 11-00690 ODW (JEMx)<br><br>**YARDI SYSTEMS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS PURSUANT TO FED. R. CIV. P. 12(B)(6)** |
| RealPage, Inc.,<br><br>   Counterclaimant,<br><br>  v.<br><br>Yardi Systems, Inc.,<br><br>   Counterdefendant. | Hearing Date:  November 14, 2011<br>Time:  1:30 p.m.<br>Place:  Courtroom 11, Spring Street<br>Judge:  Hon. Otis D. Wright II |

1

## TABLE OF CONTENTS

2

Page

3   I.     INTRODUCTION ..................................................................... 1

4   II.    OVERVIEW OF THE PARTIES AND THE INDUSTRY .......................... 4

    III.   MOTION TO DISMISS LEGAL STANDARDS ......................................... 4

5   IV.    REALPAGE FAILS TO STATE ANTITRUST COUNTERCLAIMS ......... 5

6          A.    A Client Can Still Use Yardi's Voyager Software Without
                 Cloud Services .......................................................................... 6

7          B.    RealPage's Relevant Market Fails As A Matter Of Law .................... 8

8          C.    RealPage's Market Power Allegation Fails ...................................... 11

9          D.    RealPage's Attempted Monopolization Claim Fails ......................... 14

10         E.    RealPage's Alleged Amended Software Licenses Do Not
                 Amount To Exclusive Dealing .................................................... 18

11  V.     REALPAGE FAILS TO STATE A COUNTERCLAIM FOR
           INTERFERENCE WITH CONTRACT ...................................................... 20

12  VI.    REALPAGE'S UNFAIR COMPETITION AND PROSPECTIVE
           INTERFERENCE COUNTERCLAIMS FAIL ............................................. 23

13  VII.   THE COURT SHOULD NOT GRANT ANOTHER AMENDMENT ....... 24

14  VIII.  CONCLUSION .......................................................................... 25

15

16

17

18

19

20

21

22

23

24

25

26

27

28

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1

## TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

*Abrams & Fox v. Briney,*
5     39 Cal. App. 3d 604, 114 Cal. Rptr. 328 (1974) ................................................ 22

6 *Allied Orthopedic Alliances, Inc. v. Tyco Health Care Group LP,*
7     592 F.3d 991 (9th Cir. 2010) ................................................................ 19

8 *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal Aid*
    *Prof'l Publ'ns, Inc.,*
9     108 F.3d 1147 (9th Cir. 1997) .............................................................. 17

10

11 *Apple, Inc. v. Psystar Corp.,*
    586 F. Supp. 2d 1190 (N.D. Cal. 2008)................................... 8, 9, 10, 11

12

13 *Ascon Props., Inc. v. Mobil Oil Co.,*
    866 F.2d 1149 (9th Cir. 1989) .............................................................. 24

14

15 *Ashcroft v. Iqbal,*
    556 U.S. ---, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...................... 5, 19, 22

16

17 *Axis Imex, Inc. v. Sunset Bay Rattan, Inc.,*
    No. C 08 3931, 2009 U.S. Dist. LEXIS 2667 (N.D. Cal. Jan. 7, 2009)........... 24

18

19 *Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ...................... passim

20 *Biller v. Toyota Motor Corp.,*
    No. CV 09 5429 GHK, 2010 U.S. Dist. LEXIS 10008 (C.D. Cal. Jan. 4,
21     2010) ...................................................................................... 5

22 *Brantley v. NBC Universal, Inc.,*
23     649 F. 3d 1078 (9th Cir. 2011) .............................................................. 6

24 *Colonial Med. Group, Inc. v. Catholic Healthcare West,*
25     No. C 09 2192, 2010 WL 2108123 (N.D. Cal. May 25, 2010).................... 9, 11

26 *County of Tuolumne v. Sonora Cmty. Hosp.,*
    236 F.3d 1148 (9th Cir. 2001) .............................................................. 6

27

28

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1

## TABLE OF AUTHORITIES
(continued)

2

Page

3

*Davies v. Genesis Med. Ctr.*,

4

    994 F. Supp. 1078 (S.D. Iowa 1998) ................................................................. 11

5

*Dickson v. Microsoft Corp.*,

6

    309 F.3d 193 (4th Cir. 2002) .......................................................................... 12

7

*Digital Envoy, Inc. v. Google, Inc.*,

8

    370 F. Supp. 2d 1025 (N.D. Cal. 2005) ......................................................... 24

9

*DocMagic, Inc. v. Ellie Mae, Inc.*,

10

    745 F. Supp. 2d 1119 (N.D. Cal. 2010) ......................................................... 17

11

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,

12

    504 U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) ............................. 7

13

*First Advantage Background Srvcs. Corp. v. Private Eyes, Inc.*,

14

    569 F. Supp. 2d 929 (N.D. Cal. 2008) ........................................................... 24

15

*G & C Auto Body Inc. v. Geico Gen. Ins. Co.*,

16

    No. C06-04898, 2008 WL 687371 (N.D. Cal. Mar. 11, 2008) .................. 20, 21

17

*Image Technical Serv., Inc. v. Eastman Kodak Co.*,

18

    903 F.2d 612 (9th Cir. 1990) ........................................................................... 7

19

*Imperial Ice Co. v. Rossier*,

20

    18 Cal. 2d 33, 112 P.2d 631 (1941) ............................................................... 22

21

*In re Cal. Title Ins. Antitrust Litig.*,

22

    No. C 08-01341, 2009 WL 3756686 (N.D. Cal. Nov. 6, 2009) ...................... 23

23

*Independent Ink, Inc. v. Trident, Inc.*,

24

    210 F. Supp. 2d 1155 (C.D. Cal. 2002) ........................................................... 9

25

*Int'l Norcent Tech. v. Koninklijke Philips Elecs. N.V.*,

26

    2007 WL 4976364 ......................................................................................... 24

27

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,

28

    466 U.S. 2, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984) ................................. 7, 15

*K.C. Multimedia v. Bank of Am. Tech. & Operations, Inc.*,

    171 Cal. App. 4th 939, 90 Cal. Rptr. 247 (2009) .......................................... 24

1

## TABLE OF AUTHORITIES
(continued)

2                                                                              Page

3   *Kendall v. Visa U.S.A., Inc.,*
4       518 F.3d 1042 (9th Cir. 2008) ........................................................................ 5

5   *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.,*
6       146 F.3d 691 (9th Cir. 1998) ........................................................ 20, 21, 23

7   *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau,*
8       701 F.2d 1276 (9th Cir. 1983) ................................................................. 5, 24

9   *Kwikset Corp. v. Superior Court,*
        51 Cal. 4th 310, 120 Cal. Rptr. 3d 741 (2011) ...................................... 24

10
11  *Movie 1 & 2 v. United Artists Commc'ns, Inc.,*
        909 F.2d 1245 (9th Cir. 1990) ................................................................. 15

12
13  *nSight, Inc. v. Peoplesoft, Inc.,*
        No. C 04 3836, 2005 U.S. Dist. LEXIS 24847 (N.D. Cal. Aug. 5, 2005) ........ 12

14
15  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.,*
        50 Cal. 3d 1118, 270 Cal. Rptr. 1 (1990) ............................................... 20

16  *Papasan v. Allain,*
17      478 U.S. 265, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) ....................... 5

18  *Pareto v. F.D.I.C.,*
19      139 F.3d 696 (9th Cir. 1998) ............................................................. 4, 11

20  *Philips Med. Capital, LLC v. Med. Insights Diagnostics Ctr., Inc.,*
        471 F. Supp. 2d 1035 (N.D. Cal. 2007) ................................................. 21

21
22  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
        124 F.3d 430 (3rd Cir. 1997) ............................................................ 9, 11

23
24  *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,*
        51 F.3d 1421 (9th Cir. 1995) ................................................... passim

25
26  *Reddy v. Litton Indus., Inc.,*
        912 F.2d 291 (9th Cir. 1990) ................................................................ 24

27  *Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
28      532 F.3d 963 (9th Cir. 2008) .................................................... 11, 14

1

## TABLE OF AUTHORITIES
(continued)

2                                                                                           Page

3   *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*,

4        36 Cal. 3d 752, 206 Cal. Rptr. 354 (1984) ........................................................ 22

5   *Silvaco Data Systems v. Intel Corp.*,

6        184 Cal. App. 4th 210, 109 Cal. Rptr. 3d 27 (2010) ......................................... 24

7   *Spectrum Sports, Inc. v. McQuillan*,

         506 U.S. 447 (1993)........................................................................................... 14
8

9   *Sprewell v. Golden State Warriors*,

         266 F.3d 979 (9th Cir. 2001) ............................................................................... 5
10

11  *Strawflower Elecs., Inc. v. Radioshack Corp.*,

         No. C-05-0747, 2005 U.S. Dist. LEXIS 45205 (N.D. Cal. Sept. 20, 2005) ..... 13
12

13  *Tampa Elec. Co. v. Nashville Coal Co.*,

         365 U.S. 320, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961) .................................... 8, 19

14  *Townshend v. Rockwell Int'l Corp.*,

15       No. C 99-0400, 2000 U.S. Dist. LEXIS 5070 (N.D. Cal. Mar. 28, 2000) ........ 18

16  *U.S. v. Microsoft Corp.*,

17       253 F.3d 34 (D.C. Cir. 2001)................................................................................ 7

18  *United States v. E.I. du Pont de Nemours & Co.*,

         351 U.S. 377, 76 S. Ct. 994, 100 L. Ed. 1264 (1956) ........................................ 8
19

20  *United States v. Syufy Enters.*,

         903 F.2d 659 (9th Cir. 1990) ............................................................................. 17
21

22  *Yanik v. Countrywide Home Loans, Inc.*,
         No. CV 10-6268, 2010 WL 4256312

23       (C.D. Cal. Oct. 18, 2010)............................................................................. 20, 21

24  **STATUTES**

25  15 U.S.C. §§ 1, 2.............................................................................................. 5, 6

26

27

28

# I.   INTRODUCTION

After this Court dismissed RealPage, Inc.'s ("RealPage") antitrust and intentional interference counterclaims against Yardi Systems, Inc. ("Yardi") for failure to state a claim, RealPage elected to amend.  At first glance, the Second Amended Counterclaims ("SACC") appear drastically different from both the original and First Amended Counterclaims ("FACC").  The changes are myriad, contradictory, and often perplexing.  For example, the FACC's lengthy descriptions of Yardi's on-premises and Application Service Provider services have vanished, replaced by curt references and a curious insistence that RealPage does not actually compete with such services.  Where before RealPage included almost no facts about what it now calls the Property Management Back Office Accounting Software Market, the SACC now overflows with indignant rhetoric about the high switching costs that imprison Yardi's software licensees in that market.  And although the FACC failed to exclude from the Vertical Cloud Market other competitors for the business of *multifamily* real estate owners and property managers, the SACC sharply curtails that market to only two competitors, while simultaneously *expanding* it to include the business of ***all*** real estate owners and property managers.  Finally, RealPage has added a Sherman Act Section 2 claim for attempted monopolization of the so-called Vertical Cloud Market, despite previously bragging about its dominance of that alleged market.

These changes, though extensive,  do  not – because RealPage cannot – alter the basic and limited facts on which RealPage's flawed claims rest.  That reality requires that the SACC's antitrust, interference, and unfair competition claims be dismissed yet again.

***Voyager still does not have to be hosted in a cloud***.  The Court previously held that RealPage's attempt to plead an antitrust tying claim failed because there was no allegation that Yardi's Voyager software must be hosted in a cloud, vertical or otherwise.  Without any such requirement, the Court held, *there could be no tie*

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   between the software and the optional choice of cloud hosting.  Nothing has

2   changed:  as the SACC admits repeatedly, Voyager licensees can and do choose

3   from multiple hosting options for their software.  Accordingly, the Court's prior

4   reasoning applies in full force again.

5       ***RealPage fails to allege a properly-defined vertical cloud market.***  This too is

6   familiar.  All of RealPage's antitrust claims require an adequately-defined market for

7   Vertical Cloud Services.  Yet RealPage has failed to allege facts explaining why

8   software licensees' choices to self-host their own software – an obvious and

9   admitted alternative – should be excluded from that market.  To dispel all doubt, the

10  SACC itself alleges that not one, but two specific clients on which RealPage's

11  claims depend are now, or have in the past, self-hosted their Voyager software.

12  Thus, RealPage admits that self-hosting is a reasonable substitute for vertical cloud

13  hosting.  The failure to include that substitute in the relevant market dooms ***all*** the

14  antitrust claims.

15      ***RealPage fails to adequately allege Yardi's power in the software market.***

16  To allege a tying or aftermarket antitrust claim, RealPage must demonstrate that

17  Yardi possesses power over a substantial portion of the market for real estate

18  property management software.  However, rather than offer concrete facts about the

19  software market and Yardi's share of it, the SACC repeats Yardi's standard

20  marketing language and describes Yardi's locked-in software customers.  The SACC

21  does ***not*** allege how many of these customers exist and what proportion of the

22  overall software market they constitute.  RealPage's failure to connect the dots

23  between Yardi's allegedly locked-in customers and actual market share means it has

24  not sufficiently alleged market power.

25      ***RealPage fails to allege exclusive dealing***.  To successfully plead an

26  exclusive dealing claim, RealPage must allege facts showing that Yardi has

27  substantially foreclosed the market for Vertical Cloud Services.  Setting aside that

28  relevant market's independent flaws, RealPage has offered no more than bare legal

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   conclusions about substantial foreclosure, certainly not the required specific and

2   concrete allegations about Yardi's imminent dominance of a substantial share of that

3   market.  This claim too, therefore, must fall.

4        ***RealPage fails to allege a dangerous probability of successful***

5   ***monopolization.***  The SACC does include one new claim: the Section 2 claim for

6   attempted monopolization of the Vertical Cloud Market.  It is clear from the face of

7   this claim why RealPage chose not to include it in either of the two prior iterations

8   of its counterclaims.  The Section 2 claim requires facts to demonstrate Yardi's

9   alleged dominant share of the market, the barriers to entry in that market, and the

10  barriers to expansion.  RealPage's conclusory allegations fail on all three counts.

11  Without these facts, RealPage has failed to demonstrate, as it must, the existence of a

12  dangerous probability of Yardi's successful monopolization of that market.

13       ***RealPage fails to allege interference with contract.***  Finally, and once again,

14  RealPage's intentional interference claims rest on careful, and misleading,

15  implications that cannot stand up to scrutiny.  Despite trying to leave the impression

16  that Yardi has caused two of RealPage's clients to breach their contracts with

17  RealPage, RealPage actually does not allege any such breach or interference.

18  Without such allegations, these claims fail yet again.

19       The SACC's changes are therefore of no avail.  What have *not* changed are

20  RealPage's admissions in its Answer to much of the copyright infringement, trade

21  secret misappropriation, and computer fraud Yardi alleged.  Because RealPage

22  cannot escape those admissions, it seeks to distract the Court and the market with its

23  increasingly shrill allegations that Yardi has engaged in equal misconduct.  Even if

24  RealPage's factual allegations were true (they are not), however, the higher word

25  count of the SACC cannot cure the extensive flaws that again require its dismissal.

26  Three chances are enough: the Court should dismiss RealPage's antitrust and

27  intentional interference counterclaims without leave to amend.  Yardi will then

28  prove the falsity of the remaining trade secret misappropriation claim in due time.

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

## II.    OVERVIEW OF THE PARTIES AND THE INDUSTRY

Yardi and RealPage both develop and license software and provide related services for real estate and property management clients.  SACC, Dkt. No. 139, ¶¶ 14, 15.[1]  Yardi calls its flagship software application product "Voyager."  RealPage calls its primary product "OneSite."  *See, e.g.*, *id.*, ¶ 18.  Many other companies develop and license software in competition with both Yardi and RealPage.  *See, e.g., id.*, ¶ 18 (including MRI Software, J.D. Edwards, and AMSI as competitors).

Yardi and RealPage sell support services for their software.  *See, e.g., id.*, ¶¶ 28, 30.  Support services can include "hosting," which refers to the location where the software is installed and accessed by the client.  Some clients host their software on computers they own or lease ("on-premises" or "self hosting"), and pay the software provider, consultants, and/or employees to maintain the software.  *See, e.g.*, *id.*, ¶ 35.  Other clients host their software remotely with the provider.  This remote hosting goes by various terms.  RealPage now refers to its and Yardi's hosting services as "Vertical Cloud Services."  *See, e.g., id.*, ¶¶ 28, 37.  Yardi does not require that its Voyager software be hosted in any particular location, including in a vertical or other cloud.  *See, e.g.*, *id.*, ¶¶ 35, 50, 52.  Clients choose from multiple hosting options for their software according to their preferences.  *See id.*, ¶¶ 28, 33, 35.

## III.    MOTION TO DISMISS LEGAL STANDARDS

To survive a motion to dismiss, a plaintiff must allege sufficient facts.  Relying on "labels and conclusions," unwarranted inferences, or a "formulaic recitation of the elements" does not suffice without "further factual enhancement."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-57, 127 S. Ct. 1955, 1964-66, 167 L. Ed. 2d 929, 940-41 (2007); *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir.

---

[1]    As of filing, there is no docket number for the Consolidated SACC.  Thus, citations are to Exhibit A to the parties' related stipulation (Dkt. No. 139).  Yardi has also sued defendant DC Consulting, Inc., a surviving entity resulting from RealPage's acquisition of Evergreen Solutions, Inc., a software support services provider.  DC Consulting did not bring counterclaims.

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1998) ("[C]onclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss.").  This "factual enhancement" is critical for antitrust claims because of the "potentially enormous expense of discovery." *Twombly*, 544 U.S. at 557, 559.  Such facts also ensure that a defendant knows the claims against it.  *Id.* at 565 n.10 ("[A] defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin."). Therefore, "evidentiary facts" must be alleged because "discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046-48 (9th Cir. 2008) (citation omitted).

Thus, a court should not accept as true "a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92 L. Ed. 2d 209, 232 (1986); *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868, 884 (2009) ("[P]leadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").  Unwarranted inferences undeserving of deference include conclusions contradicted by alleged factual details. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (A plaintiff can "plead himself out of a claim by including . . . details contrary to his claims.").

Denying leave to amend a complaint is appropriate when amendment would be "futile."  *Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983).

## IV.    REALPAGE FAILS TO STATE ANTITRUST COUNTERCLAIMS

RealPage alleges Yardi has violated Sections 1 and 2 of the Sherman Act and the California Cartwright Act.  SACC, ¶¶ 93-116.[2]  The pleading requirements under

---

[2]    RealPage first filed the SACC on September 2, 2011.  This independent filing was improper under Rules 7 and 13.  *See, e.g., Biller v. Toyota Motor Corp.*, No. CV 09 5429 GHK, 2010 U.S. Dist. LEXIS 10008, at *1-2 (C.D. Cal. Jan. 4, 2010).  After a productive meet and confer, the parties stipulated that RealPage would re-file its SACC consolidated with its Answer, and that Yardi would move to dismiss that version of the SACC.  Dkt. Nos. 139-40.

## YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   the Sherman and Cartwright Acts are the same.  *County of Tuolumne v. Sonora*

2   *Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

3        All three claims fail.  First, as the Court correctly held in its order dismissing

4   the FACC's Section 1 and Cartwright Act claims, Yardi's Voyager software need

5   not be used with *any* cloud computing services.  *See* Order Granting in Part and

6   Denying in Part Counterdefendant's Motion to Dismiss, Dkt. No. 83, ("Order") at 7.

7   With this fact unchanged, the Court need go no further to dismiss the tying claims.

8   Second, RealPage has again failed to define properly the relevant market at issue, a

9   requirement for all three of its antitrust-related statutory claims, regardless of theory.

10  Third, RealPage has failed to allege that Yardi has sufficient market power in the

11  Software Market to substantially restrain trade in the Vertical Cloud Market.  Fourth,

12  RealPage fails to state a claim for attempted monopolization under Section 2

13  because it has not shown a dangerous probability that Yardi will succeed in

14  monopolizing the Vertical Cloud Market.  Finally, to the extent any of RealPage's

15  antitrust claims rest on an exclusive dealing theory, it has failed to allege either

16  substantial foreclosure of the Vertical Cloud Market or the existence of an exclusive

17  deal.  *Brantley v. NBC Universal, Inc.*, 649 F. 3d 1078 (9th Cir. 2011); 15 U.S.C.

18  §§ 1, 2.

19      **A.    A Client Can Still Use Yardi's Voyager Software Without Cloud**
20              **Services**

21      The first independent ground for dismissal is that RealPage has failed to cure

22  the flaw that led to the Court's dismissal of the prior antitrust counterclaims.

23  RealPage continues to rest its antitrust claims primarily on the theory that Yardi is

24  illegally tying the licensing of Voyager software to the non-purchase of Vertical

25  Cloud Services from RealPage.  *See, e.g.*, SACC, ¶¶ 42, 46-47.  The Court has

26  already identified the factual flaw in this theory.  It previously dismissed RealPage's

27  antitrust claims on the grounds that "for an illegal tying arrangement to exist, the

28  sale of Voyager software must be conditioned on the purchase of cloud computing,

Case No. CV-11-00690 ODW (JEMx)

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   or at least the non-purchase of cloud computing from RealPage."  Order at 7.  The

2   Court continued,

3          Yet, the facts indicate that Voyager software does not have
       to be used with *any* cloud computing services.  (FACC, ¶¶
4      2, 39.)  Indeed, clients can elect to use the on-premise
       approach whereby they can install the software on their
5      own computers and manage it themselves.  (*Id.*)  Thus,
       because Yardi does not tie the sale of Voyager with a tied
6      product, *i.e.* the purchase of cloud computing or the non-
       purchase of cloud computing from RealPage, the facts as
7      pleaded do not fit the definition of  tying arrangement.

8

9   *Id.* (emphasis in original); *cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2,

10  12, 104 S. Ct. 1551, 1558, 80 L. Ed. 2d 2, 13 (1984) (The "essential characteristic"

11  of illegal tying is that a seller has "force[d] the buyer into the purchase of a tied

12  product.").[3]  Although RealPage has deleted FACC paragraphs 2 and 39 from the

13  SACC, it still admits elsewhere the reality that Voyager software still "does not have

14  to be used with *any* cloud computing services."  *See, e.g.*, SACC, ¶ 33 (describing

15  "single-application hosting services, in which a client accesses its own individual

16  copy of a software program (such as Voyager) remotely via the internet"); ¶ 35

17  (describing "on premise hosting" as when "the [software] client installs and runs

18  property management software [such as Voyager] on its own computer servers").  In

19  other words, nothing has changed from the Court's earlier ruling that "the facts as

20

21  [3]      RealPage cites *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir.
    1990), for the proposition that Yardi's amended license agreements force customers not to
22  purchase RealPage's Vertical Cloud Services and therefore constitute a "negative tie."  See SACC,
    ¶¶ 60-62.  Yardi's license agreements, however, do nothing of the sort.  Voyager software
23  customers remain free to purchase Vertical Cloud Services from RealPage, or any other potential
    vendor of Vertical Cloud Services.  That such vendors may be limited from accessing Yardi's
24  intellectual property and proprietary Voyager software does not mean that Voyager licensees are
    left with "no choice" but to buy Yardi Cloud Services from Yardi.  *See U.S. v. Microsoft Corp.*,
25  253 F.3d 34, 85 (D.C. Cir. 2001) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504
    U.S. 451, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)) (Per se tying requires that "the defendant
26  affords consumers no choice but to purchase the tied product from it.").  Indeed, RealPage has not,
    and cannot, allege that Client 1 – its lone example of such a customer – has been left with no
27  choice but to purchase cloud services from Yardi.  *See* SACC, ¶¶ 96 and Section IV.B., below.
    Moreover, RealPage affirmatively alleges that Client 2 is, in fact, currently hosting its Yardi
28  software *in the RealPage Cloud.  See id.*, ¶ 55.

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    pleaded do not fit the definition of a tying arrangement." Order at 7. The Court

2    need go no further to dismiss the tying claim.

3        **B.    RealPage's Relevant Market Fails As A Matter Of Law**

4        The second independent ground for dismissal is that RealPage's own alleged

5    facts contradict its relevant market definition. Whether RealPage bases its antitrust

6    claims on tying, aftermarket, or exclusive dealing theories, whether it asserts its

7    tying claim is *per se* or rule of reason, and whether it alleges an illegal restraint of

8    trade under Section 1 or attempted monopolization under Section 2, one requirement

9    is constant: RealPage must allege at least one relevant market affected by Yardi's

10   alleged misconduct. For the tying and aftermarket theories, for example, RealPage

11   must allege a relevant market for the allegedly tied or downstream product (as well

12   as one for the allegedly tying or upstream product). *See, e.g., Apple, Inc. v. Psystar*

13   *Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008). For exclusive dealing, it must

14   allege a market either being, or at risk of being, substantially foreclosed by the

15   alleged misconduct. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328,

16   81 S. Ct. 623, 628, 5 L. Ed. 2d 580, 587 (1961). "Market definition is crucial.

17   Without [it], it is impossible to determine market share." *Rebel Oil Co., Inc. v.*

18   *Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

19       A relevant market must consist of all products with "reasonable

20   interchangeability for the purpose for which they are produced." *United States v.*

21   *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S. Ct. 994, 1012, 100 L. Ed.

22   1264, 1285 (1956) (cellophane was reasonably interchangeable with other packaging

23   materials, despite costing up to three times more). Reasonably interchangeable

24   products are competing products sold by "the group or groups of sellers or producers

25   who have actual or potential ability to deprive each other of significant levels of

26   business." *Apple*, 586 F. Supp. 2d at 1196 (citation and internal quotation marks

27   omitted). An alleged relevant market is facially unsustainable, and a claim based on

28   it should be dismissed, if it "does not encompass all interchangeable substitute

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    products."  *Colonial Med. Group, Inc. v. Catholic Healthcare West*, No. C 09 2192,

2    2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010) (citing *Queen City Pizza, Inc. v.*

3    *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3rd Cir. 1997)).  Courts disregard

4    allegations that a plaintiff's product happens to be designed specifically for the same

5    narrow market the plaintiff alleges.  *See, e.g.*, *Independent Ink, Inc. v. Trident, Inc.*,

6    210 F. Supp. 2d 1155, 1169 (C.D. Cal. 2002).

7          All of RealPage's theories and statutory bases rest in some way on the

8    sufficiency of its allegations about the Vertical Cloud Market.  This is (allegedly) the

9    market for the tied or downstream product, the market being substantially

10   foreclosed, the market that Yardi's alleged anticompetitive agreements affect, and

11   the market Yardi is attempting to monopolize.  *See, e.g.,* SACC, ¶¶ 40, 42-43, 46-51,

12   61, 69-73.  RealPage alleges that the Vertical Cloud Market is "for vertically-

13   integrated cloud computing services specialized to the needs of real estate owners

14   and property managers."  SACC, ¶ 28.[4]  "Vertically-integrated cloud computing

15   services" are defined as "services that enable customers' multiple software

16   applications to be hosted and managed off-site in a multi-tenant data center,

17   accessible via the Internet, and specifically tuned to the specialized applications and

18   related IT service needs of real estate owners and property managers."  *Id.*, ¶ 2.  The

19   only participants in the Vertical Cloud Market are alleged to be Yardi and RealPage.

20   *Id.*, ¶ 28.

21         RealPage has expanded this definition from its FACC equivalent (*see, e.g.*,

22   FACC, ¶ 2), solely to foreclose the argument that Yardi made before:  the market is

23   too narrow because it does not include, as it must, a competing option that has the

24   "actual or potential ability" to deprive RealPage of business.  *Apple*, 586 F. Supp. 2d

---

25   [4]      In stark contrast, the FACC defined the Vertical Cloud Market as including "vertically-
26   integrated cloud computing services for *multifamily* real estate owners and property managers."
     FACC, ¶¶ 37, 59 (emphasis supplied).  RealPage deleted the multifamily limitation from the
27   SACC after Yardi pointed out in its first motion to dismiss that at least one of the customers on
     which RealPage purported to rest its FACC claims was also a *commercial*, not just multifamily,
28   business.  Motion to Dismiss, Dkt. No. 40-1, at 9-12.

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1  at 1196 (citation omitted).  The attempt fails because RealPage cannot justify

2  excluding customer self-hosting, also known as on-premise hosting, from the

3  Vertical Cloud Market.  RealPage acknowledges the existence of the self-hosting

4  option, describing it as when "the client installs and runs property management

5  software on its own computer servers."  SACC, ¶ 35.  But RealPage then argues that

6  self-hosting is not a reasonable substitute for Vertical Cloud Services because a

7  small but significant and non-transitory increase in price ("SSNIP") in Vertical

8  Cloud Services would not cause customers to switch to self-hosting, because of the

9  costs of hosting software in-house.  *See id.*

10  But the question for substitutability is whether the product in question has the

11  actual or potential capability of depriving competitors – in this case, RealPage or

12  Yardi – of business.  *Apple*, 586 F. Supp. 2d at 1196.  The Court need not speculate

13  about whether self-hosting *might* be a viable substitute[5] for Vertical Cloud Services

14  because RealPage admits it.  The SACC itself demonstrates that Client 1, the ***only***

15  customer RealPage points to for its Section 1 and Cartwright Act claims, has

16  selected self-hosting over Vertical Cloud Services from either RealPage *or* Yardi.

17  RealPage alleges that Yardi amended Client 1's Voyager license to prohibit Client 1

18  from hosting its Voyager software in the RealPage Cloud, and that as a consequence

19  Client 1 did not move the software to the RealPage Cloud.  SACC, ¶¶ 50, 51.

20  RealPage then alleges "Yardi's intent was to force Client 1 to use Yardi Cloud

21  Services for its software hosting needs," *id.*, ¶ 51, trying to leave the impression that

22  Client 1 knuckled under to Yardi's coercion.  But *nowhere* does RealPage allege that

23  Client 1 is, in fact, using Yardi's Client Services to host Voyager.  *See id.*, ¶¶ 49-51.

24  Nor can RealPage in good faith make that allegation on amendment.

25  Since there is also no allegation that Client 1 has cast off its Voyager software

26  _____

27  [5]   Note that RealPage admits that its own SSNIP argument, on which it rests the exclusion of
self-hosting from the Vertical Cloud Market, is limited: "a SSNIP *might* cause a customer on the

28  margin to delay adoption of Vertical Cloud Services."  SACC, ¶ 35 (emphasis in original).

Case No. CV-11-00690 ODW (JEMx)

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    (and indeed such an allegation cannot be made, and would contradict RealPage's

2    other allegations about the prohibitive switching costs of changing software

3    platforms), the remaining conclusion is that Client 1 is, in fact, self-hosting its

4    Voyager software.  In other words, Client 1 chose self-hosting as an alternative to

5    Vertical Cloud Services, demonstrating that the self-hosting option has the ability to

6    deprive RealPage and Yardi of business and so belongs in the Vertical Cloud

7    Market.  Indeed, Client 1's decision is particularly significant because

8    substitutability is measured "from the point of view of the *buyers*."  *Colonial Med.*,

9    2010 WL 2108123, at *3 (emphasis supplied) (internal citation omitted).

10        Thus, by its own solitary, self-chosen example,[6] the SACC demonstrates that

11   self-hosting is a reasonable substitute for the Vertical Cloud.  As a result, RealPage's

12   Vertical Cloud relevant market is improperly narrow, its definition contradicted by

13   the SACC itself.  Since all of RealPage's antitrust claims rely on the Vertical Cloud

14   Market allegations, they all fail for failure to properly allege the relevant market.

15   *Twombly*, 550 U.S. at 554-57; *Pareto*, 139 F.3d at 699; *Apple*, 586 F. Supp. 2d at

16   1196; *Queen City Pizza*, 124 F.3d at 437-38; *see also Davies v. Genesis Med. Ctr.*,

17   994 F. Supp. 1078, 1098-99 (S.D. Iowa 1998) (dismissing a "narrow market"

18   contradicted by "many factual assertions" in the complaint).

19        **C.   RealPage's Market Power Allegation Fails**

20        The third independent ground for dismissal is that RealPage fails to allege

21   adequately, as it must for its tying theory, that Yardi possesses market power in the

22   Property Management Back Office Accounting Software Market (the "Software

23   Market").  *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th

24   Cir. 2008) ("A failure to allege power in the relevant market is a sufficient ground to

25   dismiss an antitrust complaint.").  A claim must "allege facts demonstrating that the

---

26   [6]        Although RealPage does not rely on Client 2 to support its antitrust claims, it does admit
27   that Client 2 *also* has self-hosted its Voyager software.  *See* SACC, ¶ 52.  Put another way,
     RealPage has admitted that at third of the Voyager clients included in its SACC either currently
28   self-host, or have done so in the past.

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    defendants played a significant role in the relevant market." *Dickson v. Microsoft*

2    *Corp.*, 309 F.3d 193, 207 (4th Cir. 2002) (internal citation and quotation omitted).  A

3    typical, well-pled claim would include descriptive facts about the alleged market,

4    which the Court then could use to assess an allegation of market power.

5         The FACC alleged only that Yardi Voyager is "industry leading" and "is used

6    to manage over 25,000 apartment sites."  FACC, ¶ 60.  RealPage has added words,

7    but not substance, with the SACC's allegations.  RealPage offers three bases on

8    which it concludes that Yardi possesses market power in the Software Market: (1)

9    Yardi and analysts have said so, (2) Yardi has power over its software customers

10   because those customers are "locked in" to Yardi's software through high switching

11   costs, and (3) Yardi actually coerced Clients 1 and 3 into refusing the RealPage

12   Cloud.  See SACC, ¶¶ 24-26.  All of these bases are deficient, because they neither

13   individually nor collectively demonstrate that Yardi plays "a significant role" in the

14   Software Market.  *Dickson*, 309 F.3d at 207 (internal citation and quotation omitted).

15        First, RealPage provides three quotations from Yardi itself:  the First

16   Amended Complaint, which describes Yardi as "a leading developer of [] software,"

17   and two Yardi marketing pieces, which call Voyager "the industry-leading asset and

18   property management software solution" and a "core business system."  SACC, ¶ 24.

19   These statements do not establish market power – if they did, every software

20   company in the world would qualify.  These standard marketing statements convey

21   no connotation of size.  They provide no data about the market.  "Leading,"

22   "industry-leading," and "core" are qualitative terms about Yardi's products, not

23   admissions of market dominance or even share.  *See, e.g., nSight, Inc. v. Peoplesoft,*

24   *Inc.*, No. C 04 3836, 2005 U.S. Dist. LEXIS 24847, at *2 (N.D. Cal. Aug. 5, 2005)

25   (denying plaintiff leave to amend its monopolization complaint to allege that

26   defendant's marketing documents stated that it was "the largest consulting firm

27   dedicated to PeopleSoft applications" noting that being the "largest" is not

28   equivalent to being a monopolist).  Similarly, the analyst quotations that RealPage

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1  provides say nothing about market power, only that Yardi's software's features are

2  advantageous and capable.  *See* SACC, ¶ 24.  Without a reasonable connection

3  between these comments and actual market power, these allegations are beside the

4  point, and fail to meet the *Twombly* pleading standard.  *Twombly*, 550 U.S. at 554-

5  57.

6        RealPage then contends that Yardi possesses "power" over its software

7  customers because those customers are "locked in" to Voyager, since it is expensive

8  to switch software applications after a client licenses, installs, learns, and begins

9  using the software.  *See, e.g.*, SACC, ¶¶ 4, 19, 25.  But of course every company has

10  some degree of power over customers with whom it has a contractual relationship;

11  RealPage must allege facts showing something more – that those locked-in

12  customers represent a *substantial portion* of the Software Market.  *See, e.g.*,

13  *Strawflower Elecs., Inc. v. Radioshack Corp.*, No. C-05-0747, 2005 U.S. Dist.

14  LEXIS 45205, at *30 (N.D. Cal. Sept. 20, 2005) (dismissing locked-in plaintiff's

15  claims for failure to allege that a "substantial portion" of the relevant market was

16  impacted by defendant's behavior).  Because the SACC is silent on that point, the

17  Court is left to guess whether Yardi's locked-in customers represent – and therefore

18  Yardi has power over – a majority, substantial, or even minuscule percentage of the

19  Software Market.  Such guesswork does not meet RealPage's pleading burden.

20  *Twombly*, 550 U.S. at 554-57; *Strawflower*, 2005 U.S. Dist. LEXIS 45205, at *30;

21  SACC, ¶¶ 4, 19, 25-26.  Indeed, although RealPage tries to leave the *impression* that

22  it has alleged Yardi's overall market share in the Software Market, such as by

23  alleging that 75% of the "top 50" and 90% of the "top 25"[7] property managers use

24  Voyager, those allegations fall short because they shed no light on Yardi's share of,

25  and power over, the *overall* Software Market.  *See, e.g.*, SACC, ¶ 26.  Nor do

26  conclusory terms like "powerful," "effective," and "dominant" suffice.  SACC,

---

27  [7]        RealPage does not explain what parameters define the "top 50" and "top 25" property

28  managers.  *See* SACC, ¶ 26.

Case No. CV-11-00690 ODW (JEMx)

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   ¶¶ 20, 39-40, 73; *Twombly*, 550 U.S. at 554-57.  The allegations about Yardi's

2   locked-in customers therefore provide no basis to conclude that Yardi possesses

3   power over a substantial portion of the Software Market.

4        Finally, RealPage alleges that Yardi coerced Clients 1 and 3 into not using the

5   RealPage Cloud, and suggests these two instances support an inference of market

6   power in the Software Market.  *See* SACC, ¶¶ 27, 67.  But since Yardi's alleged

7   power over Clients 1 and 3 comes from its license agreements with those entities,

8   RealPage is just re-stating its inconclusive point about power over locked-in

9   customers.  As explained above, without knowing the size of the Software Market or

10  the portion of that market occupied by locked-in Yardi customers, it is impossible to

11  extrapolate market power from these allegations.  *See, e.g.*, *Rick-Mik Enters.*, 532

12  F.3d at 972-73 (dismissing antitrust claim for failing to allege market power because

13  the complaint alleged no quantitative facts about the parties' or other competitors'

14  presence in the purported relevant market).

15       **D.    RealPage's Attempted Monopolization Claim Fails**

16       RealPage's Section 2 claim fares no better.  To state a claim for attempted

17  monopolization, RealPage must adequately allege four separate elements:

18  "(1) specific intent to control prices or destroy competition; (2) predatory or

19  anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous

20  probability of achieving 'monopoly power': and (4) causal antitrust injury."  *Rebel*

21  *Oil*, 51 F.3d at 1433-34.  To determine whether there is a dangerous probability of

22  achieving "monopoly power," courts must "consider the relevant market and the

23  defendant's ability to lessen or destroy competition in that market."  *Spectrum*

24  *Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Market power is the measure

25  of such ability, which when well-pled, (1) defines the relevant market, (2) shows that

26  the defendant owns a dominant share of that market, (3) shows that there are

27  significant barriers to entry, and (4) shows that there are significant barriers to

28  expansion.  *Rebel Oil*, 51 F.3d at 1434.  The SACC does none of these things.

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   RealPage's failure to allege Yardi's market power in the Vertical Cloud Market

2   dooms its Section 2 claim for four independent reasons.

3        ***No relevant market.***  First, as discussed above in Section IV.B., RealPage has

4   failed to allege a properly defined relevant product market for Vertical Cloud

5   Services.  This is a "crucial" allegation, without which it is impossible to determine

6   Yardi's market share, or make any other required determination of market power.

7   *Id.*

8        ***No showing of dominant share.***  Second, even if RealPage had alleged a

9   properly defined relevant market, which it did not, it has still failed to allege Yardi's

10  corresponding market share.  While market share alone does not determine

11  monopoly power, it is the principal factor courts consider in making that

12  determination.  *See Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245,

13  1254 (9th Cir. 1990) ("[M]arket share is perhaps the most important factor to

14  consider in determining the presence or absence of monopoly power.").  Market

15  share is necessary to determine whether the defendant possesses sufficient leverage

16  to influence market-wide output and control prices, the dangerous probability of

17  which is essential for a Section 2 attempted monopolization claim.[8]  *Rebel Oil*,

18  51 F.3d at 1437.  RealPage alleges only that Yardi has market power as to its

19  "locked-in" Voyager *software* customers, SACC, ¶¶ 72, 103, which represent a

20  "substantial share of potential" Vertical Cloud customers.  *Id.*, ¶ 75.  As explained

21  above, however, such allegations say nothing about market size, market share, or

22  market power in the Software Market as a whole, *much less* in the Vertical Cloud

23  Market that Yardi is purportedly attempting to monopolize.  Moreover, RealPage's

24  allegations of Yardi's inferiority belie its claim of *any* appreciable Yardi market

25  power in the Vertical Cloud Market.  *See, e.g.*, SACC, ¶ 37 (Yardi has "lagged

26          [8]       "[M]ost cases hold that a market share of 30 percent is presumptively insufficient to

27  establish the power to control price."  *Rebel Oil*, 51 F.3d at 1438 (citing *Jefferson Parish*, 466 U.S. at 26 n.43).  RealPage conspicuously fails to allege that Yardi possesses any share, much less

28  anywhere close to that much.

1    behind RealPage in the Vertical Cloud Market"), ¶ 38 (Yardi Cloud Services is

2    "impaired and limited"), and ¶ 39 (discussing "Yardi's limited cloud computing

3    capabilities").[9]

4         ***No showing of significant barriers to entry.***  Third, even if RealPage had

5    alleged a dominant market share in a properly defined relevant market, which it did

6    not, RealPage has failed to allege adequate barriers to entry in the Vertical Cloud

7    Market.  Barriers to entry are the "additional long-run costs that were not incurred by

8    incumbent firms but must be incurred by new entrants," or "factors in the market

9    that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel*

10   *Oil*, 51 F.3d at 1439 (internal quotation omitted).  RealPage has not adequately

11   alleged such long-run costs or deterrent factors in its SACC.[10]  In an exercise in

12   misdirection, RealPage has instead alleged "industry-specific *software* expertise,"

13   "established reputation[]" in the *Software* Market, and a purported lock-up of an

14   unspecified volume of consumers in the *Software* Market.  These allegations fail to

15   adequately allege barriers to entry in the relevant Vertical Cloud Market.

16        RealPage alleges that "industry-specific software expertise" is a barrier to

17   entry into the Vertical Cloud Market for those who lack such expertise.  SACC, ¶ 31.

18   RealPage, however, does not explain why the other providers of industry-specific

19   software that it lists in the SACC (which presumably have expertise with their own

20   real estate software), such as MRI Software, J.D. Edwards, and AMSI, are ill-

21   equipped to enter the Vertical Cloud Market.  *See* SACC, ¶¶ 18, 31.

22        RealPage also alleges that "market acceptance," which it defines as

23

24        [9]    Compare RealPage's FACC allegations, which conveniently have disappeared from the SACC: ¶ 8 ("Most of Yardi's so-called "cloud" offerings are in fact ASP services."); ¶¶ 9, 21

25   (Yardi's "multiple shortcomings" put it at a "growing" and "significant disadvantage" as its "clients have gravitated quickly toward . . . RealPage."); ¶ 27 (Yardi security is "woefully lagging"

26   and such "deficiencies" led a "market leading client . . . to terminate its hosting relationship with Yardi."); and ¶ 28 ("RealPage is positioned to succeed in the cloud computing market.  Yardi is

27   not.").
     [10]   RealPage has, however, alleged that the Vertical Cloud Market is "new," "rapidly

28   evolving," and "growing quickly."  SACC, ¶¶ 2, 10.

1   "customer[] trust" and "established reputations and track records" is a further barrier

2   to entry.  SACC, ¶ 32.  However, the Ninth Circuit has rejected the theory that the

3   good reputation of one vendor for providing high quality service constitutes an entry

4   barrier to other vendors.  *See Am. Prof'l Testing Serv., Inc. v. Harcourt Brace*

5   *Jovanovich Legal Aid Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997); *see*

6   *also United States v. Syufy Enters.*, 903 F.2d 659, 669 (9th Cir. 1990) ("We fail to

7   see how the existence of good will achieved through effective service is an

8   impediment to, rather than the natural result of, competition.") (citation and

9   quotation omitted).  "Customer trust" is simply another way of expressing good will

10  or reputation.  Even if it were something more, however, RealPage alleges that

11  customers trust their knowledge and expertise "*because* Yardi and RealPage offer

12  underlying property management software."  SACC, ¶ 32 (emphasis supplied).

13  Presumably then, other industry-specific property management software providers

14  would also possess customer trust and it would not act as a barrier to entry into the

15  Vertical Cloud Market.  RealPage admits as much.  *See id.* ("[P]roperty management

16  software providers are the only companies capable of offering Vertical Cloud

17  Services.").

18          It is unclear whether RealPage is alleging that Yardi's purported "lock-in" of

19  its software customers is a barrier to entry into the Vertical Cloud Market.  *See*

20  SACC, ¶ 72.  Regardless, this allegation also would fail to allege a dangerous

21  probability of monopoly power over the Vertical Cloud Market as a whole.  At best,

22  the contractual "limitation that [Yardi] has [allegedly] placed on [Voyager] users'

23  choice of [Vertical Cloud] vendors ha[s] not created a barrier to entry into the

24  [Vertical Cloud] market as a whole.  Rather, [RealPage's] allegations show only that

25  there is a barrier to entry for the submarket consisting of [Cloud hosting] services

26  *provided to [Yardi] users*."  *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d

27  1119, 1138 (N.D. Cal. 2010) (dismissing claim for attempted monopolization for

28  failure to allege facts showing a dangerous probability of successful monopolization

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   of the relevant market despite an alleged 60% market share).

2   ***No showing of significant barriers to expansion.***  Finally, even if RealPage

3   had alleged Yardi's market share in a properly defined relevant market as well as

4   barriers to entry, which it did not, RealPage has failed to allege that barriers to

5   expansion exist in the Vertical Cloud Market.  "Market power cannot be inferred

6   solely from the existence of entry barriers and a dominant market share.  The ability

7   to control output and prices – the essence of market power – depends largely on the

8   ability of existing firms to quickly increase their own output in response to a

9   contraction by the defendant."  *Rebel Oil*, 51 F.3d at 1441.  The SACC is silent as to

10  whether existing competitors are unable to expand output in the Vertical Cloud

11  Market.  Under *Rebel Oil*, this alone warrants dismissal.  *See Townshend v. Rockwell*

12  *Int'l Corp.*, No. C 99-0400, 2000 U.S. Dist. LEXIS 5070, at *35-36 (N.D. Cal. Mar.

13  28, 2000) (holding that despite alleging a 50% market share in the relevant market

14  and adequate barriers to entry, counterclaimant failed to allege barriers to expansion

15  and therefore failed to adequately allege dangerous probability of monopolization).

16         Because it has neither properly defined the relevant market, nor alleged

17  sufficient facts about Yardi's market share, barriers to entry, or barriers to expansion

18  in that market, RealPage has failed to plead facts essential to its claim that a

19  dangerous probability exists that Yardi will successfully monopolize the Vertical

20  Cloud Market.  Thus, the Court should dismiss RealPage's Section 2 claim for

21  attempted monopolization.

22
23         **E.     RealPage's Alleged Amended Software Licenses Do Not Amount To Exclusive Dealing**

24         Finally, to the extent that RealPage attempts to plead an exclusive dealing

25  claim, that too fails.  RealPage's claim that Yardi's amended license agreements

26  constitute exclusive dealing under Section 1 of the Sherman Act, *see* SACC ¶ 69,

27  rests on the faulty premise that whatever degree of control Yardi possesses over its

28  purportedly "locked-in" software customers somehow translates into a substantial

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   foreclosure of the Vertical Cloud Market.  That allegation fails as a matter of law.

2       "Exclusive dealing involves an agreement between a vendor and a buyer that

3   prevents the buyer from purchasing a given good from any other vendor."  *Allied*

4   *Orthopedic Alliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 (9th

5   Cir. 2010).  Because of the "well-recognized" economic benefits to exclusive

6   dealing, it is not accorded per se treatment, but analyzed under the rule of reason.

7   *Id.*  Thus, an exclusive dealing arrangement violates Section 1 only if its effect is to

8   actually "foreclose competition in a substantial share of the line of commerce

9   affected."  *Id.* at 996 (quoting *Tampa Electric*, 365 U.S. at 327) & n.1.

10      Substantial foreclosure of the relevant market means that "the opportunities

11  for other traders to enter into or remain in that market must be significantly limited."

12  *Tampa Electric*, 365 U.S. at 328.  As explained above in section IV.D., RealPage's

13  allegations of purported barriers to entry into the Vertical Cloud Market are

14  insufficient, as are its bare legal conclusions that Yardi's license agreements[11] have

15  "foreclosed competition in a substantial share of the Vertical Cloud Market."  *See*

16  SACC, ¶¶ 9, 69; *Twombly*, 550 U.S. at 554-57; *Iqbal*, 129 S. Ct. at 1949 ("[F]acts

17  that are merely consistent with a defendant's liability . . . stop[] short of the line

18  between possibility and plausibility.").  RealPage has not alleged what Yardi's

19  "substantial share" of the Vertical Cloud Market might be, nor could it.  Without

20  knowing the size of the Vertical Cloud Market, it is impossible to determine whether

21  Yardi's locked-in *software* customers – the unknown volume of *potential* Vertical

22  Cloud customers from whom RealPage is purportedly foreclosed – represent

23  anything approaching a substantial share of the Vertical Cloud Market.  *See Tampa*

24  *Electric*, 365 U.S. at 329 ("[S]ubstantiality" necessitates taking into account "the

---

25  [11]     In affirming the district court's grant of summary judgment in favor of the antitrust
26  defendant, the court noted, "It is significant that the [agreements] in this case did not contractually
    obligate Tyco's customers to purchase anything from Tyco."  *Allied Orthopedic*, 592 F.3d at 996.
27  The same is true here.  Yardi's amended licensing agreements do not require Voyager customers to
    purchase any hosting services from Yardi.  RealPage has not alleged otherwise and in fact, as
28  discussed above, its allegations about Client 1 demonstrate the opposite.

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1    proportionate volume of commerce involved in relation to the total volume of

2    commerce in the relevant market area.").  Thus, Yardi's license agreements do not

3    amount to exclusive dealing arrangements that violate the Sherman Act.

4    **V.      REALPAGE FAILS TO STATE A COUNTERCLAIM FOR**
     **INTERFERENCE WITH CONTRACT**
5

6         The Court dismissed RealPage's previous interference counterclaim because it

7    failed to allege an actual breach or disruption of a contract.  Order at 8-9.  It still

8    doesn't.

9         An interference with contract claim must allege, among other elements, a

10   valid contract with a third party and actual breach or disruption of the contract.  *Pac.*

11   *Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126, 270 Cal. Rptr. 1, 3

12   (1990); Judicial Council of Cal. Civ. Jury Instruction (CACI) No. 2201.  Courts

13   should dismiss contractual interference claims that do not identify the contract at

14   issue and/or allege facts describing how the contract was "actually breached or

15   disrupted."  *G & C Auto Body Inc. v. Geico Gen. Ins. Co.*, No. C06-04898, 2008 WL

16   687371, at *11 (N.D. Cal. Mar. 11, 2008); *Kentmaster Mfg. Co. v. Jarvis Prods.*

17   *Corp.*, 146 F.3d 691, 695 (9th Cir. 1998) (dismissing claim because plaintiff did "not

18   identif[y] any existing contracts and does not even directly allege that any contracts

19   were breached"); *Yanik v. Countrywide Home Loans, Inc.*, No. CV 10-6268, 2010

20   WL 4256312, at *5-6 (C.D. Cal. Oct. 18, 2010) (dismissing claim where plaintiff

21   "fail[ed] to identify facts establishing the contracts with which defendants allegedly

22   interfered").

23        As in its prior version, RealPage cites in support of its contractual interference

24   counterclaim an alleged "Letter Agreement for Interim Services" with "Client 1,"

25   which allegedly provided for Real Page to provide services for "non-Yardi

26   applications."  SACC, ¶¶ 49, 118.  In addition, RealPage has added a reference to a

27   "five year agreement" with Client 2 to host Client 2's software applications.

28   RealPage otherwise refers to unspecified "contracts with third parties."  *Id.*, ¶ 118.

Case No. CV-11-00690 ODW (JEMx)

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1    Excluding Clients 1 and 2, RealPage's counterclaim fails because RealPage

2  has not identified any of the supposed "third parties" at issue, the contracts with

3  which Yardi has allegedly interfered, or the nature of any alleged breach or

4  disruption.  *See Kentmaster*, 146 F.3d at 695; *Yanik*, 2010 WL 4256312, at *5.

5    Nor does the alleged Client 1 "Letter Agreement for Interim Services" save

6  the counterclaim.  *RealPage fails to allege that Client 1 breached this agreement or*

7  *to identify any specific contractual obligation of Client 1 that Yardi disrupted.*

8  RealPage alleges that Client 1 "was forced to *cancel the services* that RealPage was

9  providing," but does *not* allege, as it must, that doing so breached the "Letter

10  Agreement," or how Yardi disrupted performance of any term of the "Letter

11  Agreement."  SACC, ¶ 49 (emphasis supplied).  As the Court previously noted, the

12  Letter Agreement did not require RealPage to host Client 1's Yardi software in its

13  "Cloud."  Order at 8.  If no hosting of Yardi software was required, then no alleged

14  restriction by Yardi could have caused a breach or disruption.

15    The alleged Client 2 "five year agreement" also does not save the interference

16  claim.  Again, *RealPage fails to allege that Client 2 breached this agreement*, to

17  identify any specific contractual obligation of Client 2 that Yardi disrupted, or to

18  allege damages that have *resulted from a breach*.  It alleges only that because of

19  Yardi's statements, certain RealPage employees "*will need to move back* to Client

20  2," and that Client 2 "has declined to move forward" with plans "to use *additional*

21  RealPage services and products, . . . depriving RealPage of *future* revenue."  SACC

22  ¶ 55.  Nowhere is it alleged that these supposed future events were caused by or

23  amount to a breach or disruption of any specific contractual obligation under the

24  "five year agreement."

25    RealPage thus alleges no facts to warrant concluding that Yardi "did interfere

26  with or disrupt RealPage's contractual relationships," *id.*, ¶ 119, and the Court

27  should once again dismiss the interference with contract counterclaim.  *See G & C*

28  *Auto Body*, 2008 WL at 687371, at *11; *Philips Med. Capital, LLC v. Med. Insights*

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   *Diagnostics Ctr., Inc.*, 471 F. Supp. 2d 1035, 1046 (N.D. Cal. 2007) (dismissing

2   interference claims based on "conclusory language that merely repeats the elements

3   of these torts").[12]

4          In addition, "in an action for inducing breach of contract it is essential that

5   plaintiff plead and prove that the defendant '*intended* to induce a breach

6   thereof . . . .'"  *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co*., 36 Cal. 3d

7   752, 766, 206 Cal. Rptr. 354 (1984) (*quoting Abrams & Fox v. Briney,* 39 Cal. App.

8   3d 604, 608, 114 Cal. Rptr. 328 (1974) (emphasis in original).  "If the actor had no

9   knowledge of the existence of the contract or his actions were not intended to induce

10  a breach, he cannot be held liable though an actual breach results from his lawful

11  and proper acts."  *Id*. (quoting *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 37, 112

12  P.2d 631 (1941)).

13         "While legal conclusions can provide the framework of a complaint, they

14  must be supported by factual allegations."  *Iqbal*, 129 S. Ct. at 1950.  The SACC's

15  allegations that "Yardi has or had knowledge of these contracts with third parties"

16  and "Yardi has willfully and intentionally interfered with those contracts," SACC

17  ¶¶ 118-119, are exactly the sort of conclusory allegations that have been found

18  inadequate, standing alone, to state the requisite state of mind.  *See, e.g.*, *Iqbal*, 129

19  S. Ct. at 1952 (dismissing complaint alleging defendants "knew of, condoned, and

20  willfully and maliciously agreed to subject [plaintiff]" to harsh conditions of

21  confinement "as a matter of policy, solely on account of [his] religion, race, and/or

22  national origin," that one was the "principal architect" of this invidious policy, and

23  that the other was "instrumental" in adopting and executing it, because it failed to

24  plead "sufficient factual matter to show that petitioners adopted and implemented the

25  policies at issue for the purpose of discriminating on account of race, religion, or

26  ───────────────

27  [12]     In addition, as shown in the next section, if and to the extent RealPage bases its Fifth
     Counterclaim on Yardi's alleged misappropriation of trade secrets (*see, e.g.*, SACC, ¶ 51), the

28  Fifth Counterclaim is preempted by the California Uniform Trade Secrets Act.

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1   national origin . . . .").

2         Here, for Client 1, the only supporting "factual" allegations about Yardi's

3   knowledge of the "Letter Agreement for Interim Services" and intent to induce its

4   breach are the bare conclusions that "Yardi learned of the Letter Agreement" and

5   that "it set out to interfere" with the "relationship" (notably, not the contractual

6   provisions at issue or, even, the contract).  SACC, ¶ 49.  For Client 2, there are *no*

7   supporting factual allegations about Yardi's knowledge of the "five year agreement"

8   or its intent to induce a breach.  *See* SACC, ¶ 55.

9         The SACC's conclusory allegations are insufficient to state a claim for

10  inducing breach of contract, and it should be dismissed.

11  **VI.  REALPAGE'S UNFAIR COMPETITION AND PROSPECTIVE**
    **INTERFERENCE COUNTERCLAIMS FAIL**
12

13        In the Sixth Counterclaim, RealPage alleges that Yardi interfered with its

14  prospective economic advantage with respect to Clients 1, 2, 3, and 4, and otherwise

15  unidentified "current and prospective" clients.  *See* SACC, ¶ 123.

16        The only "independently wrongful acts" RealPage offers to support this

17  interference claim are its allegations that (1) Yardi violated antitrust laws and (2)

18  Yardi misappropriated RealPage's trade secrets.  *See* SACC, ¶¶ 125, 131.[13]

19        If the Court dismisses the antitrust counterclaims, it also should dismiss

20  RealPage's prospective interference counterclaims insofar as they rely on the

21  antitrust claims, as it previously did.  Order at 9.  The same is true of RealPage's

22  Unfair Competition Law ("UCL") section 17200 claim.  *See Kentmaster*, 146 F.3d at

23  695 (affirming dismissal of unfair competition claim based on dismissed antitrust

24  claims); *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341, 2009 WL 3756686, at

25  *8 (N.D. Cal. Nov. 6, 2009) (dismissing unfair competition claim "to the extent it

26  ───────────────
    [13]       The Sixth Counterclaim also alleges that Yardi's alleged acts are unlawful under
27  California's Unfair Competition statutes (SACC, ¶ 51), as alleged in the Seventh Counterclaim.
    As shown below, however, the Seventh Counterclaim should be dismissed because, like the Sixth
28  Counterclaim, it is based on Yardi's alleged antitrust violations and trade secret misappropriation.

**YARDI'S RULE 12(B)(6) MOTION TO DISMISS**

1  relies on [dismissed] alleged antitrust violations").

2       In addition, and independently, the Court should dismiss the Sixth and

3  Seventh Counterclaims, for interference with prospective economic advantage and

4  violation of California's UCL, to the extent they are based on Yardi's alleged

5  misappropriation of trade secrets.  The California Uniform Trade Secrets Act

6  provides the exclusive remedy for misappropriation of trade secrets and preempts

7  other tort claims based on trade secret misappropriation.  *K.C. Multimedia v. Bank of*

8  *Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 958, 90 Cal. Rptr. 247, 260

9  (2009) (dismissing interference with contract and UCL claims); *Digital Envoy, Inc.*

10  *v. Google, Inc.*, 370 F. Supp. 2d 1025, 1029, 1035 (N.D. Cal. 2005) (dismissing

11  UCL claims); *see also Silvaco Data Systems v. Intel Corp.*, 184 Cal. App. 4th 210,

12  236, 109 Cal. Rptr. 3d 27, 50 (2010) ("CUTSA provides the exclusive civil remedy

13  for conduct falling within its terms, so as to supersede other civil remedies 'based

14  upon misappropriation of a trade secret.'") (dismissing UCL claim), *disapproved on*

15  *other grounds by Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 337, 120 Cal.

16  Rptr. 3d 741, 763 (2011)); *Axis Imex, Inc. v. Sunset Bay Rattan, Inc.*, No. C 08 3931,

17  2009 U.S. Dist. LEXIS. 2667, at *15 (N.D. Cal. Jan. 7, 2009) (dismissing

18  interference with prospective economic advantage claim); *First Advantage*

19  *Background Srvcs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 938 (N.D. Cal.

20  2008) (dismissing interference with prospective economic advantage claim).

21  **VII.   THE COURT SHOULD NOT GRANT ANOTHER AMENDMENT**

22       Courts should deny leave to amend when amendment would be "futile."

23  *Klamath-Lake*, 701 F.2d at 1293.  An amended complaint "may only allege other

24  facts consistent with the challenged pleading." *Reddy v. Litton Indus., Inc.*, 912 F.2d

25  291, 296-97 (9th Cir. 1990) (internal citation and quotation omitted).  A court has

26  "particularly broad" discretion to deny leave to amend "where plaintiff has

27  previously amended the complaint," as here. *Ascon Props., Inc. v. Mobil Oil Co.*,

28  866 F.2d 1149, 1160 (9th Cir. 1989); *see also Int'l Norcent Tech. v. Koninklijke*

YARDI'S RULE 12(B)(6) MOTION TO DISMISS

1   *Philips Elecs. N.V.*, 2007 WL 4976364, at *15-16 (denying leave to file a second

2   amended complaint that "allege[d] essentially the same claim pled in the original

3   complaint").

4    RealPage has had three chances to plead sufficient antitrust, interference, and

5   unfair competition claims.  The original counterclaims, the FACC, and the SACC

6   vary wildly, but nonetheless all fail to state claims upon which relief may be granted.

7   RealPage should not be permitted to waste this Court's or the parties' time further

8   with these flawed claims.

9   **VIII.  CONCLUSION**

10    For all of the reasons stated above, the Court should dismiss RealPage's

11   Second, Third, Fourth, Fifth, Sixth, and Seventh Amended Counterclaims without

12   leave to amend.

13

DATED:  September 30, 2011 Bingham McCutchen LLP

14

15

By:      /s/ Bree Hann

16                          Bree Hann

17        Attorneys for Plaintiff and Counterdefendant

18            Yardi Systems, Inc.

19

20

21

22

23

24

25

26

27

28