1   MARK A. SAMUELS (S.B. #107026)
    msamuels@omm.com
2   JAMES M. PEARL (S.B.#198481)
    jpearl@omm.com
3   O'MELVENY & MYERS LLP
    400 South Hope Street
4   Los Angeles, CA 90071-2899
    Telephone:  (213) 430-6000
5   Facsimile:  (213) 430-6407

6   DAVID R. EBERHART (S.B. #195474)
    deberhart@omm.com
7   SHARON M. BUNZEL (S.B. #181609)
    sbunzel@omm.com
8   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
9   San Francisco, CA 94111-3823
    Telephone:  (415) 984-8700
10  Facsimile:  (415) 984-8701

11  Attorneys for Defendant and
    Counterclaimant REALPAGE, INC.
12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15  YARDI SYSTEMS, INC.,              Case No. CV11-690 ODW (JEMx)
    a California corporation,
16                                    CONSOLIDATED SECOND
17              Plaintiff,            AMENDED COUNTERCLAIMS AND
         v.                           ANSWER TO YARDI'S FIRST
18                                    AMENDED COMPLAINT;
    REALPAGE, INC., a Delaware        DEMAND FOR JURY TRIAL
19  corporation, and DC CONSULTING,
    INC., a Washington, D.C.
20  corporation,

21              Defendants.

22  REALPAGE, INC., a Delaware
    corporation,
23
                Counterclaimant,
24       v.

25  YARDI SYSTEMS, INC., a
    California corporation,
26
                Counterdefendant.
27

28

    CONSOLIDATED SECOND AMENDED
    COUNTERCLAIMS AND ANSWER                    NO. CV11-690 ODW (JEMx)

## SECOND AMENDED COUNTERCLAIMS

COMES NOW RealPage, Inc. ("RealPage"), and for its counterclaims against Yardi Systems, Inc. ("Yardi"), avers on knowledge as to itself and its own acts, and on information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.     This case is about Yardi's attempts to use its dominant position and stranglehold over its Voyager software customers to block them from using a product they want: the RealPage Cloud.  Rather than compete on the merits for cloud computing customers, Yardi used stolen RealPage trade secrets to build a competitive cloud offering.  Once it had an ill-gotten competitive cloud offering in place, Yardi then bullied its customers into amended license agreements that forbid the customers' use of competitive cloud offerings, including the RealPage Cloud. When customers have resisted Yardi's pressure, Yardi has threatened to terminate the customers' license agreements, which would propel those customers' operations into chaos, as they rely upon Yardi's software to run their businesses.  By these counterclaims, RealPage seeks redress for Yardi's misconduct.

2.     Currently, Yardi and RealPage are the only two competitors in the market for vertically-integrated cloud computing services specialized to the needs of real estate owners and property managers (the "Vertical Cloud Market").  In the Vertical Cloud Market, Yardi and RealPage offer services that enable customers' multiple software applications to be hosted and managed off-site in a multi-tenant data center, accessible via the Internet, and specifically tuned to the specialized applications and related IT service needs of real estate owners and property managers ("Vertical Cloud Services").  To illustrate, a manager of real property requires multiple software applications to run its business, typically including a back office accounting application, property management software application, maintenance and purchasing applications, leasing and prospect management

applications, a revenue management application, a background screening application, a payment processing application, document management system, and reporting and utility management software, in addition to its other standard office applications such as virus protection, Microsoft Outlook, Exchange, Excel, and Word. RealPage and Yardi host these various applications or interfaces to them in the "cloud" and provide industry-specific expertise that allows these applications to integrate and run smoothly together. This hosting and integration is described as "enterprise managed service." In addition, Yardi and RealPage—both of whom also offer their own proprietary property management software applications—use their industry-specific expertise to help their cloud computing clients optimize the unique applications commonly used in the property management industry. This specialized focus on serving clients' multiple hosting and integration needs within that single industry is what makes RealPage's and Yardi's cloud services "vertically-integrated." The Vertical Cloud Market is relatively new, but it is growing quickly.

3.     RealPage was the first company to offer Vertical Cloud Services, and RealPage made substantial investments in its infrastructure to serve its cloud computing customers. Yardi arrived later to the game, but was only able to enter the Vertical Cloud Market because of cloud computing trade secrets it misappropriated from RealPage. While Yardi has fought vigorously to attract customers to its Vertical Cloud Services, it has not fought fairly. In addition to misappropriating RealPage's trade secrets pertaining to RealPage's Vertical Cloud Services, and rather than competing for vertical cloud business fairly and on the merits, Yardi has leveraged its substantial market power in a separate, adjacent market—the market for back office accounting software for the residential property management industry (the "Property Management Back Office Accounting Software Market")—to prevent customers from using RealPage's Vertical Cloud Services offering, referred to herein as the "RealPage Cloud."

4.      Yardi possesses market power in the Property Management Back Office Accounting Software Market.  This business-critical software houses all of a property manager's accounting records and offers capabilities specialized to its needs.  Yardi offers the market-leading Property Management Back Office Accounting Software which it markets as Yardi Voyager.  Once a customer deploys Yardi's Voyager Back Office Accounting software, it is exceedingly difficult, and in some cases prohibitively expensive, for that customer to switch to an alternative Property Management Back Office Accounting Software product due to the high switching costs associated with moving the data from one system to another, new license fees, and the disruption of day-to-day business necessitated by re-aligning IT systems and transferring data.  Yardi's market power therefore derives not only from Voyager Back Office Accounting Software's high penetration among Property Management Back Office Accounting Software customers, but also from the fact that those customers are locked in and cannot easily switch to competing software.

5.      Yardi is using both its substantial market power in the Property Management Back Office Accounting Software Market, and stolen trade secrets, to harm competition in the Vertical Cloud Market.  Yardi has coerced its *own Yardi Voyager Back Office Accounting Software clients* into signing amended license agreements that prevent them from using the RealPage Cloud hosting services.  For those licensee clients that have resisted and tried to host Voyager Back Office Accounting Software in the RealPage Cloud, Yardi has threatened to terminate their software licenses on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud.  Yardi has also threatened to send notices of potential termination due to breach to those licensees' own customers.  If a firm uses its market power in one market (here, the Property Management Back Office Accounting Software Market) to prevent customers from using a competitor's product in another market (here, the Vertical Cloud Market), it is illegal under federal and California antitrust and unfair competition laws.  It is

1   also illegal conduct under California's tortious interference with prospective

2   economic advantage and tortious interference with contract statutes.

3         6.    In addition to the naked coercion of its customers, Yardi also hired a

4   key RealPage employee to steal RealPage's most highly confidential trade secrets

5   including:

6        ➢ RealPage's superior primary and disaster recovery data center

7           infrastructure and architectural design;

8        ➢ RealPage's proprietary technology used to monitor and improve the

9           performance of third party applications, including Yardi applications;

10       ➢ RealPage's proprietary change management, release management and

11          problem management business processes;

12       ➢ RealPage's marketing and technology plans regarding the RealPage

13          Cloud; and

14       ➢ RealPage's confidential bid proposals made to specific potential cloud

15          computing clients where Yardi was competing against RealPage.

16        7.    While improperly attempting to limit competition in the Vertical Cloud

17  Market, Yardi has used stolen RealPage trade secrets to create its own cloud service

18  modeled after the RealPage Cloud.  Yardi has also used these trade secrets to

19  interfere with RealPage's customer relationships.  Without stealing RealPage's

20  trade secrets, Yardi would not have a viable cloud service of its own.  Using these

21  stolen secrets and its market power in the Property Management Back Office

22  Accounting Software Market, Yardi has interfered with RealPage's client

23  relationships and prevented customers from using the RealPage Cloud, leaving

24  consumers with only one Vertical Cloud Services provider: Yardi.  Through

25  Yardi's campaign of stealing trade secrets, forcing changes to contract terms,

26  threatening to terminate existing software license agreements, and threatening to

27  notify licensees' own customers of potential termination of the licenses, Yardi

28

1   seeks to deny consumers the benefits of choice and fair competition in the Vertical

2   Cloud Market.

3        8.     Finally, in addition to its anticompetitive conduct in the market place

4   and its bullying of its own customers, Yardi has waged an unprecedented assault on

5   RealPage on Wall Street and in the press, including having its agents communicate

6   with Wall Street analysts to try and drive down the RealPage stock price.

7        9.     Through its conduct, Yardi has harmed competition in the Vertical

8   Cloud Market.  Yardi's Property Management Back Office Accounting Software

9   customers represent a substantial share of potential Vertical Cloud Services

10  customers.  Yardi's objective is to obstruct RealPage's ability to compete for these

11  customers so that Yardi will face less competition in the Vertical Cloud Market.

12  This diminished competition from RealPage will enable Yardi to charge a higher

13  price to consumers while selling an inferior product.  If Yardi ultimately is

14  successful in driving RealPage out of the market altogether, then consumers will

15  face no choice in the Vertical Cloud Market.

16       10.     Moreover, Yardi's Property Management Back Office Accounting

17  Software customers include many of the largest property managers.  Yardi's

18  restrictive agreements are thus blocking the natural organic growth that would

19  otherwise allow RealPage to achieve the scale necessary to continually innovate its

20  services and reduce its costs.  These large property managers enable RealPage to

21  spread the costs of expensive hardware and software investments over a greater

22  volume of clients and in the end offer a lower price to consumers.  In addition to

23  lower prices, the savings RealPage achieves through increased economies of scale

24  can also be invested by RealPage in innovative new cloud computing technology.

25  Cloud computing is a new and rapidly evolving industry.  Yardi's attempts to stifle

26  the most innovative new player in this market (RealPage) have significant

27  anticompetitive implications in the form of diminished current and future

28  innovation.  Consequently, as a direct result of Yardi's conduct, there is reduced

1   choice, higher prices for consumers and less innovation in the Vertical Cloud
2   Market.

3                              **JURISDICTION AND VENUE**

4        11.    This Court has original jurisdiction over RealPage's federal antitrust
5   claims, which arise under the Sherman Antitrust Act (15 U.S.C. § 1, § 2).  28
6   U.S.C. §§ 1331, 1337(a).  This Court also has supplemental jurisdiction over the
7   related claims for violation of California statutory and common law alleged herein
8   because these claims are so related to the federal claims in this case, over which the
9   Court has original jurisdiction, that they form a part of the same case or controversy
10  within the meaning of Article III of the United States Constitution.  28 U.S.C.
11  § 1367.

12       12.    This Court also has diversity jurisdiction over RealPage's
13  counterclaims because RealPage and Yardi are citizens of different states and the
14  amount in controversy exceeds $75,000.  28 U.S.C. § 1332.

15       13.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a
16  substantial part of the wrongful conduct alleged herein occurred in this district,
17  including but not limited to the antitrust violations, acts of unfair competition, and
18  acts of misappropriation of trade secrets that give rise to RealPage's claims against
19  Yardi.

20

21                              **THE PARTIES**

22       14.    RealPage is a Delaware corporation with its principal place of business
23  in Carrollton, Texas.  It is engaged in the business of, among other things, licensing
24  multifamily property management software and Property Management Back Office
25  Accounting Software, providing software consulting services for the real estate
26  industry, and providing Vertical Cloud Services for its clients.

27       15.    Yardi Systems is a California corporation with its principal place of
28  business in Goleta, California.  It is engaged in the business of, among other things,

licensing property management software and Property Management Back Office Accounting Software and providing Vertical Cloud Services for its clients.

## FACTUAL BACKGROUND

**Market Definition – Property Management Back Office Accounting Software Market**

16. As described above, Yardi's conduct affects two distinct but related markets—the Property Management Back Office Accounting Software Market and the Vertical Cloud Market.

17. Property Management Back Office Accounting Software is accounting software designed specifically for residential property management. It includes standard accounting features, such as accounts payable, accounts receivable, cash management, general ledger, portfolio reporting and asset management, but it also offers capabilities specialized to the needs of real estate owners and property managers. It is generally used in conjunction with property management front office software—referred to in the industry as "leasing and rents" software.[1] Property Management Back Office Accounting Software is critical to a property manager's ability to effectively run its business.

18. Yardi competes in the Property Management Back Office Accounting Software Market through its Voyager product line. The other competitors in this market include RealPage, with its OneSite software brand, MRI Software, J.D. Edwards and AMSI. It is important to note, however, that MRI Software, J.D. Edwards and AMSI have only been marginal players in the Property Management Back Office Accounting Software Market, and their products are not ideally suited to the customers in this market. In addition, the same barriers to entry in the

---

[1] Front office software assists a property manager with various aspects of acquiring, managing and moving out residents. Its functions, for example, include storing resident information, updating and maintaining the resident ledger, running credit and background checks, generating and sending invoices to residents for rent and utilities, tracking deposits and late fees, and monitoring occupancy and amenities for rental units.

1  Property Management Back Office Accounting Software Market, discussed below,
2  that make entry by a new competitor unlikely, also function to make expansion by
3  these weak substitutes implausible.

4      19.   There are high barriers to entry in the Property Management Back
5  Office Accounting Software Market due to the large upfront costs, development
6  time, complexity, and combination of expertise and experience required to make a
7  commercially successful product in this market.  Moreover, new entrants are
8  unlikely to get a return on their initial investment of time, money and resources
9  because most of the customers in this market have already adopted a Property
10  Management Back Office Accounting Software product, and due to high switching
11  costs, are generally unwilling to move their business to a new entrant.  Therefore, it
12  is unlikely that a new competitor will enter the market for Property Management
13  Back Office Accounting Software.

14      20.   The Property Management Back Office Accounting Software Market is
15  recognized as a distinct product market in the property management industry.
16  While most competitors in this market sell both back office and front office
17  software, there is separate customer demand for these products.  For example,
18  because each vendor's back office and front office software may offer different
19  strengths or unique features, customers often use one vendor's back office software
20  and another vendor's front office software.  In fact, because Yardi's Voyager Back
21  Office Accounting Software product is so dominant in the Property Management
22  Back Office Accounting Software Market, for reasons described below, many
23  customers use Yardi's Back Office Accounting Software, but nonetheless elect to
24  use another competitor's front office software.  Indeed, as one industry analyst
25  noted, Yardi has a "large base of residential units (that typically run only [Yardi's
26  back office] accounting [software])."

27      21.   Property Management Back Office Accounting Software customers
28  tend to be managers of 1,000 or more individual apartment units ("units") who,

because they manage such large numbers of units, have complex and specialized needs. Less sophisticated property management accounting software products exist for managers of single-family units and small numbers of multi-family units. The competitors in the market recognize the differing needs of property managers based upon the number of units managed. For example, RealPage offers, via a subsidiary, a separate product known as Propertyware and Yardi has a separate product, known as DIY Real Estate Solutions, specifically developed to address the needs of property managers of fewer than 1,000 units.[2] If subjected to a small but significant non-transitory increase in price ("SSNIP"), the customers of Property Management Back Office Accounting Software would not switch to these less sophisticated property management software products because they do not perform the complex functions or possess the advanced features that managers of 1,000 plus units require. Therefore, basic property management accounting software is not an adequate substitute for Property Management Back Office Accounting Software.

22. In addition, industry-neutral or generic back office accounting software is not an adequate substitute for Property Management Back Office Accounting Software because it is not designed to process the specific types of data that are unique and integral to property management. Property managers require software that contemplates, facilitates and streamlines accounting tasks that are specific to the property management business. Such specialized requirements include, for example, (i) utilization of real estate-specific nomenclature, data types and data fields, (ii) accounting for and managing tenant deposit funds, (iii) accounting for and presentation of data that involves the interperformance of both the general ledger and the resident/tenant ledger, and (iv) management of other types of

---

[2] Yardi acquired DIY Real Estate Solutions in May 2010. The press release announcing the acquisition stated: "The acquisition of DIY adds a complete, integrated property management system designed for companies that manage 1,000 or fewer units . . . DIY will enable Yardi to provide Web solutions for small property managers."

1   information and data that are unique to or specialized in the real estate industry,

2   such as information related to intercompany relationships, specialized methods of

3   addressing percentage ownership of properties or assets and partnership

4   distributions and reporting, common area maintenance pools, expense

5   reconciliations and real estate asset valuations.  Generic, industry-neutral back

6   office accounting software, even sophisticated accounting software, does not

7   readily address these needs.  If subjected to a SSNIP, Property Management Back

8   Office Accounting Software customers would not switch to sophisticated but

9   industry-neutral accounting software applications, such as SAP, because they do

10  not have the real estate specific feature sets described above.  Therefore, the

11  Property Management Back Office Accounting Software Market constitutes its own

12  distinct relevant product market for which there is no adequate substitute.

13      23.    The relevant geographic market for the Property Management Back

14  Office Accounting Software Market is the United States.

15

16  **Yardi Has Market Power in the Property Management Back Office**

17  **Accounting Software Market**

18      24.    Yardi has market power in the Property Management Back Office

19  Accounting Software Market.  According to Yardi's First Amended Complaint in

20  this case, "[f]or almost thirty years, Yardi has been a leading developer of database

21  and application software for real estate and property management clients."  Yardi's

22  website describes its Voyager brand, which includes Yardi's Property Management

23  Back Office Accounting Software, as "the industry-leading asset and property

24  management software solution."  Yardi's marketing materials similarly tout the

25  Voyager brand as its clients' "core business system."  Moreover, independent

26  industry analysts recognize that Yardi derives market power from its Property

27  Management Back Office Accounting Software.  As one analyst noted, "Yardi's

28  competitive advantages are its back-end accounting systems and reporting

features." Another analyst noted that one of Yardi's key strengths "is its back office accounting capability." A third analyst noted that "Yardi is more suited for back office accounting functions and not front office (renter-facing sales) staff."

25. Additionally, Yardi possesses power over its Property Management Back Office Accounting Software clients because those clients are "locked in" and cannot easily switch to an alternative Property Management Back Office Accounting Software product due to high switching costs. For example, Property Management Back Office Accounting Software stores all of a customer's accounting data and information related to its property management. If a customer chooses to switch software, there are massive costs associated with transferring this data and information to a new system. This transfer also results in disruption of the customer's day-to-day business. In addition, customers invest a great deal of time and expense creating highly customized accounting reports for their specific business needs. If a customer switches away from Yardi's Property Management Back Office Accounting Software, these vital customized reports will not generally transfer to another software so the investment in creating those reports is lost. Also, there are additional costs related solely to acquiring and adopting new software, such as costs associated with the potential disruption of the business, and the need to train users, develop and implement new processes where required, and recreate customized forms and reports. Moreover, the risk of failure of critical business systems during the process of switching software can put an entire business at risk. These switching costs are staggering and often run into the millions of dollars. In fact, these switching costs can be up to three times more expensive than the software licensing costs—which makes switching costs the number one factor in a company's decision to remain with its current Property Management Back Office Accounting Software provider. Indeed, because of these staggering switching costs, it would take a property manager many years to see a return on its investment in any new Property Management Back Office Accounting Software product that it

1    switched to, making it virtually impossible to justify a switch.  Therefore, once

2    customers have adopted a particular Property Management Back Office Accounting

3    Software system, there is a strong incumbency factor that prevents them from

4    switching to another vendor.  As one industry analyst explained in analyzing

5    RealPage's market position, "RealPage competes to sell its solutions against

6    existing systems that prospects have already made significant expenditures to

7    install, making them 'sticky.'"  Yardi's market power therefore derives not only

8    from high market penetration among Property Management Back Office

9    Accounting Software customers, but also from the fact that those customers are

10   locked in to Yardi's "sticky" Voyager Back Office Accounting Software and cannot

11   easily switch to a competing product.

12        26.    The high switching costs that users of Voyager Back Office

13   Accounting Software face have effects beyond those users themselves.  Many large

14   institutional property owners and investors do not manage properties themselves,

15   but instead hire professional property management firms to manage their properties

16   for a fee ("fee managers").  These institutional owners and investors frequently use

17   Yardi's Voyager Back Office Accounting Software themselves in order to monitor

18   their investments.  To ensure that they maintain a single system of record

19   throughout their portfolio, these institutional owners and investors often require

20   their fee managers to also use Yardi's Voyager Back Office Accounting Software.

21   Once these fee managers adopt Yardi's Voyager Back Office Accounting Software,

22   they face *two* layers of lock-in: lock-in due to switching costs, and lock-in because

23   the institutional owners are themselves locked into the use of Voyager Back Office

24   Accounting Software and mandate that their fee managers use it as well.  Thus, a

25   fee manager that wishes to stop using Voyager Back Office Accounting Software

26   faces two virtually insurmountable obstacles: (1) switching costs that would take

27   years to recoup, and (2) a significant loss of business from institutional owners and

28   investors that are, themselves, locked-in to using Voyager Back Office Accounting

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER                    12                    NO. CV11-690 ODW (JEMx)

Software and will not work with fee managers who do not also license and use Voyager Back Office Accounting Software. The effects of this double lock-in problem on fee managers are pronounced. To illustrate, when looking at the total number of apartment units managed by the top 50 property managers, over 75% of those that are fee managed (over 1.1 million units) are managed using Yardi's Voyager Back Office Accounting Software. Yardi's dominance is even more apparent when looking at the total number of apartment units managed by the top 25 property managers (those most likely to fee manage for major institutional property owners): among that subset, *over 90% of those units that are fee managed are managed using Yardi's Voyager Back Office Accounting Software.*[3]

27. Finally, Yardi's power in the Property Management Back Office Accounting Software Market is evidenced by its ability to coerce customers and prevent them from exercising their free will in an adjacent market—the Vertical Cloud Market. The power to successfully coerce a customer is evidence of market power. Accordingly, Yardi has market power in the Property Management Back Office Accounting Software Market.

## Market Definition – Vertical Cloud Market

28. The market in which competition has been harmed by Yardi's conduct is the Vertical Cloud Market. As described above, the Vertical Cloud Market is the market for vertically-integrated cloud computing services specialized to the needs of real estate owners and property managers. This product market includes only two providers—Yardi and RealPage.

29. The real estate and property management industry is uniquely positioned to benefit from the transition to cloud computing. As one industry analyst observed in describing the benefits of the RealPage Cloud: "Perhaps more

---

[3] These "locked in" fee managers are precisely the customers that RealPage is trying to attract to its RealPage Cloud.

than most industries, real estate has a tendency to constantly expand and contract.
This dynamic makes it challenging for IT managers to purchase the appropriate
amount of hardware and staff to support it.  In most cases, property managers have
either overinvested or underinvested in hardware and headcount.  Further,
companies that manage their own data centers often spend as much 80% of their IT
dollars on 'keeping the lights on'—maintaining legacy IT systems—as opposed to
investing in innovative technologies."

30.    The Vertical Cloud Market is distinct from generic cloud computing
services, such as those offered by Amazon and Rackspace, because it offers a
specialized service tailored to real estate owners and property managers.  As
explained above, Yardi and RealPage offer services that enable customers' multiple
software applications to be hosted and managed off-site in a multi-tenant data
center.  Some of the most important services provided as part of Vertical Cloud
Services are the structuring of the infrastructure and architecture on which the
property management software applications operate and the integration of such
software applications so they run smoothly together and at peak optimization.  This
requires industry-specific knowledge, expertise and technologies that generic cloud
service providers do not possess and cannot provide to these customers.  For
example, Amazon and Rackspace have little, if any, experience integrating back
office accounting software to front office property management software, nor do
they have experience integrating front office property management applications to
the hundreds of potential third party applications that are available to interface with
the front office property management system.  Yet the integration of these interface
points is essential to the many clients that seek Vertical Cloud Services.  Indeed,
Yardi touts this industry specific expertise on its website promoting its cloud
service, stating "[a]s a leading provider of real estate software and services, Yardi is
uniquely positioned to provide IT infrastructure for real estate enterprises."  In a
product brochure for its cloud service, Yardi similarly explains that "[w]ith Yardi as

your outsourced IT provider, your core business applications are maintained and supported by experienced professionals focused on your business and the industry." Yardi goes on to describe the following as a "competitive differentiator[]" that "set[s] Yardi apart from other IT outsource providers": "A unique understanding of clients' business processes as a provider of their core business system, Yardi Voyager™." As a result of the industry expertise RealPage and Yardi provide, the software applications used by real estate owners and property managers perform dramatically better in the Vertical Cloud Market than they do or would in a generic cloud market.  For these reasons, customers in the Vertical Cloud Market would not switch to generic cloud hosting services, such as those offered by Amazon and Rackspace, in response to a SSNIP.

31.  This industry-specific software expertise is a significant barrier to entry for other potential competitors.  The knowledge, expertise and technology necessary for cloud hosting that is specific to the property management industry are trade secrets that RealPage developed over many years and as a result of substantial financial investment, and that Yardi acquired through theft and misappropriation.  Without this trade secret information, which only RealPage and Yardi possess, other potential competitors are not able to penetrate the Vertical Cloud Market and offer a competing service.

32.  An additional barrier to entry is market acceptance.  Because Yardi and RealPage offer underlying property management software, customers trust their knowledge and expertise regarding these products.  Moreover, Yardi and RealPage both have established reputations and track records in this industry and with these customers.  Property management is a conservative industry that prefers established vendors, especially for critical software hosting needs.  It is virtually impossible for new entrants without an established track record in the property management software industry to enter the Vertical Cloud Market.  Indeed, in light of the market acceptance and industry-specific software expertise barriers to entry, property

1  management software providers are the only companies capable of offering Vertical

2  Cloud Services.

3       33.    In addition, single-application hosting services, in which a client

4  accesses its own individual copy of a software program (such as Voyager) remotely

5  via the Internet, are not adequate or reasonable substitutes for Vertical Cloud

6  Services.  To put it simply, a single-application of software hosted over the Internet

7  is not a Vertical Cloud Service.  Indeed, Yardi itself defines cloud computing as

8  services in which "a third party IT provider . . . house[s], host[s], and maintain[s]

9  all or most of the hardware and applications a real estate company would use to run

10  its business."  In other words, a Vertical Cloud Service offers enterprise managed

11  services, which involve the management of *multiple* software applications.  This

12  service requires specialized expertise because different systems, such as back office

13  accounting, front office property management, maintenance and purchasing,

14  revenue management, utility billing, applicant screening, Internet marketing, human

15  resources, payroll, document management and email are dependent on one another

16  and need to be integrated in order to function properly together.  A customer whose

17  applications are not properly integrated may face computer crashes, data corruption

18  issues and other technical problems.

19       34.    In addition, Vertical Cloud Services have distinct advantages over

20  single-application hosting related to the outsourcing of a customer's IT and

21  hardware.  For example, rather than making large capital expenditures to buy and

22  hold equipment that may become obsolete or redundant, companies using Vertical

23  Cloud Services have access to state-of-the-art infrastructure that is administered by

24  professionals in capacities that meet the company's current needs and can be

25  quickly upsized or downsized as circumstances require.  In addition, because the

26  operative software and data reside at a remote, centralized location, local computers

27  require far less maintenance and fewer "bug" fixes.  Also, the servers needed to

28  maintain the cloud can easily be updated and repaired in the background while the

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER                    16                    NO. CV11-690 ODW (JEMx)

1    users continue their work uninterrupted.  In summary, Vertical Cloud Services host
2    and integrate a client's information technology systems, obviating much of the need
3    for the client to invest in its own IT infrastructure, hardware maintenance, service,
4    and other related costs.[4]  Vertical Cloud Services are thus fundamentally different
5    from a one-off, single-application hosting option, and the latter is thus not a
6    reasonable substitute for the former.  For all these reasons, customers in the Vertical
7    Cloud Market would not switch to single-application hosting in response to a
8    SSNIP, and single-application hosting services do not compete in the Vertical
9    Cloud Market.

10       35.    Similarly, on premise "hosting," also known as self-hosting, is not a
11   reasonable substitute in the Vertical Cloud Market.  With on premise hosting, the
12   client installs and runs property management software on its own computer servers.
13   A SSNIP in the Vertical Cloud Market would not cause cloud customers to switch
14   to on premise hosting because the small price increase in the cost of Vertical Cloud
15   Services would be offset by the much higher costs to the customer of hiring IT
16   personnel, purchasing hardware, and managing and maintaining the infrastructure
17   necessary for on premise hosting.  Vertical Cloud Services offer specialized and
18   valuable features to customers, including integrated support for a broad range of
19   software applications designed specifically for use by property managers, and an
20   operating system environment and IT infrastructure, including servers, storage,
21   routing hardware, and disaster recovery capabilities, accessible to the customer
22   through the Internet.  Therefore, while a SSNIP *might* cause a customer on the
23   margin to delay adoption of Vertical Cloud Services, the features offered by

24   
25   _____
     [4] As Yardi explains in marketing its cloud service: "The core assumption of cloud
     computing is that an outsourced technology provider will assume responsibility for
26   a company's IT functions, including application hosting and maintenance, data
     hosting and maintenance, data center related database administration and network
27   support, custom reports and interfaces. . . . Cloud computing relieves clients of the
     costs associated with maintaining large IT staffs and clients pay only for those
28   servers and other resources they actually use."

1  Vertical Cloud Services are so unique that ultimately a customer's decision to use
2  Vertical Cloud Services is governed by non-price factors, such as the age of a
3  customer's IT, the complexity of a customer's applications, a customer's comfort
4  level with hosting its IT off-site, and a customer's desire for adoption of new
5  technology. A customer's decision to switch from on premise hosting to Vertical
6  Cloud Services is not governed by small increases in price. Consequently, on
7  premise hosting does not provide a price discipline on Vertical Cloud Services nor
8  would a SSNIP affect demand between the two products. As a result, on premise
9  hosting is not an adequate substitute in the Vertical Cloud Market.

10       36.    The relevant geographic market for the Vertical Cloud Market is the
11  United States.

12

13              **Competitive Landscape of the Vertical Cloud Market**

14       37.    While Yardi is a leading provider in the Property Management Back
15  Office Accounting Software Market, Yardi has lagged behind RealPage in the
16  Vertical Cloud Market. RealPage offers cloud computing services to clients in a
17  way that Yardi has not yet successfully matched, putting Yardi at a significant
18  disadvantage as companies recognize and migrate to the unquestionable benefits of
19  the RealPage Cloud. Thus, as the Vertical Cloud Market formed, RealPage
20  achieved through innovation and merit a significant lead in technology,
21  infrastructure, and customer service as a result of its substantial investment. As one
22  industry analyst explained: "We believe that RealPage has a unique competitive
23  position and that the company, therefore, should benefit disproportionately from
24  increasing cloud computing adoption in the rental housing vertical."

25       38.    Yardi aggressively entered the Vertical Cloud Market with the launch
26  of its competing vertically-integrated cloud service, Yardi Cloud Services™. Yardi
27  Cloud Services is impaired and limited by Yardi's inadequate investment. For
28  example, Yardi's security is lagging, and Yardi's cloud does not provide adequate

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER              18              NO. CV11-690 ODW (JEMx)

1  real-time disaster recovery, leaving its clients vulnerable to outages.  Yardi also

2  offers only an uptime "goal" and refuses to guarantee that its hosted systems will

3  remain continuously operable.  Uptime guarantees are critical in this industry, as

4  they enable property managers to better manage their businesses.

5      39.   Yardi, while effective in designing and selling property management

6  and accounting software, eschewed the opportunity to build the necessary

7  infrastructure, business processes, and technology to meet the new challenge of

8  vertically-integrated cloud computing.  As a result of Yardi's limited cloud

9  computing capabilities, Yardi clients understandably have looked for alternative

10  ways to host their Yardi software and satisfy their manifold needs for property

11  management.  For these and other reasons, several major Yardi clients have asked

12  RealPage to host their Yardi software, along with other software applications, in the

13  RealPage Cloud.

14      40.   Recognizing that Yardi Cloud Services could not compete on the

15  merits, Yardi embarked on a campaign to leverage its powerful position in the

16  Property Management Back Office Accounting Software Market to stifle

17  competition in the Vertical Cloud Market.  Specifically, Yardi is forcing its

18  Voyager Back Office Accounting Software clients, through express and implied

19  threats and intimidation, into anticompetitive exclusionary amendments to their

20  software licensing agreements whereby those clients agree not to use the RealPage

21  Cloud or any other potential cloud service provider.  In doing so, Yardi has

22  conditioned its clients' ability to continue to enjoy use of their Voyager Back Office

23  Accounting Software on such clients' agreement not to use any competing Vertical

24  Cloud Services provider.  These agreements are described in detail below.

25      41.   Customers acquiesce in these anticompetitive exclusionary

26  amendments to their Voyager Back Office Accounting Software licensing

27  agreements with Yardi not because they prefer Yardi Cloud Services or wish to

28  constrain their future purchasing decisions in the Vertical Cloud Market, but instead

1  because they are *forced* to do so by Yardi's actual and implied threats of license
2  termination, in the event the customer chooses to do business with RealPage.  Once
3  a customer chooses Voyager Back Office Accounting Software, it is locked into the
4  use of this software due to extremely high switching costs, which would take years
5  to recoup.  In addition, because of Voyager Back Office Accounting Software's
6  unique functionality, for some customers who require these capabilities, there are
7  no viable competitive alternatives.  As a result, customers have no practical
8  alternative but to agree to Yardi's demands of exclusivity and succumb to its
9  anticompetitive threats, even though customers may prefer to host their Voyager
10  Back Office Accounting Software in the RealPage Cloud.  This problem is
11  particularly pronounced for larger institutional fee managers, who face two layers
12  of lock-in: one due to high switching costs, and another due to their clients'
13  (institutional property owners and investors) lock-in.  Customers' acquiescence in
14  Yardi's demands, and Yardi's ability to impose these demands without meaningful
15  risk of customer defection, underscores Yardi's market power in the Property
16  Management Back Office Accounting Software Market.

17

18  ## YARDI'S UNLAWFUL PRACTICES

19       42.  Rather than innovate and invest in a superior architecture and
20  infrastructure, Yardi is trying to impede the adoption of the RealPage Cloud
21  through a campaign of customer interference and intimidation.  Yardi's tactics
22  include coercing its own customers to sign anticompetitive amendments to their
23  Voyager Back Office Accounting Software license agreements that explicitly
24  prohibit them from using RealPage's cloud computing and consulting services.  For
25  those that resist the restrictions (including current RealPage Cloud customers),
26  Yardi has threatened to terminate their software licenses and also contact their
27  customers, leaving them with an impossible choice: face prohibitively high
28  switching costs and business interruption if they abandon Voyager Back Office

1   Accounting Software, or forego using the Vertical Cloud Services provider of their

2   choice.

3       43.    Yardi's interference campaign has stifled competition in the Vertical

4   Cloud Market.  First, Voyager Back Office Accounting Software customers, who

5   tend to manage large numbers of units and utilize multiple software applications,

6   are exactly the type of customer that requires the specialized expertise and

7   application optimization offered by Vertical Cloud Services.  Smaller property

8   managers, who use basic real estate property management software, have less need

9   for the integration and application infrastructure that Vertical Cloud Services

10  afford.  Second, in order for RealPage to reach economies of scale and provide an

11  efficient Vertical Cloud Services product to consumers, it needs to provide those

12  services to customers that manage a large volume of units.  Many of the large fee

13  managers use Voyager Back Office Accounting Software.  So Yardi in effect is

14  attempting to lock RealPage out of the most likely customers for its Vertical Cloud

15  Services and the high volume customers in the market.  Without these customers,

16  RealPage cannot achieve economies of scale and offer the lower prices to

17  consumers that result from high volumes and increased efficiency.  These

18  customers are essential for RealPage to be able to offer the best Vertical Cloud

19  Services at the lowest price, and to continue to innovate and offer next generation

20  products in this industry.  Yardi's conduct, therefore, reduces the quality of

21  RealPage's product, increases prices overall to consumers, stifles innovation in the

22  industry, and allows Yardi to offer an inferior product for a higher price.  As a

23  result, Yardi's conduct is harming competition in the Vertical Cloud Market.

24      44.    Yardi has not only blocked customers to prevent their use of the

25  RealPage Cloud, Yardi also has stolen RealPage's most highly confidential trade

26  secrets.  Yardi obtained these trade secrets by poaching a newly hired high-level

27  RealPage executive who was privy to the granular details of RealPage's cloud

28  computing technology, who went on sales calls pitching the RealPage Cloud to

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER          21                    NO. CV11-690 ODW (JEMx)

potential customers, and who had participated in the shaping and design of RealPage's competitive sales strategy for cloud computing. Notably, Yardi did not begin interfering with RealPage's client relationships and forcing amendments to its Voyager Back Office Accounting Software license agreements *until after* Yardi had stolen RealPage's trade secrets and used them to develop and launch a competing cloud service of its own.

## Yardi's Anticompetitive and Exclusionary Conduct and Interference with RealPage's Customers

45.    By way of background, RealPage is committed to providing its clients a broad range of consulting and support services for software hosted in the RealPage Cloud—including Yardi software. Yardi clients frequently hire independent consultants to assist them with software, add-on products, and add-on service modules. One such independent consultant was EverGreen Solutions, Inc. As part of RealPage's strategic planning to enhance its available in-house consulting and support services, RealPage acquired the assets of EverGreen Solutions in September 2009. EverGreen Solutions became a RealPage division and provided consulting services for software users in the real estate industry, including users of Yardi's software. The EverGreen division ("EverGreen") helped these clients by designing, recommending, and installing software solutions and helping them implement best management practices. RealPage understands that in some instances, a Yardi software solution, such as Yardi's Voyager Back Office Accounting Software, may be what is best for a RealPage client.

46.    Following industry-standard computing and licensing practices, Yardi until recently allowed its clients—many of whom pay Yardi thousands of dollars monthly or annually for the rights to use Yardi software and maintain client data— to have their Voyager Back Office Accounting Software hosted by a third party. On information and belief, the majority of Yardi's software licenses with its clients

1    permitted or did not prohibit clients from allowing their agents, third parties,

2    contractors, or others to assist with, use, and host Yardi software.  Yardi's contracts

3    with its clients did not, before Yardi's misconduct began, limit the types of

4    contractors a client could retain, much less bar perceived competitors from being

5    retained as contractors.  Recognizing that it found itself at a distinct competitive

6    disadvantage to RealPage's superior Vertical Cloud Service, Yardi recently

7    changed its software license agreements to illegally counter the RealPage

8    competitive threat and lock its installed base of Voyager Back Office Accounting

9    Software clients out of the RealPage Cloud.

10          47.    Specifically, Yardi has begun changing its license agreements to

11   prohibit licensees from using any "contractor" to implement or host Yardi software.

12   The agreements define an excluded contractor as "a provider, or an affiliate of a

13   provider, of real property management and accounting software marketed primarily

14   to the real estate industry"—a definition designed and intended by Yardi to target

15   and exclude RealPage specifically, and other potential Vertical Cloud Services

16   competitors, more generally.[5]  These restrictions on using the RealPage Cloud are

17   of unlimited duration.  Yardi imposed these restrictions on existing licensees that

18   had already purchased Voyager Back Office Accounting Software.  Thus, these

19   Yardi licensees are locked into an unanticipated way of implementing or hosting

20   their Voyager Back Office Accounting Software.  If a Voyager Back Office

21   Accounting Software client now wants to use the RealPage Cloud (which today is

22   the only competitor to Yardi Cloud Services in the Vertical Cloud Market), the

23   client would first have to change its back office accounting software.  Clients

24   cannot easily switch to an alternative back office accounting software because of

25   the high switching costs associated with re-aligning their IT systems, and in many

26

27   [5] Although RealPage is currently the only competitor to Yardi in the Vertical Cloud
     Market, to the extent a new competitor enters the market, it would also be subject to
28   these restrictions.

1   cases because of the locked-in position of their own clients, as described above.  By

2   preventing its licensees from hosting their Voyager Back Office Accounting

3   Software in the RealPage Cloud, Yardi is effectively preventing these clients from

4   using the RealPage Cloud *at all* because, in the long term, it does not make

5   technological or economic sense for property management firms to host their

6   Voyager Back Office Accounting Software separately from their other property

7   management software products.   Finally, Yardi also has threatened to terminate

8   license agreements with clients who use both Yardi Back Office Accounting

9   Software and the RealPage Cloud on objectively baseless grounds solely for the

10  purpose of intimidating those clients into not using the RealPage Cloud.

11       48.    Yardi's anticompetitive actions have harmed RealPage by

12  compromising RealPage's contractual relationships with its clients and destroying

13  the trust and goodwill earned by RealPage through years of client development and

14  high-quality service.  Yardi's illegal conduct is intended to destroy competition in

15  the Vertical Cloud Market so that Yardi can gain market share and foist its inferior

16  Vertical Cloud Services on unwilling or unwitting customers.  Indeed, Yardi's

17  actions have already restrained and injured competition in the Vertical Cloud

18  Market, and have harmed consumers by preventing RealPage from achieving

19  economic scale and the accompanying ability to offer its Vertical Cloud Services to

20  both Yardi customers and non-Yardi customers with increased efficiency,

21  continued innovation and lower prices.  Moreover, there is a dangerous probability

22  that Yardi will achieve monopoly power in the Vertical Cloud Market if its conduct

23  does not cease.  Below are some specific examples of Yardi's anticompetitive

24  conduct and tortious interference with RealPage clients.

25       49.    Client 1 is a large property management firm that develops, constructs,

26  and acquires multifamily properties in fourteen geographic markets throughout the

27  United States.  Client 1 uses Voyager Back Office Accounting Software.  RealPage

28  had built a successful existing client relationship with Client 1 which culminated in

the negotiation and signing of a Letter Agreement for Interim Services on August 1, 2010. The Letter Agreement was its own stand-alone *executed, valid and enforceable agreement* whereby RealPage would provide transition and migration services, as well as hosting and other base services during the interim term for all non-Yardi applications. When Yardi learned of the Letter Agreement, it set out to interfere with RealPage's new client relationship and to disparage and damage RealPage. Yardi advised Client 1 that it could not continue to work with RealPage either under its existing Letter Agreement for Interim Services, nor under any contemplated future agreements with RealPage. Therefore, Client 1 was forced to cancel the services that RealPage was providing for the *non-Yardi applications* under the Letter Agreement, depriving RealPage of substantial revenue. Absent Yardi's interference and disruption of the contractual relationship, RealPage would have continued to perform these services for *non-Yardi applications* pursuant to the Letter Agreement.

50.    Worse yet, after Client 1 was locked into using Voyager Back Office Accounting Software due to high switching costs, Yardi amended Client 1's existing software license agreement to prohibit Client 1 from hosting its Yardi Back Office Accounting Software in the RealPage Cloud, as described above. Because of the high switching costs it would face if it did not accede to this coercive amendment, Client 1 agreed to the amendment. Client 1's amended license agreement thus prohibited it from executing its existing plan to host its Voyager Back Office Accounting Software in the RealPage Cloud. Because it would not make economic or practical sense for Client 1 to continue hosting its non-Yardi software in the RealPage Cloud without hosting its Voyager Back Office Accounting Software as well (indeed, this was the reason Client 1 could only agree to host its non-Yardi software in the RealPage Cloud on an interim basis), Yardi's amended license agreement effectively prohibited Client 1 from using the RealPage Cloud to host even its non-Yardi software. When Client 1 asked Yardi to change

the newly modified license agreement to allow Client 1 to use the RealPage Cloud, Yardi refused. Yardi's refusal to remove or waive its illegal anticompetitive license provision prohibited Client 1 from being able to use the RealPage Cloud, disrupting an economic relationship RealPage enjoyed with Client 1 which carried a probability of future economic benefit to RealPage.

51. Yardi's intent was to force Client 1 to use Yardi Cloud Services for its software hosting needs—a service that Yardi was able to offer only as a result of its misappropriation of RealPage's trade secrets. Without this purloined knowledge, Yardi would not have a competing Vertical Cloud Service to coerce its Voyager Back Office Accounting Software customers into patronizing and would not have had the ability to interfere with and disrupt RealPage's existing contractual relationship with Client 1, nor its prospective economic advantage with Client 1. As a result of the unlawful and anticompetitive restrictions imposed by Yardi, Client 1 announced that it could not use the RealPage Cloud, thus depriving RealPage of over $100,000 per year in lost revenue as well as other losses.

52. Similarly, RealPage had successfully built a client relationship with Client 2. Client 2 is a top-ten property management firm that uses Yardi Voyager Back Office Accounting Software, and at different times has used Yardi's hosting services for Yardi Voyager, and has self-hosted such software. As discussed in more detail below, in late 2008 and early 2009, an individual named Joe Hendrix ostensibly accepted a job offer as RealPage's Chief Information Officer. In this role, Hendrix acquired RealPage's confidential and proprietary information related to the RealPage Cloud. Hendrix participated in sales calls to Client 2 together with RealPage executives. During the Client 2 sales calls, Hendrix acquired substantial confidential information from Client 2 and RealPage including details regarding Client 2's dissatisfaction with Yardi, Client 2's desire to move to the RealPage Cloud and to use other RealPage products, RealPage's plans and goals for the

1  RealPage Cloud, and detailed bid information regarding the pricing of the RealPage

2  Cloud to Client 2.

3      53.    Unbeknownst to RealPage, Hendrix was a mole working for Yardi.

4  Shortly after acquiring confidential information related to RealPage's relationship

5  with Client 2, Hendrix would accomplish his bait and switch and start working for

6  Yardi. Yardi immediately made use of the RealPage trade secrets Hendrix

7  misappropriated to unfairly compete for cloud computing clients. For example,

8  Yardi initially had refused to bid in response to Client 2's Request for Proposal for

9  third party hosting and the outsourcing of related IT services. Once Hendrix

10  disclosed RealPage's trade secrets to Yardi, Yardi realized that it was in real

11  jeopardy of Client 2 moving to the RealPage Cloud. As a result of Hendrix's

12  disclosure of RealPage's confidential and proprietary information, Hendrix and

13  Yardi were able to submit aggressive bids to Client 2 for Yardi's competing cloud

14  computing service. For example, in a February 25, 2010 email to Client 2's CEO,

15  Yardi's President wrote: "We understand through the rumor mill that you may be

16  considering the RealPage Cloud Computing solution. . . . If you are reviewing

17  Cloud Computing there is significant advantage to reviewing our offerings. At a

18  minimum it will give you negotiating advantage when you speak with any provider

19  of Cloud Computing." In fact, there was no rumor mill—it was Joe Hendrix, the

20  Yardi mole.

21      54.    Hendrix's disclosure of secret RealPage bid information to Yardi

22  damaged RealPage in the Vertical Cloud Market by forcing RealPage to bid against

23  a Yardi proposal that was prepared with ill-gotten confidential information.

24  Furthermore, on information and belief, portions of Yardi's bid simply mimicked

25  RealPage's bid, using RealPage's proprietary information and even the same font

26  and ink color used by RealPage. As a result of Yardi's interference and

27  misappropriation of RealPage's trade secrets, the deal between RealPage and Client

28  2 was delayed and RealPage was forced to compete against its own technology and

1   to lower the price of the cloud services it offered to Client 2.  Yardi's conduct

2   therefore resulted in both a disruption of the relationship with Client 2 and

3   substantial monetary damage to RealPage through the lowered prices forced by the

4   illegal Yardi bid and lost revenue resulting from the delay in implementing the

5   service.  These damages are a direct consequence of Yardi's anticompetitive

6   conduct, its tortious interference and its misappropriation of RealPage trade secrets.

7        55.    RealPage and Client 2 subsequently entered into a five year agreement

8   for RealPage to host Client 2's software applications, including its Voyager Back

9   Office Accounting Software.  As a result of the deal, several Client 2 employees

10  transitioned over to RealPage in order to facilitate the hosting of Client 2's software

11  on the RealPage Cloud.  At the time, Yardi assured Client 2 that so long as it

12  allowed Yardi to compete for its Vertical Cloud Services business, it would respect

13  Client 2's purchase decision.  When, after that head to head competition between

14  Yardi and RealPage, Client 2 decided to use the RealPage Cloud, Yardi again said

15  it would respect Client 2's decision to host with RealPage and that Yardi would

16  cooperate with the arrangement.  However, more than a year later, Yardi repudiated

17  that agreement and now claims that Client 2's hosting with RealPage is in violation

18  of Client 2's 2003 Voyager licensing agreement.  Yardi's claims are without any

19  merit or justification.  Yet, Yardi continues to make threats to Client 2 and Client

20  2's customers that they will no longer be able to use Yardi's applications if they

21  host with the RealPage Cloud.  As a result of Yardi's baseless claims and threats,

22  the Client 2 employees who had shifted over to RealPage will need to move back to

23  Client 2—at great financial cost to RealPage.  In addition to this disruption, Client

24  2, who previously had planned to use additional RealPage services and products,

25  has declined to move forward with these plans in light of Yardi's threats, depriving

26  RealPage of future revenue.  Yardi's campaign of intimidation and coercion has

27  made customers, like Client 2, hesitant to do any future business with RealPage for

28

1   fear of harassment by Yardi, and this has directly resulted in lost business and direct

2   monetary damage to RealPage.

3       56.   Yardi has also extended its interference campaign further downstream,

4   threatening RealPage's clients' clients. Yardi has bound RealPage's clients' clients

5   to anticompetitive exclusionary agreements designed to indirectly interfere with the

6   RealPage client's ability to use the RealPage Cloud. For example, Client 2-A is

7   one of Client 2's clients. Client 2-A recently signed a contract with Yardi for use of

8   Yardi's Utility Billing product. The contract, however, forbids Client 2-A from

9   engaging RealPage to implement Client 2-A's software interface. Yardi also has

10  interfered with another of Client 2's clients, Client 2-B. Client 2-B is planning to

11  upgrade its Yardi software, but Yardi is refusing to allow Client 2-B to engage

12  RealPage to support Client 2-B's upgraded software. These restrictions are

13  designed to interfere with Client 2's business relations with Clients 2-A and 2-B

14  and, indirectly, with Client 2's ability to use the RealPage Cloud.

15      57.   Client 3, another multifamily and commercial real estate owner, had

16  agreed to move its data center to the RealPage Cloud and was in the process of

17  doing so. During the process of moving its data, however, Yardi demanded that

18  Client 3 not use the RealPage Cloud and not even publicly associate itself with

19  RealPage. As a result of Yardi's interference, Client 3 has decided not to use the

20  RealPage Cloud to host its Voyager Back Office Accounting Software. Yardi's

21  actions have damaged RealPage by causing it to lose revenue, reputational benefit,

22  and profit from Client 3's cloud business.

23      58.   Yardi also has repeatedly interfered with EverGreen's relationships

24  with its existing and prospective consulting clients. For example, Client 4 was in

25  the process of negotiating a consulting contract with EverGreen when Yardi began

26  threatening to refuse to work with EverGreen. On January 15, 2010—as

27  discussions between EverGreen and Client 4 were just beginning—a representative

28  of Client 4 wrote the following to EverGreen's President:

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER            29            NO. CV11-690 ODW (JEMx)

1  "One big issue that we have got to get addressed is the friction

2  between EverGreen and Yardi.  We cannot afford to be a casualty in

3  our rollout of a strained relationship between both companies.  Please

4  be prepared to address verbally Thursday.  Yardi has indicated that this

5  will be a problem even after I clarified that we are not hosting with

6  EverGreen."

7      59.    As discussions progressed, Yardi's threats escalated.  On February 13,

8  2010, the same representative of Client 4 wrote the following to EverGreen's

9  President:

10     "I have requested a meeting with Yardi this week to meet with you to

11     discuss implementation.  The initial response I got from . . . our

12     [Yardi] sales representative suggested that it was likely Yardi will

13     walk from the deal if we request EverGreen as our implementor."

14  Ultimately, Yardi's threats forced Client 4 to choose another implementation

15  consultant, causing EverGreen to lose this business opportunity and the revenue and

16  profit it would have generated.

17

18  **Yardi's Conduct Constitutes Negative Tying, Which is _Per Se_ Illegal**

19     60.    A tying arrangement is "an agreement by a party to sell one product but

20  only on the condition that the buyer also purchase a different (or tied) product, _or at_

21  _least agrees that he will not purchase that product from any other supplier._  A tying

22  arrangement is _per se_ unreasonable if the defendant has sufficient economic power

23  in the tying product market to restrain competition appreciably in the tied product

24  market and if the arrangement affects more than an insubstantial volume of

25  interstate commerce in the tied product."  _Image Technical Serv., Inc. v. Eastman_

26  _Kodak Co._, 903 F.2d 612, 615 (9th Cir. 1990) (emphasis in original, internal

27  citations omitted).

28

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER          30          NO. CV11-690 ODW (JEMx)

61.     Yardi's newly amended software license agreements condition licensees' use of Yardi's Voyager Back Office Accounting Software (the tying product) on an agreement not to use the Vertical Cloud Services (the tied product) of competing property management software companies, the only one of which today belongs to RealPage.  These agreements are commonly referred to as negative tying, or "tie out," agreements and they are *per se* violations of the Sherman Act and California's Cartwright Act.  *See, e.g., Kodak*, 903 F.2d at 615 (agreements not to use a competitor's products or services are *per se* illegal); Cal. Bus. & Prof. Code § 16727 (stating that "[i]t shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, [or] commodities. . . on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . or services of a competitor or competitors of the lessor or seller).

62.     Such agreements are *per se* illegal regardless of whether some Yardi licensees might choose to self-host their Voyager Back Office Accounting Software (*i.e.*, host the software "on premise") and regardless of whether Voyager Back Office Accounting Software *must* be hosted with a cloud services provider.  For example, plaintiffs in *Kodak* argued that Kodak had illegally tied the sale of its photocopier parts to an agreement not to use the maintenance services of Independent Service Organizations. *Kodak*, 903 F.2d at 615.  Notably, Kodak acknowledged that it would, however, "sell parts to owners who agree to self-service their machines." *Id.*  The Ninth Circuit determined that this fact in no way barred plaintiff's negative tying claim. *Id.*  The Supreme Court subsequently affirmed the Ninth Circuit's reasoning. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 463, 112 S. Ct. 2072, 2080, 119 L.Ed.2d 265, 281 (1992) (allowing negative tying claim despite the fact that "some consumers, those who self-service for example, would purchase parts without service").

63.     Finally, because the Vertical Cloud Market includes only two competitors at this time—Yardi and RealPage—Yardi's restrictive license agreements foreclose all other suppliers in the tied market.  In other words, Yardi has effectively prohibited its locked-in clients from using the services of all other potential Vertical Cloud Services providers.

## Property Management Back Office Accounting Software and Vertical Cloud Services are Two Distinct Products

64.     Property Management Back Office Accounting Software and Vertical Cloud Services are distinct products and services with different demand, and they are used in two separate and distinct product markets.  Clients often seek Property Management Back Office Accounting Software products and Vertical Cloud Services independently of each other and often from different providers.  In addition, many customers purchase Property Management Back Office Accounting Software and choose not to purchase Vertical Cloud Services.  Also, these products are provided separately to buyers by sellers, including RealPage and Yardi.  In fact, on its website Yardi advertises its Vertical Cloud Service separately from its software products.  In fact, Yardi has sold Property Management Back Office Accounting Software for years, but only recently entered the Vertical Cloud Market.

65.     Moreover, Property Management Back Office Accounting Software and Vertical Cloud Services are not substitutes for one another, as they perform completely separate functions.  Rather than displacing the underlying software, the Vertical Cloud Market serves to complement Property Management Back Office Accounting Software by outsourcing the information technology needs of the customer and ensuring interoperability among the property manager's various software products, including Property Management Back Office Accounting Software.

<u>Yardi Has Market Power in the Property Management Back Office Accounting Software Market</u>

66.    Yardi possesses market power in the Property Management Back Office Accounting Software Market by virtue of its Voyager Back Office Accounting Software, manifested by its ability to coerce customers into signing amended license agreements and the high switching costs those customers face. *See supra* at ¶¶ 24-27.  Yardi therefore possesses sufficient market power in the tying product market to coerce its customers (a substantial share of potential Vertical Cloud Services customers) into not using the RealPage Cloud in the tied product market.

67.    Market power is the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 15, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984).  The foregoing allegations of coercion—including the specific allegations of coercion relating to Clients 1 and 3—constitute direct and specific evidence of Yardi's market power in the Property Management Back Office Accounting Software Market.  Furthermore, Yardi has threatened to terminate the software licenses of Yardi clients that choose to host Yardi software in the RealPage Cloud.  Customers have succumbed to those threats, which provides further evidence and support for an inference of market power.

<u>Yardi's Conduct Affects a Substantial Volume of Commerce</u>

68.    Yardi's anticompetitive and exclusionary conduct affects more than an insubstantial volume of interstate commerce in the Property Management Back Office Accounting Software Market and the Vertical Cloud Market.  For example, as alleged above, Yardi bound Client 1 to a newly amended license agreement that foreclosed access to Yardi's competitors in the Vertical Cloud Market, including RealPage.  Client 1 was prepared to use the RealPage Cloud, but was prevented

1  from doing so by Yardi's amended license agreement, depriving RealPage of over

2  $100,000 per year in revenue.  Thus, the amount of business affected by Yardi's

3  negative tying agreement is *at least* this much.

4

5  **Yardi's Amended Software Licenses Constitute Exclusive Dealing Agreements**

6  **and are Unreasonable Restraints of Trade Under the Rule of Reason**

7      69.    Yardi's newly amended software license agreements prohibit Voyager

8  Back Office Accounting Software customers from using any Vertical Cloud

9  Services product on the market other than Yardi's Vertical Cloud Services product.

10  These amended license agreements constitute exclusive dealing in violation of

11  Section 1 of the Sherman Act, 15 U.S.C. § 1.  For the reasons explained *supra* in

12  ¶¶ 9, 10 and *infra* in ¶¶ 74-77, these agreements have foreclosed competition in a

13  substantial share of the Vertical Cloud Market.  If these agreements are allowed to

14  stand, every Voyager Back Office Accounting Software customer will have only

15  one Vertical Cloud Services option and Yardi could raise its prices and reduce its

16  services in this market without any repercussions.

17

18  **Yardi's Conduct Constitutes Attempted Monopolization of the Vertical**

19  **Cloud Market**

20      70.    Yardi's campaign of stealing trade secrets, communicating with Wall

21  Street analysts to try and drive down the RealPage stock price, forcing changes to

22  contract terms, threatening to terminate existing license agreements, threatening to

23  communicate with its licensee's customers, conditioning its clients' ability to use

24  Voyager Back Office Accounting Software on their coerced agreement not to use

25  the RealPage Cloud, and interfering with RealPage's client relationships is intended

26  to monopolize the Vertical Cloud Market in violation of Section 2 of the Sherman

27  Act, 15 U.S.C. § 2.  As explained *supra* in ¶¶ 9, 10, 42-44 and *infra* in ¶¶ 74-77,

28  Yardi has engaged in anticompetitive conduct designed to destroy competition in

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER          34          NO. CV11-690 ODW (JEMx)

1   the Vertical Cloud Market and there is a dangerous probability of Yardi achieving
2   monopoly power in this market if its conduct does not cease.

3       71.   In addition, the Vertical Cloud Market constitutes an aftermarket for
4   cloud services used to host Property Management Back Office Accounting
5   Software.  Yardi and RealPage are the only competitors in this aftermarket.  When
6   Yardi's customers entered into their original Voyager Back Office Accounting
7   Software license agreements, there were no restrictions on what Vertical Cloud
8   Services the customers could use.  In and around 2010, Yardi began forcing
9   customers—through exclusive agreements and threats of Voyager license
10  termination—to purchase only Yardi's Vertical Cloud Services.  Because these
11  customers are already locked in to using Voyager Back Office Accounting
12  Software, for the reasons described *supra* in ¶¶ 4 and 25, this post lock-in change
13  has a significant effect.  Even though many customers would like to use RealPage's
14  Vertical Cloud Services, customers are unable to do so for fear of violating the
15  anticompetitive amendments to their Voyager Back Office Accounting Software
16  license agreements.

17      72.   Yardi has unquestionable market power with respect to the customers
18  that are locked into using Voyager Back Office Accounting Software.  By changing
19  policies once customers are already locked-in, Yardi is able to wield this market
20  power in order to force customers to restrict their purchasing decisions in the cloud
21  services aftermarket and, therefore, there is a dangerous probability that Yardi's
22  attempt to monopolize this aftermarket will be successful.

23      73.   Yardi's efforts to foreclose RealPage—its sole competitor in the
24  Vertical Cloud Market—from a substantial share of the market will have the effect
25  of increasing prices and decreasing innovation in the Vertical Cloud Market.  Left
26  unchecked, Yardi's efforts to leverage its market dominance in the Property
27  Management Back Office Accounting Software Market to gain a dominant share of
28  the Vertical Cloud Market will leave customers with no viable competitive

alternatives in the Vertical Cloud Market, allowing Yardi to dictate prices in this market, particularly with respect to customers already locked into the use of Yardi's Property Management Back Office Accounting Software.  As discussed in more detail below, Yardi's conduct has already resulted in harm to competition.

## MARKET EFFECTS AND HARM TO COMPETITION

74.   The cumulative, anticompetitive effects of these improper client restrictions far outweigh any pro-competitive benefits.  Yardi's unlawful restrictions have had a pernicious effect on competition and lack any redeeming value.  Yardi's campaign, to date, has already substantially harmed competition in the Vertical Cloud Market and threatens to permanently deny Yardi clients the superior technology and cost savings offered by the RealPage Cloud.  Indeed, Yardi's campaign threatens to seriously impede or halt the growth of the Vertical Cloud Market.

75.   Yardi's Property Management Back Office Accounting Software customers represent a substantial share of potential Vertical Cloud Services customers.  Yardi's coercive tactics and market power in the Property Management Back Office Accounting Software Market have caused at least two prospective RealPage Cloud customers to abandon their plans to use the service.  Moreover, these two customers are simply examples of the many customers affected by Yardi's new policy of coercively restricting its customers' choice of Vertical Cloud Services providers.  In fact, over the past year, Yardi is believed to have coerced most, if not all, of its locked-in Voyager Back Office Accounting Software customers into signing exclusionary license agreement amendments that restrict them in their choice of Vertical Cloud Services providers.

76.   Yardi's conduct has also prevented RealPage from achieving economic scale.  Yardi is locking up its Property Management Back Office Accounting Software customers, which include many of the largest property managers.  In other

1   words, Yardi's restrictive agreements are preventing RealPage from reaching a
2   critical mass of customers for its RealPage Cloud that will allow it to achieve scale
3   and reduce costs.  These savings will either be passed on to the consumer or
4   invested in innovative new cloud computing technology.  In either case,
5   competition in the Vertical Cloud Market will be enhanced.

6       77.   With the RealPage Cloud artificially stunted by Yardi's misconduct,
7   consumers are denied the innovations and lower prices that would ensue from
8   customers choosing the RealPage Cloud of their own volition and RealPage's
9   growing its vertical cloud offering and continuing to innovate.  Yardi's conduct
10  therefore has not only denied its own Voyager Back Office Accounting Software
11  customers the ability to freely choose the Vertical Cloud Services that best fit their
12  needs, but Yardi's anticompetitive conduct has also deprived non-Yardi customers
13  of the innovation and lower prices that flow from unrestrained competition.

14

15  **Yardi Used a Mole to Misappropriate RealPage's Vertical Cloud Trade**
16  **Secrets**

17      78.   Yardi has not only blocked customers to prevent their use of the
18  RealPage Cloud, Yardi also has stolen RealPage's most highly confidential trade
19  secrets.  Yardi obtained these trade secrets by poaching a newly-hired high-level
20  RealPage executive who was privy to RealPage's confidential and proprietary
21  information, and then used this trade secret information to develop and launch its
22  own Vertical Cloud Service, and interfere with RealPage's customer relationships.

23      79.   Specifically, in late 2008 and early 2009, an individual associated with
24  a RealPage client ("Client X"), Joe Hendrix, ostensibly accepted a job offer as
25  RealPage's Chief Information Officer.  He was issued a company phone, badge
26  with secure-area access capabilities, and a company computer.  He was also
27  provided with invaluable proprietary information.  Hendrix participated in sales
28  calls and strategy discussions with RealPage's CEO, COO, and CTO and spent

weeks learning the inner-workings of RealPage and its plans for the development of its cloud computing service. He also met with RealPage clients and was entrusted with valuable RealPage confidential information as well as critical bid information that RealPage clients chose to provide directly to RealPage. Hendrix knew and understood that the information provided to him was confidential and proprietary and that he was required to maintain its confidentiality. At the same time that Hendrix was insinuating himself into RealPage's confidences, however, he was secretly working with Yardi to expand its Texas office to build Yardi's competing cloud computing service. Yardi immediately made use of the RealPage trade secrets Hendrix misappropriated to unfairly compete for cloud computing clients.

80. The betrayal began when Hendrix, while employed by Client X (a significant client of both Yardi and RealPage), entered into discussions about moving Client X's data center to the RealPage Cloud in order to provide a secure environment for its data. RealPage agreed and successfully moved Client X's data center to the RealPage Cloud. Knowing that after a successful migration to the RealPage Cloud Client X would have no further need for his IT services, Hendrix negotiated with RealPage for a job as Chief Information Officer. RealPage agreed to hire Hendrix, but Client X requested that Hendrix be permitted to wind down his responsibilities while he was also working for RealPage. RealPage's CEO agreed to this unusual arrangement as a favor to Client X. In addition to agreeing to allow Hendrix to wind down his responsibilities at Client X concurrent with his RealPage responsibilities, RealPage offered Hendrix a senior position, a substantial salary, 150,000 stock options, and provided Hendrix with sensitive, confidential, and proprietary documents and information about the RealPage Cloud business model and strategy, as well as access to RealPage's current and prospective clients. Hendrix also was included in high-level strategy discussions and was privy to some of RealPage's most sensitive information. For example, just a few days before his duties with Client X were to end, Hendrix spent hours discussing confidential

future RealPage business strategy with RealPage's Chief Operating Officer.

81.    At all times prior to his departure from Client X, Hendrix was subject to the provisions of a Mutual Confidentiality Agreement between RealPage and Client X.  This Agreement, which Hendrix personally signed, obligated Hendrix and Client X to "hold in confidence and not to disclose or reveal to any person or entity the Disclosing Party's Confidential Information."  The Agreement was entered into on June 19, 2008, at the outset of discussions between RealPage and Client X.  The Agreement provides that "[a]ll obligations undertaken respecting Confidential Information . . . will survive for two (2) years from the date of provision of such Confidential Information."

82.    Unbeknownst to RealPage, Hendrix—while extracting RealPage's confidences and promises of a sizeable salary and stock options—was acting as a mole, working with Yardi to expand Yardi's office in Dallas, Texas.  Yardi, meanwhile, knew or had reason to know that Hendrix was presenting himself as a RealPage employee to his friends and family and in sales meetings to third parties, and knew or had reason to know that Hendrix was under an obligation not to disclose RealPage's confidential information.  After having participated in sales calls and strategy discussions with RealPage and having used and relied upon RealPage's provision of information, hardware, and software, Hendrix abruptly announced that he had accepted a position as officer in charge of Yardi's expanded Texas operations.

83.    The disclosure and misuse of RealPage trade secrets began immediately and may have been happening even before Hendrix announced officially that he had become a Yardi employee.  On information and belief, Hendrix provided Yardi with RealPage's proprietary information concerning: (a) RealPage data center and disaster recovery architecture, a well-known architectural shortcoming of Yardi's offerings; (b) RealPage technology used to monitor and improve the operation of third-party applications; (c) RealPage process

1   methods for change, problem, and release management; (d) detailed and proprietary
2   descriptions of the RealPage Cloud including marketing and technology plans; and
3   (e) the confidential details of RealPage's bids for large Yardi clients.  Yardi used
4   this proprietary RealPage information, misappropriated by Hendrix, to unfairly
5   compete with RealPage.  RealPage's sophisticated knowledge of data security,
6   performance monitoring, and hosting was accumulated and refined through over ten
7   years of experience and over $100 million of investment.  In the hands of Yardi, a
8   competitor that had deliberately chosen not to make such an investment, this secret
9   information was an invaluable and ill-gotten advantage in developing its competing
10  cloud computing service.

11       84.    Given this illicit head start at RealPage's expense, within three weeks
12  after Hendrix joined Yardi, the company began offering a vertically-integrated
13  service modeled on the RealPage Cloud called "Yardi Cloud Services."  Later,
14  Hendrix even went so far as to present confidential RealPage Cloud documents to
15  prospective clients as if they were Yardi's.  The timing of Yardi's Cloud Services
16  offering was no coincidence.  Yardi could not have developed this competing cloud
17  business without the boost that it gained by exploiting the confidential RealPage
18  information Hendrix misappropriated.

19

20                        **FIRST COUNTERCLAIM**
21                  **(Misappropriation of Trade Secrets)**
22       85.    RealPage realleges and incorporates by reference the allegations
23  contained in Paragraphs 1 through 84 as though fully set forth herein.
24       86.    RealPage has invested millions of dollars and years of time in the
25  development of confidential and trade secret information.  This trade secret
26  information includes, but is not limited to, the following categories of information:
27  (a) RealPage data center and disaster recovery architecture; (b) RealPage
28  technology used to monitor and improve the operation of third-party applications;

1    (c) RealPage process methods for change, problem and release management; (d)

2    detailed and proprietary descriptions of the RealPage Cloud including marketing

3    and technology plans; and (e) the confidential details of RealPage's cloud

4    computing bids for large Yardi clients.

5         87.   RealPage's trade secrets relevant to this case comprise information not

6    generally known to the public or to other persons who would obtain economic

7    value from their disclosure or use.  This information is the subject of reasonable

8    efforts by RealPage to maintain its secrecy, including the use of confidentiality and

9    nondisclosure agreements, and derives independent economic value from not being

10   generally known.  The information constitutes "trade secrets" under California Civil

11   Code section 3426.1.  RealPage's trade-secret information gives it a competitive

12   advantage in, among other things, its ability to offer services such as consulting

13   services and the RealPage Cloud hosting service.

14        88.   Yardi willfully and maliciously misappropriated RealPage's trade

15   secrets through improper means by obtaining them from Joe Hendrix, who had a

16   duty to maintain the trade secrets' secrecy and to forebear from disseminating or

17   using them.  Yardi worked in concert with Hendrix to obtain RealPage's trade

18   secret information, all the while knowing that Hendrix was representing himself as

19   a RealPage employee and that he was subject to a confidentiality agreement.  Upon

20   acquiring these stolen trade secrets, Yardi proceeded to use them without

21   RealPage's express or implied consent for the purpose of developing a competing

22   cloud computing business and competing for Client 2's and others' business.  Yardi

23   has also used these stolen trade secrets as an integral part of its customer

24   interference campaign.  Without the stolen trade secrets, Yardi would be unable to

25   offer a competing product to the RealPage Cloud.

26        89.   By reason of the above-alleged acts and conduct of Yardi, RealPage

27   has been damaged, and it will suffer further great and irreparable harm and damage.

28

1    The amount of this irreparable harm will be difficult to ascertain, and RealPage will

2    be without an adequate remedy at law.

3          90.   RealPage is entitled to an injunction restraining Yardi, its officers,

4    agents, employees, and all persons acting in concert with it, from engaging in

5    further unlawful acts and from reaping any additional commercial advantage from

6    its misappropriation and use of RealPage's trade secrets.

7          91.   RealPage is further entitled to an order requiring Yardi, its agents,

8    employees, and all persons acting in concert with it, to return to RealPage any and

9    all of its trade secrets and confidential, proprietary materials, including but not

10   limited to any and all materials created incorporating, referencing, or derived from

11   RealPage's trade secrets and confidential, proprietary information.

12         92.   RealPage is further entitled to recover from Yardi the damages

13   sustained by RealPage as a result of the wrongful acts as alleged herein.  RealPage

14   is further entitled to recover from Yardi the gains, profits, and advantages Yardi has

15   obtained as a result of the wrongful acts alleged herein.  The amount of such

16   damages, gains, profits, and advantages cannot be determined at this time but will

17   be proven at trial.

18

19                    **SECOND COUNTERCLAIM**

20            **(Violation of Section 1 of the Sherman Act)**

21         93.   RealPage realleges and incorporates by reference the allegations

22   contained in Paragraphs 1 through 84 as though fully set forth herein.

23         94.   Yardi's conduct as alleged herein has been for the purpose of, and has

24   had the effect of, injuring and restraining competition in the Vertical Cloud Market

25   in the United States.  Yardi has entered into agreements that restrain competition in

26   a substantial portion of the Vertical Cloud Market by forcing Voyager Back Office

27   Accounting Software clients, through threats and intimidation, into anticompetitive

28   exclusionary agreements whereby the client agrees explicitly, or in effect, not to use

1    the RealPage Cloud.  Yardi's amended license agreement with Client 1 is one

2    example of these anticompetitive agreements.  Yardi's conduct has had and

3    continues to have anticompetitive effects and violates Section 1 of the Sherman

4    Act, 15 U.S.C. § 1.

5         95.    Yardi possesses market power in the Property Management Back

6    Office Accounting Software Market by virtue of its Voyager Back Office

7    Accounting Software.  Additionally, Yardi possesses market power over its

8    Voyager Back Office Accounting Software clients because those clients cannot

9    easily switch to an alternative Property Management Back Office Accounting

10   Software due to the high switching costs associated with re-aligning their IT

11   systems and transferring their data to new software architecture.  Yardi therefore

12   possesses sufficient market power to coerce its customers (a substantial share of

13   potential Vertical Cloud Services customers) into not using the RealPage Cloud.

14   This power over its Voyager Back Office Accounting Software customers gives

15   Yardi substantial market power in the Vertical Cloud Market as evidenced by its

16   ability to prevent customers from exercising their free will to use competing

17   products.

18        96.    Voyager Back Office Accounting Software and the RealPage Cloud are

19   distinct products and services with different demand, and clients often seek them

20   independently of each other.  Yardi has conditioned its clients' ability to continue

21   using Voyager Back Office Accounting Software on their coerced agreement not to

22   use the RealPage Cloud.  Yardi has done so through amended license agreements,

23   imposed on its clients after they have already licensed Voyager Back Office

24   Accounting Software and are locked in due to the extraordinarily high financial and

25   logistical switching costs, whereby the client agrees at Yardi's demand to explicitly,

26   or in effect, not use the RealPage Cloud.  Yardi's amended license agreement with

27   Client 1 is one example of these anticompetitive agreements.  These agreements

28   affect and foreclose a substantial amount of commerce in the Vertical Cloud

Market, a market in which Yardi competes, and prevent RealPage from achieving economic scale. Absent Yardi's anticompetitive restrictions, RealPage would reach optimal economic scale and Yardi customers and non-Yardi customers would enjoy lower prices, greater innovation and freedom of choice to select the Vertical Cloud Services provider that best suits their needs.

97.    The agreements also constitute an unreasonable restraint of trade upon interstate commerce. The anticompetitive effects of these agreements outweigh any procompetitive effect or legitimate business justifications.

98.    The agreements are *per se* illegal as negative tying agreements. The agreements are also illegal as tying arrangements under the rule of reason. Finally, Yardi's amended Voyager license agreements constitute unlawful exclusive dealing under Section 1 of the Sherman Act as the amended license agreements force Voyager Back Office Accounting Software customers into using only Yardi's cloud product.

99.    As a direct and proximate result of Yardi's unlawful and anticompetitive conduct, RealPage has been injured and damaged in its business and property.

100.   Unless enjoined, Yardi's unlawful conduct will continue and cause further injury to competition, and RealPage will continue to suffer injury for which it is without adequate remedy at law

## THIRD COUNTERCLAIM
### (Violation of Section 2 of the Sherman Act)

101.   RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

102.   Yardi's conduct as alleged herein has been intended to, and has had the effect of, injuring and destroying competition in the Vertical Cloud Market in the United States. Yardi has engaged in predatory and anticompetitive conduct as a

1  result of its misappropriation of RealPage's trade secrets, its attempts to drive down

2  the RealPage stock price via communications with Wall Street analysts, its threats

3  and intimidation of Voyager Back Office Accounting Software clients, its coercion

4  of those clients (including Client 1) into anticompetitive exclusionary agreements

5  whereby the client agrees explicitly, or in effect, not to use the RealPage Cloud, and

6  its interference with RealPage's client relationships.  There is a dangerous

7  probability that Yardi will achieve monopoly power in the Vertical Cloud Market.

8  Yardi's conduct has had and continues to have anticompetitive effects and violates

9  Section 2 of the Sherman Act, 15 U.S.C. § 2.

10      103.  Yardi possesses market power in the Property Management Back

11  Office Accounting Software Market by virtue of its Voyager Back Office

12  Accounting Software.  Additionally, Yardi possesses market power over its

13  Voyager Back Office Accounting Software clients because those clients cannot

14  easily switch to an alternative Property Management Back Office Accounting

15  Software due to the high switching costs associated with re-aligning their IT

16  systems and transferring their data to new software architecture.  Yardi therefore

17  possesses sufficient market power to coerce its Back Office Accounting Software

18  customers (a substantial share of potential Vertical Cloud Services customers) into

19  not using the RealPage Cloud.  This power over its Voyager Back Office

20  Accounting Software customers gives Yardi substantial market power in the

21  Vertical Cloud Market as evidenced by its ability to prevent customers from

22  exercising their free will to use competing products.

23      104.  Voyager Back Office Accounting software and the RealPage Cloud are

24  distinct products and services with different demand, and clients often seek them

25  independently of each other.  Yardi has conditioned its clients' ability to continue

26  using Voyager Back Office Accounting Software on their coerced agreement not to

27  use the RealPage Cloud.  Yardi has done so through amended license agreements,

28  imposed on its clients after they have already licensed Voyager Back Office

1  Accounting Software and are locked in due to the extraordinarily high financial and
2  logistical switching costs, whereby the client agrees at Yardi's demand to explicitly,
3  or in effect, not to use the RealPage Cloud.  Yardi's amended license agreement
4  with Client 1 is one example of these anticompetitive agreements.  These
5  agreements affect and foreclose a substantial amount of commerce in the Vertical
6  Cloud Market, a market in which Yardi competes, and prevent RealPage from
7  achieving economic scale.  Absent Yardi's anticompetitive restrictions, RealPage
8  would reach optimal economic scale and Yardi customers and non-Yardi customers
9  would enjoy lower prices, greater innovation and freedom of choice to select the
10  vertical cloud provider that best suits their needs.

11      105.   The Vertical Cloud Market constitutes an aftermarket for cloud
12  services used to host Property Management Back Office Accounting Software.
13  Yardi and RealPage are the only competitors in this aftermarket.  When Yardi's
14  customers entered into their original Voyager Back Office Accounting Software
15  agreements, there were no restrictions on what Vertical Cloud Services the
16  customers could use.  Yardi later began forcing customers—through exclusive
17  agreements and threats of Voyager license termination—to purchase only Yardi
18  cloud services.  Because these customers are already locked in to using Voyager
19  Back Office Accounting Software, customers are unable to use the RealPage
20  Cloud for fear of violating the anticompetitive amendments to their Voyager Back
21  Office Accounting Software license agreements.

22      106.   Yardi has unquestionable market power with respect to the customers
23  that are locked into using Voyager Back Office Accounting Software.  By
24  changing policies once customers are already locked-in, Yardi is able to wield this
25  market power in order to force customers to restrict their purchasing decisions in
26  the cloud services aftermarket and, therefore, there is a dangerous probability that
27  Yardi's attempt to monopolize this aftermarket will be successful.

28

107.   The agreements also constitute an unreasonable restraint of trade upon interstate commerce.  The anticompetitive effects of these agreements outweigh any procompetitive effect or legitimate business justifications.

108.   The agreements are illegal as negative tying agreements.  Finally, Yardi's amended Voyager license agreements constitute unlawful exclusive dealing as the amended license agreements force Voyager Back Office Accounting Software customers into using only Yardi's cloud product.

109.   As a direct and proximate result of Yardi's unlawful and anticompetitive conduct, RealPage has been injured and damaged in its business and property.

110.   Unless enjoined, Yardi's unlawful conduct will continue and cause further injury to competition, and RealPage will continue to suffer injury for which it is without adequate remedy at law.

## **FOURTH COUNTERCLAIM**

**(Violation of the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16722, 16726, and 16727))**

111.   RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

112.   Yardi's conduct as alleged herein has been for the purpose of, and has had the effect of, injuring and restraining competition in the Vertical Cloud Market. Yardi has entered into agreements intending to restrain competition by forcing its Voyager Back Office Accounting Software clients (including Client 1), through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud.  That conduct has had and continues to have substantial anticompetitive effects in California, and violates Cal. Bus. & Prof. Code §§16720, 16722, 16726, and 16727 (stating that "[i]t shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise,

1   machinery, supplies, [or] commodities. . . on the condition, agreement or

2   understanding that the lessee or purchaser thereof shall not use or deal in the goods

3   . . . or services of a competitor or competitors of the lessor or seller).  The

4   anticompetitive effects of these agreements outweigh any beneficial effect or

5   legitimate business justifications.

6          113.  Yardi possesses market power in the Property Management Back

7   Office Accounting Software Market by virtue of its Voyager Back Office

8   Accounting Software.  Additionally, Yardi possesses market power over its

9   Voyager Back Office Accounting Software clients because those clients cannot

10  easily switch to an alternative Property Management Back Office Accounting

11  Software due to the high switching costs associated with re-aligning their IT

12  systems and transferring their data to new software architecture.  Yardi therefore

13  possesses sufficient market power to coerce its customers (a substantial share of

14  potential vertical cloud customers) into not using the RealPage Cloud.  This power

15  over its Voyager Back Office Accounting Software customers gives Yardi

16  substantial market power in the Vertical Cloud Market as evidenced by its ability to

17  prevent customers from using competing products.

18         114.  Voyager Back Office Accounting Software and the RealPage Cloud are

19  distinct products and services with different demand, and clients often seek them

20  independently of each other.  Yardi has conditioned its clients' ability to continue

21  using Voyager Back Office Accounting Software on their coerced agreement not to

22  use the RealPage Cloud.  Yardi has done so through amended license agreements,

23  imposed on its clients after they have licensed Voyager Back Office Accounting

24  Software and are locked in to its high switching costs, whereby the client agrees at

25  Yardi's demand to explicitly, or in effect, not to use the RealPage Cloud.  Yardi's

26  amended license agreement with Client 1 is one example of these anticompetitive

27  agreements.  These agreements affect and foreclose a substantial amount of

28  commerce in the Vertical Cloud Market, a market in which Yardi competes, and



1  prevent RealPage from achieving economic scale.  Absent Yardi's anticompetitive

2  restrictions, RealPage would reach optimal economic scale and Yardi customers

3  and non-Yardi customers would enjoy lower prices, greater innovation and freedom

4  of choice to select the Vertical Cloud Services provider that best suits their needs.

5       115.  As a direct and proximate result of Yardi's unlawful and

6  anticompetitive conduct, RealPage has been injured and damaged in its business

7  and property.

8       116.  Unless enjoined, Yardi's unlawful conduct will continue and cause

9  further injury to competition, and RealPage will continue to suffer injury for which

10  it is without adequate remedy at law.

11

12                      **FIFTH COUNTERCLAIM**

13              **(Intentional Interference with Contract)**

14       117.  RealPage realleges and incorporates by reference the allegations

15  contained in Paragraphs 1 through 84 as though fully set forth herein.

16       118.  RealPage has or had valid contracts with third parties, including

17  Clients 1 and 2, for hosting and consulting services.  Yardi has or had knowledge of

18  these contracts with third parties.

19       119.  Yardi has willfully and intentionally interfered with those contracts by

20  threatening RealPage's clients with termination of software licensing agreements if

21  they use the RealPage Cloud.  These threats were made on objectively baseless

22  grounds solely for the purpose of intimidating those clients into not using the

23  RealPage Cloud.  Yardi also has willfully and intentionally interfered with those

24  contracts by amending its software license agreements to prohibit its licensees from

25  using the RealPage Cloud.  Yardi's wrongful acts were designed to and actually did

26  interfere and disrupt RealPage's contractual relationships with its clients, including

27  Clients 1 and 2.

28

120.   RealPage has suffered actual damages and loss as a direct and proximate result of Yardi's unlawful interference.  RealPage has lost business with Client 1 and Client 2 and has suffered losses with other clients as a result of Yardi's interference.

121.   Yardi acted intentionally and in conscious disregard of the rights of RealPage, with malice and oppression, in that Yardi knew that its acts and conduct, as alleged herein, were unjustified and improper and would result in severe financial and economic injury to RealPage.  Accordingly, RealPage is entitled to an award of punitive damages against Yardi for the sake of example and by way of punishing Yardi, in an amount to be determined at trial.

## SIXTH COUNTERCLAIM

### (Intentional Interference with Prospective Economic Advantage)

122.   RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

123.   An economic relationship, with the reasonable probability of future economic benefit to RealPage, existed between RealPage, on the one hand, and its current and prospective RealPage Cloud clients and consulting clients (including Clients 1, 2, 3, and 4), on the other hand.

124.   Yardi knew of these relationships and intended to disrupt them by threatening RealPage's clients with termination of their software licensing agreements if they chose to use the RealPage Cloud or EverGreen consulting services.  These threats were made on objectively baseless grounds solely for the purpose of intimidating those clients into not using the RealPage Cloud.  Yardi also has intended to disrupt these relationships by amending its software license agreements to prohibit its licensees from using the RealPage Cloud, and by using RealPage's trade secrets to bid against RealPage.

125.   As described throughout these Counterclaims, Yardi's conduct was independently tortious or unlawful because Yardi has restrained trade and competition in violation of the antitrust laws of the United States and California by forcing its Voyager Back Office Accounting Software clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby those clients agree not to use the RealPage Cloud.  Yardi's business acts and practices are also independently tortious or unlawful in that Yardi has used RealPage's own trade secrets, obtained unlawfully by Yardi, to unfairly compete against RealPage and to interfere with RealPage's client relationships.  Finally, Yardi's acts constitute (1) unlawful business practices and (2) unfair business practices under California's Unfair Competition statutes because, among other reasons, they violate the policy and spirit of the antitrust laws and significantly threaten or harm competition.

126.   As a direct and proximate result of Yardi's wrongful acts as alleged herein, numerous clients and prospective clients have been forced to terminate their use of, or have been forced not to use, the RealPage Cloud and EverGreen consulting services.  Yardi's wrongful conduct was a substantial factor in disrupting these relationships.

127.   As a direct and proximate result of Yardi's wrongful acts as alleged herein, RealPage has suffered actual damages and loss.  RealPage has lost business and has suffered losses with clients as a result of Yardi's interference.

128.   Yardi acted intentionally and in conscious disregard of the rights of RealPage, with malice and oppression, in that Yardi knew that its acts and conduct, as alleged herein, were unjustified and improper and would result in severe financial and economic injury to RealPage.  Accordingly, RealPage is entitled to an award of punitive damages against Yardi for the sake of example and by way of punishing Yardi, in an amount to be determined at trial.

# SEVENTH COUNTERCLAIM

## (Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200 et seq.)

129.  RealPage realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

130.  Yardi's acts, as alleged above, constitute unlawful, unfair, and fraudulent business practices in violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.

131.  Yardi's business acts and practices are unlawful, fraudulent and unfair, and in violation of the UCL because Yardi has restrained trade and competition in violation of the antitrust laws of the United States and California by forcing its Voyager Back Office Accounting Software clients, through threats and intimidation, into anticompetitive exclusionary agreements whereby the client agrees not to use the RealPage Cloud or EverGreen consulting services.  Yardi's business acts and practices are also unlawful, fraudulent, and unfair in that it has used trade secrets that it misappropriated from RealPage to unfairly compete against RealPage and interfere with RealPage's contractual and prospective economic relations.

132.  As a direct and proximate result of Yardi's statutory unfair competition, Yardi has been unjustly enriched in an amount to be determined at trial.

133.  In addition, Yardi's statutory unfair competition has caused, and is continuing to cause, substantial and irreparable harm to RealPage.  Unless Yardi's wrongful acts are restrained by this Court, RealPage's business will continue to suffer.  RealPage has no adequate or complete remedy at law, and the harm RealPage will suffer cannot be adequately compensated in monetary damages.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28  //

## PRAYER FOR RELIEF

WHEREFORE, RealPage prays for judgment in its favor as follows:

      a.    That RealPage be awarded damages against Yardi, including treble damages as authorized by law, in an amount to be determined at trial;

      b.    That RealPage be awarded punitive damages against Yardi;

      c.    That the Court award RealPage its attorneys' fees and litigation expenses as authorized by law;

      d.    That the Court enter injunctions restraining Yardi preliminarily and permanently from further misappropriation of RealPage's trade secrets;

      e.    That the Court enter injunctions restraining Yardi preliminarily and permanently from further acts of unfair competition;

      f.    That the Court enter injunctions restraining Yardi preliminarily and permanently from further acts of interference;

      g.    That the Court enter injunctions restraining Yardi preliminarily and permanently from continuing its anticompetitive conduct as alleged herein; and

      h.    That the Court award RealPage such other and further relief as the Court deems just and appropriate.

## ANSWER

COMES NOW RealPage, Inc. ("RealPage"), for itself alone and for no other defendant, and for its Answer to the First Amended Complaint of Yardi Systems, Inc. ("Yardi"), admits, denies, and alleges as follows:

1.    In answer to Paragraph 1, RealPage admits that this action purports to be brought under the theories cited but believes that Yardi's hidden intent in filing this lawsuit is to inhibit RealPage from fairly competing with Yardi and to limit alternative choices for Yardi's clients, thereby preventing a more open and competitive marketplace.  Except as so admitted, RealPage denies each and every allegation set forth in Paragraph 1, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

2.    In answer to Paragraph 2, RealPage admits that Yardi is a leading provider of database and application software for real estate and property management clients.  Except as so admitted, RealPage denies each and every allegation set forth in Paragraph 2.

3.    In answer to Paragraph 3, RealPage admits that it competes with Yardi in some markets and with respect to some products.  RealPage admits and alleges that in 2009 it acquired substantially all the assets of EverGreen Solutions, Inc., including EverGreen Solutions, Inc.'s rights to the name "EverGreen," and that RealPage used those assets to create a division of RealPage previously known as EverGreen Solutions; this division has since been reorganized and consolidated into the RealPage Professional Services Group.  RealPage admits that prior to its acquisition of EverGreen Solutions, Inc., EverGreen Solutions, Inc. (and its predecessor entities, referred to collectively herein as "EverGreen Solutions, Inc.") was a consultant that provided technology and software support services for users of Yardi's software, among others, but denies that it affirmatively joined any then-so called "Yardi Independent Consultant Network" or that it undertook any

obligations toward Yardi as a result of its purported membership in such a Network. RealPage admits and alleges that EverGreen Solutions, Inc. was given unconditional access to Yardi's Client Central, the information posted thereon, and Yardi's software, but denies that such access was granted by Yardi as a result of EverGreen Solutions, Inc. affirmatively joining any purported Independent Consultant Network or pursuant to any purported "strict confidentiality agreement." RealPage admits that EverGreen Solutions, Inc. employed, and RealPage still employs, certain of Yardi's former employees.  RealPage admits and alleges that, at or around the time RealPage acquired substantially all the assets of EverGreen Solutions, Inc., the corporate entity previously known as Evergreen Solutions, Inc. changed its name to EverGreen Management Solutions, Inc. and, in December 2009, to DC Consulting, Inc.  RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegation that EverGreen Solutions, Inc. was "best known" for providing services "almost exclusively for users of Yardi software," and therefore denies same on that ground.  Except as so admitted and denied, RealPage denies each and every allegation set forth in Paragraph 3.  Other than as expressly set forth in this paragraph, to the extent that the allegations in Paragraph 3 are directed to or involve EverGreen Management Solutions, Inc. or DC Consulting, Inc. (hereinafter collectively "DC Consulting, Inc."), RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

     4.    In answer to Paragraph 4, RealPage denies each and every allegation therein, except admits and alleges that Yardi sent an email to EverGreen Solutions, Inc. purporting to terminate its "access to Yardi Systems online support and services, phone and email technical support, [and] marketing and sales resources" in apparent retaliation for the acquisition of its assets by RealPage, that Yardi or its representatives have sent various communications to RealPage or its counsel stating in substance that RealPage should not misuse Yardi's purported confidential

1   information and RealPage has abided by those admonitions, and specifically denies

2   that Yardi did in fact or could lawfully terminate EverGreen Solutions, Inc.'s or its

3   clients' legitimate access to Client Central.  RealPage specifically denies that the

4   information Yardi makes available on Client Central is confidential, proprietary, or

5   trade secret.  To the extent that the allegations in Paragraph 4 are directed to or

6   involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to

7   form a belief as to the truth of those allegations, and therefore denies same on that

8   ground.

9          5.      In answer to Paragraph 5, RealPage admits and alleges that it

10  announced that the former EverGreen division "will continue to work with its real

11  estate clients to improve management systems in the areas of application hosting,

12  including upgrades and new product implementation, application support, custom

13  programming and reports and integrations and interfaces," and that prior to its

14  acquisition, EverGreen Solutions, Inc. was a consultant that provided technology

15  and software support services for users of Yardi's software, among others.

16  RealPage denies that EverGreen Solutions, Inc. affirmatively joined any then-so

17  called "Yardi Independent Consultant Network" or that it undertook any obligations

18  toward Yardi as a result of its purported membership in such a Network.  Except as

19  so admitted, RealPage denies each and every allegation set forth in Paragraph 5,

20  and specifically denies that it has engaged in any wrongful conduct toward Yardi or

21  that it has injured Yardi in the manner alleged, in any manner, or at all.

22         6.      In answer to Paragraph 6, RealPage denies each and every allegation

23  set forth in Paragraph 6, except (i) RealPage admits that prior to its acquisition,

24  EverGreen Solutions, Inc. was a consultant that provided technology and software

25  support services for users of Yardi's software, among others, but denies that it

26  affirmatively joined any then-so called "Yardi Independent Consultant Network" or

27  that it undertook any obligations toward Yardi as a result of its purported

28  membership in such a Network; and (ii) RealPage admits and alleges that since

1   September 2009 it has legitimately and with proper authority accessed Client

2   Central, but specifically denies that it has engaged in any wrongful conduct toward

3   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

4   the extent that the allegations in Paragraph 6 are directed to or involve DC

5   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

6   belief as to the truth of those allegations, and therefore denies same on that ground.

7        7.    In answer to Paragraph 7, RealPage denies each and every allegation

8   therein, and specifically denies that it has engaged in any wrongful conduct toward

9   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

10  the extent that the allegations in Paragraph 7 are directed to or involve DC

11  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

12  belief as to the truth of those allegations, and therefore denies same on that ground.

13       8.    In answer to Paragraph 8, RealPage denies for lack of knowledge or

14  information the allegations therein, except specifically denies that Yardi welcomes

15  fair competition, that RealPage has stolen Yardi's intellectual property, or that

16  RealPage has injured Yardi in the manner alleged, in any manner, or at all.

17       9.    In answer to Paragraph 9, RealPage admits the allegations set forth

18  therein.

19       10.   In answer to Paragraph 10, RealPage denies each and every allegation

20  contained therein, except admits and alleges that it is a Delaware corporation whose

21  stock is publicly-traded, that its headquarters are in Carrollton, Texas, and that it

22  competes with Yardi in some markets and with respect to some products.

23       11.   In answer to Paragraph 11, RealPage admits and alleges that in

24  September 2009 it acquired substantially all the assets of the entity then known as

25  EverGreen Solutions, Inc. and that those assets subsequently comprised the division

26  of RealPage previously known as EverGreen Solutions; this division has since been

27  reorganized and consolidated into the RealPage Professional Services Group.

28  RealPage admits that prior to its acquisition of EverGreen Solutions, Inc.,

1  EverGreen Solutions, Inc. was a consultant that provided technology and software
2  support services for users of Yardi's software, among others.  RealPage denies that
3  EverGreen Solutions, Inc. affirmatively joined any then-so called "Yardi
4  Independent Consultant Network" or that it undertook any obligations toward Yardi
5  as a result of its purported membership in such a Network.  To the extent that the
6  allegations in Paragraph 11 are directed to or involve DC Consulting, Inc.,
7  RealPage lacks knowledge or information sufficient to form a belief as to the truth
8  of those allegations, and therefore denies same on that ground.

9       12.    In answer to Paragraph 12, RealPage admits that it does business in
10  California and that it services and supports clients in California and in this judicial
11  district.  RealPage admits that its former Evergreen Solutions division legitimately
12  accessed and downloaded certain materials from Client Central, but denies that any
13  of those materials were trade secrets.  Except as so admitted and denied, RealPage
14  lacks knowledge or information sufficient to form a belief as to the truth of the
15  allegations set forth in Paragraph 12, and therefore denies same on that ground.  To
16  the extent that the allegations in Paragraph 12 are directed to or involve DC
17  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a
18  belief as to the truth of those allegations, and therefore denies same on that ground.

19       13.    In answer to Paragraph 13, RealPage denies each and every allegation
20  therein, and specifically denies that with respect to DC Consulting, Inc. it is or was
21  an agent, partner, representative, subsidiary, parent, affiliate, alter ego, or co-
22  conspirator, that it encouraged or assisted DC Consulting, Inc. in any alleged
23  misconduct, or that it undertook any activity within the scope of any agency,
24  partnership, representation, affiliation, or conspiracy with DC Consulting, Inc.

25       14.    In answer to Paragraph 14, RealPage admits that this Court has subject
26  matter jurisdiction over this action and admits that Yardi purports to state claims
27  under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, the Digital
28  Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.*, and the Copyright Act, 17

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER

NO. CV11-690 ODW (JEMx)

1   U.S.C. § 101 *et seq.*  RealPage denies that Yardi has suffered any damage or loss,

2   and denies that Yardi is entitled to any relief against RealPage, whether under the

3   cited statutes or otherwise.

4       15.    In answer to Paragraph 15, RealPage admits that Yardi's state law

5   claims purport to invoke this Court's supplemental subject matter jurisdiction

6   pursuant to 28 U.S.C. § 1367.  RealPage denies that Yardi is entitled to any relief

7   against RealPage, whether under the cited statutes or otherwise.

8       16.    In answer to Paragraph 16, RealPage denies for lack of knowledge or

9   information the allegations therein, but admits and alleges that Yardi purports to

10  have invoked this Court's subject matter jurisdiction under the statute cited.

11      17.    In answer to Paragraph 17, RealPage denies that it improperly

12  accessed Client Central servers and denies that it downloaded trade secret materials.

13  Except as so denied, RealPage lacks knowledge or information sufficient to form a

14  belief as to the truth of the allegations set forth in Paragraph 17, and therefore

15  denies same on that ground.  To the extent that the allegations in Paragraph 17 are

16  directed to or involve DC Consulting, Inc., RealPage lacks knowledge or

17  information sufficient to form a belief as to the truth of those allegations, and

18  therefore denies same on that ground.

19      18.    In answer to Paragraph 18, RealPage admits that Yardi is a leading

20  provider of database and application software for real estate and property

21  management clients.  Except as so admitted, RealPage lacks knowledge or

22  information sufficient to form a belief as to the truth of the allegations in Paragraph

23  18, and therefore denies same on that ground.

24      19.    In answer to Paragraph 19, RealPage admits and alleges that Yardi

25  sells a software product known as Yardi Voyager ("Voyager") and that Yardi

26  markets and promotes that product as having certain characteristics.  RealPage

27  denies that Yardi has only provided Voyager to its clients or members of any so-

28  called Yardi Independent Consultant Network, and also denies that Yardi has only

1   provided Voyager pursuant to licenses and confidentiality agreements.  Except as
2   so admitted and denied, RealPage lacks knowledge or information sufficient to
3   form a belief as to the truth of the allegations in Paragraph 19 and therefore denies
4   same on that ground.

5        20.    In answer to Paragraph 20, RealPage admits and alleges that Yardi
6   sells a product called Yardi Genesis ("Genesis") and that Yardi markets and
7   promotes that product as having certain characteristics.  RealPage specifically
8   denies that Yardi has only provided Genesis to its clients or members of any so-
9   called Yardi Independent Consultant Network, and also denies that Yardi has only
10  provided Genesis pursuant to licenses and confidentiality agreements.  Except as so
11  admitted and denied, RealPage lacks knowledge or information sufficient to form a
12  belief as to the truth of the allegations in Paragraph 20 and therefore denies same on
13  that ground.

14       21.    In answer to Paragraph 21, RealPage admits and alleges that Yardi
15  offers certain add-on products and service modules and that Yardi markets and
16  promotes such products and services as having certain characteristics.  RealPage
17  denies that Yardi has only provided add-on products and service modules to its
18  clients or members of any so-called Yardi Independent Consultant Network, and
19  denies that Yardi has only provided these add-on products and service modules
20  pursuant to licenses and confidentiality agreements.  Except as so admitted and
21  denied, RealPage lacks knowledge or information sufficient to form a belief as to
22  the truth of the allegations in Paragraph 21 and therefore denies same on that
23  ground.

24       22.    In answer to Paragraph 22, RealPage lacks knowledge or information
25  sufficient to form a belief as to the truth of the allegations therein and therefore
26  denies same on that ground, except specifically denies that Yardi has proprietary
27  methods of handling complex business processes, that a logged in user has access to
28  any trade secret aspect of Yardi's software, that access to Yardi's software has

1    always been limited by Yardi pursuant to licenses or confidentiality agreements, or

2    that credential sharing is or has been prohibited in all instances by Yardi's software

3    licenses and confidentiality agreements.

4        23.   In answer to Paragraph 23, RealPage lacks knowledge or information

5    sufficient to form a belief as to the truth of the allegations therein and therefore

6    denies same on that ground, except admits and alleges that Yardi's clients have

7    sometimes desired assistance with their licensed software, add-on products, or

8    service modules and have frequently chosen to obtain such assistance from

9    independent consultants of their choosing, and specifically denies that Yardi may

10    lawfully preclude its clients from obtaining such services from third party

11    consultants of their choosing, that all such third party consultants are members of

12    any so-called Yardi Independent Consultant Network or have entered into

13    cooperation, consulting, nondisclosure, and/or confidentiality agreements with

14    Yardi concerning such client assistance, or that Yardi may lawfully require them to

15    do so.

16        24.   In answer to Paragraph 24, RealPage lacks knowledge or information

17    sufficient to form a belief as to the truth of the allegations therein and therefore

18    denies same on that ground, except (i) admits that RealPage competes with Yardi in

19    certain markets and with respect to certain products; (ii) admits and alleges that

20    Yardi has created certain user guides, release notes, and other written materials for

21    certain of its software systems, add-on products, and add-on service modules; (iii)

22    specifically denies that such user guides, release notes and other written materials

23    constitute or contain Yardi's trade secrets or that the information contained therein

24    "is valuable because it allows Yardi to compete effectively and advantageously";

25    and (iv) specifically denies that Yardi "spen[t] enormous time and resources

26    researching, developing, writing, improving, [and] acquiring the technology for"

27    Yardi Cloud Services.

28        25.   In answer to Paragraph 25, RealPage lacks knowledge or information

1   sufficient to form a belief as to the truth of the allegations therein and therefore

2   denies same on that ground, except admits and alleges that certain user guides,

3   release notes, and other written materials created by Yardi contain information

4   about Yardi's products and specifically denies that such user guides, release notes

5   and other written materials constitute or contain Yardi's trade secrets.

6       26.    In answer to Paragraph 26, RealPage lacks knowledge or information

7   sufficient to form a belief as to the truth of the allegations therein and therefore

8   denies same on that ground, except specifically denies that user guides, release

9   notes and other written materials for Yardi's International Management and/or

10  Voyager International Management constitute or contain trade secrets that give

11  Yardi a competitive advantage.

12      27.    In answer to Paragraph 27, RealPage lacks knowledge or information

13  sufficient to form a belief as to the truth of the allegations therein and therefore

14  denies same on that ground, except specifically denies that all of Yardi's user

15  guides, release notes and written materials constitute or contain trade secrets.

16      28.    In answer to Paragraph 28, RealPage lacks knowledge or information

17  sufficient to form a belief as to the truth of the allegations therein and therefore

18  denies same on that ground, except specifically denies that Yardi has provided its

19  user guides, release notes and other written materials only to clients and consultants

20  pursuant to licenses or other contracts with strict confidentiality provisions, and

21  further specifically denies that Yardi has designated all of its user guides, release

22  notes and other written materials as copyrighted, confidential, and trade secret.

23      29.    In answer to Paragraph 29, RealPage admits and alleges that Yardi's

24  clients and their consultants can obtain access to Yardi's software and certain

25  related documents through Yardi's Client Central, among other means.  RealPage

26  admits that Yardi has issued credentials to clients and consultants for their use in

27  accessing Client Central, but denies that such credentials have been issued only to

28  clients who license Yardi software or only to consultants who contract to

1   affirmatively join any purported "Yardi Independent Consultant Network."

2   RealPage further denies that Client Central log-on credentials are valuable and that

3   the documents accessible on Client Central are all copyrighted and trade secrets.

4   Except as so admitted and denied, RealPage lacks knowledge or information

5   sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29,

6   and therefore denies same on that ground.

7        30.    In answer to Paragraph 30, RealPage denies that all information about

8   Yardi's services, sales practices, client tools, internal procedures and product

9   pricing, including price lists, are highly proprietary, confidential, trade secrets, and

10   available only on Client Central.  Except as so denied, RealPage lacks knowledge

11   or information sufficient to form a belief as to the truth of the allegations set forth

12   in Paragraph 30, and therefore denies same on that ground.

13        31.    In answer to Paragraph 31, RealPage denies that Credentials are or

14   have been treated by Yardi as highly proprietary, confidential, and trade secret.

15   Except as so denied, RealPage lacks knowledge or information sufficient to form a

16   belief as to the truth of the allegations set forth in Paragraph 31, and therefore

17   denies same on that ground.

18        32.    In answer to Paragraph 32, RealPage admits that Yardi is among

19   RealPage's competitors in certain markets with respect to certain products, and that

20   on or about September 9, 2009, RealPage acquired substantially all the assets of the

21   entity then known as EverGreen Solutions, Inc.  RealPage denies for lack of

22   knowledge or information how Yardi markets itself, whether as being a main

23   competitor of RealPage, or otherwise.  RealPage admits that in September 2010, an

24   analyst for William Blair & Company, L.L.C. wrote that EverGreen Solutions, Inc.

25   was "the largest consultant for Yardi," that RealPage's acquisition of EverGreen

26   Solutions, Inc. provided RealPage "with an entry point for offering a hosting

27   service for Yardi clients," that "integrating tightly with Yardi and running Yardi

28   solutions gives RealPage the ability to sell its solutions into Yardi's large base of

residential units (that typically run only accounting)" and that "Targeting the Yardi base in this way is clever, in our opinion." Except as so admitted, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 32, and therefore denies same on that ground. To the extent that the allegations in Paragraph 32 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

33.    In answer to Paragraph 33, RealPage admits that RealPage and Yardi compete in certain markets with respect to certain products. RealPage admits that in an email dated September 3, 2009, Yardi purported to terminate its "3rd Party Consultant Cooperation Agreement with EverGreen Solutions, Inc." and purported to terminate access to "Yardi Systems online support and services, phone and email technical support, marketing and sales resources." RealPage denies that Yardi informed EverGreen Solutions, Inc. that it was terminating, and denies that Yardi in fact terminated, EverGreen Solutions, Inc.'s or its clients' legitimate access to Client Central. RealPage denies that Yardi purported to terminate access to any Yardi confidential information, and further denies that Yardi designates all information it makes available to clients and consultants as "confidential." RealPage denies that any of the acts alleged in Paragraph 33 were taken, or necessary, to protect Yardi. Except as so admitted and denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 33, and therefore denies same on that ground. To the extent that the allegations in Paragraph 33 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

34.    In answer to Paragraph 34, RealPage admits that it acquired substantially all the assets of the entity formerly known as EverGreen Solutions, Inc. RealPage denies that it completed that acquisition "knowing that EverGreen

no longer had Yardi's permission to access Client Central or Yardi confidential information (including Yardi software)" and denies that EverGreen Solutions, Inc. needed or lacked such permission.  RealPage denies that it completed that acquisition knowing that it had no form of authorized access to Client Central or Yardi confidential information and denies that it in fact had no form of authorized access to Client Central or Yardi confidential information (including Yardi software).  RealPage denies that it completed that acquisition knowing that it would "choose to force [its] way into" Yardi's systems and software, and denies that it in fact "force[d]" its way into Yardi's systems and software.  To the extent that the allegations in Paragraph 34 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

35.    In answer to Paragraph 35, RealPage admits and alleges that it has lawfully copied Voyager software onto certain RealPage systems.  Except as so admitted, RealPage denies each and every allegation set forth in Paragraph 35, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 35 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

36.    In answer to Paragraph 36, RealPage admits and alleges that, on one occasion, a RealPage Cloud customer legitimately and lawfully provided RealPage with the files necessary to install that client's version of Voyager in the RealPage Cloud.  RealPage admits and alleges that, on another occasion, RealPage legitimately and lawfully obtained the installation files for Voyager from a Yardi website after Yardi had made those installation files available with the express understanding that that the RealPage Cloud client had chosen RealPage to host its installation of Voyager.  Except as so admitted, RealPage denies each and every

1  allegation set forth in Paragraph 36, and specifically denies that it has engaged in

2  any wrongful conduct toward Yardi or that it has injured Yardi in the manner

3  alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 36

4  are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or

5  information sufficient to form a belief as to the truth of those allegations, and

6  therefore denies same on that ground.

7        37.    In answer to Paragraph 37, RealPage denies that it circumvented the

8  access restrictions on Client Central, denies that it obtained unauthorized, illegal

9  access to the Vault, denies that it altered data in the Vault, denies that it deleted or

10  created Client Central Credentials, and denies that it "took an assortment of

11  confidential Credentials belonging to Yardi employees, clients, and consultants"

12  from the Vault.  RealPage admits that it used Client Central credentials to access

13  Client Central and download certain information therefrom but specifically denies

14  that it has engaged in any wrongful conduct toward Yardi or that it has injured

15  Yardi in the manner alleged, in any manner, or at all.  RealPage alleges that each of

16  the instances of downloading described by Yardi in its First Amended Complaint

17  either (i) was a lawful action conducted on behalf of a RealPage client, (ii) was

18  accidental and innocuous, or (iii) concerned material that was not, in fact, a trade

19  secret, and for these and other reasons, Yardi suffered no harm.  Except as so

20  admitted and denied, RealPage lacks knowledge or information sufficient to form a

21  belief as to the truth of the allegations set forth in Paragraph 37, and therefore

22  denies same on that ground.  To the extent that the allegations in Paragraph 37 are

23  directed to or involve DC Consulting, Inc., RealPage lacks knowledge or

24  information sufficient to form a belief as to the truth of those allegations, and

25  therefore denies same on that ground.

26        38.    RealPage denies each and every allegation in Paragraph 38, except (i)

27  admits and alleges that the identified IP address is leased to RealPage's former

28  office in Tulsa, Oklahoma; (ii) admits and alleges that on or around April 1, 2010, a

person accessed Client Central and downloaded a Yardi price list, but denies that

the information on said price list is a trade secret; (iii) denies for lack of knowledge

and information the credentials used to access Client Central on that occasion, and,

therefore, the identity of the person to whom such credentials were issued or the

circumstances under which the same were provided to RealPage; (iv) denies for

lack of knowledge or information the whereabouts on April 1, 2010 of Ms. Dowen;

and (v) denies for lack of knowledge or information each and every allegation to

the extent same are directed to or involve DC Consulting, Inc.

39.     RealPage denies each and every allegation in Paragraph 39, except (i)

denies that the identified IP address is leased to any of RealPage's satellite offices;

(ii) denies for lack of knowledge or information whether any internet service

provider is dynamically allocating or has ever dynamically allocated that IP address

to any RealPage employee in the vicinity of Eugene, Oregon; (iii) admits and

alleges that on or around May 5, 2010, a person accessed Client Central and

downloaded a Yardi price list, but denies that the information on said price list is a

trade secret; (iv) denies for lack of knowledge and information the credentials used

to access Client Central on that occasion, and, therefore, the identity of the person

to whom such credentials were issued or the circumstances under which the same

were provided to RealPage; (v) denies for lack of knowledge or information the

whereabouts on May 5, 2010 of Mr. Pendergast; and (vi) denies for lack of

knowledge or information each and every allegation to the extent same are directed

to or involve DC Consulting, Inc.

40.     RealPage denies each and every allegation in Paragraph 40, except (i)

specifically denies that the identified IP address is leased to any of RealPage's

satellite offices; (ii) denies for lack of knowledge or information whether any

internet service provider is dynamically allocating or has ever dynamically

allocated that IP address to any RealPage employee in the vicinity of Eugene,

Oregon; (iii) admits and alleges that on or around November 4, 2010, a person

1   accessed Client Central and downloaded materials relating to Yardi's Voyager 7.0

2   software, but denies that the information in those materials is a trade secret or that

3   the downloaded materials could be used to "reverse-engineer" any "unique

4   functionality of Yardi's software" or would allow a competitor to "gain an unfair

5   competitive advantage" in any fashion; (iv) denies for lack of knowledge and

6   information the credentials used to access Client Central on that occasion, and,

7   therefore, the identity of the person to whom such credentials were issued or the

8   circumstances under which they were provided to RealPage; (v) denies for lack of

9   knowledge or information the whereabouts on November 4, 2010 of Ms. Mills; and

10  (vi) denies for lack of knowledge or information each and every allegation to the

11  extent same are directed to or involve DC Consulting, Inc.

12       41.    RealPage denies each and every allegation in Paragraph 41, except (i)

13  admits and alleges that it legitimately used its client's credentials to access Yardi's

14  Client Central to facilitate the lawful provision of consulting services to RealPage

15  clients; (ii) specifically denies that such access of Client Central was illegal; (iii)

16  specifically denies that it "took and used Yardi client and consultant credentials" in

17  an effort to make its access "appear normal" or to "obscure [its] tracks;" (iv) admits

18  and alleges that the identified IP address is leased to RealPage's office in

19  Washington, D.C.; (v) admits and alleges that on or around October 7, 2010, a user

20  accessed Client Central with a "dts" credential and downloaded a Voyager Debt-

21  Mortgage User's Guide, but denies that the information in said guide is a trade

22  secret and that a "competitor could use the detailed information contained in this

23  manual to develop a competing software product at a fraction of the cost required to

24  create this program independently;" (vi) admits and alleges that the second page of

25  the Voyager Debt-Mortgage User's Guide contains the language alleged in

26  Paragraph 41; (vii) specifically denies that it needed Yardi's authorization to access

27  Client Central and download documents therefrom; (viii) denies for lack of

28  knowledge or information the whereabouts on October 7, 2010 of Ms. Sears; and

CONSOLIDATED SECOND AMENDED
COUNTERCLAIMS AND ANSWER                    68                    NO. CV11-690 ODW (JEMx)

1   (ix) denies for lack of knowledge or information each and every allegation to the

2   extent same are directed to or involve DC Consulting, Inc.

3        42.   RealPage denies each and every allegation in Paragraph 42, except (i)

4   admits and alleges that the identified IP address is leased to RealPage's office in

5   Washington, D.C.; (ii) admits and alleges that on or around November 10, 2010, a

6   user accessed Client Central with a "dts" credential and downloaded a Voyager

7   International User's Guide, but denies that the information in said guide is a trade

8   secret and that access to this guide "would allow a competitor to reverse-engineer

9   critical International-specific functions without devoting the time or resources that

10  Yardi did;" (iii) admits and alleges that the second page of the Voyager

11  International User's Guide contains the language alleged in Paragraph 42; (iv)

12  specifically denies that RealPage needed Yardi's authorization to access Client

13  Central and download documents therefrom; (v) denies for lack of knowledge or

14  information that "Yardi spent over seven years creating the specific functionality

15  contained within its International program;" (vi) denies for lack of knowledge or

16  information the whereabouts on November 10, 2010 of Ms. Sears; and (vii) denies

17  for lack of knowledge or information each and every allegation to the extent same

18  are directed to or involve DC Consulting, Inc.

19       43.   RealPage denies each and every allegation in Paragraph 43, except (i)

20  admits and alleges that on or around November 4, 2010, a person accessed Client

21  Central and downloaded a Voyager International User's Guide (Version 7.0) and a

22  Voyager International Currency User's Guide (Version 7.0), but denies that the

23  information in the downloaded documents is a trade secret and denies for lack of

24  knowledge or information that said access was made from the identified IP address;

25  (ii) denies for lack of knowledge and information the credentials used to access

26  Client Central on that occasion; (iii) admits and alleges that on or around November

27  10, 2010, a user accessed Client Central with a "dts" credential and downloaded a

28  Voyager International User's Guide (Version 6.0.08.22, not 6.08.22) from the

1    identified IP address, but denies that the information in the downloaded document

2    is a trade secret; (iv) admits and alleges that RealPage has never provided services

3    to an existing client for its implementation of Yardi International software, but

4    denies that this makes the downloading of documents wrongful; (v) specifically

5    denies that RealPage has no legitimate business use for the documents downloaded;

6    and (vi) denies for lack of knowledge or information each and every allegation to

7    the extent same are directed to or involve DC Consulting, Inc.

8        44.    RealPage denies each and every allegation in Paragraph 44, except (i)

9    admits and alleges that it leases the identified IP address; (ii) admits and alleges that

10   on or around January 3, 2011, a user, acting as an agent of RealPage client

11   Progressive Redevelopment, Inc. ("PRI"), not Progressive Development, Inc. as

12   alleged by Yardi, and using the "jbrock" ID of PRI employee Jackie Brock logged

13   into Client Central for the purpose of accessing Yardi Voyager materials to

14   facilitate the legitimate and lawful provision of consulting services to PRI relating

15   to Yardi's Voyager software; (iii) admits and alleges that the user, in search of

16   certain Yardi Voyager materials, instead accidentally downloaded Yardi's

17   Enterprise 1099 Installation Utility and QuickSteps and Enterprise 2010 End-of-

18   Year Procedures Guide, but specifically denies that the information in the

19   downloaded documents is a trade secret; (iv) denies for lack of knowledge and

20   information whether PRI has a license or legitimate business use for the Enterprise

21   materials downloaded, but denies that this renders the download wrongful and

22   alleges that Yardi gave PRI access to such materials; and (v) denies for lack of

23   knowledge or information each and every allegation to the extent same are directed

24   to or involve DC Consulting, Inc.

25       45.    In answer to Paragraph 45, RealPage denies each and every allegation

26   contained therein, and specifically denies that it has engaged in any purported

27   "widespread pattern" of unauthorized access, theft of Yardi trade secrets, illegal

28   downloads, or any other improper conduct, except denies for lack of knowledge or

1    information the basis for Yardi's assertions about the results of its own internal

2    investigation.  To the extent that the allegations in Paragraph 45 are directed to or

3    involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to

4    form a belief as to the truth of those allegations, and therefore denies same on that

5    ground.

6         46.    In answer to Paragraph 46, RealPage denies each and every allegation

7    contained therein, and specifically denies that it has illegally accessed or

8    downloaded Yardi proprietary and trade secret information.  To the extent that the

9    allegations in Paragraph 46 are directed to or involve DC Consulting, Inc.,

10   RealPage lacks knowledge or information sufficient to form a belief as to the truth

11   of those allegations, and therefore denies same on that ground.

12        47.    In answer to Paragraph 47, RealPage denies each and every allegation

13   contained therein, and specifically denies that it lacked or lacks legitimate access to

14   Yardi software, Client Central and other supposedly "confidential" information,

15   denies that it had or has "illicit knowledge and use of and access to Yardi's trade

16   secret and copyrighted materials," and denies that it needed such access,

17   knowledge, or use to win or to provide services to any clients.  To the extent that

18   the allegations in Paragraph 47 are directed to or involve DC Consulting, Inc.,

19   RealPage lacks knowledge or information sufficient to form a belief as to the truth

20   of those allegations, and therefore denies same on that ground.

21        48.    In answer to Paragraph 48, RealPage denies that Yardi's data models,

22   user interfaces, and process workflows constitute trade secrets, denies that a

23   competitor with access to Yardi's specifications, data models, user interfaces, and

24   process workflows could significantly advance the development cycle of the

25   competitor's analogous product, and denies that access to such information would

26   allow a competitor to compete much earlier in the market or to reduce or eliminate

27   any competitive advantage of Yardi.  Except as so denied, RealPage lacks

28   knowledge or information sufficient to form a belief as to the truth of the

1    allegations set forth in Paragraph 48, and therefore denies same on that ground.

2         49.    In answer to Paragraph 49, RealPage lacks knowledge or information

3    sufficient to form a belief as to the truth of the allegations set forth therein and

4    therefore denies same on that ground.

5         50.    In answer to Paragraph 50, RealPage admits and alleges that it has

6    expanded its software offerings over time and that it launched OneSite Budgeting,

7    an integrated budgeting and forecasting tool for the multifamily industry, in May

8    2010.  Except as so admitted, RealPage denies each and every allegation set forth in

9    Paragraph 50, and specifically denies that it has engaged in any wrongful conduct

10   toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at

11   all.  To the extent that the allegations in Paragraph 50 are directed to or involve DC

12   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

13   belief as to the truth of those allegations, and therefore denies same on that ground.

14        51.    In answer to Paragraph 51, RealPage incorporates by this reference

15   each and every admission, denial and allegation set forth in paragraphs 1 through

16   50 of this Answer as if set forth fully herein.

17        52.    In answer to Paragraph 52, RealPage denies each and every allegation

18   therein, and specifically denies that it has engaged in any wrongful conduct toward

19   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

20   the extent that the allegations in Paragraph 52 are directed to or involve DC

21   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

22   belief as to the truth of those allegations, and therefore denies same on that ground.

23        53.    In answer to Paragraph 53, RealPage denies each and every allegation

24   therein, and specifically denies that it has engaged in any wrongful conduct toward

25   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

26   the extent that the allegations in Paragraph 53 are directed to or involve DC

27   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

28   belief as to the truth of those allegations, and therefore denies same on that ground.

54.     In answer to Paragraph 54, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 54 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

55.     In answer to Paragraph 55, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 55 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

56.     In answer to Paragraph 56, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 56 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

57.     In answer to Paragraph 57, RealPage denies each and every allegation therein.  To the extent that the allegations in Paragraph 57 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

58.     In answer to Paragraph 58, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 58 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

59.    In answer to Paragraph 59, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. RealPage specifically denies that any injunctive relief is appropriate. To the extent that the allegations in Paragraph 59 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

60.    In answer to Paragraph 60, RealPage incorporates by this reference each and every admission, denial and allegation set forth in paragraphs 1 through 59 of this Answer as if set forth fully herein.

61.    In answer to Paragraph 61, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To the extent that the allegations in Paragraph 61 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

62.    In answer to Paragraph 62, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To the extent that the allegations in Paragraph 62 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

63.    In answer to Paragraph 63, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To the extent that the allegations in Paragraph 63 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

1        64.    In answer to Paragraph 64, RealPage denies each and every allegation

2 therein, and specifically denies that it has engaged in any wrongful conduct toward

3 Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To

4 the extent that the allegations in Paragraph 64 are directed to or involve DC

5 Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

6 belief as to the truth of those allegations, and therefore denies same on that ground.

7        65.    In answer to Paragraph 65, RealPage denies that any of the materials

8 obtained by RealPage comprise trade secrets. Except as so denied, RealPage lacks

9 knowledge or information sufficient to form a belief as to the truth of the

10 allegations set forth in Paragraph 65, and therefore denies same on that ground. To

11 the extent that the allegations in Paragraph 65 are directed to or involve DC

12 Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

13 belief as to the truth of those allegations, and therefore denies same on that ground.

14       66.    In answer to Paragraph 66, RealPage denies each and every allegation

15 therein, and specifically denies that it has engaged in any wrongful conduct toward

16 Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To

17 the extent that the allegations in Paragraph 66 are directed to or involve DC

18 Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

19 belief as to the truth of those allegations, and therefore denies same on that ground.

20       67.    In answer to Paragraph 67, RealPage denies each and every allegation

21 therein, and specifically denies that it has engaged in any wrongful conduct toward

22 Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

23 that any punitive damages are appropriate. To the extent that the allegations in

24 Paragraph 67 are directed to or involve DC Consulting, Inc., RealPage lacks

25 knowledge or information sufficient to form a belief as to the truth of those

26 allegations, and therefore denies same on that ground.

27       68.    In answer to Paragraph 68, RealPage denies each and every allegation

28 therein, and specifically denies that it has engaged in any wrongful conduct toward

1   Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

2   that any injunctive relief is appropriate.  To the extent that the allegations in

3   Paragraph 68 are directed to or involve DC Consulting, Inc., RealPage lacks

4   knowledge or information sufficient to form a belief as to the truth of those

5   allegations, and therefore denies same on that ground.

6       69.   In answer to Paragraph 69, RealPage incorporates by this reference

7   each and every admission, denial and allegation set forth in paragraphs 1 through

8   68 of this Answer as if set forth fully herein.

9       70.   In answer to Paragraph 70, RealPage denies that Yardi has employed

10  technological measures that effectively control access to all parts of Client Central

11  or that have effectively protected Yardi's rights in all purportedly copyrighted

12  materials available through Client Central.  Except as so denied, RealPage lacks

13  knowledge or information sufficient to form a belief as to the truth of the

14  allegations set forth in Paragraph 70, and therefore denies same on that ground.

15      71.   In answer to Paragraph 71, RealPage denies each and every allegation

16  therein, and specifically denies that it has engaged in any wrongful conduct toward

17  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

18  the extent that the allegations in Paragraph 71 are directed to or involve DC

19  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

20  belief as to the truth of those allegations, and therefore denies same on that ground.

21      72.   In answer to Paragraph 72, RealPage denies each and every allegation

22  therein, and specifically denies that it has engaged in any wrongful conduct toward

23  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

24  the extent that the allegations in Paragraph 72 are directed to or involve DC

25  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

26  belief as to the truth of those allegations, and therefore denies same on that ground.

27      73.   In answer to Paragraph 73, RealPage denies each and every allegation

28  therein, and specifically denies that it has engaged in any wrongful conduct toward

1  Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

2  that any injunctive relief is appropriate. To the extent that the allegations in

3  Paragraph 73 are directed to or involve DC Consulting, Inc., RealPage lacks

4  knowledge or information sufficient to form a belief as to the truth of those

5  allegations, and therefore denies same on that ground.

6        74.    In answer to Paragraph 74, RealPage incorporates by this reference

7  each and every admission, denial and allegation set forth in paragraphs 1 through

8  73 of this Answer as if set forth fully herein.

9        75.    In answer to Paragraph 75, RealPage lacks knowledge or information

10  sufficient to form a belief as to the truth of the allegations therein and therefore

11  denies same on that ground, except admits that Yardi has received registrations or

12  has applied to the Register of Copyrights for the Certificates of Registration listed

13  in the table set forth following Paragraph 75. To the extent that the allegations in

14  Paragraph 75 are directed to or involve DC Consulting, Inc., RealPage lacks

15  knowledge or information sufficient to form a belief as to the truth of those

16  allegations, and therefore denies same on that ground.

17        76.    In answer to Paragraph 76, RealPage denies each and every allegation

18  therein, and specifically denies that it has engaged in any wrongful conduct toward

19  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To

20  the extent that the allegations in Paragraph 76 are directed to or involve DC

21  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

22  belief as to the truth of those allegations, and therefore denies same on that ground.

23        77.    In answer to Paragraph 77, RealPage denies each and every allegation

24  therein, and specifically denies that it has engaged in any wrongful conduct toward

25  Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To

26  the extent that the allegations in Paragraph 77 are directed to or involve DC

27  Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

28  belief as to the truth of those allegations, and therefore denies same on that ground.

78.     In answer to Paragraph 78, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 78 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

79.     In answer to Paragraph 79, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 79 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

80.     In answer to Paragraph 80, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 80 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

81.     In answer to Paragraph 81, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or that any injunctive relief is appropriate.  To the extent that the allegations in Paragraph 81 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

82.     In answer to Paragraph 82, RealPage incorporates by this reference each and every admission, denial and allegation set forth in paragraphs 1 through 81 of this Answer as if set forth fully herein.

83.     In answer to Paragraph 83, RealPage denies that the "Voyager software and the Documentation, price lists, Credentials, and other information stored on Client Central" described in the First Amended Complaint constitute trade secrets and denies that the information is not generally known to others who, if they had access to the information, could use it to compete against Yardi.  Except as so denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 83, and therefore denies same on that ground.

84.     In answer to Paragraph 84, RealPage denies that Yardi makes reasonable efforts to maintain the confidentiality of "its Voyager software and its Documentation, price lists, Credentials, and other information stored on Client Central" described in the First Amended Complaint, denies that Yardi discloses all materials and software only to clients or independent consultants pursuant to licenses or other contracts with strict confidentiality provisions, and denies that Yardi has designated all of these materials and software as confidential, proprietary, copyrighted, and trade secrets.  Except as so denied, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 84, and therefore denies same on that ground.

85.     In answer to Paragraph 85, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 85 are directed to or involve DC Consulting, Inc., RealPage lacks knowledge or information sufficient to form a belief as to the truth of those allegations, and therefore denies same on that ground.

86.     In answer to Paragraph 86, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To the extent that the allegations in Paragraph 86 are directed to or involve DC

1    Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

2    belief as to the truth of those allegations, and therefore denies same on that ground.

3          87.    In answer to Paragraph 87, RealPage denies each and every allegation

4    therein, and specifically denies that it has engaged in any wrongful conduct toward

5    Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all. To

6    the extent that the allegations in Paragraph 87 are directed to or involve DC

7    Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

8    belief as to the truth of those allegations, and therefore denies same on that ground.

9          88.    In answer to Paragraph 88, RealPage denies each and every allegation

10    therein, and specifically denies that it has engaged in any wrongful conduct toward

11    Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

12    that Yardi is entitled to exemplary damages or attorneys' fees. To the extent that

13    the allegations in Paragraph 88 are directed to or involve DC Consulting, Inc.,

14    RealPage lacks knowledge or information sufficient to form a belief as to the truth

15    of those allegations, and therefore denies same on that ground.

16          89.    In answer to Paragraph 89, RealPage denies each and every allegation

17    therein, and specifically denies that it has engaged in any wrongful conduct toward

18    Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

19    that any injunctive relief is appropriate. To the extent that the allegations in

20    Paragraph 89 are directed to or involve DC Consulting, Inc., RealPage lacks

21    knowledge or information sufficient to form a belief as to the truth of those

22    allegations, and therefore denies same on that ground.

23          90.    In answer to Paragraph 90, RealPage incorporates by this reference

24    each and every admission, denial and allegation set forth in paragraphs 1 through

25    89 of this Answer as if set forth fully herein.

26          91.    In answer to Paragraph 91, RealPage lacks knowledge or information

27    sufficient to form a belief as to the truth of the allegations therein and therefore

28    denies same on that ground, except admits and alleges that Yardi has agreements

with its clients which speak for themselves, and specifically denies that RealPage has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

92.    In answer to Paragraph 92, RealPage lacks knowledge or information sufficient to form a belief as to the truth of the allegations therein and therefore denies same on that ground, except admits and alleges that Yardi has agreements with its clients which speak for themselves, and specifically denies RealPage has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

93.    In answer to Paragraph 93, RealPage denies each and every allegation therein, except admits and alleges that RealPage has Cloud customers, that RealPage and its Cloud customers have the right to contract with one another in the way that they have, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

94.    In answer to Paragraph 94, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

95.    In answer to Paragraph 95, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

96.    In answer to Paragraph 96, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.

97.    In answer to Paragraph 97, RealPage denies each and every allegation therein, and specifically denies that it has engaged in any wrongful conduct toward Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or that Yardi is entitled to exemplary damages,  attorneys' fees, or costs.

1    98.    In answer to Paragraph 98, RealPage denies each and every allegation

2    therein, and specifically denies that it has engaged in any wrongful conduct toward

3    Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

4    that any injunctive relief is appropriate.

5    99.    In answer to Paragraph 99, RealPage incorporates by this reference

6    each and every admission, denial and allegation set forth in paragraphs 1 through

7    98 of this Answer as if set forth fully herein.

8    100.    In answer to Paragraph 100, RealPage denies each and every allegation

9    therein, and specifically denies that it has engaged in any wrongful conduct toward

10   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

11   the extent that the allegations in Paragraph 100 are directed to or involve DC

12   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

13   belief as to the truth of those allegations, and therefore denies same on that ground.

14   101.    In answer to Paragraph 101, RealPage denies each and every allegation

15   therein, and specifically denies that it has engaged in any wrongful conduct toward

16   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

17   the extent that the allegations in Paragraph 101 are directed to or involve DC

18   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

19   belief as to the truth of those allegations, and therefore denies same on that ground.

20   102.    In answer to Paragraph 102, RealPage denies each and every allegation

21   therein, and specifically denies that it has engaged in any wrongful conduct toward

22   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

23   the extent that the allegations in Paragraph 102 are directed to or involve DC

24   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

25   belief as to the truth of those allegations, and therefore denies same on that ground.

26   103.    In answer to Paragraph 103, RealPage denies each and every allegation

27   therein, and specifically denies that it has engaged in any wrongful conduct toward

28   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

1   the extent that the allegations in Paragraph 103 are directed to or involve DC

2   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

3   belief as to the truth of those allegations, and therefore denies same on that ground.

4       104.   In answer to Paragraph 104, RealPage denies each and every allegation

5   therein, and specifically denies that it has engaged in any wrongful conduct toward

6   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

7   the extent that the allegations in Paragraph 104 are directed to or involve DC

8   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

9   belief as to the truth of those allegations, and therefore denies same on that ground.

10       105.   In answer to Paragraph 105, RealPage denies each and every allegation

11   therein, and specifically denies that it has engaged in any wrongful conduct toward

12   Yardi or that it has injured Yardi in the manner alleged, in any manner, or at all.  To

13   the extent that the allegations in Paragraph 105 are directed to or involve DC

14   Consulting, Inc., RealPage lacks knowledge or information sufficient to form a

15   belief as to the truth of those allegations, and therefore denies same on that ground.

16       106.   In answer to Paragraph 106, RealPage denies each and every allegation

17   therein, and specifically denies that it has engaged in any wrongful conduct toward

18   Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

19   that any injunctive relief is appropriate.  To the extent that the allegations in

20   Paragraph 106 are directed to or involve DC Consulting, Inc., RealPage lacks

21   knowledge or information sufficient to form a belief as to the truth of those

22   allegations, and therefore denies same on that ground.

23       107.   In answer to Paragraph 107, RealPage denies each and every allegation

24   therein, and specifically denies that it has engaged in any wrongful conduct toward

25   Yardi, that it has injured Yardi in the manner alleged, in any manner, or at all, or

26   that any injunctive relief is appropriate.  To the extent that the allegations in

27   Paragraph 107 are directed to or involve DC Consulting, Inc., RealPage lacks

28   knowledge or information sufficient to form a belief as to the truth of those

1    allegations, and therefore denies same on that ground.

2         RealPage denies that Yardi is entitled to any of the relief prayed for in the

3    "Prayer For Relief" on pages 30-32 of Yardi's First Amended Complaint.

4                              **AFFIRMATIVE DEFENSES**

5         AS AND FOR ITS SEPARATE AND AFFIRMATIVE DEFENSES,

6    RealPage alleges as follows:

7                           **FIRST AFFIRMATIVE DEFENSE**

8                              (Failure to State a Claim)

9         108.   The First Amended Complaint, and each and every purported claim for

10   relief therein, fails to state a claim upon which relief may be granted.

11                         **SECOND AFFIRMATIVE DEFENSE**

12                              (No Injury or Damage)

13        109.   Yardi's claims are barred, in whole or in part, because Yardi has not

14   been injured or damaged as a proximate result of any act or omission for which

15   RealPage is responsible.

16                          **THIRD AFFIRMATIVE DEFENSE**

17                              (Damages Speculative)

18        110.   Yardi's claims are barred, in whole or in part, because any alleged

19   damages are speculative, uncertain, and not foreseeable to RealPage.

20                         **FOURTH AFFIRMATIVE DEFENSE**

21                              (Mitigation of Damages)

22        111.   Yardi's claims are barred, in whole or in part, by Yardi's failure to

23   mitigate its damages, if any damages exist.

24                          **FIFTH AFFIRMATIVE DEFENSE**

25                                 (No Detriment)

26        112.   Yardi's claims are barred, in whole or in part, because Yardi has

27   suffered no detriment from the alleged acts and omissions about which Yardi now

28   complains.

## SIXTH AFFIRMATIVE DEFENSE

### (Waiver)

113.   Yardi's claims are barred, in whole or in part, by the doctrine of waiver.

## SEVENTH AFFIRMATIVE DEFENSE

### (Assumption of Risk)

114.   Yardi's claims are barred, in whole or in part, due to Yardi's express or implicit assumption of risk.

## EIGHTH AFFIRMATIVE DEFENSE

### (License)

115.   Yardi's claims are barred, in whole or in part, because RealPage's acts, including access and use, were authorized and/or licensed, either directly or through the rights of third parties.

## NINTH AFFIRMATIVE DEFENSE

### (Laches)

116.   Yardi's claims are barred, in whole or in part, by the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

### (Good Faith)

117.   At all times material hereto, all of RealPage's actions were undertaken in good faith and without fraud, oppression or malice against Yardi or its rights, thereby precluding any and all claims for punitive or exemplary damages.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Contributory Negligence)

118.   If and to the extent Yardi has suffered any compensable injury or damage as a proximate result of RealPage's conduct, all of which is specifically denied, all such injury and damage was the proximate result, in whole or in part, of Yardi's own negligence, fault and want of due care.

1

## TWELFTH AFFIRMATIVE DEFENSE

2

### (Unclean Hands)

3  119.   Yardi's claims are barred, in whole or in part, by the doctrine of

4 unclean hands.

5

## THIRTEENTH AFFIRMATIVE DEFENSE

6

### (Fair Use)

7  120.   Yardi's copyright claims are barred, in whole or in part, by the

8 doctrine of fair use.

9

## FOURTEENTH AFFIRMATIVE DEFENSE

10

### (Merger)

11  121.   Yardi's copyright claims are barred, in whole or in part, by the

12 doctrine of merger.

13

## FIFTEENTH AFFIRMATIVE DEFENSE

14

### (Copyright Misuse)

15  122.   Yardi's copyright claims are barred, in whole or in part, by the

16 doctrine of copyright misuse, as Yardi's copyright claims seek to secure exclusive

17 rights beyond the scope of Yardi's copyrights.

18

## SIXTEENTH AFFIRMATIVE DEFENSE

19

### (Statutory Copyright Damages Precluded)

20  123.   Yardi's claims for statutory copyright damages are barred, in whole or

21 in part, by 17 U.S.C. § 504 and cases interpreting the same because Yardi did not

22 register the asserted copyrights prior to commencement of the alleged infringement

23 and, to the extent any infringements transpired after the registration of any asserted

24 copyright, Yardi may not recover statutory damages for those infringements

25 pursuant to *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 700–01 (9th

26 Cir. 2008).

27

28

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Statutory Copyright Damages Limited By Work)

124.   Yardi's claims for statutory copyright damages are barred, in whole or in part, by 17 U.S.C. § 504 and cases interpreting the same because Yardi may recover statutory damages only once for any of the 36 asserted copyrighted works as to which Yardi proves infringement, regardless of the number of times any such work is proved to have been infringed.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Statutory Copyright Damages Limited By Lack Of Willfulness)

125.   Yardi's claims for statutory copyright damages are barred, in whole or in part, by 17 U.S.C. § 504 and cases interpreting the same because (a) Yardi cannot prove that RealPage's alleged infringement was willful or (b) to the extent Yardi provides sufficient proof of willfulness, Yardi's claims are still barred, in whole or in part, because RealPage acted with a reasonable and good faith belief that its actions were authorized and, accordingly, any statutory damages are limited to a maximum of $30,000 for any of the 36 works as to which infringement is proved.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Preemption)

126.   Yardi's state law claims are barred in whole or in part by the doctrine of preemption.

## TWENTIETH AFFIRMATIVE DEFENSE

### (No Injunctive Relief)

127.   Yardi is not entitled to injunctive relief because any alleged injury to Yardi is not immediate or irreparable, and Yardi has an adequate remedy at law.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Ascertainability of Alleged Trade Secrets)

128.   Each and all of plaintiff's alleged trade secrets are readily ascertainable

1     by proper means and hence not protectable.

2     **TWENTY-SECOND AFFIRMATIVE DEFENSE**

3     (Agency)

4     129.   Yardi's inducing breach of contract claim is barred, in whole or in

5 part, by reason of the fact that at the time Clients A and B allegedly breached their

6 contracts with Yardi, RealPage was acting as their agent.

7     **TWENTY-THIRD AFFIRMATIVE DEFENSE**

8     (Competition Privilege)

9     130.   Yardi's inducing breach of contract claim is barred, in whole or in

10 part, by reason of the competition privilege.

11     **TWENTY-FOURTH AFFIRMATIVE DEFENSE**

12     (Justification)

13     131.   Yardi's inducing breach of contract claim is barred, in whole or in

14 party, by reason of the fact that any alleged inducement of breach of Yardi's

15 contracts with Clients A and B was justified.

16

17     WHEREFORE, REALPAGE, INC. respectfully prays for judgment in its

18 favor as follows:

19     (a)   That the First Amended Complaint, and each and every purported

20 claim for relief contained therein, be dismissed with prejudice;

21     (b)   For an award of attorneys' fees and costs in its favor; and

22     (c)   For such other and further relief as the Court may deem just and

23 proper.

24 //

25 //

26 //

27 //

28 //

DATED:      September 30, 2011

MARK A. SAMUELS
DAVID R. EBERHART
SHARON M. BUNZEL
JAMES M. PEARL
O'MELVENY & MYERS LLP

By: _____
        Mark A. Samuels
Attorneys for Defendant and
Counterclaimant REALPAGE, INC.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, RealPage hereby demands a jury trial on all issues so triable.

DATED:   September 30, 2011

MARK A. SAMUELS
DAVID R. EBERHART
SHARON M. BUNZEL
JAMES M. PEARL
O'MELVENY & MYERS LLP

By: _____
Mark A. Samuels
Attorneys for Defendant and
Counterclaimant REALPAGE, INC.